1

2

3

4

5

6

7

8

9

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

10

11

12

13

14

15

16

17

18

19

20

21

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>               Plaintiff,<br><br>  v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security,<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY, and<br><br>DAVID RICHARDSON, in his official capacity as the Senior Official Performing the Duties of the FEMA Administrator,<br><br>               Defendants. | NO.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

22

23

24

25

26

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

# TABLE OF CONTENTS

I.     INTRODUCTION.................................................................................................. 1

II.    JURISDICTION AND VENUE ........................................................................... 5

III.   PARTIES............................................................................................................. 5

IV.    ALLEGATIONS ................................................................................................. 6

    A.   Congress Created the Shelter and Services Program to Reimburse Non-Federal Partners, Like Washington, for Providing Shelter to Noncitizen Migrants Released From DHS's Custody.................................................... 6

        1.   Faced with significant need, Washington and local partners provided shelter and essential resources to newly arrived noncitizen migrants............... 6

        2.   Congress created the Shelter and Services Program to ensure states, localities, and community organizations could meet the needs of noncitizen migrants, after their release from DHS custody ............................11

        3.   FEMA awards Washington more than $4 million in SSP funds to continue providing shelter and services to noncitizen migrants in Washington................................................................................................13

    B.   The Trump Administration Illegally Cut Funding Appropriated by Congress for the Shelter and Services Program ....................................... 18

        1.   President Trump directed DHS to eliminate federal funding from "Sanctuary Jurisdictions" ................................................................... 18

        2.   Defendants imposed "special conditions" on Washington's SSP grant and then terminated it entirely ................................................................ 22

        3.   The loss of SSP funds irreparably harms Washington and its subrecipients................................................................................................ 24

V.     CLAIMS FOR RELIEF ................................................................................... 25

VI.    PRAYER FOR RELIEF................................................................................... 34

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.

i

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

# I.    INTRODUCTION

1.    The State of Washington brings this complaint for declaratory and injunctive relief in response to the Trump Administration's unlawful termination of the Shelter and Services Program, a grant program established by Congress for the specific purpose of enabling non-Federal entities—like the State of Washington and its cities, counties, and non-profit partners—to provide shelter and essential services to the noncitizen migrants who settled in Washington after being processed and released by the U.S. Department of Homeland Security (DHS).

2.    Washington recognizes the value of its immigrant residents and strives to "remain[] a place where the rights and dignity of all residents are maintained and protected," regardless of immigration status. *See* Wash. Rev. Code § 43.17.425; Laws of 2019 ch. 440, E2SB 5497. These values were confirmed in practice between 2022 and 2024 when, cumulatively and consistent with national trends, more than 45,000 noncitizen migrants settled in Washington after they were processed and released by DHS.

3.    For many of these newcomers, their arrival in Washington was the culmination of a long and traumatic journey that began when they were forced to flee persecution in their home countries and seek asylum in the United States. They arrived in Washington with few resources to their name, let alone stable shelter, and without access to federal support or even permission to earn a living. Unfortunately, Washington's housing and homeless crisis response system was already over capacity at this time and stretched too thin to provide the kind of initial support that would not only meet the immediate needs of these newcomers but also allow them to find their bearings in their new home. Indeed, most of Washington's emergency shelters were already being filled each night. Lacking better options, these noncitizen migrants sought shelter wherever they could find it, sometimes in informal encampments in King County, which may have provided a measure of stability but were an unsustainable option, particularly with winter fast approaching.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.

1

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

4.      More resources and better coordination among service providers were desperately needed. Washington responded, launching the Washington Migrant and Asylum-Seeker Support Project in October 2024 to connect these newcomers with support and services and backing that program with more than $25 million in state funding. Washington was joined in its humanitarian commitment by local governments, including King County and the City of Tukwila, and community organizations, like the Seattle-based shelter, Mary's Place, which provided shelter space, educational and health programs, and other services to help ensure the basic needs of these new Washingtonians were met.

5.      Congress also recognized that the cost of providing initial support to these newcomers was straining the budgets of non-Federal entities, including states like Washington. And it further acknowledged that expanding the shelter capacity of non-Federal entities was necessary and a far better option than needlessly detaining these newcomers—many of whom were seeking humanitarian protections—in overcrowded DHS detention facilities. In 2023, Congress responded to these concerns by creating the Shelter and Services Program (SSP) and appropriating federal funds "to support sheltering and related activities provided by non-Federal entities, . . . in support of relieving overcrowding in short-term holding facilities of U.S. Customs and Border Protection[.]" *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 STAT. 4730 (Dec. 29, 2022).

6.      Congress reauthorized the grant program in 2024, once again appropriating federal funds to help non-Federal partners, like state governments, provide shelter to those who had been processed and released by DHS—a population Congress understood necessarily included many people who entered into the United States without inspection. *See* Pub. L. No. 118-47, 138 STAT. 597, 598 (March 23, 2024).

7.      In recognition of the promising but costly steps Washington and its local partners had taken to provide shelter to noncitizen migrants, as well as the continuing need for additional resources, the Federal Emergency Management Agency (FEMA) awarded Washington

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

$4,039,516 in SSP funds to reimburse Washington and its local partners for the costs they had already incurred and to increase their capacity to provide more of the same.

8.    To date, Washington and its partners have not received a single dollar from that award.

9.    Almost as soon as President Trump was sworn into office for his second term, he began an all-out assault on grant programs that were distributing federal funds to recipients and causes he dislikes. In particular, he directed DHS "to ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds" and to "[t]erminate" any grants "providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens[.]" Protecting the American People Against Invasion, Exec. Order 14159 §§ 17, 19, 90 Fed. Reg. 8443, 8446-47 (Jan. 29, 2025).

10.    Defendants took prompt action to carry out these directives against the Shelter and Services Program.

11.    First, on February 10, 2025, Defendants quietly zeroed out Washington's entire SSP award, taking action behind the scenes to reduce the amount of SSP funds from which Washington could request a reimbursement for covered expenses from $4,039,516 to $0.

12.    Second, on March 11, 2025, Defendants provided Washington with a sham "notice" of its alleged noncompliance with the terms of its SSP grant and informed Washington that its funding would be withheld until further notice. Defendants made vague reference to their "significant concerns that SSP funding" was "going to entities engaged in or facilitating illegal activities," but provided no evidence to support their concerns about the Shelter and Services Program, generally, or Washington's use of SSP funds, specifically. Instead, Defendants gave Washington 30 days to comply with onerous information requests—including the demand that Washington provide the "names and contact information" for every individual who received services from its subrecipients—or 60 days to lodge an appeal with FEMA.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
NO.

3

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

13. Third, and before either of FEMA's deadlines had expired, Defendants officially terminated Washington's SSP grant on April 1, 2025. Defendants' termination notice made no mention of the "significant concerns" hinted at in FEMA's March 11 letter but, rather, explained that they were terminating Washington's SSP grant because the Shelter and Services Program funds "provide[] support for illegal aliens," which "is not consistent with DHS's current priorities."

14. When it authorized and appropriated funds to support the Shelter and Services Program, Congress could not have been clearer that these funds were intended "to support sheltering and related activities provided by non-Federal entities," in order to "reliev[e] overcrowding" in U.S. Customs and Border Protection's (CBP) short-term holding facilities. *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 STAT. 4730 (Dec. 29, 2022). Achieving that goal necessarily required providing support, in the form of emergency shelter and other essential services, for a population that was certain to include individuals who entered the United States without inspection, who Defendants derisively refer to as "illegal aliens."

15. Defendants have made clear their disdain for noncitizen migrants, especially those who entered without inspection and seek humanitarian protection in the United States. Likewise, Defendants have made clear their opposition to jurisdictions, like Washington, that protect the rights and dignity of all residents, regardless of immigration status, and leave the cost and responsibility of enforcing federal, civil immigration law to the federal government. And they have further made clear their view that neither should receive federal support of any kind. But Defendants' policy preference, no matter how much of a priority it might be for them, cannot override the policy priorities that Congress has expressed through statute.

16. Here, Congress' decision to authorize and fund the Shelter and Services Program provides a clear expression of its policy judgment to, in Defendants' verbiage, "provide[] support for illegal aliens" after their release by DHS.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.

4

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

17.     Defendants had no lawful basis to override Congress' judgment or the plain purpose of its funding program and their actions to pause, withhold, and then terminate Washington's SSP grant violates the U.S. Constitution's Separation of Powers Doctrine, the Spending Clause, the Administrative Procedure Act, and is additionally *ultra vires*.

18.     The Court must set aside Defendants' unlawful actions and compel the restoration of the Shelter and Services Program so that, consistent with Congress' wishes, Washington can continue supporting its new immigrant neighbors with shelter and essential services.

## II.    JURISDICTION AND VENUE

19.     The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(a)(2). The Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202. Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702.

20.     Venue is proper in the Western District of Washington under 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States officers, employees, and/or agencies sued in their official capacities. Plaintiff State of Washington is a resident of the Western District of Washington. Venue is appropriate in the Seattle Division because a substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within this judicial division, including in King County, where the shelter and other services Washington intended to support through its SSP grant were provided.

## III.    PARTIES

21.     Plaintiff State of Washington, represented by and through its Attorney General, Nicholas W. Brown, is a sovereign state of the United States of America. The Attorney General is the chief legal adviser to the State. The Attorney General's powers and duties include acting in federal court on behalf of the State on matters of public concern. Wash. Rev. Code § 43.10.030(1); Wash. Const. art. III § 21.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.

5

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

22.     Defendant U.S. Department of Homeland Security (DHS) is a federal agency headquartered in Washington, D.C. DHS administers the Shelter and Services Program (SSP), including the grant awarded to Washington under that program, which is the subject of this action.

23.     Defendant Kristi Noem is the Secretary of DHS and serves as that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency, including decisions and actions concerning the Shelter and Services Program. She is sued in her official capacity.

24.     Defendant Federal Emergency Management Agency (FEMA) is a federal agency within DHS that coordinates operational and logistical disaster response and administers many of DHS's federal grant programs, including the Shelter and Services Program.

25.     Defendant David Richardson is the Senior Official Performing the Duties of the Administrator of FEMA and serves as FEMA's highest ranking official. He is sued in his official capacity.

## IV.    ALLEGATIONS

A.    **Congress Created the Shelter and Services Program to Reimburse Non-Federal Partners, Like Washington, for Providing Shelter to Noncitizen Migrants Released From DHS's Custody**

1.    **Faced with significant need, Washington and local partners provided shelter and essential resources to newly arrived noncitizen migrants**

26.     "Immigrants make a significant contribution to" the State of Washington and the State has, accordingly, enacted "policies that recognize" the importance of noncitizens to its economy and ensure that the state "remains a place where the rights and dignity of all residents," regardless of their immigration status, "are maintained and protected." Wash. Rev. Code § 43.17.425; Laws of 2019, ch. 440, § 1. It was with these values firmly in mind that, beginning in 2022, Washington welcomed tens of thousands of noncitizen migrants who settled in Washington after they were released from DHS custody near the southwest border.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.

6

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

27.     The swell of noncitizen migrants settling in Washington was connected to broader migration trends that resulted in millions of individuals entering the United States through the southwest border between 2019 and 2024,[1] many of whom sought humanitarian protection, including asylum.  Detaining everyone it encountered during this period would have stretched DHS resources well past the breaking point, threatening national security, and creating inhumane and dangerous conditions of confinement in the process.[2]

28.     Accordingly, those individuals not subject to expedited removal were either transferred to another agency or released into the United States with instructions to appear at future immigration proceedings.[3] Between 2019 and 2024, nearly 3 million individuals were released by U.S. Border Patrol with notices to appear or report, on their own recognizance, as an exercise of prosecutorial discretion, or as part of an alternative to detention or parole with conditions programs.[4]

29.     Once released from DHS custody, "[t]he majority of migrants disperse from the

---

[1] *See generally* U.S. Customs and Border Prot., Southwest Land Border Encounters (last visited July 24, 2025), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (detailing southwest land border encounters between 2022 and 2025 and collecting previous year statistics showing the same for Fiscal Years 2017 to 2022).

[2] *See* U.S. Dep't of Homeland Sec., Off. of the Inspector Gen., OIG-23-45, CBP Could Do More to Plan for Facilities Along the Southwest Border at 14 (Aug. 29, 2023), https://www.oig.dhs.gov/sites/default/files/assets/2023-09/OIG-23-45-Aug23.pdf (noting that Border Patrol has, at various points, exercised prosecutorial discretion authority to "release noncitizens without placing them in removal proceedings" when doing so is necessary "to mitigate operational challenges, including risks to national security"); U.S. Dep't of Homeland Sec., Off. of the Inspector Gen., OIG-19-46, Management Alert - DHS Needs to Address Dangerous Overcrowding Among Single Adults at El Paso Del Norte Processing Center (May 30, 2019), https://www.oig.dhs.gov/sites/default/files/assets/Mga/2019/oig-19-46-may19-mgmtalert.pdf (alerting DHS to "dangerous overcrowding" and reports that "detainees had been held in standing-room-only conditions for days or weeks").

[3] CBP Could Do More to Plan for Facilities Along the Southwest Border, *supra* note 2 at 1.

[4] U.S. Dep't of Homeland Sec., Off. of Homeland Sec. Statistics, Immigr. Enf't and Legal Processes Monthly Tables (Jan. 16, 2025), https://ohss.dhs.gov/topics/immigration/immigration-enforcement/monthly-tables (Yearly Southwest Border Book-outs by Calendar Year); *see also* Elizabeth M. Webster and Audrey Singer, Congressional Research Service, R47681, FEMA Assistance for Migrants Through the Emergency Food and Shelter Program-Humanitarian (EFSP-H) and Shelter and Services Program (SSP) at 4-5 (Aug. 31, 2023),

---

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.

7

border and travel by bus or plane to other areas typically away from their entry point."[5] Cumulatively, more than 45,000 settled in Washington between 2022 and 2024.

30.    Upon arrival, these newcomers faced numerous barriers to securing stable shelter. The long and expensive journey to Washington left many without much money. Some were also burdened by the trauma of the hardships that forced them to flee from their countries of birth. And, given their immigration status, most lacked access to federal support or employment authorization.

31.    Unfortunately, Washington's housing and homeless crisis response system was already over capacity at this time and stretched too thin to provide the kind of initial support that would not only meet the immediate needs of these newcomers but also allow them to find their bearings in their new home. Indeed, most of Washington's emergency shelters were already filled each night. Unsurprisingly, of the estimated 21,457 noncitizen migrants who arrived in Washington in 2023, approximately 3,841, or 18 percent, reported experiencing homelessness.

32.    The unsustainable strain of this additional need was abundantly clear to local shelters, like Seattle-based Mary's Place, which saw the amount of shelter space it allocated to noncitizen migrants jump from 25 percent in 2023 to 48 percent in 2024.

33.    Statewide, Washington estimates that approximately 1,200 to 1,500 noncitizen migrants were reliant on unstable housing options in 2024, including hotels, family shelters, or

---

https://www.congress.gov/crs-product/R47681 (describing the "[s]everal factors" that "led DHS to release more encountered migrants into the United States than had been typical" during this period, including shifts in "the demographic composition" of encountered migrants away from singe adults and toward "family units" and individuals with "health- or age-related vulnerabilities").

[5] Webster and Singer, *supra* note 4 at 4; *see also* U.S. Immigr. and Customs Enf't, Fiscal Year 2023: ICE Annual Report at 9 (Dec. 29, 2023), https://www.ice.gov/doclib/eoy/iceAnnualReportFY2023.pdf ("ICE does not transport released noncitizens to their destination in the interior of the United States and does not choose where released noncitizens ultimately settle.").

1    tent encampments, which had formed in several locations during this period, particularly in King

2    County.[6]

3        34.    The largest tent encampment formed in early 2023 on the property of the Riverton

4    Park United Methodist Church (RPUMC) in the City of Tukwila. At its peak, upwards of 300

5    noncitizen migrants, mainly from Venezuela, Angola, and Congo, were living in "50 to 60 tents"

6    that had been "crammed into the church's front lawn, around side buildings and on the pavement

7    of what used to be a parking lot."[7] The RPUMC encampment residents included families with

8    children, as well as pregnant and post-partum people.

9        35.    For a group that included those who arrived in Washington after "surviving war,

10   rape and other atrocities," encampments provided a measure of relative safety and stability.[8] But

11   they also lacked adequate protection from the elements or appropriate sanitation infrastructure,

12   which presented numerous public health and safety issues.[9]

13

14

15

16        [6] *See, e.g.*, Anna Patrick, *Asylum-seekers removed from Kent encampment; many
     questions remain*, Seattle Times (Sept. 28, 2024), https://www.seattletimes.com/seattle-
17   news/homeless/asylum-seekers-removed-from-kent-encampment-many-questions-remain/;
     Gene Johnson, *Hundreds of asylum-seekers are camped out near Seattle. There's a vacant motel
18   next door*, Assoc. Press (June 7, 2024), https://apnews.com/article/seattle-kent-asylum-seekers-
     aa05d9f113f2e16d3dfa463ae4e25358; Michelle Esteban, *Hundreds of refugees set up
19   encampment at Powell Barnett Park in Seattle*, KOMO News (April 30, 2024),
     https://komonews.com/news/local/seattle-refugees-encampment-powell-barnett-park-central-
20   district-migrants-asylum-seeking-process-quality-innkent-hotel-venezuela-congo-central-
     africa-tukwila-church.
21
          [7] Nura Ahmed and Guy Oron, *Nowhere to lay their head: Hundreds of migrants making
22   camp    at    Tukwila    church*,    Real    Change    News    (Nov.    2,    2023),
     https://www.realchangenews.org/news/2023/11/01/tukwila-church-asylum-seekers-
23   humanitarian-crisis.

24        [8] *See id.*

25        [9] Johnson, *supra* note 6 (quoting a Congolese man living in the Kent encampment, who
     shared that the living conditions were "very difficult" and that he and his wife did not have
26   enough food or any way to wash themselves); *see also* Ahmed and Oron, *supra* note 7
     (describing the RPUMC encampment's overflowing dumpsters and heavily used restrooms).

36.     The City of Tukwila eventually proclaimed a state of emergency at the RPUMC encampment, finding that the site "constitutes a humanitarian crisis where the need for resources for safe sanitary shelter is acute and beyond the capabilities of Tukwila itself to manage."[10]

37.     Washington recognized that, without additional resources and better coordination among service providers, the needs of its new noncitizen migrant residents would continue to go unmet. True to its values, Washington responded, launching the Washington Migrant and Asylum-Seeker Support Project (the "WA MASS Project") in October 2024, which increased the state's capacity to help the recently arrived noncitizen migrants meet their most basic needs: suitable shelter; access to food, water, and acute medical care; and basic hygiene supplies, like clean diapers.

38.     Specifically, the WA MASS Project vested the Washington Department of Social & Health Services (DSHS) Office of Refugee and Immigrant Assistance (ORIA) with new legal authority to "administer services to immigrants who are ineligible for federal [refugee resettlement] services" and to "contract with . . . community-based organizations" for that purpose. Wash. Rev. Code § 74.74.060; Laws of 2024 ch. 153, SHB 2368. The Legislature also appropriated $25 million for the WA Mass Project, which funded a one-year pilot project designed to provide essential services for noncitizen migrants who had entered the United States in 2022 or later, did not qualify for federal refugee resettlement assistance, had not been granted a permanent immigration status, and had a household income below 200% of the federal poverty guidelines.[11]

39.     Through the WA MASS Project, Washington sought to build a statewide network of organizations that could deliver a coordinated response to meet the specific and immediate

---

[10] Allan Ekberg, Mayor of the City of Tukwila, *Proclamation* (Oct. 6, 2023), https://www.tukwilawa.gov/wp-content/uploads/Emergency-Proclamation-re-Riverton-Park-United-Methodist-Church-RPUMC.pdf.

[11] Press Release, Wash. State Dep't of Social and Health Services, *Washington state launches Migrant and Asylum-Seeker Support Project* (Nov. 6, 2024),

needs of the recently arrived noncitizen migrants. The funds available through the WA MASS Project were competitively awarded to organizations that could provide services in six core service areas: (1) reception and navigation services, (2) emergency shelter, (3) housing navigation and rental assistance, (4) culturally responsive case management services, (5) immigration-related legal services, and (6) education, employment, and training services.

40.    Although the support provided through the WA MASS Project was an important expression of Washington's values, as well as an important infusion of material support, Washington recognized that more was needed to ensure that the essential needs of its noncitizen migrant residents were met, particularly given the time-limited nature of the WA MASS pilot program. Accordingly, Washington looked to expand the reach of the WA MASS Project by adding federal Shelter and Services Program funds into its resource mix.

**2.    Congress created the Shelter and Services Program to ensure states, localities, and community organizations could meet the needs of noncitizen migrants, after their release from DHS custody**

41.    Recognizing the need for additional resources to help local communities meet the needs of noncitizen migrants, in 2019, Congress began appropriating funds to FEMA for disbursement "to jurisdictions or local recipient organizations serving communities that have experienced a significant influx of" noncitizen migrants as reimbursement "for costs incurred in providing services" to those newcomers. *See* Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the Southern Border Act, Pub. L. No. 116-26, Title III, 133 Stat. 1020, 1020-21 (July 1, 2019).

42.    President Trump signed the first iteration of this funding into law on July 1, 2019, appropriating $30,000,000 "for the emergency food and shelter program," which "provid[ed] assistance to aliens released from the custody of the Department of Homeland Security" through grants administered by FEMA under the Emergency Food and Shelter Program - Humanitarian

https://www.dshs.wa.gov/os/office-communications/media-release/washington-state-launches-migrant-and-asylum-seeker-support-project.

(EFSP-H). *See id.* Congress continued to support the EFSP-H grant program with further appropriations in 2021 and 2022. *See* American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 79 (March 11, 2021) ($110,000,000); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 345 (March 15, 2022) ($150,000,000).

43.    In 2023, Congress established the Shelter and Services Program by appropriating $800,000,000 "to support sheltering and related activities provided by non-Federal entities . . . in support of relieving overcrowding in short-term [CBP] holding facilities." Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 STAT. 4730 (Dec. 29, 2022). In an accompanying Joint Explanatory Statement, Congress clarified that "the $800 million [wa]s appropriated for" the creation of the SSP but, "'[i]n order to avoid any interruption in support for CBP short-term holding facility decompression,' up to $785 million" was available for award under the existing EFSP-H grant program.[12] SSP, which awards funds directly to recipients, was meant to replace the EFSP-H, which distributed funds to recipients through a national board.[13]

44.    Congress reauthorized the Shelter and Services Program in March 2024 and directed CBP to transfer $650,000,000 to FEMA "to support sheltering and related activities provided by non-Federal entities, in support of relieving overcrowding in [CBP's] short-term holding facilities." Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 STAT. 597, 598 (March 23, 2024).

45.    On April 12, 2024, FEMA announced that it was accepting applications for $340,900,000 in competitive SSP grant funds, which it would award by September 30, 2024. *See* FY 2024 SSP-C Notice of Funding Opportunity (NOFO), attached as Exhibit 1. FEMA expressly stated that these funds were being made available, "*[a]s directed by Congress*, . . . to enable non-federal entities to off-set allowable costs incurred for services associated with

---

[12] U.S. Dep't of Homeland Sec., Fiscal Year 2023 Report to Congress at 2 (October 18, 2023), https://www.dhs.gov/sites/default/files/2023-11/2023_1018_fema_shelter_and_services_program_fy23.pdf.

[13] *Id.*

12

noncitizen migrants recently encountered and released by DHS," in order to achieve "the primary purpose of SSP": "'relieving overcrowding in short-term holding facilities of [CBP].'" *Id.* at 5 (emphasis added) (quoting Pub. L. No. 118-47, 138 STAT. at 598).

46.     Although the grants were awarded on September 30, 2024, their performance period was October 1, 2023 – September 30, 2026, which meant that grant recipients could seek reimbursement for any allowable expenses incurred during that period. *See id* at 7.

47.     As specified in the NOFO, state and local governments, Native American tribes, and certain non-profit organizations were eligible to apply and would be evaluated based on their ability to meet "Performance Measures," such as the number of meals and nights of lodging they had provided or expected to provide, and the number of "noncitizen migrants served through translation services." *See id.* at 6-7.

48.     In keeping with the purpose of SSP, only services provided to "noncitizen migrants released from a DHS facility" were reimbursable under SSP grants. *See* NOFO at 47. In addition, only costs related to the "allowable activities" designated by FEMA in an appendix to the NOFO were subject to reimbursement. *See id.* at 47-51.

49.     In order to be reimbursed for an allowable expense under an SSP award, grant recipients were required to submit documentation, including the names, Alien Registration Numbers, and evidence of DHS processing, for the individuals being served, as well as proof of payment for the allowable services provided. *See id.* at 52-53.

**3.     FEMA awards Washington more than $4 million in SSP funds to continue providing shelter and services to noncitizen migrants in Washington**

50.     Washington submitted its application for a competitive Shelter and Services Grant on June 21, 2024. *See* Washington SSP Application, attached as Exhibit 2.

51.     In its application, Washington proposed disbursing SSP funds to three subrecipient partners, which it identified as well-suited to help advance the complementary goals of the WA MASS Project and SSP: the City of Tukwila, Public Health - Seattle & King County

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.

13

(Public Health), and the non-profit organization, Mary's Place Seattle. Washington planned to identify additional subrecipient partner organizations at a later date that would also be able to provide shelter and other essential services to noncitizen migrants.

52.    Washington's proposed subrecipients each had established track records of successfully providing shelter and other services to noncitizen migrants and Washington anticipated that, collectively and with support from SSP funds, they would be able to provide shelter and other services to approximately 525 noncitizen migrants each day.

53.    In support of its application, Washington described the services its intended subrecipients had already provided to noncitizen migrants, which would have been reimbursable and/or extended through Washington's SSP grant.

54.    For instance, in October 2023, the City of Tukwila paid for the construction and operation of a large, heated tent structure at the RPUMC encampment, and also hired a consulting firm with experience doing outreach and providing services to unhoused populations. *See id.* at 4-21. Washington estimated that the City of Tukwila's efforts at RPUMC and other locations throughout the city were "support[ing] 200 to 250 people per night." *Id.* at 2.

55.    Washington also sought SSP funds to support Public Health's work providing culturally relevant health information and acute medical care for noncitizen migrants residing in various encampments and hotels in Seattle and King County, including at RPUMC. In particular, Public Health hired community navigators—health workers with relevant cultural and language competencies—that provided in-language guidance and support to noncitizen migrants on critical topics for those living in a congregate shelter with limited facilities. Through the community navigators, Public Health was able to provide information on best practices for hygiene and sanitation, rodent prevention, food safety, severe weather safety, vaccination, and health care system navigation, including health care enrollment and linkage to care.

56.    Beyond its work to share information with noncitizen migrants, Public Health also provided goods and services. For instance, it provided direct healthcare through its Mobile

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.

14

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Medical van, arranged transportation for pregnant people with health emergencies, such as preeclampsia, and handed out essential items, like hygiene kits, baby formula and diapers, and baby and maternity clothing.

57.    Washington also planned to use SSP funds to support the work of Mary's Place, a Seattle-based non-profit with a long history of providing emergency shelter for unhoused families, including pregnant people, families with infants or medically fragile children, and families fleeing domestic violence. Washington estimated that Mary's Place was able to serve approximately 150 noncitizen migrants per day with a 24/7 shelter operation that included, in addition to bed space, a centralized food service, connections to housing specialists, healthcare, youth programming, legal clinics, job fairs, and resume workshops.

58.    In addition to the City of Tukwila, Public Health, and Mary's Place, Washington planned to identify through the WA MASS Project's competitive application process one or more additional partner organizations that were expected to provide shelter and services to an additional 425 noncitizen migrants each day.

59.    As part of its application, Washington certified that it and its intended subrecipients either had or would develop the "internal controls and processes" necessary "to clearly identify migrants who will be receiving services to be funded by SSP dollars and to ensure said migrants were processed and released from DHS apart from other populations served." *See* Washington SSP Application Worksheet (Tab 5), attached as Exhibit 3. Washington further certified that, when seeking reimbursement for services rendered, it would submit "verified status and release dates . . . by Alien Registration Number . . . or evidence of DHS processing . . . for any A-numbers being submitted with this application." *Id.*

60.    On September 26, 2024, FEMA notified Washington that its SSP grant application had been approved and that it had been awarded $4,039,516. *See* SSP Award Package at 1, attached as Exhibit 4.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.

15

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

61.    Included with FEMA's Award Package was an Award Summary, which described the purpose of the Shelter and Services Program:

> The Fiscal Year (FY) 2024 Shelter and Services Program (SSP) provides non-federal entities that *serve noncitizen migrants recently released from DHS custody* to temporarily provide shelter, food, transportation, acute medical care, personal hygiene supplies, and labor necessary to manage cases to provide these services, and to provide funding to non-federal entities to increase their capacity to *temporarily shelter noncitizen migrants recently released from DHS custody*, including renovations and modifications to existing facilities**.**

*Id.* at 2 (emphases added).

62.    In connection with the award, FEMA also provided an approved scope of work for Washington's SSP grant, which included the following budgeted amounts:

a.    $25,237.66 for DSHS, through a subrecipient partner, to rent hotel/motel rooms as emergency shelter for an estimated 500-600 noncitizen migrants;

b.    $284,035.32 for the City of Tukwila's six-month rental of a large tent at RPUMC, which provided shelter to 75 noncitizen migrants;

c.    $182,500 for the City of Tukwila's operation of a food pantry at the RPUMC;

d.    $180,000 for the City of Tukwila serving 12,000 meals to noncitizen migrant residents at RPUMC and hotels in Tukwila;

e.    $688,098.92 for the City of Tukwila retaining the services of Innovative Impact Strategies, LLC (i2), which was engaged to help manage the temporary shelter and services being provided to the 250-300 noncitizen migrants residing at RPUMC;

f.    $22,947.99 to the City of Tukwila for garbage and refuse collection, site cleanup and disposal of debris;

g.    $10,000 to the City of Tukwila for translation and interpretation services to help with community and external communications at RPUMC;

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
NO.

16

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

h.  $117,000 for Public Health to purchase a one-year supply of diapers for 150 infants;

i.  $25,500 for Public Health to provide emergency medical transportation for pregnant people needing stabilization due to preeclampsia, for three years;

j.  $11,250 for Public Health to purchase maternity clothes for 150 pregnant people;

k.  $4,500 for Public Health to purchase baby clothing for 150 babies;

l.  $30,000 for Public Health to purchase a one-year supply of baby formula for 20 babies;

m.  $161,032.20 for Public Health mobile teams to conduct health screenings for noncitizen migrants residing in emergency shelters and hotels in King County;

n.  $175,000 for Public Health to purchase 5,000 hygiene kits containing soap, shampoo, combs, brushes, deodorant, baby wipes, body wipes, and storage bags;

o.  $10,000 for Public Health to purchase and distribute hygiene and sanitation outreach materials;

p.  $250,000 for Public Health to hire a full-time equivalent midwife for three years to provide health screenings for pregnant people.

q.  $246,375.00 for Mary's Place to provide meals to 150 people per day for one year; and

r.  $684,375.00 for Mary's Place to provide shelter beds to 150 noncitizen migrants per day for one year.

63.  In total, FEMA's approved scope of work contemplated that Washington would allocate its $4,039,516 award to subrecipients in the following amounts: $1,507,088.34 for the City of Tukwila; $1,218,595.18 for Public Health; and $1,080,741 for Mary's Place. The

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF NO.

17

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

remaining $233,091.48 was reserved for additional lodging costs and DSHS' administrative expenses.

64.    Although the entire award amount was obligated to Washington, FEMA placed payment holds on $1,480,000, pending its review of more detailed cost breakdowns and justifications. Washington anticipated being able to provide that information and, over the course of the performance period, utilizing the full award amount.

65.    These funds would have been used to reimburse allowable expenses for services that had already been provided, as well as to support the continued provision of services by Washington's intended subrecipients.

66.    Washington entered into a client service contract with Mary's Place on February 20, 2025, pursuant to which the state is obligated to reimburse Mary's Place for the full amount it planned to allocate from the SSP award. Given the uncertainty created by Defendants' actions, Washington decided not to move forward with similar client service contracts for the City of Tukwila and Public Health.

**B.    The Trump Administration Illegally Cut Funding Appropriated by Congress for the Shelter and Services Program**

**1.    President Trump directed DHS to eliminate federal funding from "Sanctuary Jurisdictions"**

67.    As soon as he took office, President Trump issued an executive order entitled "Protecting the American People Against Invasion" (the "Invasion EO"). Exec. Order 14159, 90 Fed. Reg. 8443 (Jan. 29, 2025). The Invasion EO asserted that the United States had experienced an "unprecedented flood of illegal immigration" and that this influx "has cost taxpayers billions of dollars at the Federal, State, and local levels." *Id.* at 8443.

68.    The Invasion EO also called for a "Funding Review" and directed the Secretary of DHS, among other agency officials, to review "all contracts, grants or other agreements providing federal funding to non-governmental organizations" that support or provide services,

"directly or indirectly," to "removable or illegal aliens" and to "[p]ause distribution of all further funds pursuant to such agreements pending the results of" this review. *Id.* at 8447.

69.    The Invasion EO further directed the DHS Secretary to ensure that "so-called 'sanctuary' jurisdictions" did not receive federal funds. *Id.* at 8446.

70.    DHS considers Washington to be a "sanctuary jurisdiction."[14]

71.    On January 28, 2025, Secretary Noem issued a memorandum directing DHS "Component and Office Heads" to place "on hold pending review" all DHS "grant disbursements and assessments of grant applications that: (a) go to non-profit organizations or for which non-profit organizations are eligible, and (b) touch in any way on immigration." Secretary Noem, Memorandum for Component and Office Heads (Jan. 28, 2025) (the "January 28 Noem Memo"), attached as Exhibit 5. Secretary Noem gave the DHS component heads one week to "provide a report to the Undersecretary for Management" with "a summary of every grant covered by this memorandum and its status." *Id.*

72.    The Secretary's reason for this sweeping decision "include[d]" her unsupported "concerns" that the grants: (1) "may be funding illegal activities, such as encouraging or inducing illegal immigration, 8 U.S.C. § 1324(a)(1)(A)(iv), or illegal harboring of illegal aliens, 8 U.S.C. §§ 1324(a)(1)(A)(ii)-(iii)"; (2) may include "racially discriminatory language"; and (3) "may not be an efficient use of government resources." *Id.*

73.    Despite having tasked DHS component and office heads with identifying covered grant programs, Secretary Noem summarily asserted that the "hold . . . appl[ies] to the Shelter and Services Program[.]" *Id.*; *see also* Decl. of Cameron Hamilton at ¶ 9, *City of New York v. Trump*, 25-cv-1510 (S.D.N.Y.), ECF No. 17-1 (testifying that, based on the January 28 Noem

---

[14] *See* U.S. Dep't of Homeland Sec., Sanctuary Jurisdictions Defying Fed. Immigr. Law, *available at* https://web.archive.org/web/20250531234232/https://www.dhs.gov/sanctuary-jurisdictions (last visited on June 20, 2025); *see also* Simone Carter, *Trump targets WA state with 'sanctuary jurisdiction' list, and wants to withhold funds*, The Olympian (June 3, 2025), https://www.theolympian.com/news/politics-government/article307552996.html.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.

19

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1    Memo, "FEMA did not have the authorization to make [a] payment" to New York City under an

2    open SSP award).

3        74.    But FEMA did more than merely place SSP funding "on hold"; it eliminated it

4    entirely. Indeed, the transaction history for Washington's SSP grant on USASpending.gov shows

5    that, on February 10, 2025, FEMA revised Washington's award downward by the full award

6    amount of $4,039,516, leaving $0 outlayed or obligated.[15]

| Transaction History | Sub-Awards | Federal Account Funding | | | | |
|---|---|---|---|---|---|---|
| **Modification Number** | **Assistance Listing** | **Action Date** | **Amount** | **Action Type** | **Transaction Description** | |
| – | 97.141 | 02/10/2025 | -$4,039,516 | C: REVISION | SHELTER AND SERVICES PROGRAM | |
| 0 | 97.141 | 09/27/2024 | $4,039,516 | A: NEW | SHELTER AND SERVICES PROGRAM | |

| | |
|---|---|
| ● Outlayed Amount | $0.00 |
| ● Obligated Amount | $0.00 |
| ○ Non-Federal Funding | $0.00 |
| ● Total Funding | $0.00 |

16        75.    On information and belief, FEMA took similar action to zero out all other SSP

17    awards, as well.

18        76.    FEMA's deobligation[16] of Washington's entire $4,039,516 SSP award rendered

19    Washington unable to seek reimbursement for allowable expenses incurred under the grant.

20        77.    FEMA did not notify Washington of this action, either before or after it occurred.

21        78.    On February 14, 2025, Mr. Hamilton, the Senior Official Performing the Duties

22    of the Administrator at FEMA, issued Grant Processing Guidance, which contained "additional

---

[15] *See* U.S. Dep't of Homeland Sec., EMW-2024-SP-05140 (last visited on July 25, 2025), https://www.usaspending.gov/award/ASST_NON_EMW-2024-SP-05140_7022.

[16] Deobligation is "[a]n agency's cancellation or downward adjustment of previously incurred obligations." U.S. Gov't Accountability Office, A Glossary of Terms Used in the Federal Budget Process, GAO-05-734SP at 44 (Sept. 2005), https://www.gao.gov/assets/gao-05-734sp.pdf.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.                                                           20                    **ATTORNEY GENERAL OF WASHINGTON**
                                                                                    Civil Rights Division
                                                                                    800 Fifth Avenue, Suite 2000
                                                                                    Seattle, WA 98104
                                                                                    (206) 464-7744

1   process steps to ensure that Secretary Noem has the opportunity to review" all "obligations,

2   disbursements, and payments" "to non-governmental organizations and private non-profits" or

3   supporting "non-congregate sheltering [for] illegal aliens." *See* FEMA, Grant Processing

4   Guidance (Feb. 14, 2025), attached as Exhibit 6. The FEMA Grant Processing Guidance thus

5   put yet another bureaucratic layer between the funds and SSP grant recipients, thereby ensuring

6   they remained unavailable. *Id.*

7         79.    Next, having "paused" access to SSP funds based on their availability to non-

8   profit organizations and connection to immigration, *see* January 28 Noem Memo, Secretary

9   Noem directed all DHS components, including FEMA, "to review all federal financial assistance

10   awards to determine if Department funds, directly or indirectly, are going to sanctuary

11   jurisdictions" and to "cease providing federal funding to sanctuary jurisdictions" identified in

12   that process." *See* Memorandum for All Agencies and Offices, Restricting Grant Funding for

13   Sanctuary Jurisdictions (Feb. 19, 2025) (the "February 19 Noem Memo"), attached as Exhibit 7.

14         80.    FEMA carried out the directives imposed by the January 28 Noem Memo and the

15   February 19 Noem Memo by: (1) identifying grant programs that, in FEMA's view, do not "align

16   with Administration and Secretary priorities on non-governmental organizations, immigration,

17   and sanctuary jurisdictions"; and (2) recommending that DHS place "conditions or restrictions"

18   on all Shelter and Services Program awards, *see* Approval of FEMA-Administered Grant

19   Disbursements at 1-2, attached as Exhibit 8, and further (3) review all SSP awards "for

20   [t]ermination," *see id.*, Table A.

21         81.    Secretary Noem approved FEMA's recommendations on March 25, 2025. *See*

22   *generally id.* at 3-4 (reflecting Secretary Noem's signature and approval of FEMA's

23   recommendations).

24

25

26

COMPLAINT FOR DECLARATORY AND       21       **ATTORNEY GENERAL OF WASHINGTON**
INJUNCTIVE RELIEF                                  Civil Rights Division
NO.                                         800 Fifth Avenue, Suite 2000
                                                   Seattle, WA  98104
                                                   (206) 464-7744

## 2. Defendants imposed "special conditions" on Washington's SSP grant and then terminated it entirely

82.    On March 11, 2025, FEMA notified Washington that, in light of its "significant concerns that SSP funding is going to entities engaged in facilitating illegal activities," it was "temporarily withholding payments" under the SSP grant "pursuant to 2 C.F.R. § 200.339(a)" and "instituting specific conditions . . . pursuant to 2 C.F.R. § 200.208." *See* Letter from Cameron Hamilton at 1 (March 11, 2025) (the "March 11 Letter"), attached as Exhibit 9.

83.    As "special conditions," FEMA announced that it would conduct "additional monitoring and review of [Washington's] award(s)"; require Washington to provide FEMA with documents and information regarding the individuals to whom services had been provided under the SSP award within 30 days, including "names and contact information" for those individuals; and submit affidavits "attesting" that neither Washington nor its subrecipients have any "knowledge or suspicion that" the SSP funds had been used in violation of 8 U.S.C. § 1324. *See id.* at 1-2.

84.    FEMA further directed Washington not "to incur any additional costs under the grant," until further notice. *Id.* at 2.

85.    FEMA did not identify specific incidents or evidence that gave rise to the "significant concerns" that supposedly justified the imposition of these conditions. Nor did it acknowledge that it had already zeroed out Washington's SSP funds on February 10, 2025, or that Washington had yet to submit any reimbursement requests under the relatively new award.

86.    FEMA promised that "[u]pon the conclusion of" its newly imposed "monitoring" period, it would notify Washington if further action would be taken. *Id.* It also notified Washington of its "right to appeal" the decision to withhold the funds and/or impose special conditions by writing to the FEMA Grant Programs Directorate by May 10, 2025. *See id.* ("Your organization has the right to appeal this action within 60 days of the date of this letter.").

87.    On April 1, 2025, before Washington's deadline for responding to FEMA's information request or appealing the withholding decision had run, FEMA terminated Washington's SSP grant. *See* Termination Notice from Cameron Hamilton, Senior Official Performing the Duties of the Administrator at 1 (April 1, 2025) (the "Termination Notice"), attached as Exhibit 10.

88.    The Termination Notice did not mention the "significant concerns" that had purportedly motivated FEMA to withhold Washington's SSP funds and impose monitoring requirements only a few weeks earlier. Nor did the Termination Notice contend that the "special conditions" Defendants imposed would have been insufficient to correct Washington's alleged noncompliance. *See id.* Indeed, the Termination Notice did not even mention that FEMA had previously accused Washington of failing to comply with the terms and conditions of its grant.

89.    Rather, FEMA simply stated that it was terminating Washington's SSP award because "funding . . . non-federal entities to provide shelter, food, transportation, acute medical care, and personal hygiene supplies for individuals released from DHS short-term holding facilities"—individuals who "often have no legal status and are in the United States unlawfully"—"is not consistent with DHS's current priorities." Termination Notice at 1. That determination, according to FEMA, justified termination under 2 C.F.R. § 200.340(a)(2), which provides that an "award may be terminated" if it "no longer effectuates the program goals or agency priorities."[17] *See* Termination Notice at 1.

90.    FEMA thus instructed Washington to begin closing out the grant and advised that, if Washington "wish[ed] to object to the termination of this award, it should submit a written objection within 30 days." *Id.* at 2.

---

[17] The Office of Management and Budget revised this regulation in 2024 and the operative language is now located at 2 C.F.R. § 200.340(a)(4). *See* 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.

23

91.     On April 23, 2025, Washington responded with its written objection to FEMA's unlawful decision to withhold and then terminate its SSP grant. *See* Letter from Cheryl Strange, Secretary of the Washington Department of Social and Health Services at 1 (April 23, 2025), attached as Exhibit 11. Washington disputed that it had breached any obligations under the SSP grant, asserted that FEMA's decisions were unlawful and were causing Washington to suffer irreparable harm, and demanded that FEMA reverse its decision and/or respond to its objection letter by May 9, 2025. *Id.* at 2.

92.     As of the date of this filing, FEMA has neither responded to Washington's objection letter, nor reversed its unlawful decisions to pause, withhold, and terminate Washington's SSP grant.

**3.      The loss of SSP funds irreparably harms Washington and its subrecipients**

93.     When Defendants terminated Washington's SSP grant, Washington and its intended subrecipients had already provided services that would have been reimbursable under the terms of the award. And, although Washington had not yet requested reimbursement for any such expenses, it would have done so in due course.

94.     Washington also intended to work with its subrecipients to ensure that the needs of noncitizen migrants continued to be met, at least through the end of the SSP performance period on September 30, 2026.

95.     Without SSP funds, there is likely to be an overall drop in the level of services provided to noncitizen migrants in Washington; neither state or local governments or community organizations are likely to fill the $4,039,516 hole left by Defendants' termination of Washington's SSP grant.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.

24

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

96.     Moreover, U.S. Senator Chris Murphy, Ranking Member of the Senate Committee on Appropriations, has raised concerns that Defendants have not only impounded the Shelter and Services funds but also used them "to fund other things, like ICE."[18]

97.     Public reporting suggests that Defendants have begun reallocating funds appropriated for other purposes to ICE, or otherwise intend to misappropriate Shelter and Services Program funds and use that money for other purposes, including their ongoing mass deportation efforts.[19]

## V.    CLAIMS FOR RELIEF

### COUNT I
### Violation of the Separation of Powers Doctrine

98.     Plaintiffs repeat and incorporate by reference the allegations set forth in each of the preceding paragraphs.

99.     Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-327 (2015).

100.    "The Separation of Powers was an integral part of the Founders' design" of our constitutional order, *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018), and fidelity to that principle remains necessary to "preserve the liberty of all the people," *Collins v. Yellen*, 594 U.S. 220, 245 (2021).

---

[18] U.S. Senator Chris Murphy, *Murphy To Sec'y Of Homeland Sec. Kristi Noem: Your Department Is Out Of Control* (May 8, 2025), https://www.murphy.senate.gov/newsroom/press-releases/murphy-to-secretary-of-homeland-security-kristi-noem-your-department-is-out-of-control.

[19] *See* Gustaf Kilander, *ICE could 'run out of money next month' and is already $1bn over budget to carry out Trump's deportation plans*, The Independent (June 17, 2025), https://www.independent.co.uk/news/world/americas/us-politics/ice-dhs-budget-deportations-trump-b2770916.html (reporting that "DHS recently took the step of moving nearly $500 million from within its own funds to support its immigration clampdown").

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

101.    Pursuant to that doctrine, the Constitution "grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco*, 897 F.3d at 1231 (first citing U.S. Const. art. I, §9, cl. 7 (Appropriations Clause), and then citing U.S. Const. art. I, §8, cl. 1 (Spending Clause)). The ability to control federal spending is "[a]mong Congress's most important authorities." *Biden v. Nebraska*, 600 U.S. 477, 505 (2023). The Appropriations Clause thus operates as a "bulwark of the Constitution's separation of powers" and prevents the Executive from "possess[ing] an unbounded power over the public purse of the nation." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.) (internal citations omitted).

102.    In addition, Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution states that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and [a] House of Representatives." U.S. Const. art. I, §1; *see Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."). Accordingly, "[a]side from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress." *City & Cnty. of San Francisco*, 897 F.3d at 1232. That means that "'the President does not have unilateral authority to refuse to spend'" funds that have been lawfully appropriated by Congress or to "'decline to follow a statutory mandate or prohibition simply because of policy objections.'" *Id.* (quoting *In re Aiken Cnty.*, 725 F.3d 255, 259, 261 n.1 (D.C. Cir. 2013)).

103.    The Constitution further delineates the division of responsibilities between the Legislative and Executive Branches by specifying that the Executive must "take Care that the Laws be faithfully executed." U.S. Const. Art. II, Sec. 3; *see Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes [the] laws and the President . . . faithfully executes them." (brackets and quotation marks omitted)). The

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.

26

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Executive Branch violates the Take Care Clause where it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution"); *see also Util. Air. Reg. Grp.*, 573 U.S. at 327 (noting that the President "act[s] at time through agencies").

104.    The federal courts have "not hesitated to enforce the principle of separation of powers embodied in the Constitution when its application has proved necessary for the decisions of cases or controversies properly before it." *Buckley v. Valeo*, 424 U.S. 1, 123 (1976). Thus, "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins*, 594 U.S. at 245.

105.    Congress created the Shelter and Services Program through duly enacted authorizing legislation and appropriated funding under that program "to support sheltering and related activities provided by non-Federal entities . . . in support of relieving overcrowding in short-term [CBP] holding facilities." *See* Pub. L. No. 117-328, 136 STAT. 4730; Pub. L. No. 118-47, 138 STAT. 597, 598. Congress thus knowingly decided to spend money for the benefit of a group that was certain to include some who had entered into the United States without inspection and might ultimately be ordered removed from the country. Doing so, in Congress' judgment, was desirable in order to achieve its objective of relieving overcrowding in DHS detention facilities.

106.    Defendants may disagree with Congress' policy choice but that does not entitle them to ignore Congress' clear funding command and their decision to terminate the Shelter and Services Program for that reason violates the Separation of Powers doctrine.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF NO.

27

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

**COUNT II**
**Violation of the Spending Clause**
**U.S. Const. Art. I, Sec. 8, cl. 1**

107.    Plaintiffs repeat and incorporate by reference the allegations set forth in each of the preceding paragraphs.

108.    The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. Art. I, Sec. 8, cl. 1.

109.    The Spending Clause requires any conditions on federal funds to be imposed "unambiguously," *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17 (1981), so that States deciding whether to accept such funding can "exercise their choice knowingly, cognizant of the consequences of their participation," *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). This is because "legislation enacted pursuant to the spending power is much in the nature of a contract," where Congress's authority "to legislate . . . rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst*, 451 U.S. at 17. Accordingly, Congress must provide States clear notice of the applicable funding conditions. *See, e.g.*, *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

110.    Nothing in the Shelter and Services Program authorizing legislation, or anywhere else in the U.S. Code, allows Defendants to pause, withhold, or terminate grants made under that program simply because they dislike the program and find that it conflicts with their current policy preferences or priorities. *See* Termination Notice at 1 (citing 2 C.F.R. § 200.340(a)(2)). And, within the confines of the Spending Clause, no statute could empower agencies to administer grant funds in such an arbitrary fashion. Washington would not have applied for or accepted SSP funds—with all the recordkeeping and other administrative burdens acceptance entails—had it understood that Defendants might decide, midstream, to terminate the grant because providing shelter and other services to noncitizen migrants was no longer an agency

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.

28

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

priority. *See Arlington Cent. Sch. Dist. Bd. of Educ.*, 548 U.S. at 296 (analyzing Spending Clause claim "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [federal] funds and the obligations that go with those funds").

111.    Defendants' actions to pause, withhold, and terminate Washington's SSP grant based only on a change in agency priorities violates the Spending Clause.

## COUNT III
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706 (2)(A)
### Arbitrary and Capricious

112.    Plaintiffs repeat and incorporate by reference the allegations set forth in each of the preceding paragraphs.

113.    Defendants are "agencies" under the Administrative Procedure Act (APA), 5 U.S.C. § 551(1), and their decision to pause, withhold, and eventually terminate Washington's SSP grant constitutes "[a]gency action made [judicially] reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704; *see Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

114.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

115.    An agency action is arbitrary and capricious if it is not "reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency fails to meet that standard if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins., Co.*, 463 U.S. 29, 43 (1983). Furthermore, where an agency changes its position on an issue, it must acknowledge the change, account for

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.

29

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

the "serious reliance interests" that may have attached to the prior policy, and provide a "reasoned explanation" if it is "disregarding facts and circumstances that underlay or were engendered by the prior policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009). Finally, courts must set aside agency actions as arbitrary and capricious where, "viewing the evidence as a whole," there is "a significant mismatch between the decision the [agency] made and the rationale [it] provided." *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019). "Accepting contrived reasons" of that sort "would defeat the purpose of the enterprise" and convert judicial review into "an empty ritual." *Id.* at 785.

116.    Defendants' actions pausing, withholding, and terminating the Shelter and Services Program and Washington's SSP grant are arbitrary and capricious for myriad reasons.

117.    To start, on January 28, Secretary Noem announced a policy that funds under the Shelter and Services Program should be withheld, even as she instructed DHS component and office heads to undertake a review of funding programs. But, instead of merely withholding SSP funds, Defendants zeroed out all SSP funds on February 10 without notice or explanation. They then proceeded to undertake a sham process—asserting a need, based on vague reference to unspecified "concerns," to investigate whether Washington had used SSP funds for illegal purposes, despite knowing that Washington had not drawn a single dollar from its SSP grant and, more importantly, that Defendants had recently reduced the available funds to zero. Less than a month later, however, Defendants terminated Washington's SSP grant without even briefly mentioning the "concerns" about SSP grants being used to fund illegal activities. Instead, Defendants stated simply that they were terminating Washington's SSP grant because of their policy-based objection to "provid[ing] support for illegal aliens." Termination Notice at 1.

118.    Defendants' explanations for their actions, if an explanation was offered at all, were contrived, pretextual, and fail to consider that Congress specifically authorized and funded the Shelter and Services Program to "reliev[e] overcrowding in [CBP's] short-term holding

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.

30

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

facilities" by reimbursing "non-Federal entities" that provide "shelter and related activities" for noncitizen migrants. *See* Pub. L. No. 118-47, 138 STAT. 597, 598. Ignoring that clear statutory purpose, Defendants' actions were taken for the purpose of depriving disfavored groups of federal support, including noncitizen migrants, nonprofit organizations, and jurisdictions deemed to be so-called "sanctuary" jurisdictions. Defendants thus "relied on factors which Congress has not intended it to consider[.]" *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.

119.    Defendants have thus fallen well short of the APA's requirement that agency actions be "reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423.

120.    Defendants' actions also run afoul of the regulations governing their administration of federal awards, including because they: (1) failed to provide notice to Washington before zeroing out its funding on February 10, 2 C.F.R. § 200.342; (2) imposed specific conditions on Washington's SSP award without explaining why those conditions were being imposed, *id.* § 200.208(2); and (3) terminated Washington's SSP grant without allowing Washington time to satisfy the specific conditions, appeal the withholding decision, or actually determine that the specific conditions were insufficient to remedy Washington's alleged noncompliance, *see id.* § 200.339.

121.    Defendants' failure to comply with binding regulations renders their conduct arbitrary and capricious. *See Erie Boulevard Hydropower, LP v. FERC*, 878 F.3d 258, 269 (D.C. Cir. 2017) ("[I]f an agency action fails to comply with its regulations, that action may be set aside as arbitrary and capricious.").

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.

31

**COUNT IV**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)-(C)**
**Contrary to Law**

122.    Plaintiffs repeat and incorporate by reference the allegations set forth in each of the preceding paragraphs.

123.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law; . . . contrary to constitutional right, power, privilege, or immunity;" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C).

124.    The Shelter and Services Program was created by Congress in order "to support sheltering and related activities provided by non-Federal entities . . . in support of relieving overcrowding in short-term [CBP] holding facilities." *See* Pub. L. No. 118-47, 138 STAT. 597, 598. Thus, by design, the Shelter and Services Program was created to provide financial support to non-Federal entities, like Washington and its intended subrecipient partners, as reimbursement for the cost of providing emergency shelter and related services to noncitizen migrants following their release into the community by DHS. Congress thus made a conscious choice to provide funds in a manner that would benefit some individuals who may have entered into the United States unlawfully because doing so was necessary to achieve its goal of "relieving overcrowding in short-term [CBP] holding facilities." *Id.*

125.    Defendants openly engaged in actions meant to contravene the clear purpose of the Shelter and Services Program and, in turn, violated the Constitution's Separation of Powers principle and usurped Congress' authority under the Spending Clause. Finally, they attempt to justify their actions by misconstruing a regulation an Office of Management and Budget regulation, 2 C.F.R. § 200.340(a)(2), that does not, and could not, permit their straightforward effort to undermine a duly enacted grant program they do not like.

126.    Accordingly, they have acted contrary to law and in excess of their statutory authority and their actions should be set aside.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.

32

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

**COUNT V**
*Ultra Vires*

127.    Plaintiffs repeat and incorporate by reference the allegations set forth in each of the preceding paragraphs.

128.    An executive agency "has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see also Nat'l Fed. Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided.").

129.    Defendants may exercise only that authority which is conferred by statute. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (federal agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires").

130.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

131.    Because Defendants paused, withheld, and terminated Washington's SSP funds for reasons that directly conflict with the very purpose for which those funds were authorized and appropriated, they acted in excess of their statutory authorization to administer Washington's SSP grant.

132.    Defendants' *ultra vires* actions have caused and will continue to cause ongoing, irreparable harm to Plaintiff States for which there is no adequate remedy at law.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
NO.

33

1

## VI.   PRAYER FOR RELIEF

2        WHEREFORE, Washington prays that this Court:

3        133.    Declare that Defendants' decision to pause, withhold, or terminate Washington's

4   Shelter and Services grant funds was unlawful because it: (a) arrogates Congress' power to

5   control federal spending in violation of the Separation of Powers doctrine; (b) rests on an

6   assertion of unfettered authority to terminate grants, in violation of the Spending Clause;

7   (c) constitutes arbitrary and capricious agency decision-making, in violation of the APA;

8   (d) contravenes multiple sources of binding law, in violation of the APA; and (e) is *ultra vires*.

9        134.    Preliminarily and permanently enjoin Defendants to rescind any and all decisions

10  to pause, withhold, or terminate Washington's SSP grant;

11       135.    Vacate and set aside Defendants' decisions to pause, withhold, or terminate

12  Washington's SSP grant;

13       136.    Retain jurisdiction to monitor Defendants' compliance with this Court's

14  judgment;

15       137.    Award the Plaintiff States their reasonable fees, costs, and expenses, including

16  attorneys' fees; and

17       138.    Award such additional relief as the interests of justice may require.

18

19

20

21

22

23

24

25

26

COMPLAINT FOR DECLARATORY AND                    34            **ATTORNEY GENERAL OF WASHINGTON**
INJUNCTIVE RELIEF                                              Civil Rights Division
NO.                                                           800 Fifth Avenue, Suite 2000
                                                              Seattle, WA  98104
                                                              (206) 464-7744

1    DATED this 25th day of July 2025.

2                                          Respectfully submitted,

3                                          NICHOLAS W. BROWN
                                           Attorney General
4
                                           */s/ Benjamin Seel*
5                                          BENJAMIN SEEL, WSBA # 61165
                                           EMILY C. NELSON, WSBA # 48440
6                                          Assistant Attorneys General
                                           Wing Luke Civil Rights Division
7                                          Washington State Attorney General's Office
                                           800 Fifth Avenue, Suite 2000
8                                          Seattle, WA 98104
                                           (206) 464-7744
9                                          benjamin.seel@atg.wa.gov
                                           emily.nelson@atg.wa.gov
10
11                                         *Attorneys for Plaintiff State of Washington*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR DECLARATORY AND              35              **ATTORNEY GENERAL OF WASHINGTON**
INJUNCTIVE RELIEF                                               Civil Rights Division
NO.                                                         800 Fifth Avenue, Suite 2000
                                                              Seattle, WA  98104
                                                                (206) 464-7744

# EXHIBIT 1

1

**The U. S. Department of Homeland Security (DHS)**
**Notice of Funding Opportunity (NOFO)**
**Fiscal Year 2024 Shelter and Services Program - Competitive (SSP-C)**

**All entities wishing to do business with the federal government must have a Unique Entity Identifier (UEI). The UEI number is issued by the system. Request a UEI using System for Award Management (SAM.gov) at: SAM's Entity Registration webpage.**

**Grants.gov registration information can be found at: Grants.gov Register webpage.**

**Updates in Grant Application Forms:**

The Data Universal Numbering System (DUNS) Number was replaced by a new, non-proprietary identifier requested in, and assigned by SAM.gov. This new identifier is the Unique Entity Identifier.

Additional Information can be found on Grants.gov: Grants.gov.

Table of Contents

Updates in Grant Application Forms: ................................................................................. 1
A.    Program Description ................................................................................................... 5
      1.    Issued By ....................................................................................................... 5
      2.    Assistance Listing Number ............................................................................ 5
      3.    Assistance Listing Title ................................................................................. 5
      4.    Funding Opportunity Title ............................................................................. 5
      5.    Funding Opportunity Number ........................................................................ 5
      6.    Authorizing Authority for Program ............................................................... 5
      7.    Appropriation Authority for Program ............................................................ 5
      8.    Announcement Type ....................................................................................... 5
      9.    Program Category ........................................................................................... 5
      10.   Program Overview, Objectives, and Priorities .............................................. 5
      11.   Performance Measures ................................................................................... 6
B.    Federal Award Information ........................................................................................ 7
      1.    Available Funding for the NOFO:    $340,900,000 ...................................... 7
      2.    Projected Number of Awards:    N/A ............................................................. 7
      3.    Period of Performance:    36 months ............................................................. 7
      4.    Projected Period of Performance Start Date(s):  October 1, 2023 ............... 7
      5.    Projected Period of Performance End Date(s):  September 30, 2026 ............ 7
      6.    Projected Budget Period(s) ............................................................................ 7
      7.    Funding Instrument Type:  Grant ................................................................... 7
C.    Eligibility Information ............................................................................................... 7
      1.    Eligible Applicants ........................................................................................ 7
      2.    Applicant Eligibility Criteria ........................................................................ 7
      3.    Subawards and Beneficiaries ......................................................................... 8
            a. Subaward Allowability ............................................................................ 8
            b. Subrecipient Eligibility ........................................................................... 8
            c. Other Subaward Information (if applicable) ............................................ 8
            d. Beneficiaries or Participants ................................................................... 8
      4.    Other Eligibility Criteria/Restrictions .......................................................... 8
      5.    Maintenance of Effort (MOE) ....................................................................... 8
      6.    Cost Share or Match ....................................................................................... 8
D.    Application and Submission Information ................................................................... 8
      1.    Key Dates and Times ..................................................................................... 8
            a. Application Start Date:    04/12/2024 ..................................................... 8
            b. Application Submission Deadline:    06/13/2024 at 3:00 PM ET ........... 8
            c. Anticipated Award Date:    No later than September 30, 2024 ............... 9
            d. Other Key Dates ...................................................................................... 9
      2.    Agreeing to Terms and Conditions of the Award ........................................ 10
      3.    Address to Request Application Package ..................................................... 10
      4.    Requirements: Obtain a Unique Entity Identifier (UEI) and Register in the System for
            Award Management (SAM.gov) ................................................................... 10
      5.    Steps Required to Obtain a UEI, Register in SAM.gov, and Submit an Application .... 10
      6.    Electronic Delivery ...................................................................................... 11
      7.    How to Register to Apply ............................................................................. 12

a. General Instructions: ............................................................................. 12
b. Obtain an UEI Number: ......................................................................... 12
c. Obtain Employer Identification Number: ................................................ 12
d. Create a login.gov Account: ................................................................... 12
e. Register with SAM: ................................................................................ 13
f. Register in FEMA GO, Add the Organization to the System, and Establish the AOR: 13

8.  Submitting the Final Application ................................................................... 14
9.  Timely Receipt Requirements and Proof of Timely Submission .................. 14
10. Content and Form of Application Submission .............................................. 14
    a. Standard Required Application Forms and Information ......................... 14
    b. Program-Specific Required Forms and Information .............................. 15
11. Other Submission Requirements .................................................................. 16
12. Intergovernmental Review ........................................................................... 16
13. Funding Restrictions and Allowable Costs .................................................. 16
    a. Prohibitions on Expending FEMA Award Funds for Covered Telecommunications
    Equipment or Services ............................................................................... 17
    b. Pre-Award Costs ................................................................................... 18
    c. Management and Administration (M&A) Costs ..................................... 19
    d. Indirect Facilities & Administrative (F&A) Costs ................................. 19
    e. Evaluation Costs ................................................................................... 19
    f. Other Direct Costs ................................................................................ 19

E.  Application Review Information ........................................................................ 19
1.  Application Evaluation Criteria .................................................................... 19
    a. Programmatic Criteria .......................................................................... 19
    b. Financial Integrity Criteria ................................................................... 22
    c. Supplemental Financial Integrity Criteria and Review ......................... 22
2.  Review and Selection Process ...................................................................... 22
    a. Security Review .................................................................................... 22
    b. Subrecipient Process ............................................................................. 23
    c. Review and Selection Process ............................................................... 23
    d. Pre-Scoring Process .............................................................................. 23
    e. Technical Evaluation Process ................................................................ 23
    f. Final Ranking of Applications .............................................................. 23

F.  Federal Award Administration Information ....................................................... 23
1.  Notice of Award ............................................................................................ 23
2.  Pass-Through Requirements ......................................................................... 24
3.  Administrative and National Policy Requirements ....................................... 24
    a. DHS Standard Terms and Conditions ................................................... 24
    b. Ensuring the Protection of Civil Rights ................................................ 24
    c. Environmental Planning and Historic Preservation (EHP) Compliance ............... 25
    d. Mandatory Disclosures .......................................................................... 26
4.  Reporting ....................................................................................................... 27
    a. Financial Reporting Requirements ........................................................ 27
    b. Programmatic Performance Reporting Requirements ........................... 27
    c. Closeout Reporting Requirements ......................................................... 28

d. Additional Reporting Requirements.................................................................29
5. Monitoring and Oversight........................................................................................30
G. DHS Awarding Agency Contact Information..................................................................32
1. Contact and Resource Information ..........................................................................32
a. Program Office Contact ...................................................................................32
b. FEMA Grants News ........................................................................................32
c. Grant Programs Directorate (GPD) Award Administration Division .....................32
d. Equal Rights ...................................................................................................32
e. Environmental Planning and Historic Preservation ............................................32
2. Systems Information ..............................................................................................32
a. FEMA GO .......................................................................................................32
H. Additional Information.................................................................................................32
1. Termination Provisions ..........................................................................................32
a. Noncompliance ...............................................................................................33
b. With the Consent of the Recipient ...................................................................33
c. Notification by the Recipient ...........................................................................33
2. Program Evaluation ...............................................................................................33
3. Period of Performance Extensions..........................................................................34
4. Disability Integration ............................................................................................35
5. Conflicts of Interest in the Administration of Federal Awards or Subawards..............36
6. Procurement Integrity ...........................................................................................36
a. Important Changes to Procurement Standards in 2 C.F.R. Part 200 .....................37
b. Competition and Conflicts of Interest ...............................................................37
c. Supply Schedules and Purchasing Programs .....................................................39
d. Procurement Documentation ...........................................................................40
7. Financial Assistance Programs for Infrastructure.....................................................41
a. Build America, Buy America Act ......................................................................41
b. Waivers..........................................................................................................41
c. Definitions .....................................................................................................42
8. Record Retention ..................................................................................................42
a. Record Retention Period ..................................................................................42
b. Types of Records to Retain ..............................................................................43
9. Actions to Address Noncompliance.........................................................................43
10. Audits..................................................................................................................44
11. Payment Information .............................................................................................46
12. Whole Community Preparedness.............................................................................46
12. Report Issues of Fraud, Waste, Abuse ....................................................................46
13. Hazard-Resistant Building Codes ...........................................................................46
Appendix A: Allowable Activities....................................................................................47
Appendix B: Payment Requests and Amendments ...........................................................52

A. **<u>Program Description</u>**
1. **Issued By**
   U.S. Department of Homeland Security (DHS)/Federal Emergency Management Agency (FEMA)/Grant Programs Directorate

2. **Assistance Listing Number**
   97.141

3. **Assistance Listing Title**
   Shelter and Services Program – Competitive (SSP-C)

4. **Funding Opportunity Title**
   Fiscal Year 2024 Shelter and Services - Competitive Program (SSP-C)

5. **Funding Opportunity Number**
   DHS-24-GPD-141-00-99

6. **Authorizing Authority for Program**
   Department of Homeland Security Appropriations Act, 2024, Pub. L. No. 118-47, Title II Security, Enforcement, and Investigations, U.S. Customs and Border Protection, Operations and Support.

7. **Appropriation Authority for Program**
   Department of Homeland Security Appropriations Act, 2024, Pub. L. No. 118-47, Title II Security, Enforcement, and Investigations, U.S. Customs and Border Protection, Operations and Support.

8. **Announcement Type**
   Initial

9. **Program Category**
   CBP Human Services

10. **Program Overview, Objectives, and Priorities**

a. **Overview**
   As directed by Congress, SSP makes federal funds available to enable non-federal entities to off-set allowable costs incurred for services associated with noncitizen migrants recently encountered and released by DHS.[1] As stated in the FY 2024 appropriation, the primary purpose of SSP is to "reliev[e] overcrowding in short-term holding facilities of [CBP]." Recipients of SSP may also seek grant funds for renovations or costs associated with

---

[1] The term Encounter as used in this announcement means: An encounter is an apprehension by a U.S. Border Patrol (Title 8) Agent or a determination of inadmissibility by a CBP Officer at a Port of Entry (Title 8).

modifications to existing facilities in support of individuals who have recently been released from the custody of CBP. Refer to Appendix A of the NOFO for allowable activities.

The Department of Homeland Security (DHS) has committed to bolstering the capacity of non-federal entities to receive noncitizens after they have been processed by U.S. Customs and Border Protection (CBP) and released from a DHS facility. DHS is committed to ensuring appropriate coordination with and support for state, local, and community leaders to help mitigate increased impacts to their communities as outlined in the DHS Plan for Southwest Border Security and Preparedness, issued on April 26, 2022, and updated on December 13, 2022.

The FY 2024 appropriation provided $650 million for SSP, including FEMA administrative costs. This NOFO announces $340.9 million to be distributed through a competitive application process, as described below.  The second FY 2024 SSP NOFO, distributing $275 million in funds through an allocated methodology, will be announced separately.

b. **Goals, Objectives, and Priorities**
The goal of SSP is the safe, orderly, and humane release of noncitizen migrants from DHS short-term holding facilities.

The objectives are:
- To provide funding to non-federal entities that serve noncitizen migrants recently released from DHS custody to temporarily provide shelter, food, transportation, acute medical care, personal hygiene supplies, and labor necessary to provide these services; and,
- To provide funding to non-federal entities to increase their capacity to temporarily shelter noncitizen migrants recently released from DHS custody, including renovations and modifications to existing facilities.

c. **Alignment to Program Purpose and the DHS and FEMA Strategic Plan**
SSP supports the FY 2020–2024 DHS Strategic Plan, Goal 5: Strengthen Preparedness and Resilience, Objective 5.1: Build a National Culture of Preparedness, and the 2022-2026 FEMA Strategic Plan Goal 3: Promote and Sustain a Ready FEMA and Prepared Nation.

11. **Performance Measures**
Performance measures for SSP awardees are:
- Number of meals provided.
- Number of nights of lodging provided.
- Number of noncitizen migrants transported.
- Number of acute medical care items provided, by type.
- Number of personal hygiene supplies provided, by type.
- Number of hours of labor paid to manage cases to provide these services.
- Number of clothing items provided.
- Number of noncitizen migrants served through translation services.
- Number of noncitizen migrants served through outreach activities.

- Number of renovation or modifications to existing facilities projects completed.

FEMA will calculate and analyze the above metrics through a review of performance progress reports and award monitoring to ensure that the funds are expended for their intended purpose and achieve the stated outcomes in the grant application.

**B.  Federal Award Information**
**1.  Available Funding for the NOFO**:                         **$340,900,000**
At least one primary service is required for all eligible applicants. See Appendix A for all allowable activities. Applicants that request less than $10,000 will not receive funding.  No single applicant will be awarded more than 10% of the total funding available under this NOFO.

**2.  Projected Number of Awards**:                          **N/A**

**3.  Period of Performance:**                              **36 months**
Extensions to the period of performance (POP) are allowed. For additional information on period of performance extensions, please refer to Section H of this NOFO.

**4.  Projected Period of Performance Start Date(s)**:      October 1, 2023

**5.  Projected Period of Performance End Date(s)**:        September 30, 2026

**6.  Projected Budget Period(s)**
There will be only a single budget period with the same start and end dates as the period of performance.

**7.  Funding Instrument Type:**                            Grant

**C.  Eligibility Information**
**1.  Eligible Applicants**
- Local governments as defined by 2 C.F.R. § 200.1
- Indian Tribes as defined by 2 C.F.R. § 200.1
- Nonprofit organizations as defined by 2 C.F.R. § 200.1
- The 50 states of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any agency or instrumentality thereof exclusive of local governments. (The term "state" or "state government" where used in this NOFO refers to these entities.)

**2.  Applicant Eligibility Criteria**
Each eligible applicant may submit only one SSP-C grant application to FEMA.

An eligible applicant, through their application, must demonstrate their capacity, either internally or through a partnership, to carry out each SSP-C allowable activity for which they propose funding.

Funding will **not** be provided to any applicant that charges any noncitizen migrant for services.

3. **Subawards and Beneficiaries**
   a. ***Subaward Allowability***
      Under the FY 2024 SSP-C, eligible subapplicants may apply to and receive subawards from a non-federal entity that is applying for and receiving an SSP-C award directly from FEMA.

   b. ***Subrecipient Eligibility***
      Subapplicants must meet the following criteria to be eligible:

      1. Are one of the following entities:
         a. Local governments as defined by 2 C.F.R. § 200.1
         b. Indian Tribes as defined by 2 C.F.R. § 200.1
         c. Nonprofit organizations as defined by 2 C.F.R. § 200.1
         d. The 50 states of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any agency or instrumentality thereof exclusive of local governments (the term "state" or "state government" where used in this NOFO refers to these entities).
      2. Must have the capacity to perform each SSP allowable activity as proposed by the applicant.

   c. ***Other Subaward Information (if applicable)***
      The other parts of this NOFO that discuss requirements or restrictions specifically related to subawards/subrecipients are: cost share or match, Unique Entity Identifier, content and form of application submission, funding restrictions, and allowable costs (Appendix A.), management and administration costs, and indirect costs.

   d. ***Beneficiaries or Participants***
      This NOFO and any subsequent federal awards create no rights or causes of action for any participant or beneficiary.

4. **Other Eligibility Criteria/Restrictions**
   Not applicable

5. **Maintenance of Effort (MOE)**
   Maintenance of Effort is not required.

6. **Cost Share or Match**
   Cost share or match is not required or allowed.

D. **Application and Submission Information**
1. **Key Dates and Times**

   a. ***Application Start Date:***                    **04/12/2024 at 12 p.m. ET**

   b. ***Application Submission Deadline:***           **06/13/2024 at 3 p.m. ET**

All applications **must** be received by the established deadline.

FEMA's Grants Outcomes System (FEMA GO) automatically records proof of timely submission and the system generates an electronic date/time stamp when FEMA GO successfully receives the application. The individual with the Authorized Organization Representative role that submitted the application will also receive the official date/time stamp and a FEMA GO tracking number in an email serving as proof of their timely submission. For additional information on how an applicant will be notified of application receipt, see the subsection titled "Timely Receipt Requirements and Proof of Timely Submission" in Section D of this NOFO.

**FEMA will not review applications that are received after the deadline or consider these late applications for funding**. FEMA may, however, extend the application deadline on request for any applicant who can demonstrate that good cause exists to justify extending the deadline. Good cause for an extension may include technical problems outside of the applicant's control that prevent submission of the application by the deadline, other exigent or emergency circumstances, or statutory requirements for FEMA to make an award.

**Applicants experiencing technical problems outside of their control must notify FEMA as soon as possible and before the application deadline**. Failure to timely notify FEMA of the issue that prevented the timely filing of the application may preclude consideration of the award. "Timely notification" of FEMA means the following: prior to the application deadline and within 48 hours after the applicant became aware of the issue.

A list of FEMA contacts can be found in Section G of this NOFO, "DHS Awarding Agency Contact Information." For technical assistance with the FEMA GO system, please contact the FEMA GO Helpdesk at femago@fema.dhs.gov or (877) 585-3242, Monday through Friday, 9 a.m. – 6 p.m. Eastern Time (ET). For programmatic or grants management questions, please contact your Program Analyst or Grants Management Specialist. If applicants do not know who to contact or if there are programmatic questions or concerns, please contact the FEMA Grants News by phone at (800) 368-6498 or by email at fema-grants-news@fema.dhs.gov, Monday through Friday, 9 a.m. – 5 p.m. ET.

c.    *Anticipated Award Date:*                    No later than September 30, 2024

d.    *Other Key Dates*

| Event | Suggested Deadline for Completion |
|---|---|
| Obtaining Unique Entity Identifier (UEI) number | Four weeks before actual submission deadline |
| Obtaining a valid Employer Identification Number (EIN) | Four weeks before actual submission deadline |
| Creating an account with login.gov | Four weeks before actual submission deadline |
| Registering in SAM or updating SAM registration | Four weeks before actual submission deadline |
| Registering Organization in FEMA GO | Prior to beginning application |

*FY 2024 Shelter and Services Program – Competitive (SSP-C)*

| Event | Suggested Deadline for Completion |
|---|---|
| Submitting complete application in FEMA GO | By the submission deadline |

2. **Agreeing to Terms and Conditions of the Award**
   By submitting an application, applicants agree to comply with the requirements of this NOFO and the terms and conditions of the award, should they receive an award.

3. **Address to Request Application Package**
   Applications are processed through the FEMA GO system. To access the system, go to FEMA GO.

   Hard copies of the NOFO can be downloaded at Grants.gov or obtained via email from the Awarding Office points of contact listed in Section G of this NOFO, "DHS Awarding Agency Contact Information" or by TTY (800) 462-7585.

4. **Requirements: Obtain a Unique Entity Identifier (UEI) and Register in the System for Award Management** (SAM.gov)
   Each applicant, unless they have a valid exception under 2 CFR §25.110, must:
   1) Be registered in SAM.gov before application submission.
   2) Provide a valid UEI in its application.
   3) Continue to always maintain an active System for Award Management (SAM) registration with current information during the Federal Award process.

   Note: Per 2 C.F.R. § 25.300, subrecipients are NOT required to go through the full SAM registration process. First-tier subrecipients (meaning entities receiving funds directly from the recipient) are only required to obtain a UEI through SAM, but they are not required to complete the full SAM registration to obtain a UEI. Recipients may not make subawards unless the subrecipient has obtained and provided the UEI.

   Lower-tier subrecipients (meaning entities receiving funds passed through by a higher-tier subrecipient) are not required to have a UEI and are not required to register in SAM. Applicants are also not permitted to require subrecipients to register in SAM.

5. **Steps Required to Obtain a UEI, Register in SAM.gov, and Submit an Application**
   Applying for an award under this program is a multi-step process and requires time to complete. Applicants are encouraged to register early as the registration process can take four weeks or more to complete. Therefore, registration should be done in sufficient time to ensure it does not impact your ability to meet required submission deadlines.
   Please review the table above for estimated deadlines to complete each of the steps listed. Failure of an applicant to comply with any of the required steps before the deadline for submitting an application may disqualify that application from funding.

   To apply for an award under this program, all applicants must:

*FY 2024 Shelter and Services Program – Competitive (SSP-C)*

a. Apply for, update, or verify their Employer Identification Number (EIN) from the Internal Revenue Service;
b. In the application, provide an UEI number;
c. Have an account with login.gov;
d. Register for, update, or verify their SAM account and UEI and ensure the account is active before submitting the application;
e. Register in FEMA GO, add the organization to the system, and Authorized Organization Representative (AOR). The organization's electronic business point of contact (EBiz POC) from the SAM registration may need to be involved in this step. For step-by-step instructions, see the FEMA GO Startup Guide.
f. Submit the complete application in FEMA GO; and
g. Continue to maintain an active SAM registration with current information at all times during which it has an active federal award or an application or plan under consideration by a federal awarding agency. As part of this, applicants must also provide information on an applicant's immediate and highest-level owner and subsidiaries, as well as on all predecessors that have been awarded federal contracts or federal financial assistance within the last three years, if applicable.

Applicants are advised that FEMA may not make a federal award until the applicant has complied with all applicable SAM requirements. Therefore, an applicant's SAM registration must be active not only at the time of application, but also during the application review period and when FEMA is ready to make a federal award. Further, as noted above, an applicant's or recipient's SAM registration must remain active for the duration of an active federal award. If an applicant's SAM registration is expired at the time of application, expires during application review, or expires any other time before award, FEMA may determine that the applicant is not qualified to receive a federal award and use that determination as a basis for making a federal award to another applicant.

Per 2 C.F.R. § 25.110(c)(2)(iii), if an applicant is experiencing exigent circumstances that prevents it from obtaining an UEI number and completing SAM registration prior to receiving a federal award, the applicant must notify FEMA as soon as possible by contacting fema-grants-news@fema.dhs.gov and providing the details of the circumstances that prevent completion of these requirements. If FEMA determines that there are exigent circumstances and FEMA has decided to make an award, the applicant will be required to obtain an UEI number, if applicable, and complete SAM registration within 30 days of the federal award date.

Further, following acceptance of a federal award, a recipient's SAM registration must remain active for the duration of the award. If a recipient's SAM registration expires during the federal award period of performance, FEMA may impose one or more remedy for noncompliance (see 2 C.F.R. § 200.339), which could include terminating the federal award.

**6. Electronic Delivery**
DHS is participating in the Grants.gov initiative to provide the grant community with a single site to find and apply for grant funding opportunities. DHS encourages or requires applicants

to submit their applications online through Grants.gov, depending on the funding opportunity.

For this funding opportunity, FEMA requires applicants to submit applications through FEMA GO.

**7. How to Register to Apply**

a. *General Instructions:*
Registering and applying for an award under this program is a multi-step process and requires time to complete. Read the instructions below about registering to apply for FEMA funds. Applicants should read the registration instructions carefully and prepare the information requested before beginning the registration process. Reviewing and assembling the required information before beginning the registration process will alleviate last-minute searches for required information.

**The registration process can take up to four weeks to complete.** To ensure an application meets the deadline, applicants are advised to start the required steps well in advance of their submission.

Organizations must have an UEI number, an EIN, and an active SAM registration to apply for a federal award under this funding opportunity.

b. *Obtain an UEI Number:*
All entities applying for funding, including renewal funding, must have a UEI number. Applicants must enter the UEI number in the applicable data entry field on the SF-424 form.

For more detailed instructions for obtaining a UEI number, refer to: SAM.gov.

c. *Obtain Employer Identification Number:*
All entities applying for funding must provide an Employer Identification Number (EIN). The EIN can be obtained from the IRS by visiting: Apply for an Employer Identification Number (EIN) Online.

d. *Create a login.gov Account:*
Applicants must have a login.gov account in order to register with SAM or update their SAM registration. Applicants can create a login.gov account by visiting: login.gov.

Applicants only have to create a login.gov account once. For applicants that are existing SAM users, use the same email address for the login.gov account as with SAM.gov so that the two accounts can be linked.

For more information on the login.gov requirements for SAM registration, refer to: SAM.gov.

e.  ***Register with SAM:***

Applicants applying online through FEMA GO must register with SAM. Failure to register with SAM will prevent an applicant from completing the application in FEMA GO. SAM registration must be renewed annually. Organizations will be issued a UEI number with the completed SAM registration.

For more detailed instructions for registering with SAM, refer to [Step 2: Register with SAM](Step 2: Register with SAM).

Note: Per 2 C.F.R. § 25.200, applicants must also provide the applicant's immediate and highest-level owner, subsidiaries, and predecessors that have been awarded federal contracts or federal financial assistance within the last three years, if applicable.

I.  ADDITIONAL **SAM** REMINDERS

Existing SAM.gov account holders should check their account to make sure it is "ACTIVE." SAM registration should be completed at the very beginning of the application period and should be renewed annually to avoid being "INACTIVE." **Please allow plenty of time before the grant application submission deadline to obtain an UEI number and then to register in SAM. It may be four weeks or more after an applicant submits the SAM registration before the registration is active in SAM, and then it may be an additional 24 hours before FEMA's system recognizes the information.**

It is imperative that the information applicants provide is correct and current. Please ensure that your organization's name, address, and EIN are up to date in SAM and that the UEI number used in SAM is the same one used to apply for all other FEMA awards. Payment under any FEMA award is contingent on the recipient's having a current SAM registration.

II.  HELP WITH **SAM**

The SAM quick start guide for new recipient registration and SAM video tutorial for new applicants are tools created by the General Services Administration (GSA) to assist those registering with SAM. If applicants have questions or concerns about a SAM registration, please contact the Federal Service Desk at [https://www.fsd.gov/gsafsd_sp](https://www.fsd.gov/gsafsd_sp) or call toll free (866) 606-8220.

f.  ***Register in FEMA GO, Add the Organization to the System, and Establish the AOR:***

Applicants must register in FEMA GO and add their organization to the system. The organization's electronic business point of contact (EBiz POC) from the SAM registration may need to be involved in this step. For step-by-step instructions, see [FEMA GO Startup Guide.](FEMA GO Startup Guide.)

Note: FEMA GO will support only the most recent major release of the following browsers:
- Google Chrome
- Internet Explorer
- Mozilla Firefox
- Apple Safari
- Microsoft Edge

Users who attempt to use tablet type devices or other browsers may encounter issues with using FEMA GO.

**8. Submitting the Final Application**

Applicants will be prompted to submit the standard application information and any program-specific information required as described in Section D.10 of this NOFO, "Content and Form of Application Submission." The Standard Forms (SF) may be accessed in the Forms tab under the SF-424 family on Grants.gov. Applicants should review these forms before applying to ensure they have all the information required.

After submitting the final application, FEMA GO will provide either an error message or a successfully received transmission in the form of an email sent to the AOR that submitted the application. Applicants using slow internet connections, such as dial-up connections, should be aware that transmission can take some time before FEMA GO receives your application.

For additional application submission requirements, including program-specific requirements, please refer to the subsection titled "Content and Form of Application Submission" under Section D of this NOFO.

**9. Timely Receipt Requirements and Proof of Timely Submission**

All applications must be completed in FEMA GO by the application deadline. FEMA GO automatically records proof of timely submission and the system generates an electronic date/time stamp when FEMA GO successfully receives the application. The individual with the AOR role that submitted the application will also receive the official date/time stamp and a FEMA GO tracking number in an email serving as proof of their timely submission on the date and time that FEMA GO received the application.

**Applicants who experience system-related issues will be addressed until 3 p.m ET on the date applications are due.** No new system-related issues will be addressed after this deadline. Applications not received by the application submission deadline will not be accepted.

**10. Content and Form of Application Submission**

**a.** *Standard Required Application Forms and Information*

The following forms or information are required to be submitted via FEMA GO. The Standard Forms (SF) are also available at SF-424 family on Grants.gov.

- **SF-424, Application for Federal Assistance**
- **Grants.gov Lobbying Form, Certification Regarding Lobbying**
- **SF-424A, Budget Information (Non-Construction)**
  - **For construction under an award, submit SF-424C, Budget Information (Construction)**, in addition to or instead of SF-424A
- **SF-424B, Standard Assurances (Non-Construction)**
  - **For construction under an award, submit SF-424D, Standard Assurances (Construction)**, in addition to or instead of SF-424B
- **SF-LLL, Disclosure of Lobbying Activities**

b. *Program-Specific Required Forms and Information*
The following program-specific forms or information are required to be submitted in FEMA GO:

- **SSP-C Application Worksheet:** Additional certifications for the funds requested, budget instructions, supporting documentation, as applicable, and any subapplicant information known at the time of application submission. Applicants must use the provided budget worksheet. Applicants must upload their completed worksheet to the Project Worksheet section in FEMA GO as an Excel file with the naming convention SSPC_Application_Worksheet. Incomplete worksheets may not be accepted. Additionally, applicants may be requested to provide supporting documentation for one or more applicant-provided responses in the SSP-C Application Worksheet. Failure to respond to DHS's request for supporting documentation may result in partial or complete disqualification of an application.

- **For nonprofit applicants only:** Submit evidence entity meets definition of nonprofit organization in 2 CFR 200.1; for example, submit an IRS Form 990 with your application if you have previously filed one. Applicants must upload IRS Form 990s to the Additional Attachment (General Attachment) section in FEMA GO as a PDF with the naming convention SSPC_IRS_990_Form.

- **For applicants with known nonprofit organization subapplicants only:** Applicants must verify the nonprofit status of subapplicants and retain a copy of the documentation submitted by the subapplicant(s) as evidence of their nonprofit status for auditing purposes.

- **For renovations or modifications to rented real property only:** If an applicant or subapplicant is requesting funding for renovations or modifications to rented real property, submit rental agreement addressing space, any limitations of use, and rental period. Applicants must upload documents to the Additional Attachment (General Attachment) section in FEMA GO as a PDF with the naming convention SSPC_Rental_Property. Upload one document for each individual rental agreement.

- **For Reimbursement Funding Requests Only:**
  - **Alien Registration Number (A-Number) or evidence of DHS processing (e.g., I-94, I-385, I-860, I-862):** A summary list reporting A-Numbers, names, corresponding DHS release dates of the served population, and corresponding service dates of the served population. Please do not send copies of the forms themselves. Applicants must use the provided A Number Submission Template to populate the information, then upload to the Project Worksheet Section in FEMA as an Excel file with the naming convention SSPC_ANumber_Worksheet. Recipients must ensure that full A-Numbers and accurate dates of service are provided.
  - **Proof of Purchase Documentation**:
    - For each requested allowable activity service category (See Appendix A), provide one example of proof of payment (e.g., canceled check, credit card statement, etc.) and a receipt reflecting the purchase. Applicants must upload proofs of payment and receipts to the Additional Attachment

(General Attachment) section in FEMA GO as a PDF with the naming convention SSPC_Costs_Under_5000. Upload one document inclusive of all proofs of payment and receipts under $5,000. In the document, identify which proofs of payment and receipts are for which allowable activity service category.

- For each purchase or allowable cost of $5,000 or more, provide proof of payment and a receipt reflecting the purchase or other documentation demonstrating calculation and allocation of cost in accordance with 2 CFR Part 200, Subpart E. Applicants must upload proofs of payment and receipts to the Additional Attachment (General Attachment) section in FEMA GO as a PDF with the naming convention SSPC_Costs_Over_5000. Upload one document inclusive of all proofs of payment and receipts $5,000 or more. In the document, identify which proofs of payment and receipts are for which allowable activity service category (See Appendix A).

- Note: This information will be required when recipients draw down funds.

**11. Other Submission Requirements**

Notice to applicants applying with known nonprofit organizations with 501(c) (3) IRS status subapplicants:

For nonprofit organizations that have been approved as exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, FEMA may request a copy of IRS's approval of the applicant's or subapplicant's tax exempt status (e.g., a determination letter or affirmation letter).

Applicants requesting pre-award costs must follow the instructions outlined in Section D.13.b. Pre-Award Costs.

**12. Intergovernmental Review**

An intergovernmental review may be required. Applicants must contact their state's Single Point of Contact (SPOC) to comply with the state's process under Executive Order 12372 (See Executive Order 12372; Intergovernmental Review (SPOC List)).

**13. Funding Restrictions and Allowable Costs**

Federal funds made available through this award may be used for the purpose set forth in this NOFO and the terms and conditions of the award and must be consistent with the statutory authority for the award. Award funds may not be used for matching funds for any other federal awards, lobbying, or intervention in federal regulatory or adjudicatory proceedings. In addition, federal funds may not be used to sue the Federal Government or any other government entity.

All costs charged to federal awards (including both federal funding and any non-federal matching or cost sharing funds) must comply with applicable statutes, rules and regulations, and policies, this NOFO, and the terms and conditions of the federal award. They must also comply with the Uniform Administrative Requirements, Cost Principles, and Audit Requirements at 2 C.F.R. Part 200 unless otherwise indicated in the NOFO or the terms and

conditions of the federal award. This includes, among other requirements, that costs must be incurred, and products and services must be delivered within the budget period. See 2 C.F.R. § 200.403(h) (referring to budget periods, which for FEMA awards under this program is the same as the period of performance).

The following identifies a list of activities for which a recipient may not use federal funds and any cost sharing or matching funds under federal awards:

- Matching or cost sharing requirements for other federal grants and cooperative agreements (see 2 C.F.R. § 200.306)
- Lobbying or other prohibited activities under 18 U.S.C. § 1913 or 2 C.F.R. § 200.450
- Prosecuting claims against the federal government or any other government entity (see 2 C.F.R. § 200.435) See subsections below for information on any other funding restrictions.

SSP funds may not be used for costs associated with new construction or to purchase real estate.

Costs associated with renovations or modifications to existing facilities may not exceed $250,000.00 for the entire application budget. All activities and programs funded by FEMA, including grant-funded projects, must comply with federal Environmental and Historic Preservation laws, Executive Orders, regulations, and policies, as applicable. See Section F.3.c. Environmental Planning and Historic Preservation Compliance.

a. ***Prohibitions on Expending FEMA Award Funds for Covered Telecommunications Equipment or Services***
Recipients, subrecipients, and their contractors must comply with the prohibitions set forth in Section 889 of the [John S. McCain National Defense Authorization Act](#) for Fiscal Year 2019, Pub. L. No. 115-232 (2018) (FY 2019 NDAA) and 2 C.F.R. §§ 200.216, 200.327, 200.471, and Appendix II to 2 C.F.R. Part 200. The FY 2019 NDAA and these regulations, as they apply to recipients, subrecipients, and their contractors and subcontractors, provide for two distinct prohibitions: (1) prevent the use of federal award funds to procure or obtain covered telecommunications equipment or services; and (2) prevent the use of federal award funds to contract with an entity that uses such covered telecommunications equipment or services. Guidance is available at [FEMA Policy #405-143-1 - Prohibitions on Expending FEMA Award Funds for Covered Telecommunications Equipment or Services](#)

Additional guidance is available at [Contract Provisions Guide: Navigating Appendix II to Part 200 - Contract Provisions for Non-Federal Entity Contracts Under Federal Awards (fema.gov)](#).

FEMA recipients and subrecipients **may not** use any FEMA funds under open or new awards to:

- Procure or obtain any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology of any system;

- Enter into, extend, or renew a contract to procure or obtain any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology of any system; or
- Enter into, extend, or renew contracts with entities that use covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system.

## I. REPLACEMENT EQUIPMENT AND SERVICES

FEMA grant funding may be permitted to procure replacement equipment and services impacted by this prohibition, provided the costs are otherwise consistent with the requirements of the NOFO.

## II. DEFINITIONS

Per section 889(f)(2)-(3) of the FY 2019 NDAA and 2 C.F.R. § 200.216, covered telecommunications equipment or services means:

   i.   Telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation, (or any subsidiary or affiliate of such entities);
   ii.  For the purpose of public safety, security of Government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video surveillance and telecommunications equipment produced by Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities);
   iii. Telecommunications or video surveillance services provided by such entities or using such equipment; or
   iv.  Telecommunications or video surveillance equipment or services produced or provided by an entity that the Secretary of Defense, in consultation with the Director of National Intelligence or the Director of the Federal Bureau of Investigation, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the People's Republic of China.

Examples of the types of products covered by this prohibition include phones, internet, video surveillance, and cloud servers when produced, provided, or used by the entities listed in the definition of "covered telecommunications equipment or services." See 2 C.F.R. § 200.471.

## b. *Pre-Award Costs*

Pre-award costs are costs incurred prior to the effective date of the federal award or subaward. Pre-award costs are allowable only with the prior written approval of DHS/FEMA and if they are included in the award agreement. To request pre-award costs, applicants must include the costs with their application. The application must outline what the pre-award costs are for and include a detailed budget break-out of all costs included in the funding request.

The pre-award cost must meet the requirements of 2 C.F.R Part 200.458, which provides that the cost must be necessary for efficient and timely performance of the grant's scope of work.

FEMA reserves the right to re-evaluate and disallow pre-award costs at time of award monitoring if it is later determined that the services were not properly procured or do not satisfy the requirements of 2 C.F.R Part 200.458.

**c.  *Management and Administration (M&A) Costs***
Recipients may expend up to 5% of an SSP award for allowable M&A costs. Subrecipients may also expend up to 5% of their SSP subaward for allowable M&A costs. These may include services providing grants management, including grant application preparation. These may also include recordkeeping (e.g., IT assistance (contracts and external support) and costs associated with creating a database and/or tracking system to assist with managing SSP funds as well as cybersecurity assessments and enhancements), etc.

**d.  *Indirect Facilities & Administrative (F&A) Costs***
Indirect costs are allowable under this program as described in 2 C.F.R. Part 200, including 2 C.F.R. § 200.414. Indirect (F&A) costs (IDC) mean those costs incurred for a common or joint purpose benefitting more than one cost objective and not readily assignable to the cost objectives specifically benefitted, without effort disproportionate to the results achieved. IDCs are allowable by the recipient [and subrecipients] as described in 2 C.F.R. Part 200, including 2 C.F.R. § 200.414. Applicants with a current negotiated IDC rate agreement who desire to charge indirect costs to a federal award must provide a copy of their IDC rate agreement with their applications. Not all applicants are required to have a current negotiated IDC rate agreement. Applicants that are not required to have a negotiated IDC rate agreement but are required to develop an IDC rate proposal must provide a copy of their proposal with their applications. Applicants who do not have a current negotiated IDC rate agreement (including a provisional rate) and wish to charge the de minimis rate must reach out to FEMA for further instructions. Applicants who wish to use a cost allocation plan in lieu of an IDC rate proposal must reach out to the FEMA Point of Contact for further instructions. As it relates to the IDC for subrecipients, a recipient must follow the requirements of 2 C.F.R. §§ 200.332 and 200.414 in approving the IDC rate for subawards.

For information on procedures for establishing indirect cost rates, see FEMA's Preparedness Grants Manual.

**e.  *Evaluation Costs***
Evaluation costs are allowable.

**f.  *Other Direct Costs***
Refer to Appendix A for a description of eligible activities.

**E.  Application Review Information**
**1.  Application Evaluation Criteria**
**a.  *Programmatic Criteria***
The evaluation criteria and weights for the pre-scoring process are listed in the table below. The weights listed out per criteria indicate the maximum quantity an applicant can get for each criterion. For example, under Criteria 1, an applicant would receive the entire value (10% Weight) if the entirety (100%) of the applicant's humanitarian services budget goes directly to serving noncitizen migrants.

| Points Possible | Criteria | Weight |
|---|---|---|
| 100 | 1. What percent of the organization's annualized humanitarian services budget goes directly to noncitizen migrant services? Humanitarian services are defined as costs incurred by providing water, food, hygiene support, medical care, shelter, or safety to vulnerable or crisis-impacted populations.<br><br>Points will be assigned on a standard scale, where the percent = points, e.g. 50% = 50 points. | 10% |
| 100 | 2. Total possible capacity to serve noncitizen migrants (NCMs) per day.<br><br>Points will be assigned on a normalized standard scale, with the applicant with the minimum capacity receiving 10 points, the applicant with the maximum capacity receiving 100 points, and the remaining applicants distributed along the scale according to their capacity. | 20% |
| 100 | 3. Type of services requested for funding.<br><br>Applicants will only receive points if a specific primary service meets 10% or more of their submitted budget. Secondary services do not have a minimum percentage to receive points.<br><br>**Types of Service & Recommended Points:**<br>• Shelter (primary): 15 points<br>• Food (primary): 15 points<br>• Transportation from DHS (primary), 12 points<br>• Transportation from service provider to service provider (primary): 10 points<br>• Onward destination transportation (primary): 7 points<br>• Medical (primary): 7 points<br>• Personal Hygiene (primary): 7<br>• Labor for primary services (primary): 7<br>• Renovations/modifications to existing facilities: 4 points<br>• Clothing: 4 points<br>• Outreach information: 4<br>• Translation services: 4<br>• Labor for secondary services: 4 points<br>• Total: 100 points | 15% |

| 100 | 4. | If the organization currently (within the last 30 days) provides services to noncitizen migrants immediately (the same calendar day or no later than the following calendar day) after their release from DHS custody.<br>• Yes, direct services = 100 points<br>• Yes, indirect services = 50 points<br>• No = 0 points<br><br>Direct services are defined as firsthand engagement with NCMs for the explicit purpose of serving food or providing shelter, water, medical care, or transportation.<br><br>Indirect services include any activities supporting a direct service provider, such as furnishing services or goods to direct service providers (e.g., delivering food items). | 20% |
|---|---|---|---|
| 100 | 5. | Location of shelter and service facility(ies). Location is defined as where the entity is primarily providing services, not where the entity is headquartered.<br><br>Points will be assigned on a standard scale using CBP-provided migrant release location and migrant destination location data from the preceding twelve months. This criterion is intended to ensure reasonable balance across border and interior service providers in response to current operational demands and the weight between border and interior localities will be set to achieve this balance. | 35% |

**Bonus Points**
Eligible applications will be awarded two (2) bonus points for each eligible subapplicant included in the SSP-C application worksheet (maximum 10 possible points).

FEMA and CBP will rank all complete applications based on how well they match the evaluation criteria. Answers to the application's activity-specific questions provide information used to determine each application's ranking relative to the program priorities. During the Technical Evaluation Process (see Section E.3.b.2), FEMA and CBP will review applications in a competitive range based on the evaluation criteria to ensure eligibility and compliance with all application requirements provided in this NOFO as well as apply the following programmatic criteria:
• Activities proposed are only those identified as allowable in this NOFO.
• The applicant demonstrates their capacity, either organically or through a partnership, to provide each SSP allowable activity proposed for funding.
• Proposed deliverables are consistent with the objectives and priorities of SSP.
• Project timelines are realistic, attainable, and conform to the performance period of SSP.
• Proposed costs are allowable, reasonable, and cost-effective in relation to proposed activities.

- The applicant possesses the organic capacity to manage a federal award consistent with Federal statutes, regulations, and the terms and conditions of the Federal award.

**b.  *Financial Integrity Criteria***

Prior to making a federal award, FEMA is required by 31 U.S.C. § 3354, as enacted by the Payment Integrity Information Act of 2019, Pub. L. No. 116-117 (2020); 41 U.S.C. § 2313; and 2 C.F.R. § 200.206 to review information available through any Office of Management and Budget (OMB)-designated repositories of governmentwide eligibility qualification or financial integrity information, including whether SAM.gov identifies the applicant as being excluded from receiving federal awards or is flagged for any integrity record submission. FEMA may also pose additional questions to the applicant to aid in conducting the pre-award risk review. Therefore, application evaluation criteria may include the following risk-based considerations of the applicant:

i.   Financial stability.
ii.  Quality of management systems and ability to meet management standards.
iii. History of performance in managing federal award.
iv.  Reports and findings from audits.
v.   Ability to effectively implement statutory, regulatory, or other requirements.

**c.  *Supplemental Financial Integrity Criteria and Review***

Prior to making a federal award where the anticipated total federal share will be greater than the simplified acquisition threshold, currently $250,000:

FEMA is required by 41 U.S.C. § 2313 and 2 C.F.R. § 200.206(a)(2) to review and consider any information about the applicant, including information on the applicant's immediate and highest-level owner, subsidiaries, and predecessors, if applicable, that is in the designated integrity and performance system accessible through the System for Award Management (SAM).

i.   An applicant, at its option, may review information in FAPIIS and comment on any information about itself that a federal awarding agency previously entered.
ii.  FEMA will consider any comments by the applicant, in addition to the other information in FAPIIS, in making a judgment about the applicant's integrity, business ethics, and record of performance under federal awards when completing the review of risk posed by applicants as described in 2 C.F.R. § 200.206.

**2.  Review and Selection Process**

**a.  *Security Review***

The DHS Office of Intelligence and Analysis receives a list of potential SSP recipient organizations, which it reviews against U.S. intelligence community reporting. The security review occurs after the competitive scoring and selection process is complete. The information provided for the security review is limited to the applicant's name and physical address. Any potentially derogatory information, as well as any potentially mitigating information, that could assist in determining whether a security risk exists, is sent to FEMA and is used in making award decisions.

b. ***Subrecipient Process***

For application packages that have subapplicants, the applicant must evaluate subapplicants based on the eligibility criteria (Section C). As part of the review for SSP, the applicant must:

- Conduct a preliminary eligibility review.
- Confirm each subapplicant has the capacity to perform the SSP-allowable activities proposed in the Application Worksheet.
- Populate Tab 3 (Subapplicant Information) of the Application Worksheet for each proposed subapplicant.

c. ***Review and Selection Process***

SSP applications are reviewed through a multi-step process. All applications are pre-scored and ranked based on how well they align with the funding priorities and criteria outlined in this NOFO. A Technical Evaluation panel will then develop a recommendation on which projects, or portions of projects, to award based on the evaluation criteria (see Section E.1.a. Programmatic Criteria).

d. ***Pre-Scoring Process***

The application undergoes a pre-scoring process based on the evaluation criteria. All information should comply with program requirements as stated in this NOFO and statutory funding limitations. Applications will be ranked as a result of their evaluation criteria score.

e. ***Technical Evaluation Process***

FEMA will determine a competitive range based on application submissions and funding. Applications representing that competitive range will undergo a Technical Review by a panel of subject matter experts from CBP, FEMA, and other parts of DHS with experience in noncitizen migration and grants management before being recommended for award. FEMA will evaluate applications through a series of internal review processes for eligibility and completeness. Requests may be recommended for partial funding based on findings made during this assessment.

f. ***Final Ranking of Applications***

Once the Technical Evaluation Process is complete, a final ranking of applications will be created. The Technical Review Panel will use the final results to make funding recommendations to the Secretary of Homeland Security. All final funding determinations will be made by the Secretary of Homeland Security, who retains the discretion to consider other factors and information, such as indicators of the greatest need to provide services to the greatest number of noncitizen migrants to decompress DHS facilities, in addition to the Technical Review Panel's funding recommendations.

F. **Federal Award Administration Information**

1. **Notice of Award**

Before accepting the award, the AOR and recipient should carefully read the award package. The award package includes instructions on administering the grant award and the terms and conditions associated with responsibilities under federal awards. **Recipients must accept all conditions in this NOFO as well as any specific terms and conditions in the Notice of Award to receive an award under this program.**

FEMA will provide the federal award package to the applicant electronically via FEMA GO. Award packages include an Award Letter, Summary Award Memo, Agreement Articles, and Obligating Document. An email notification of the award package will be sent through FEMA's grant application system to the AOR that submitted the application.

Recipients must accept their awards no later than 45 days from the award date. The recipient shall notify FEMA of its intent to accept and proceed with work under the award through the FEMA GO system.

Funds will remain on hold until the recipient accepts the award through the FEMA GO system and all other conditions of the award have been satisfied or until the award is otherwise rescinded. Failure to accept a grant award within the specified timeframe may result in a loss of funds.

**2. Pass-Through Requirements**

FEMA strongly encourages recipients to pass through funds to eligible subrecipients. See Section C.3. Subapplicant Eligibility Criteria.

**3. Administrative and National Policy Requirements**

In addition to the requirements of this section and in this NOFO, FEMA may place specific terms and conditions on individual awards in accordance with 2 C.F.R. Part 200.

**a. *DHS Standard Terms and Conditions***

All successful applicants for DHS grant and cooperative agreements are required to comply with DHS Standard Terms and Conditions, which are available online at: DHS Standard Terms and Conditions.

The applicable DHS Standard Terms and Conditions will be those in effect at the time the award was made What terms and conditions will apply for the award will be clearly stated in the award package at the time of award.

**b. *Ensuring the Protection of Civil Rights***

As the Nation works towards achieving the National Preparedness Goal, it is important to continue to protect the civil rights of individuals. Recipients and subrecipients must carry out their programs and activities, including those related to the building, sustainment, and delivery of core capabilities, in a manner that respects and ensures the protection of civil rights for protected populations.

Federal civil rights statutes, such as Section 504 of the Rehabilitation Act of 1973 and Title VI of the Civil Rights Act of 1964, along with DHS and FEMA regulations, prohibit discrimination on the basis of race, color, national origin, sex, religion, age, disability, limited English proficiency, or economic status in connection with programs and activities receiving federal financial assistance from FEMA, as applicable.

The DHS Standard Terms and Conditions include a fuller list of the civil rights provisions that apply to recipients. These terms and conditions can be found in the DHS Standard Terms

and Conditions. Additional information on civil rights provisions is available at External Civil Rights Division webpage.

Monitoring and oversight requirements in connection with recipient compliance with federal civil rights laws are also authorized pursuant to 44 C.F.R. Part 7 or other applicable regulations.

In accordance with civil rights laws and regulations, recipients and subrecipients must ensure the consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment.

c. ***Environmental Planning and Historic Preservation (EHP) Compliance***
As a federal agency, FEMA is required to consider the effects of its actions on the environment and historic properties to ensure that all activities and programs funded by FEMA, including grant-funded projects, comply with federal EHP laws, Executive Orders, regulations, and policies, as applicable.

**Recipients and subrecipients proposing projects that have the potential to impact the environment, including, but not limited to, the construction of communication towers, modification or renovation of existing buildings, structures, and facilities, or new construction including replacement of facilities, must participate in the FEMA EHP review process.** The EHP review process involves the submission of a detailed project description along with any supporting documentation requested by FEMA in order to determine whether the proposed project has the potential to impact environmental resources including, but not limited to, threatened or endangered species and historic properties; and identify mitigation measures and/or alternative courses of action that may lessen any impact to those resources.

In some cases, FEMA is also required to consult with other regulatory agencies and the public in order to complete the review process. Federal law requires EHP review to be completed before federal funds are released to carry out proposed projects. FEMA may not be able to fund projects that are not in compliance with applicable EHP laws, Executive Orders, regulations, and policies. FEMA may recommend mitigation measures and/or alternative courses of action to lessen any impact to environmental resources and bring the project into compliance with EHP requirements.

Guidance on the EHP process is found at Environmental Planning and Historic Preservation. The site contains links to various documents including those identifying agency EHP responsibilities and program requirements, such as implementation of the National Environmental Policy Act and other EHP laws, regulations, and Executive Orders. DHS and FEMA EHP policy is also found in the EHP Directive & Instruction.

All FEMA actions, including grant-funded actions, must comply with National Flood Insurance Program criteria or any more restrictive federal, state, or local floodplain management standards or building code (44 CFR § 9.11(d)(6)).

All FEMA-funded non-critical actions in 1% annual chance floodplains (also known as 100-year floodplains) that involve new construction or substantial improvement of structures must be elevated, at a minimum, to the lower of:

- Two feet above the 1% annual chance flood elevation (also known as the base flood elevation), in accordance with the Federal Flood Risk Management Standard (FFRMS) "Freeboard Value Approach" (FVA); or

- The 0.2% annual chance flood elevation. Where 0.2% annual chance flood elevations are not available, such actions must be elevated to at least two feet above the 1% annual chance flood elevation.

All FEMA-funded critical actions in 0.2% annual chance floodplains (also known as 500-year floodplains) that involve new construction or substantial improvement of structures must be elevated, at a minimum, to the higher of:

- Three feet above the 1% annual chance flood elevation; or

- The 0.2% annual chance flood elevation. Where 0.2% annual chance flood elevations are not available, such actions must be elevated to at least three feet above the 1% annual chance flood elevation.

See Executive Order 11988, Floodplain Management, as amended by Executive Order 13690, Establishing a Federal Flood Risk Management Standard and a Process for Further Soliciting and Considering Stakeholder Input.

In some cases, FEMA is also required to consult with other regulatory agencies and the public in order to complete the review process. Federal law requires EHP review to be completed before federal funds are released to carry out proposed projects. FEMA may not be able to fund projects that are not in compliance with applicable EHP laws, Executive Orders, regulations, and policies.

DHS and FEMA EHP policy is found in directives and instructions available on the FEMA.gov EHP page, the FEMA website page that includes documents regarding EHP responsibilities and program requirements, including implementation of the National Environmental Policy Act and other EHP regulations and Executive Orders.

The GPD EHP screening form is located on this FEMA Form. Additionally, all recipients under this funding opportunity are required to comply with FEMA GPD EHP Policy Guidance, FEMA Policy #108-023-1.

d. **_Mandatory Disclosures_**
The non-federal entity or applicant for a Federal award must disclose, in a timely manner, in writing to the Federal awarding agency or pass-through entity all violations of Federal criminal law involving fraud, bribery, or gratuity violations potentially affecting the Federal award. (2CFR 200.113)

Please note applicants and recipients may report issues of fraud, waste, abuse, and mismanagement, or other criminal or noncriminal misconduct to the Office of Inspector General (OIG) Hotline. The toll-free numbers to call are 1-800-323-8603, and TTY 1-844-889-4357.

**4. Reporting**

Recipients are required to submit various financial and programmatic reports as a condition of award acceptance. Future awards and funds drawdown may be withheld if these reports are delinquent.

**a. *Financial Reporting Requirements***

**I. FEDERAL FINANCIAL REPORT (FFR)**

Recipients must report obligations and expenditures through the FFR form (SF-425) to FEMA.

Recipients may review the Federal Financial Reporting Form (FFR) (SF-425) at Grants.gov Post-Award Reporting Forms webpage.

Recipients must file the FFR electronically using FEMA GO.

**II. FFR REPORTING PERIODS AND DUE DATES**

An FFR must be submitted quarterly throughout the POP, including partial calendar quarters, as well as in periods where no grant award activity occurs. The final FFR is due within 120 calendar days after the end of the POP. Future awards and fund drawdowns may be withheld if these reports are delinquent, demonstrate lack of progress, or are insufficient in detail.

Except for the final FFR due at 120 days after the end of the POP for purposes of closeout, the following reporting periods and due dates apply for the FFR:

| Reporting Period | Report Due Date |
|---|---|
| October 1 – December 31 | January 30 |
| January 1 – March 31 | April 30 |
| April 1 – June 30 | July 30 |
| July 1 – September 30 | October 30 |

**b. *Programmatic Performance Reporting Requirements***

**I. PERFORMANCE PROGRESS REPORT (PPR)**

Recipients are required to submit a performance progress report on a quarterly basis throughout the POP through FEMA GO, including partial calendar quarters, as well as in periods where no grant award activity occurs. PPRs are due 30 calendar days after the end of each reporting period. The final PPR is due within 120 calendar days after the end of the POP.

The report shall include:

- Quantitative data for all applicable SSP performance measures (e.g., how many nights of congregate shelter, how many meals served);
- Description of activities during the reporting period, as applicable; and,
- Narrative summaries of SSP funding impacts and any relevant organizational partnerships.

## II. PPR PERIODS AND DUE DATES (PPR)

The following reporting periods and due dates apply for the PPR:

| Reporting Period | Report Due Date |
|---|---|
| October 1–December 31 | January 30 |
| January 1–March 31 | April 30 |
| April 1–June 30 | July 30 |
| July 1–September 30 | October 30 |

### c. *Closeout Reporting Requirements*

### I. CLOSEOUT REPORTING

Within 120 calendar days after the end of the period of performance for the prime award or after an amendment has been issued to close out an award before the original POP ends, recipients must liquidate all financial obligations and must submit the following:

  i.   The final request for payment, if applicable.
  ii.  The final FFR (SF-425).
  iii. The final progress report detailing all accomplishments, including a narrative summary of the impact of those accomplishments throughout the period of performance. If applicable the recipient must include with the final progress report an inventory of all construction projects.
  iv.  Other documents required by this NOFO, terms and conditions of the award, or other FEMA guidance. If the final FFR and performance report periods coincide with the end of the period of performance, FEMA has discretion under 2 C.F.R. Part 200 to waive the last quarterly/semiannual/annual reports and only require the final FFR and performance report for closeout purposes. The recipient is responsible for returning any balances of unobligated or unliquidated funds that have been drawn down that are not authorized to be retained per 2 C.F.R. § 200.344(d).

In addition, pass-through entities are responsible for closing out their subawards as described in 2 C.F.R. § 200.344; subrecipients are still required to submit closeout materials within 90 calendar days of the period of performance end date. When a subrecipient completes all closeout requirements, pass-through entities must promptly complete all closeout actions for subawards in time for the recipient to submit all necessary documentation and information to FEMA during the closeout of the prime award.

After the prime award closeout reports have been reviewed and approved by FEMA, a closeout notice will be completed to close out the grant. The notice will indicate the period of performance as closed, list any remaining funds that will be deobligated, and address the requirement of maintaining the grant records for at least three years from the date of the final

FFR. The record retention period may be longer, such as due to an audit or litigation, for equipment or real property used beyond the period of performance, or due to other circumstances outlined in 2 C.F.R. § 200.334.

The recipient is responsible for refunding to FEMA any balances of unobligated cash that FEMA paid that are not authorized to be retained per 2 C.F.R. § 200.344(d).

## II. ADMINISTRATIVE CLOSEOUT

Administrative closeout is a mechanism for FEMA to unilaterally move forward with closeout of an award using available award information in lieu of final reports from the recipient per 2 C.F.R. § 200.344(h)-(i). It is a last resort available to FEMA, and if FEMA needs to administratively close an award, this may negatively impact a recipient's ability to obtain future funding. This mechanism can also require FEMA to make cash or cost adjustments and ineligible cost determinations based on the information it has, which may result in identifying a debt owed to FEMA by the recipient.

When a recipient is not responsive to FEMA's reasonable efforts to collect required reports needed to complete the standard closeout process, FEMA is required under 2 C.F.R. § 200.344(h) to start the administrative closeout process within the regulatory timeframe. FEMA will make at least three written attempts to collect required reports before initiating administrative closeout. If the recipient does not submit all required reports in accordance with 2 C.F.R. § 200.344, this NOFO, and the terms and conditions of the award, FEMA must proceed to administratively close the award with the information available within one year of the period of performance end date. Additionally, if the recipient does not submit all required reports within one year of the period of performance end date, per 2 C.F.R. § 200.344(i), FEMA must report in Contracting Performance Assessment Reporting System (CPARS) the recipient's material failure to comply with the terms and conditions of the award.

If FEMA administratively closes an award where no final FFR has been submitted, FEMA uses that administrative closeout date in lieu of the final FFR submission date as the start of the record retention period under 2 C.F.R. § 200.334.

In addition, if an award is administratively closed, FEMA may decide to impose remedies for noncompliance per 2 C.F.R. § 200.339, consider this information in reviewing future award applications, or apply special conditions to existing or future awards.

## d. *Additional Reporting Requirements*
## I. DISCLOSING INFORMATION PER 2 C.F.R. § 180.335

This reporting requirement pertains to disclosing information related to government-wide suspension and debarment requirements. Before a recipient enters into a grant award with FEMA, the recipient must notify FEMA if it knows if it or any of the recipient's principals under the award fall under one or more of the four criteria listed at 2 C.F.R. § 180.335:

  i. Are presently excluded or disqualified;

  ii. Have been convicted within the preceding three years of any of the offenses listed in 2 C.F.R. § 180.800(a) or had a civil judgment rendered against it or any of the recipient's principals for one of those offenses within that time period;

      iii.    Are presently indicted for or otherwise criminally or civilly charged by a governmental entity (federal, state or local) with commission of any of the offenses listed in 2 C.F.R. § 180.800(a); or

      iv.    Have had one or more public transactions (federal, state, or local) terminated within the preceding three years for cause or default.

At any time after accepting the award, if the recipient learns that it or any of its principals falls under one or more of the criteria listed at 2 C.F.R. § 180.335, the recipient must provide immediate written notice to FEMA in accordance with 2 C.F.R. § 180.350.

**II.  REPORTING OF MATTERS RELATED TO RECIPIENT INTEGRITY AND PERFORMANCE**
Appendix XII to 2 C.F.R. Part 200 sets forth a term and condition related to recipient integrity and performance matters that will apply to all federal awards under this funding opportunity. If the total value of currently active grants, cooperative agreements, and procurement contracts from all federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of a federal award under this funding opportunity, then a recipient must maintain the currency of information reported in the Contracting Performance Assessment Reporting System (CPARS) about civil, criminal, or administrative proceedings described in paragraph 2 of Appendix XII at the reporting frequency described in paragraph 4 of Appendix XII.

**III.  SINGLE AUDIT REPORT**
A recipient that expends $750,000 or more during the recipient's fiscal year in federal awards (as defined by 2 C.F.R. § 200.1) must have a single audit conducted in accordance with 2 C.F.R. § 200.514 except when it elects to have a program-specific audit conducted in accordance with 2 C.F.R. § 200.501. The audit must be conducted in accordance with 2 C.F.R. Part 200, Subpart F and, as required by 2 C.F.R. § 200.514, in accordance with the U.S. Government Accountability Office (GAO) Generally Accepted Government Auditing Standards, which can be found on the Yellow Book page of the GAO website.

**5.  Monitoring and Oversight**
The regulation at 2 C.F.R. § 200.337 provides DHS and any of its authorized representatives with the right of access to any documents, papers, or other records of the recipient [and any subrecipients] that are pertinent to a federal award in order to make audits, examinations, excerpts, and transcripts. The right also includes timely and reasonable access to the recipient's or subrecipient's personnel for the purpose of interview and discussion related to such documents. Pursuant to this right and per 2 C.F.R. § 200.329, DHS may conduct desk reviews and make site visits to review project accomplishments and management control systems to evaluate project accomplishments and to provide any required technical assistance. During site visits, DHS may review a recipient's or subrecipient's files pertinent to the federal award and interview and/or discuss these files with the recipient's or subrecipient's personnel. Recipients and subrecipients must respond in a timely and accurate manner to DHS requests for information relating to a federal award.

Effective monitoring and oversight help FEMA ensure that recipients use grant funds for their intended purpose(s); verify that projects undertaken are consistent with approved plans;

and ensure that recipients make adequate progress toward stated goals and objectives. Additionally, monitoring serves as the primary mechanism to ensure that recipients comply with applicable laws, rules, regulations, program guidance, and requirements. FEMA regularly monitors all grant programs both financially and programmatically in accordance with federal laws, regulations (including 2 C.F.R. Part 200), program guidance, and the terms and conditions of the award. All monitoring efforts ultimately serve to evaluate progress towards grant goals and proactively target and address issues that may threaten grant success during the period of performance.

FEMA staff will periodically monitor recipients to ensure that administrative processes, policies and procedures, budgets, and other related award criteria are meeting Federal Government-wide and FEMA regulations. Aside from reviewing quarterly financial and programmatic reports, FEMA may also conduct enhanced monitoring through either desk-based reviews, onsite monitoring visits, or both. Enhanced monitoring will involve the review and analysis of the financial compliance and administrative processes, policies, activities, and other attributes of each federal assistance award, and it will identify areas where the recipient may need technical assistance, corrective actions, or other support.

Financial and programmatic monitoring are complementary processes within FEMA's overarching monitoring strategy that function together to ensure effective grants management, accountability, and transparency; validate progress against grant and program goals; and safeguard federal funds against fraud, waste, and abuse. Financial monitoring primarily focuses on statutory and regulatory compliance with administrative grant requirements, while programmatic monitoring seeks to validate and assist in grant progress, targeting issues that may be hindering achievement of project goals and ensuring compliance with the purpose of the grant and grant program. Both monitoring processes are similar in that they feature initial reviews of all open awards, and additional, in-depth monitoring of grants requiring additional attention.

Recipients and subrecipients who are pass-through entities are responsible for monitoring their subrecipients in a manner consistent with the terms of the federal award at 2 C.F.R. Part 200, including 2 C.F.R. § 200.332. This includes the pass-through entity's responsibility to monitor the activities of the subrecipient as necessary to ensure that the subaward is used for authorized purposes, in compliance with federal statutes, regulations, and the terms and conditions of the subaward; and that subaward performance goals are achieved.

In terms of overall award management, recipient and subrecipient responsibilities include, but are not limited to: accounting of receipts and expenditures, cash management, maintaining adequate financial records, reporting and refunding expenditures disallowed by audits, monitoring if acting as a pass-through entity, or other assessments and reviews, and ensuring overall compliance with the terms and conditions of the award or subaward, as applicable, including the terms of 2 C.F.R. Part 200.

**G. DHS Awarding Agency Contact Information**
**1. Contact and Resource Information**
**a.** *Program Office Contact*
FEMA's Grant Programs Directorate (GPD) is the overall programmatic lead for the SSP. For questions related to project design and other required elements of the program, please contact FEMA-SSP@fema.dhs.gov.

**b.** *FEMA Grants News*
FEMA Grants News is a non-emergency comprehensive management and information resource developed by FEMA for grants stakeholders. This channel provides general information on all FEMA grant programs and maintains a comprehensive database containing key personnel contact information at the federal, state, and local levels. When necessary, recipients will be directed to a federal point of contact who can answer specific programmatic questions or concerns. FEMA Grants News can be reached by email at fema-grants-news@fema.dhs.gov or by phone at (800) 368-6498, Monday through Friday, 9 a.m. – 5 p.m. ET.

**c.** *Grant Programs Directorate (GPD) Award Administration Division*
GPD's Award Administration Division (AAD) provides support regarding financial matters and budgetary technical assistance. Additional guidance and information can be obtained by contacting the AAD's Help Desk via email at ASK-GMD@fema.dhs.gov.

**d.** *Equal Rights*
The FEMA Office of Equal Rights (OER) is responsible for compliance with and enforcement of federal civil rights obligations in connection with programs and services conducted by FEMA and recipients of FEMA financial assistance. All inquiries and communications about federal civil rights compliance for FEMA grants under this NOFO should be sent to FEMA-CivilRightsOffice@fema.dhs.gov.

**e.** *Environmental Planning and Historic Preservation*
The EHP Team provides guidance and information about the EHP review process to recipients and subrecipients. All inquiries and communications about GPD projects under this NOFO or the EHP review process, including the submittal of EHP review materials, should be sent to gpdehpinfo@fema.dhs.gov.

**2. Systems Information**
**a.** *FEMA GO*
For technical assistance with the FEMA GO system, please contact the FEMA GO Helpdesk at femago@fema.dhs.gov or (877) 585-3242, Monday through Friday, 9 a.m. – 6 p.m. ET.

**H. Additional Information**
**1. Termination Provisions**
FEMA may terminate a federal award in whole or in part for one of the following reasons. FEMA and the recipient must still comply with closeout requirements at 2 C.F.R. §§ 200.344-200.345 even if an award is terminated in whole or in part. To the extent that

subawards are permitted under this NOFO, pass-through entities should refer to 2 C.F.R. § 200.340 for additional information on termination regarding subawards.

a. *Noncompliance*
If a recipient fails to comply with the terms and conditions of a federal award, FEMA may terminate the award in whole or in part. If the noncompliance can be corrected, FEMA may first attempt to direct the recipient to correct the noncompliance. This may take the form of a Compliance Notification. If the noncompliance cannot be corrected or the recipient is non-responsive, FEMA may proceed with a Remedy Notification, which could impose a remedy for noncompliance per 2 C.F.R. § 200.339, including termination. Any action to terminate based on noncompliance will follow the requirements of 2 C.F.R. §§ 200.341-200.342 as well as the requirement of 2 C.F.R. § 200.340(c) to report in FAPIIS the recipient's material failure to comply with the award terms and conditions. See also the section on Actions to Address Noncompliance in this NOFO.

b. *With the Consent of the Recipient*
FEMA may also terminate an award in whole or in part with the consent of the recipient, in which case the parties must agree upon the termination conditions, including the effective date, and in the case of partial termination, the portion to be terminated.

c. *Notification by the Recipient*
The recipient may terminate the award, in whole or in part, by sending written notification to FEMA setting forth the reasons for such termination, the effective date, and in the case of partial termination, the portion to be terminated. In the case of partial termination, FEMA may determine that a partially terminated award will not accomplish the purpose of the federal award, so FEMA may terminate the award in its entirety. If that occurs, FEMA will follow the requirements of 2 C.F.R. §§ 200.341-200.342 in deciding to fully terminate the award.

*2.* **Program Evaluation**
Federal agencies are required to structure NOFOs that incorporate program evaluation activities from the outset of their program design and implementation to meaningfully document and measure their progress towards meeting agency priority goal(s) and program outcomes.

OMB Memorandum M-21-27, Evidence-Based Policymaking: Learning Agendas and Annual Evaluation Plans, implementing Title I of the Foundations for Evidence-Based Policymaking Act of 2018, Pub. L. No. 115-435 (2019) (Evidence Act), urges federal awarding agencies to use program evaluation as a critical tool to learn, improve equitable delivery, and elevate program service and delivery across the program lifecycle. Evaluation means "an assessment using systematic data collection and analysis of one or more programs, policies, and organizations intended to assess their effectiveness and efficiency." Evidence Act, § 101 (codified at 5 U.S.C. § 311).

As such, recipients and subrecipients are required to participate in a DHS-, Component-, or Program Office-led evaluation if selected, which may be carried out by a third-party on behalf of the DHS, its component agencies, or the Program Office. Such an evaluation may

involve information collections including but not limited to surveys, interviews, or discussions with individuals who benefit from the federal award program operating personnel, and award recipients, as specified in a DHS-, component agency-, or Program Office-approved evaluation plan. More details about evaluation requirements may be provided in the federal award, if available at that time, or following the award as evaluation requirements are finalized. Evaluation costs incurred during the period of performance are allowable costs (either as direct or indirect) Recipients and subrecipients are also encouraged, but not required, to participate in any additional evaluations after the period of performance ends, although any costs incurred to participate in such evaluations are not allowable and may not be charged to the federal award.

3. **Period of Performance Extensions**
Extensions to the period of performance (POP) for this program may be permitted only with prior written approval from FEMA. Recipients must request extensions prior to the expiration of the POP. Extensions to the POP identified in the award will only be considered through formal, written requests to the recipient's FEMA Program Analyst or other relevant FEMA position and must contain specific and compelling justifications as to why an extension is required. Recipients are advised to coordinate with the FEMA Program Analyst or other relevant FEMA position as needed when preparing an extension request.

All extension requests must address the following:
   a. The grant program, fiscal year, and award number;
   b. Reason for the delay –including details of the legal, policy, or operational challenges that prevent the final outlay of awarded funds by the deadline;
   c. Current status of the activity(ies);
   d. Approved POP termination date and new project completion date;
   e. Amount of funds drawn down to date;
   f. Remaining available funds, both federal and, if applicable, non-federal;
   g. Budget outlining how remaining federal and, if applicable, non-federal funds will be expended;
   h. Plan for completion, including milestones and timeframes for achieving each milestone and the position or person responsible for implementing the plan for completion; and
   i. Certification that the activity(ies) will be completed within the extended POP without any modification to the original statement of work and as approved by FEMA.

Extension requests will be granted only due to compelling legal, policy, or operational challenges. Extension requests will only be considered for the following reasons:
   • Contractual commitments by the recipient or subrecipient with vendors prevent completion of the project, including delivery of equipment or services, within the existing POP;
   • The project must undergo a complex environmental review that cannot be completed within the existing POP;
   • Projects are long-term by design, and therefore acceleration would compromise core programmatic goals; or
   • Where other special or extenuating circumstances exist.

Recipients should submit all proposed extension requests to FEMA for review and approval at least 120 days prior to the end of the POP to allow sufficient processing time. Extensions may be granted one time for up to 120 days. Extensions are typically granted for no more than a six-month period.

**4. Disability Integration**

Pursuant to Section 504 of the Rehabilitation Act of 1973, recipients of FEMA financial assistance must ensure that their programs and activities do not discriminate against qualified individuals with disabilities.

Grant and cooperative agreement recipients should engage with the whole community to advance individual and community preparedness and to work as a nation to build and sustain resilience. In doing so, recipients are encouraged to consider the needs of individuals with disabilities into the activities and projects funded by the grant or cooperative agreement.

FEMA expects that the integration of the needs of people with disabilities will occur at all levels, including planning; alerting, notification, and public outreach; training; purchasing of equipment and supplies; protective action implementation; and exercises/drills.

The following are examples that demonstrate the integration of the needs of people with disabilities in carrying out FEMA awards:

- Include representatives of organizations that work with/for people with disabilities on planning committees, work groups and other bodies engaged in development and implementation of the grant programs and activities.
- Hold all activities related to the grant in locations that are accessible to persons with physical disabilities and intellectual disabilities to the extent practicable.
- Provide auxiliary aids and services, including American Sign Language interpreters, that provide public information across the community and in shelters.
- Ensure shelter-specific grant funds are in alignment with FEMA's Guidance on Planning for Integration of Functional Needs Support Services in General Population Shelters.
- If making alterations to an existing building to a primary function area utilizing federal funds, complying with the most recent codes and standards and making path of travel to the primary function area accessible to the greatest extent possible.
- Implement specific procedures used by public transportation agencies that include evacuation and passenger communication plans and measures for individuals with disabilities.
- Identify, create, and deliver training to address any training gaps specifically aimed toward whole-community preparedness. Include and interact with individuals with disabilities, aligning with the designated program capability.
- Establish best practices in inclusive planning and preparedness that consider physical access, needs of individuals with intellectual disabilities, and information access

FEMA grant recipients can fund projects towards the resiliency of the whole community, including people with disabilities, such as training, outreach and safety campaigns, provided that the project aligns with this NOFO and the terms and conditions of the award.

5. **Conflicts of Interest in the Administration of Federal Awards or Subawards**
For conflicts of interest under grant-funded procurements and contracts, refer to the section on Procurement Integrity in this NOFO and 2 C.F.R. §§ 200.317 – 200.327.

To eliminate and reduce the impact of conflicts of interest in the subaward process, recipients and pass-through entities must follow their own policies and procedures regarding the elimination or reduction of conflicts of interest when making subawards. Recipients and pass-through entities are also required to follow any applicable federal and state, local, tribal, or territorial (SLTT) statutes or regulations governing conflicts of interest in the making of subawards.

The recipient or pass-through entity must disclose to the respective Program Analyst or Program Manager, in writing, any real or potential conflict of interest that may arise during the administration of the federal award, as defined by the federal or SLTT statutes or regulations or their own existing policies, within five days of learning of the conflict of interest. Similarly, subrecipients, whether acting as subrecipients or as pass-through entities, must disclose any real or potential conflict of interest to the recipient or next-level pass-through entity as required by the recipient or pass-through entity's conflict of interest policies, or any applicable federal or SLTT statutes or regulations.

Conflicts of interest may arise during the process of FEMA making a federal award in situations where an employee, officer, or agent, any members of his or her immediate family, his or her partner has a close personal relationship, a business relationship, or a professional relationship, with an applicant, subapplicant, recipient, subrecipient, or FEMA employees.

6. **Procurement Integrity**
Through audits conducted by the DHS Office of Inspector General (OIG) and FEMA grant monitoring, findings have shown that some FEMA recipients have not fully adhered to the proper procurement requirements at 2 C.F.R. §§ 200.317 – 200.327 when spending grant funds. Anything less than full compliance with federal procurement requirements jeopardizes the integrity of the grant as well as the grant program. To assist with determining whether an action is a procurement or instead a subaward, please consult 2 C.F.R. § 200.331. For detailed guidance on the federal procurement standards, recipients and subrecipients should refer to various materials issued by FEMA's Procurement Disaster Assistance Team (PDAT), such as the PDAT Field Manual and Contract Provisions Guide. Additional resources, including an upcoming trainings schedule, can be found on the PDAT Website.

The below highlights the federal procurement requirements for FEMA recipients when procuring goods and services with federal grant funds. FEMA will include a review of recipients' procurement practices as part of the normal monitoring activities. **All procurement activity must be conducted in accordance with federal procurement standards at 2 C.F.R. §§ 200.317 – 200.327.** Select requirements under these standards are

listed below. The recipient and any of its subrecipients must comply with all requirements, even if they are not listed below.

Under 2 C.F.R. § 200.317, when procuring property and services under a federal award, states (including territories) must follow the same policies and procedures they use for procurements from their non-federal funds; additionally, states must now follow 2 C.F.R. § 200.321 regarding socioeconomic steps, 200.322 regarding domestic preferences for procurements, 200.323 regarding procurement of recovered materials, and 2 C.F.R. § 200.327 regarding required contract provisions.

All other non-federal entities, such as tribes (collectively, non-state entities), must have and use their own documented procurement procedures that reflect applicable SLTT laws and regulations, provided that the procurements conform to applicable federal law and the standards identified in 2 C.F.R. Part 200. These standards include, but are not limited to, providing for full and open competition consistent with the standards of 2 C.F.R. § 200.319 and the required procurement methods at § 200.320.

a. ***Important Changes to Procurement Standards in 2 C.F.R. Part 200***
States are now required to follow the socioeconomic steps in soliciting small and minority businesses, women's business enterprises, and labor surplus area firms per 2 C.F.R. § 200.321. All non-federal entities should also, to the greatest extent practicable under a federal award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States per 2 C.F.R. § 200.322. More information on OMB's revisions to the federal procurement standards can be found in Purchasing Under a FEMA Award: OMB Revisions Fact Sheet.

The recognized procurement methods in 2 C.F.R. § 200.320 have been reorganized into informal procurement methods, which include micro-purchases and small purchases; formal procurement methods, which include sealed bidding and competitive proposals; and noncompetitive procurements. The federal micro-purchase threshold is currently $10,000, and non-state entities may use a lower threshold when using micro-purchase procedures under a FEMA award. If a non-state entity wants to use a micro-purchase threshold higher than the federal threshold, it must follow the requirements of 2 C.F.R. § 200.320(a)(1)(iii)-(v). The federal simplified acquisition threshold is currently $250,000, and a non-state entity may use a lower threshold but may not exceed the federal threshold when using small purchase procedures under a FEMA award. *See* 2 C.F.R. § 200.1 (citing the definition of simplified acquisition threshold from 48 C.F.R. Part 2, Subpart 2.1).

See 2 C.F.R. §§ 200.216, 200.471, and Appendix II as well as section D.13.a of the NOFO regarding prohibitions on covered telecommunications equipment or services.

b. ***Competition and Conflicts of Interest***
Among the requirements of 2 C.F.R. § 200.319(b) applicable to all non-federal entities other than states, in order to ensure objective contractor performance and eliminate unfair competitive advantage, contractors that develop or draft specifications, requirements, statements of work, or invitations for bids or requests for proposals must be excluded from

competing for such procurements. FEMA considers these actions to be an organizational conflict of interest and interprets this restriction as applying to contractors that help a non-federal entity develop its grant application, project plans, or project budget. This prohibition also applies to the use of former employees to manage the grant or carry out a contract when those former employees worked on such activities while they were employees of the non-federal entity.

Under this prohibition, unless the non-federal entity solicits for and awards a contract covering both development <u>and</u> execution of specifications (or similar elements as described above), and this contract was procured in compliance with 2 C.F.R. §§ 200.317 – 200.327, federal funds cannot be used to pay a contractor to carry out the work if that contractor also worked on the development of those specifications. This rule applies to all contracts funded with federal grant funds, including pre-award costs, such as grant writer fees, as well as post-award costs, such as grant management fees.

Additionally, some of the situations considered to be restrictive of competition include, but are not limited to:
- Placing unreasonable requirements on firms for them to qualify to do business;
- Requiring unnecessary experience and excessive bonding;
- Noncompetitive pricing practices between firms or between affiliated companies;
- Noncompetitive contracts to consultants that are on retainer contracts;
- Organizational conflicts of interest;
- Specifying only a "brand name" product instead of allowing "an equal" product to be offered and describing the performance or other relevant requirements of the procurement; and
- Any arbitrary action in the procurement process.

Per 2 C.F.R. § 200.319(c), non-federal entities other than states must conduct procurements in a manner that prohibits the use of statutorily or administratively imposed SLTT geographical preferences in the evaluation of bids or proposals, except in those cases where applicable federal statutes expressly mandate or encourage geographic preference. Nothing in this section preempts state licensing laws. When contracting for architectural and engineering services, geographic location may be a selection criterion provided its application leaves an appropriate number of qualified firms, given the nature and size of the project, to compete for the contract.

Under 2 C.F.R. § 200.318(c)(1), non-federal entities other than states are required to maintain written standards of conduct covering conflicts of interest and governing the actions of their employees engaged in the selection, award, and administration of contracts. **No employee, officer, or agent may participate in the selection, award, or administration of a contract supported by a federal award if he or she has a real or apparent conflict of interest.** Such conflicts of interest would arise when the employee, officer or agent, any member of his or her immediate family, his or her partner, or an organization that employs or is about to employ any of the parties indicated herein, has a financial or other interest in or a tangible personal benefit from a firm considered for a contract. The officers, employees, and agents of the non-federal entity may neither solicit nor accept gratuities, favors, or anything of

monetary value from contractors or parties to subcontracts. However, non-federal entities may set standards for situations in which the financial interest is not substantial, or the gift is an unsolicited item of nominal value. The standards of conduct must provide for disciplinary actions to be applied for violations of such standards by officers, employees, or agents of the non-federal entity.

Under 2 C.F.R. 200.318(c)(2), if the recipient or subrecipient (other than states) has a parent, affiliate, or subsidiary organization that is not a state, local, tribal, or territorial government, the non-federal entity must also maintain written standards of conduct covering organizational conflicts of interest. In this context, organizational conflict of interest means that because of a relationship with a parent company, affiliate, or subsidiary organization, the non-federal entity is unable or appears to be unable to be impartial in conducting a procurement action involving a related organization. The non-federal entity must disclose in writing any potential conflicts of interest to FEMA or the pass-through entity in accordance with applicable FEMA policy.

c. ***Supply Schedules and Purchasing Programs***
Generally, a non-federal entity may seek to procure goods or services from a federal supply schedule, state supply schedule, or group purchasing agreement.

I. **GENERAL SERVICES ADMINISTRATION SCHEDULES**
States, tribes, and local governments, and any instrumentality thereof (such as local education agencies or institutions of higher education) may procure goods and services from a General Services Administration (GSA) schedule. GSA offers multiple efficient and effective procurement programs for state, tribal, and local governments, and instrumentalities thereof, to purchase products and services directly from pre-vetted contractors. The GSA Schedules (also referred to as the Multiple Award Schedules and the Federal Supply Schedules) are long-term government-wide contracts with commercial firms that provide access to millions of commercial products and services at volume discount pricing.

Information about GSA programs for states, tribes, and local governments, and instrumentalities thereof, can be found on the GSA webpages for [State and Local Governments Resources](#) and [Schedule Buyers](#).

For tribes, local governments, and their instrumentalities that purchase off of a GSA schedule, this will satisfy the federal requirements for full and open competition provided that the recipient follows the GSA ordering procedures; however, tribes, local governments, and their instrumentalities will still need to follow the other rules under 2 C.F.R. §§ 200.317 – 200.327, such as solicitation of minority businesses, women's business enterprises, small businesses, or labor surplus area firms (§ 200.321), domestic preferences (§ 200.322), contract cost and price (§ 200.324), and required contract provisions (§ 200.327 and Appendix II).

II. **OTHER SUPPLY SCHEDULES AND PROGRAMS**
For non-federal entities other than states, such as tribes, local governments, and nonprofits, that want to procure goods or services from a state supply schedule, cooperative purchasing

program, or other similar program, in order for such procurements to be permissible under federal requirements, the following must be true:

- The procurement of the original contract or purchasing schedule and its use by the non-federal entity complies with state and local law, regulations, and written procurement procedures;
- The state or other entity that originally procured the original contract or purchasing schedule entered into the contract or schedule with the express purpose of making it available to the non-federal entity and other similar types of entities;
- The contract or purchasing schedule specifically allows for such use, and the work to be performed for the non-federal entity falls within the scope of work under the contract as to type, amount, and geography;
- The procurement of the original contract or purchasing schedule complied with all the procurement standards applicable to a non-federal entity other than states under at 2 C.F.R. §§ 200.317 – 200.327; and
- With respect to the use of a purchasing schedule, the non-federal entity must follow ordering procedures that adhere to applicable state, tribal, and local laws and regulations and the minimum requirements of full and open competition under 2 C.F.R. Part 200.

If a non-federal entity other than a state seeks to use a state supply schedule, cooperative purchasing program, or other similar type of arrangement, FEMA recommends the recipient discuss the procurement plans with its FEMA Program Analyst or other relevant FEMA position.

### d. *Procurement Documentation*

Per 2 C.F.R. § 200.318(i), non-federal entities other than states and territories are required to maintain and retain records sufficient to detail the history of procurement covering at least the rationale for the procurement method, selection of contract type, contractor selection or rejection, and the basis for the contract price. States and territories are encouraged to maintain and retain this information as well and are reminded that in order for any cost to be allowable, it must be adequately documented per 2 C.F.R. § 200.403(g).

Examples of the types of documents that would cover this information include but are not limited to:

- Solicitation documentation, such as requests for quotes, invitations for bids, or requests for proposals;
- Responses to solicitations, such as quotes, bids, or proposals;
- Pre-solicitation independent cost estimates and post-solicitation cost/price analyses on file for review by federal personnel, if applicable;
- Contract documents and amendments, including required contract provisions; and
- Other documents required by federal regulations applicable at the time a grant is awarded to a recipient.
- Additional information on required procurement records can be found on pages 24-26 of the PDAT Field Manual.

**7. Financial Assistance Programs for Infrastructure**

**a. *Build America, Buy America Act***

Recipients and subrecipients must comply with the Build America, Buy America Act (BABAA), which was enacted as part of the Infrastructure Investment and Jobs Act §§ 70901-70927, Pub. L. No. 117-58 (2021); and Executive Order 14005, Ensuring the Future is Made in All of America by All of America's Workers. See also 2 C.F.R. Part 184 and Office of Management and Budget (OMB) Memorandum M-24-02, Implementation Guidance on Application of Buy America Preference in Federal Financial Assistance Programs for Infrastructure.

None of the funds provided under this program may be used for a project for infrastructure unless the iron and steel, manufactured products, and construction materials used in that infrastructure are produced in the United States.

The Buy America preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project but are not an integral part of the structure or permanently affixed to the infrastructure project.

For FEMA's official policy on BABAA, please see FEMA Policy 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: Buy America Preference in FEMA Financial Assistance Programs for Infrastructure. To see whether a particular FEMA federal financial assistance program is considered an infrastructure program and thus required to include a Buy America preference, please see Programs and Definitions: Build America, Buy America Act | FEMA.gov and Buy America Preference in FEMA Financial Assistance Programs for Infrastructure.

**b. *Waivers***

When necessary, recipients (and subrecipients through their pass-through entity) may apply for, and FEMA may grant, a waiver from these requirements.

A waiver of the domestic content procurement preference may be granted by the agency awarding official if FEMA determines that:

- Applying the domestic content procurement preference would be inconsistent with the public interest.
- The types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality.
- The inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25%.

For FEMA awards, the process for requesting a waiver from the Buy America preference requirements can be found on FEMA's website at: <u>"Buy America" Preference in FEMA Financial Assistance Programs for Infrastructure | FEMA.gov</u>.

**c.** *Definitions*
For BABAA specific definitions, please refer to the FEMA Buy America website at: "<u>Programs and Definitions: Build America, Buy America Act | FEMA.gov</u>."

Please refer to the applicable DHS Standard Terms & Conditions for the BABAA specific term applicable to all FEMA financial assistance awards for infrastructure.

**8. Record Retention**
**a.** *Record Retention Period*
Financial records, supporting documents, statistical records, and all other non-Federal entity records pertinent to a Federal award generally must be maintained for <u>at least</u> three years from the date the final FFR is submitted. *See* 2 C.F.R. § 200.334. Further, if the recipient does not submit a final FFR and the award is administratively closed, FEMA uses the date of administrative closeout as the start of the general record retention period.

The record retention period **may be longer than three years or have a different start date** in certain cases. These include:
- Records for real property and equipment acquired with Federal funds must be retained for **three years after final disposition of the property**. *See* 2 C.F.R. § 200.334(c).
- If any litigation, claim, or audit is started before the expiration of the three-year period, the records **must be retained until** all litigation, claims, or audit findings involving the records **have been resolved and final action taken**. *See* 2 C.F.R. § 200.334(a).
- The **record retention period will be extended if the non-federal entity is notified in writing** of the extension by FEMA, the cognizant or oversight agency for audit, or the cognizant agency for indirect costs, or pass-through entity. *See* 2 C.F.R. § 200.334(b).
- Where FEMA requires recipients to report program income after the period of performance ends, the **program income record retention period begins at the end of the recipient's fiscal year in which program income is earned**. *See* 2 C.F.R. § 200.334(e).
- For indirect cost rate computations and proposals, cost allocation plans, or any similar accounting computations of the rate at which a particular group of costs is chargeable (such as computer usage chargeback rates or composite fringe benefit rates), the start of the record retention period depends on whether the indirect cost rate documents were submitted for negotiation. If the **indirect cost rate documents were submitted for negotiation, the record retention period begins from the date those documents were submitted** for negotiation. If indirect cost rate documents were **not submitted for negotiation, the record retention period begins at the end of the recipient's fiscal year or other accounting period covered by that indirect cost rate**. *See* 2 C.F.R. § 200.334(f).

    **b.** ***Types of Records to Retain***
FEMA requires that non-federal entities maintain the following documentation for federally funded purchases:
- Specifications
- Solicitations
- Competitive quotes or proposals
- Basis for selection decisions
- Purchase orders
- Contracts
- Invoices
- Cancelled checks

Non-federal entities should keep detailed records of all transactions involving the grant. FEMA may at any time request copies of any relevant documentation and records, including purchasing documentation along with copies of cancelled checks for verification. *See, e.g.*, 2 C.F.R. §§ 200.318(i), 200.334, 200.337.

In order for any cost to be allowable, it must be adequately documented per 2 C.F.R. § 200.403(g). Non-federal entities who fail to fully document all purchases may find their expenditures questioned and subsequently disallowed.

**9. Actions to Address Noncompliance**
Non-federal entities receiving financial assistance funding from FEMA are required to comply with requirements in the terms and conditions of their awards or subawards, including the terms set forth in applicable federal statutes, regulations, NOFOs, and policies. Throughout the award lifecycle or even after an award has been closed, FEMA or the pass-through entity may discover potential or actual noncompliance on the part of a recipient or subrecipient. This potential or actual noncompliance may be discovered through routine monitoring, audits, civil rights complaint investigations and compliance reviews, closeout, or reporting from various sources.

In the case of any potential or actual noncompliance, FEMA may place special conditions on an award per 2 C.F.R. §§ 200.208 and 200.339, FEMA may place a hold on funds until the matter is corrected, or additional information is provided per 2 C.F.R. § 200.339, or it may do both. Similar remedies for noncompliance with certain federal civil rights laws are authorized pursuant to 44 C.F.R. Parts 7 and 19 or other applicable regulations.

In the event the noncompliance is not able to be corrected by imposing additional conditions or the recipient or subrecipient refuses to correct the matter, FEMA may take other remedies allowed under 2 C.F.R. § 200.339. These remedies include actions to disallow costs, recover funds, wholly or partly suspend or terminate the award, initiate suspension and debarment proceedings, withhold further federal awards, or take other remedies that may be legally available. For further information on termination due to noncompliance, see the section on Termination Provisions in the NOFO.

FEMA may discover and take action on noncompliance even after an award has been closed. The closeout of an award does not affect FEMA's right to disallow costs and recover funds as long as the action to disallow costs takes place during the record retention period. *See* 2 C.F.R. §§ 200.334, 200.345(a). Closeout also does not affect the obligation of the non-federal entity to return any funds due as a result of later refunds, corrections, or other transactions. 2 C.F.R. § 200.345(a)(2).

The types of funds FEMA may attempt to recover include, but are not limited to, improper payments, cost share reimbursements, program income, interest earned on advance payments, or equipment disposition amounts.

FEMA may seek to recover disallowed costs through a Notice of Potential Debt Letter, a Remedy Notification, or other letter. The document will describe the potential amount owed, the reason why FEMA is recovering the funds, the recipient's appeal rights, how the amount can be paid, and the consequences for not appealing or paying the amount by the deadline.

If the recipient neither appeals nor pays the amount by the deadline, the amount owed will become final. Potential consequences if the debt is not paid in full or otherwise resolved by the deadline include the assessment of interest, administrative fees, and penalty charges; administratively offsetting the debt against other payable federal funds; and transferring the debt to the U.S. Department of the Treasury for collection.

FEMA notes the following common areas of noncompliance for FEMA's grant programs:
- Insufficient documentation and lack of record retention.
- Failure to follow the procurement under grants requirements.
- Failure to submit closeout documents in a timely manner.
- Failure to follow EHP requirements.
- Failure to comply with the POP deadline.

## 10. Audits

FEMA grant recipients are subject to audit oversight from multiple entities including the DHS OIG, the GAO, the pass-through entity, or independent auditing firms for single audits, and may cover activities and costs incurred under the award. Auditing agencies such as the DHS OIG, the GAO, and the pass-through entity (if applicable), and FEMA in its oversight capacity, must have access to records pertaining to the FEMA award. Recipients and subrecipients must retain award documents for at least three years from the date the final FFR is submitted, and even longer in many cases subject to the requirements of 2 C.F.R. § 200.334. In the case of administrative closeout, documents must be retained for at least three years from the date of closeout, or longer subject to the requirements of 2 C.F.R. § 200.334. If documents are retained longer than the required retention period, the DHS OIG, the GAO, and the pass-through entity, as well as FEMA in its oversight capacity, have the right to access these records as well. See 2 C.F.R. §§ 200.334, 200.337.

Additionally, non-federal entities must comply with the single audit requirements at 2 C.F.R. Part 200, Subpart F. Specifically, non-federal entities, other than for-profit subrecipients, that expend $750,000 or more in federal awards during their fiscal year must have a single or

program-specific audit conducted for that year in accordance with Subpart F. 2 C.F.R. § 200.501. A single audit covers all federal funds expended during a fiscal year, not just FEMA funds. The cost of audit services may be allowable per 2 C.F.R. § 200.425, but non-federal entities must select auditors in accordance with 2 C.F.R. § 200.509, including following the proper procurement procedures. For additional information on single audit reporting requirements, see section F of this NOFO under the header "Single Audit Report" within the subsection "Additional Reporting Requirements" or other applicable document.

The objectives of single audits are to:
- Determine if financial statements conform to generally accepted accounting principles (GAAP);
- Determine whether the schedule of expenditures of federal awards is presented fairly;
- Understand, assess, and test the adequacy of internal controls for compliance with major programs; and
- Determine if the entity complied with applicable laws, regulations, and contracts or grants.

For single audits, the auditee is required to prepare financial statements reflecting its financial position, a schedule of federal award expenditures, and a summary of the status of prior audit findings and questioned costs. The auditee also is required to follow up and take appropriate corrective actions on new and previously issued but not yet addressed audit findings. The auditee must prepare a corrective action plan to address the new audit findings. 2 C.F.R. §§ 200.508, 200.510, 200.511.

Non-federal entities must have an audit conducted, either single or program-specific, of their financial statements and federal expenditures annually or biennially pursuant to 2 C.F.R. § 200.504. Non-federal entities must also follow the information submission requirements of 2 C.F.R. § 200.512, including submitting the audit information to the Federal Audit Clearinghouse within the earlier of 30 calendar days after receipt of the auditor's report(s) or nine months after the end of the audit period. The audit information to be submitted include the data collection form described at 2 C.F.R. § 200.512(c) and Appendix X to 2 C.F.R. Part 200 as well as the reporting package described at 2 C.F.R. § 200.512(b).

The non-federal entity must retain one copy of the data collection form and one copy of the reporting package for three years from the date of submission to the Federal Audit Clearinghouse. 2 C.F.R. § 200.512; see also 2 C.F.R. § 200.517 (setting requirements for retention of documents by the auditor and access to audit records in the auditor's possession).

FEMA, the DHS OIG, the GAO, and the pass-through entity (if applicable), as part of monitoring or as part of an audit, may review a non-federal entity's compliance with the single audit requirements. In cases of continued inability or unwillingness to have an audit conducted in compliance with 2 C.F.R. Part 200, Subpart F, FEMA and the pass-through entity, if applicable, are required to take appropriate remedial action under 2 C.F.R. § 200.339 for noncompliance, pursuant to 2 C.F.R. § 200.505.

**11. Payment Information**
FEMA uses the Direct Deposit/Electronic Funds Transfer (DD/EFT) method of payment to recipients.

Payment requests are submitted through FEMA GO.

**12. Whole Community Preparedness**
Preparedness is a shared responsibility that calls for the involvement of everyone—not just the government—in preparedness efforts. By working together, everyone can help keep the nation safe from harm and help keep it resilient when struck by hazards, such as natural disasters, acts of terrorism, and pandemics.

Whole Community includes:
- Individuals and families, including those with access and functional needs
- Businesses
- Faith-based and community organizations
- Nonprofit groups
- Schools and academia
- Media outlets
- All levels of government, including state, local, tribal, territorial, and federal partners

The phrase "Whole Community" often appears in preparedness materials, as it is one of the guiding principles. It means two things:
1. Involving people in the development of national preparedness documents.
2. Ensuring their roles and responsibilities are reflected in the content of the materials.

**12. Report Issues of Fraud, Waste, Abuse**
Please note, when applying to this notice of funding opportunity and when administering the grant, applicants may report issues of fraud, waste, abuse, and mismanagement, or other criminal or noncriminal misconduct to the Office of Inspector General (OIG) Hotline. The toll-free numbers to call are 1-800-323-8603, and TTY 1-844-889-4357.

**13. Hazard-Resistant Building Codes**
Hazard-resistant building codes are a foundational element of a more resilient nation, safeguarding communities and lives against natural disasters, with an estimated $11:1 return on investment. The adoption, enforcement and application of modern building codes mitigates community vulnerabilities, reduces disaster recovery costs, and strengthens nationwide capability. FEMA is working to promote and support building codes in all areas of its work in support of the multi-agency National Initiative to Advance Building Codes. In the interest of building a stronger, more resilient nation, FEMA encourages all grant recipients and subrecipients to meet current published editions of relevant consensus-based building codes, specifications and standards, and to exceed them where feasible."

## Appendix A: Allowable Activities

To be reimbursed, all costs must be allowable, reasonable, and allocable (2 CFR §§ 200.403 - 405). In addition to the criteria at 2 CFR § 200.403, costs are allowable only for activities identified in Appendix A. At least one primary service is required for all eligible applicants. All services are allowed only for noncitizen migrants released from a DHS facility. Recipients must ensure they are not charging to FY 2024 SSP-C prior costs associated with Emergency Food and Shelter Program-Humanitarian or other SSP awards.

**Primary Services**
- Shelter
  - Per diem per noncitizen migrant sheltered in an overnight congregate facility; applicants can request full per diem on the first through last days of any multi-day stay (rate cannot exceed $12.50 per noncitizen migrant per day) OR rental costs of real property used for providing services covered under SSP
  - Hotel/motel room costs used to provide services (costs should be reasonable based on the rate set by the U.S. General Services Administration (GSA) for the location plus necessary taxes and fees, or to the extent the costs do not exceed charges normally allowed by the applicant in its regular operations).
  - Cots and beds, including pillows
  - Temporary structures (e.g., tents)
  - Linens (e.g., sheets, towels, wash cloths)
  - Overnight shelter utilities (electricity, gas, water, cell phone plans, internet plans) (rate cannot exceed $10 per noncitizen migrant served per day)
  - Non-overnight facility utilities (electricity, gas, water, cell phone plans, internet plans) (rate cannot exceed $5 per noncitizen migrant served per day)
  - Maintenance and housekeeping (e.g., repair and cleaning supplies, shower maintenance)
  - Contracted Services (e.g., security, laundry, trash pickup, cleaning services)
  - Applicants are strongly encouraged to consider use of shelter services in compliance with the Hotel and Motel Fire Safety Act of 1990, which encourages fire safety in places that offer lodging to the public.
- Food
  - Food items
  - Food banks (direct food/meal-supportive purchases for noncitizen migrants recently released by DHS)
  - Food banks (indirect support of noncitizen migrants recently released by DHS by giving food/meal supportive items to other agencies that provide the direct services)
  - Contracted meals (paying a contractor to pay for/provide meals) (rate cannot exceed $15 per meal)
  - Food storage containers (e.g., separating bulk food purchases, storing prepared food)
  - Dishes, utensils, and linens (e.g., plates, forks, knives, napkins)
  - Cookware and serveware (e.g., pots, pans)
  - Maintenance and housekeeping (e.g., repair and cleaning supplies)

- o   Contracted services (e.g., security, trash pickup, cleaning services)
- Transportation
  - o   Subject to the limitations below, transportation expenses are allowable for the following activities:
    - ▪   Transportation of noncitizen migrants from DHS release facility to the shelter or services provider's location. Eligible transportation expenses from DHS facility to shelter or service provider may include charter bus, taxi, and mileage.
    - ▪   Onward destination transportation, which is defined as transportation of a noncitizen migrant from a shelter and/or services provider's location to the noncitizen migrant's final destination/point of contact.
      - •   Long distance (50 miles or more) transportation includes air, bus, or train expenses to move families and individuals released by DHS to another city or state.
    - ▪   Transportation of a noncitizen migrant from one shelter or service provider's location to another shelter or service provider's location to decompress the population at the shelter or service provider.
    - ▪   Rideshares:
      - •   Rideshares are allowable for transportation from DHS release facility to a shelter or service provider and for transportation between shelter or service providers but are not allowable for onward destination travel.
      - •   If rideshares are purchased, total mileage cannot exceed 50 miles per ride.
  - o   Parking (e.g., local street, airport)
  - o   *Transportation Limitations:*
    - ▪   Transportation used must be the most cost-effective form and be at a reasonable overall cost to maximize grant dollars.
    - ▪   Any form of contracted transportation services must meet the procurement standards in 2 C.F.R. Part 200.
    - ▪   International transportation is not allowable. Only transportation within the contiguous United States (lower 48 states and Washington, D.C.) are allowed.
    - ▪   All fares must be coach class on a commercial airline or train; any form of "luxury" transportation is not allowable (e.g., business or first class, limousine services, etc.).
    - ▪   For all applicable transportation expenses, the mileage rate cannot exceed current GSA federal rate.
    - ▪   If tickets are purchased for individuals, airfare cannot exceed $700 per ticket. Rental/lease of multi passenger vans may be used only for transportation of noncitizen migrants from DHS facility to shelter and service provider location.
      Charter bus and other forms of grouped transportation should operate at a minimum average of 66% capacity. This minimum should be achieved on average, across multiple charter bus or other grouped transportation trips over the course of a documented period of time. Recipients should self-

        verify average grouped transportation capacity metrics on a weekly, monthly, or quarterly basis, as applicable.

- o Additional limitations on transportation of a noncitizen migrant from one shelter or service provider's location to another shelter or service provider's location:
  - ▪ This transportation is allowable only if the transportation was coordinated, in writing, between the providers prior to travel.
  - ▪ Coordination includes but is not limited to: a minimum of 48-hour (distance permitting) notice before arrival; the identification of an arrival time and location that is suitable to the receiving service provider; and the identification of any critical unmet needs.
    - Upon request, recipients may be required to provide proof of this written coordination in order to be reimbursed.
  - ▪ The chartering of aircraft, watercraft, or other vehicle not specifically stated in this Appendix is not allowable.
  - ▪ If an individual released by DHS presents themselves or is observed to have acute or severe medical issues, those issues must be addressed before engaging in long-distance travel (50 miles or greater) or the cost is not allowable.

- Acute medical care
  - o Basic first aid care and supplies (e.g., band-aids)
  - o Health screenings, including for mental health
  - o Medical care for assessment and stabilization for onward travel, including ground-based ambulance transport
  - o Testing and limited care related to quarantining and isolation
  - o Over-The-Counter Medication (e.g., aspirin)
  - o Personal Protective Equipment (PPE) for both shelter staff and noncitizen migrants
  - o Limited Durable Medical Equipment (DME)
    - ▪ Examples of DME include: bariatric cots, wheelchairs, wheelchair ramps, walkers, commodes, toilet seats, IV-Poles, canes, crutches, handheld shower, shower chair, transfer boards, gait belt, gravity feeding set, assistive listening devices, headset, magnifying glass, communication cards, adaptive eating devices, bedside commode, elevated toilet seat, 3-in-one commode, shower mat non-slip, digital infrared thermometer, seated (Bariatric) walker, comfort box, small refrigerator for medications.
  - o Prescription medication for managing acute or chronic care
  - o Lab testing
- Personal hygiene supplies (hygiene items, toiletries, feminine hygiene products, baby wipes, diapers, etc.)
- Labor for primary services (for more information, see 2 CFR 200.430)
  - o Labor for primary services means only the compensation for the time employees or contractors are directly providing primary services and/or receiving training on the provision of primary services. Labor (personal services) must follow the requirements and guidelines established in 2 CFR 200.430.
  - o Personnel managing cases to provide primary services, such as coordinating initial transportation and onward destination movement, is allowable.

- o Travel and relocation expenses for primary labor (personal service) costs are not allowable.
- o Costs associated with management and administration are addressed separately below.

**Secondary Services**
- Renovations or modifications to existing facilities
  - o Applications that include funding requests for renovations or modifications to existing facilities cannot exceed $250,000 for the entire application budget.
  - o SSP funding may only be used for those parts of the facility that are directly associated with providing services to noncitizen migrants released from DHS custody.
  - o Funding can be used for:
    - Improvements to expand capacity and services and to address safety concerns. Renovations and modifications to existing facilities cannot change the existing footprint of the facility.
    - Repairs to facilities to provide services (e.g., update bathroom/renovate kitchen) to make them safe and sanitary or compliant with state and local codes.
    - Planning costs to support the SSP renovations or modifications to existing facilities are allowable. These planning activities include the following:
      - Develop plans, protocols, or procedures for the operation and use related to new capabilities as a result of the renovations or modifications to existing facilities;
      - Conduct physical security assessments;
      - Analyze design and implementation of protection system (e.g., fire protection and suppression, atmospheric filtration, explosives mitigation) for renovations or modifications to existing facilities.
    - Obtaining permits and completing inspections which are necessary for specified improvements.
- Clothing: shirts, pants, outerwear, underwear and bras, socks, shoes/shoelaces, backpacks, belts, etc.
- Outreach information (e.g., communications development and distribution, contracts, printing services)
- Translation services (e.g., contracts and external support)
- Labor for secondary services (see 2 CFR 200.430)
  - o Labor for secondary services means only the compensation for the time employees or contractors are directly providing secondary services and/or receiving training on the provision of secondary services.
  - o Travel and relocation expenses for secondary labor (personal service) costs are not allowable.
  - o Costs associated with management and administration are addressed separately below.

**Management & Administration**

Management & Administration (M&A) costs are allowable and do not count as a primary or secondary service. M&A is defined as director/manager level and administrative staff time, contracted or otherwise, to provide services directly or to support needs of families and individuals released by DHS. Recipients may expend up to 5% of an SSP award for allowable M&A costs. Subrecipients may also expend up to 5% of their SSP subaward for allowable M&A costs. These may include services providing grants management, including grant application preparation. These may also include recordkeeping (e.g., IT assistance (contracts and external support) and costs associated with creating a database and/or tracking system to assist with managing SSP funds as well as cybersecurity assessments and enhancements).

## Appendix B: Payment Requests and Amendments

Appendix B contains detailed information on SSP Award Administration. Reviewing this information may help recipients in the programmatic and financial administration of their award(s).

### Payments and Amendments

FEMA uses the Direct Deposit/Electronic Funds Transfer (DD/EFT) method of payment to recipients. SSP payment/drawdown requests are generated using FEMA GO. SSP payment/drawdown requests will be governed by applicable federal regulations in effect at the time a grant is awarded to the recipient and may be either advances or reimbursements. Recipients should not expend funds until all special conditions listed on the grant award document have been met, including completion of EHP review, active SAM.gov registration, and the request for payment in FEMA GO has been approved.

Recipients should draw down funds based upon immediate disbursement requirements; however, FEMA strongly encourages recipients to draw down funds as close to disbursement or expenditure as possible to avoid accruing interest.

Non-federal entities must submit the following documents at time of drawdown requests:
- If the drawdown request includes money for a subrecipient, specify the subrecipient and allowable activities the funding covers.
- For renovations or modifications to rented real property only: If an applicant or subapplicant is requesting funding for renovations or modifications to rented real property and documentation has not previously been provided, submit rental agreement addressing space, any limitations of use, and rental period.
- For all services covered by the draw down request, provide Alien Registration Numbers (A-Numbers) or evidence of DHS processing (e.g., I-94, I-385, I-860, I-862): A summary list reporting A-Numbers, names, corresponding DHS release dates of the served population, and corresponding service dates of the served population. Please do not send copies of the forms themselves. Applicants must use the provided A-Number Submission Template to populate the information. Recipients must ensure that full A-Numbers and accurate dates of service are provided.
- Proof of Purchase Documentation:
  - For each requested allowable activity service category (See Appendix A), provide one example of proof of payment (e.g., canceled check, credit card statement, etc.) and a receipt reflecting the purchase. Provide one document inclusive of all proofs of payment and receipts less than $5,000. In the document (a spreadsheet is preferred), identify the following things:
    - For each proof of payment receipt, the allowable activity/service category being funded (see the Application Worksheet, Budget Worksheet tab for categories)
    - The date of the receipt
    - The proof of purchase associated with the line item (file name, page number, transaction ID, or other unique identifier to clearly link the line item with the proof of purchase)

- The line item details from the receipt (what the item is)
- The quantity if more than one
- The amount requested for reimbursement by line item, not receipt total
- If applicable, which proofs of payment and receipts are for which subrecipient.

o For each purchase or allowable cost of $5,000 or more, provide proof of payment and a receipt reflecting the purchase or other documentation demonstrating calculation and allocation of cost in accordance with 2 CFR Part 200, Subpart E. Provide one document inclusive of all proofs of payment and receipts $5,000 or more. In the document, identify which proofs of payment and receipts are for which allowable activity service category (See Appendix A). If applicable, also identify which proofs of payment and receipts are for which subrecipient.

Non-federal entities should keep detailed records of all transactions involving the grant. FEMA may at any time request copies of any relevant documentation and records. See, e.g., 2 C.F.R. §§ 200.318(i), 200.334, 200.337.

**Reimbursement and Advance Funding**
FEMA recognizes that many SSP recipients and subrecipients – particularly nonprofit organizations – may not have the requisite cash on hand readily available for immediate procurement of services. Given this situation, FEMA will allow for advanced-based funding in addition to the preferred reimbursement-based funding, with the following caveats:

**Reimbursement**
Payment by reimbursement is the preferred method (see 2 C.F.R. § 200.305). As a prerequisite of SSP approval for reimbursement requests, recipients shall include proof of purchase, in the form of a canceled check or credit card transaction, active SAM.gov registration, and a final invoice(s) in each reimbursement SSP Program payment/drawdown request. In accordance with U.S. Department of Treasury regulations at 31 C.F.R. Part 205, if applicable, the recipient shall maintain procedures to minimize the time elapsing between the transfer of funds and the disbursement of said funds.

**Advance Funding**
Recipients may be paid in advance, provided they maintain or demonstrate the willingness and ability to maintain procedures to minimize the time elapsing between the transfer of funds and its disbursement by the recipient (not to exceed 30 days), and the financial management systems that meet the standards for fund control and accountability as established in 2 C.F.R. Part 200. The recipient shall include invoice(s) and/or purchase orders for advance SSP payment/drawdown requests. In the case of advance payments, recipients must submit additional documentation (e.g., A-Number template) after the disbursement of funds. EHP review requirements must be met prior to advanced payments. Although advance drawdown requests are permissible, recipients remain subject to applicable federal laws in effect at the time a grant is awarded to the recipient. Governing interest requirements include the Uniform Administrative Requirements Cost Principles, and Audit Requirements for Federal Awards at 2 C.F.R. Part 200 and the Cash Management Improvement Act (CMIA) and its implementing regulations at 31 C.F.R. Part 205. Interest under CMIA will accrue from the time federal funds are credited to a

recipient's account until the time the recipient pays out the funds for program purposes. For the rate to use in calculating interest, please visit Treasury Current Value rate.

**Payment Requests During Closeout**

A recipient may only submit reimbursement payment requests up to 120 calendar days after the expiration of the period of performance, during an award's closeout reconciliation. Reimbursement payments are the only eligible type of requests to be submitted after a grant's period of performance has expired. The expenditure must have been obligated and received during the period of performance of the award. The recipient's request should contain clear and specific information certifying that the liquidation of federal funds is reimbursement for an obligation properly incurred during the active period of performance; FEMA may request documentation supporting the reimbursement for review at any time.

**Amendments**

FEMA may approve SSP award amendments on a case-by-case basis, for the following reasons:

- Extension of the period of performance in order to complete the scope of work;
- Changes to the activity, mission, retroactive approval (pre-award), closeout issues, and some excess funds requests;
- Program adjustments due to pressing need (transfer or redistribute available funds from uses described in the submitted budget to other uses within the grant scope);
- Budget changes (adding funds to award/non-closeout deobligation of funds); or
- Adding subrecipients to an award. To add a subrecipient to an award:
  - Provide the information listed on Tab 3 Subapplicant Information of the Application Worksheet.
  - Applicants must verify the nonprofit status of subapplicants and retain a copy of the documentation submitted by the subapplicant(s) as evidence of their nonprofit status for auditing purposes.

FEMA will only consider amendments submitted via FEMA GO. These requests must contain specific and compelling justifications for the requested change. Amendments or changes to the scope of work may require additional EHP review. FEMA strongly encourages recipients to expend grant funds in a timely manner, to be consistent with SSP goals and objectives. All amendments require recipients to maintain an active SAM.gov registration.

***NOTE: A recipient may deobligate (i.e., return) unused funds (i.e., those remaining funds previously drawn down via payment request and/or remaining award funding that was never requested) to DHS/FEMA prior to the end of an award's period of performance. To exercise this option, a recipient must submit an amendment via FEMA GO and state in the amendment that the unliquidated funds (i.e., the funds to be returned) are not necessary for the fulfillment or success of the grant's obligations or mission. The recipient must also indicate in the amendment that it understands that the returned funds will be deobligated and unavailable for any future award expenses. Deobligation of funds will decrease the federal portion of the grant and the amount of the recipient's Cost Share obligation. FEMA will confirm deobligation amendments with all points of contact; after confirmation of the recipient's intent to deobligate, FEMA will hold the approved deobligation request for 14 calendar days as a period for recipient reconsideration before FEMA processes the deobligation request. The deobligation of funds cannot be reversed.***

# EXHIBIT 2



# Office of Refugee and Immigrant Assistance
### Economic Services Administration | Community Services Division

### RE: DHS NOFO Fiscal Year 2024 Shelter and Services Program – Competitive

The Washington State Department of Social and Health Services' Office of Refugee and Immigrant Assistance (ORIA) is submitting this application to the Department of Homeland Security to provide emergency shelter and services to recently arrived noncitizen migrants.

**History and Overview**
Between 2022 and 2023, Washington has seen a significant increase in the number of migrants and asylum seekers arriving needing shelter and services. Washington estimates that 21,457 noncitizens arrived between January 2023 and December 20023, and approximately 18% (3,841 people) reported experiencing homelessness. Arriving from the Southwest border after being released from the Department of Homeland Security, many noncitizen migrants are entering the homeless crisis response system seeker shelter and safety. The housing and homeless crisis response system in Washington is already over capacity, and emergency shelters across the state are filled nightly. This system is unequipped to respond to the specific barriers and root causes that make newcomers vulnerable to experiencing homelessness.

In response to this situation, the DSHS Office of Refugee and Immigrant Assistance is launching the Washington Migrant and Asylum-Seeker Support Project. This project will utilize a hub and spoke model to ensure coordination across all service areas and to provide customized care to walk along-side each newcomer in navigating supports and services as they rebuild their lives in the United States. The project will provide six core areas of services, including reception and navigation services, emergency shelter, transitional housing, culturally responsive case management services, immigration-related legal services, and education, employment, and training services.

Washington is seeking funding from the DHS FEMA Shelter and Services Competitive application to provide emergency housing services to support qualified noncitizen migrants. DSHS ORIA serves as the primary applicant for this proposal and proposes to partner with subrecipient organizations to provide primary and secondary services. Currently, Washington estimates that there are proximately 1,200 to 1,500 noncitizen migrants residing in hotels, family shelters, or living in tent encampments. If awarded, DSHS ORIA would contract with multiple partner entities to provide allowable services under this funding, including shelter, acute medical care, food, outreach, translation, and other servicers.

**About DSHS Office of Refugee and Immigrant Assistance**
The Washington Office of Refugee and Immigrant Assistance coordinates statewide efforts to support the economic and social integration and basic needs of immigrant and refugees arriving and resettling in Washington. In Federal Fiscal Year 2024, ORIA invested over $100 million of federal and state funding into local community organizations to provide services focused on health and wellness, employment and training, immigration assistance and naturalization, and whole family programs. These programs and

services are provided by over 100 subrecipient organizations that specialize in providing culturally responsive and linguistically appropriate services.

In response to the community growing number of noncitizens migrants experiencing homelessness, the Washington State Legislature passed Substitute House Bill 2368 in 2024, which expands the legal authority for the DSHS Office of Refugee and Immigrant Assistance  to coordinate statewide efforts to support the economic and social integration and basic needs of immigrants and refugees arriving and resettling in Washington and to provide services to people who are ineligible for federal refugee resettlement services.  In addition, the Legislature appropriated $25,250,000 to DSHS ORIA for state fiscal years 2024 and 2025 to expand support services for individuals newly arriving to the U.S. and to Washington who do not qualify for federal refugee resettlement services.  Approximately, $10,000,000 of the annualized budget will provide humanitarian services as defined under the Shelter and Services Program notice of funding opportunity, and 100% of ORIA's annualized budget to support humanitarian services will go directly to noncitizen migrant services.

**Subrecipient Partners**
   a. The City of Tukwila provides support to noncitizen migrants and asylum seekers residing on the premises of the Riverton Park United Methodist Church as well as other locations throughout their jurisdiction. Their efforts support 200 to 250 people per night.
   b. The Seattle King County Department of Public Health has provided acute medical care to noncitizen migrants residing in various encampments and hotels.
   c. Mary's Place Seattle has a long history of welcoming noncitizen migrant families and providing shelter and services to them.  They propose anticipate serving 150 noncitizen migrants per night.
   d. DSHS ORIA is conducting an open application process to identify additional partners to provide humanitarian services, specifically shelter and emergency housing, to noncitizen migrants. This Notice of Funding Opportunity closes on June 13, 2024, will announce successful partners in July to start services in August 2024. DSHS ORIA anticipates serving an addition 425 noncitizens.

| Location | Estimated number of noncitizen migrants/day |
|---|---|
| City of Tukwila | 75 |
| Mary's Place | 150 |
| TBD – Orgs through NOFO | 300 |
| TOTAL Project | 525 |

### Table of Contents for Supporting Documentation

1. Sample Visual for the WA Migrant and Asylum Seeker Support Project                    p. 3
2. City of Tukwila: Riverton Park United Methodist Church Tent Contract                    p. 4
3. City of Tukwila: Innovative Impact Strategies, LLC – Asylee Humanitarian Event      p. 9

WA DSHS ORIA
DSH FEMA SSP 2024

1. **Sample Visual of the WA Migrant and Asylum-Seeker Support Project Pilot**





### *City of Tukwila*

6200 Southcenter Boulevard, Tukwila WA 98188

Contract Number: 24-041
Approved per Emergency
Proclamation 10/06/23

## CONTRACT FOR SERVICES

This Agreement is entered into by and between the City of Tukwila, Washington, a non-charter optional municipal code city hereinafter referred to as "the City," and **CORT Party Rental**, hereinafter referred to as "the Contractor," whose principal office is located at **6101 Associated Boulevard Suite 102 Everett, WA 98203**.

**WHEREAS,** the City has determined the need to have certain services performed for its citizens but does not have the manpower or expertise to perform such services; and

**WHEREAS,** the City desires to have the Contractor perform such services pursuant to certain terms and conditions; now, therefore,

**IN CONSIDERATION OF** the mutual benefits and conditions hereinafter contained, the parties hereto agree as follows:

1. **Scope and Schedule of Services to be Performed by Contractor.** The Contractor shall perform those services described on <u>Exhibit A</u> attached hereto and incorporated herein by this reference as if fully set forth. In performing such services, the Contractor shall at all times comply with all Federal, State, and local statutes, rules and ordinances applicable to the performance of such services and the handling of any funds used in connection therewith. The Contractor shall request and obtain prior written approval from the City if the scope or schedule is to be modified in any way.

2. **Compensation and Method of Payment.** The City shall pay the Contractor for services rendered according to the rate and method set forth on <u>Exhibit A</u> attached hereto and incorporated herein by this reference. The total amount to be paid shall not exceed **$284,035.33** at a rate **per Exhibit A plus estimates for heater and generator refueling and bi-weekly maintenance checks**.

3. **Contractor Budget.** The Contractor shall apply the funds received under this Agreement within the maximum limits set forth in this Agreement. The Contractor shall request prior approval from the City whenever the Contractor desires to amend its budget in any way.

4. **Duration of Agreement.**   This Agreement shall be in full force and effect for a period commencing **February 27, 2024**, and ending **August 27, 2024**, unless sooner terminated under the provisions hereinafter specified.

5. **Independent Contractor.** Contractor and City agree that Contractor is an independent contractor with respect to the services provided pursuant to this Agreement. Nothing in this Agreement shall be considered to create the relationship of employer and employee between the parties hereto. Neither Contractor nor any employee of Contractor shall be entitled to any benefits accorded City employees by virtue of the services provided under this Agreement. The City shall not be responsible for withholding or otherwise deducting federal income tax or social security or contributing to the State Industrial Insurance Program, or otherwise assuming the duties of an employer with respect to the Contractor, or any employee of the Contractor.

6. **Indemnification.** The Contractor shall defend, indemnify and hold the Public Entity, its officers, officials, employees and volunteers harmless from any and all claims, injuries, damages, losses or suits including attorney fees, arising out of or in connection with the performance of this Agreement, except for injuries and damages caused by the sole negligence of the Public Entity.

Should a court of competent jurisdiction determine that this Agreement is subject to RCW 4.24.115, then, in the event of liability for damages arising out of bodily injury to persons or damages to property caused by or resulting from the concurrent negligence of the Contractor and the Public Entity, its officers, officials, employees, and volunteers, the Contractor's liability hereunder shall be only to the extent of the Contractor's negligence. It is further specifically and expressly understood that the indemnification provided herein constitutes the Contractor's waiver of immunity under Industrial Insurance, Title 51 RCW, solely for the purposes of this indemnification. This waiver has been mutually negotiated by the parties. The provisions of this section shall survive the expiration or termination of this Agreement.

7. **Insurance.** The Contractor shall procure and maintain for the duration of the Agreement, insurance against claims for injuries to persons or damage to property which may arise from or in connection with the performance of the work hereunder by the Contractor, their agents, representatives, employees or subcontractors. Contractor's maintenance of insurance, its scope of coverage and limits as required herein shall not be construed to limit the liability of the Contractor to the coverage provided by such insurance, or otherwise limit the City's recourse to any remedy available at law or in equity.

   A. **Minimum Scope of Insurance.** Contractor shall obtain insurance of the types and with the limits described below:

      1. Automobile Liability insurance with a minimum combined single limit for bodily injury and property damage of $1,000,000 per accident. Automobile liability insurance shall cover all owned, non-owned, hired and leased vehicles. Coverage shall be written on Insurance Services Office (ISO) form CA 00 01 or a substitute form providing equivalent liability coverage. If necessary, the policy shall be endorsed to provide contractual liability coverage.

      2. Commercial General Liability insurance with limits no less than $2,000,000 each occurrence, $2,000,000 general aggregate and $2,000,000 products-completed operations aggregate limit. Commercial General Liability insurance shall be as least at broad as ISO occurrence form CG 00 01 and shall cover liability arising from premises, operations, independent contractors, products-completed operations, stop gap liability, personal injury and advertising injury, and liability assumed under an insured contract. The Commercial General Liability insurance shall be endorsed to provide a per project general aggregate limit using ISO form CG 25 03 05 09 or an equivalent endorsement. There shall be no exclusion for liability arising from explosion, collapse or underground property damage. The City shall be named as an additional insured under the Contractor's Commercial General Liability insurance policy with respect to the work performed for the City using ISO Additional Insured endorsement CG 20 10 10 01 and Additional Insured-Completed Operations endorsement CG 20 37 10 01 or substitute endorsements providing at least as broad coverage.

      3. Workers' Compensation coverage as required by the Industrial Insurance laws of the State of Washington.

   B. **Public Entity Full Availability of Contractor Limits.** If the Contractor maintains higher insurance limits than the minimums shown above, the Public Entity shall be insured for the full available limits of Commercial General and Excess or Umbrella liability maintained by the Contractor, irrespective of whether such limits maintained by the Contractor are greater than those required by this Contract or whether any certificate of insurance furnished to the Public Entity evidences limits of liability lower than those maintained by the Contractor.

   C. **Other Insurance Provision.** The Contractor's Automobile Liability and Commercial General Liability insurance policies are to contain, or be endorsed to contain that they shall be primary insurance with respect to the City. Any insurance, self-insurance, or insurance pool coverage maintained by the City shall be excess of the Contractor's insurance and shall not contribute with it.

   D. **Acceptability of Insurers.** Insurance is to be placed with insurers with a current A.M. Best rating

of not less than A: VII.

E. **Verification of Coverage.** Contractor shall furnish the City with original certificates and a copy of the amendatory endorsements, including but not necessarily limited to the additional insured endorsement, evidencing the insurance requirements of the Contractor before commencement of the work. Upon request by the City, the Contractor shall furnish certified copies of all required insurance policies, including endorsements, required in this Agreement and evidence of all subcontractors' coverage.

F. **Subcontractors.** The Contractor shall cause each and every Subcontractor to provide insurance coverage that complies with all applicable requirements of the Contractor-provided insurance as set forth herein, except the Contractor shall have sole responsibility for determining the limits of coverage required to be obtained by Subcontractors. The Contractor shall ensure that the Public Entity is an additional insured on each and every Subcontractor's Commercial General liability insurance policy using an endorsement as least as broad as ISO CG 20 10 10 01 for ongoing operations and CG 20 37 10 01 for completed operations.

G. **Notice of Cancellation.** The Contractor shall provide the City and all Additional Insureds for this work with written notice of any policy cancellation, within two business days of their receipt of such notice.

H. **Failure to Maintain Insurance.** Failure on the part of the Contractor to maintain the insurance as required shall constitute a material breach of contract, upon which the City may, after giving five business days notice to the Contractor to correct the breach, immediately terminate the contract or, at its discretion, procure or renew such insurance and pay any and all premiums in connection therewith, with any sums so expended to be repaid to the City on demand, or at the sole discretion of the City, offset against funds due the Contractor from the City.

8. **Record Keeping and Reporting.**

   A. The Contractor shall maintain accounts and records, including personnel, property, financial and programmatic records which sufficiently and properly reflect all direct and indirect costs of any nature expended and services performed in the performance of this Agreement and other such records as may be deemed necessary by the City to ensure the performance of this Agreement.
   B. These records shall be maintained for a period of seven (7) years after termination hereof unless permission to destroy them is granted by the office of the archivist in accordance with RCW Chapter 40.14 and by the City.

9. **Audits and Inspections.** The records and documents with respect to all matters covered by this Agreement shall be subject at all times to inspection, review or audit by law during the performance of this Agreement.

10. **Termination.** This Agreement may at any time be terminated by the City giving to the Contractor thirty (30) days written notice of the City's intention to terminate the same. Failure to provide products on schedule may result in contract termination. If the Contractor's insurance coverage is canceled for any reason, the City shall have the right to terminate this Agreement immediately.

11. **Discrimination Prohibited.** The Consultant, with regard to the work performed by it under this Agreement, will not discriminate on the grounds of race, religion, creed, color, national origin, age, veteran status, sex, sexual orientation, gender identity, marital status, political affiliation, the presence of any disability, or any other protected class status under state or federal law, in the selection and retention of employees or procurement of materials or supplies.

12. **Assignment and Subcontract.** The Contractor shall not assign or subcontract any portion of the services contemplated by this Agreement without the written consent of the City.

13. **Entire Agreement; Modification.** This Agreement, together with attachments or addenda, represents the entire and integrated Agreement between the City and the Contractor and supersedes all prior negotiations, representations, or agreements written or oral. No amendment or modification of this Agreement shall be of any force or effect unless it is in writing and signed by the parties.

14. **Severability and Survival.** If any term, condition or provision of this Agreement is declared void or unenforceable or limited in its application or effect, such event shall not affect any other provisions hereof and all other provisions shall remain fully enforceable. The provisions of this Agreement, which by their sense and context are reasonably intended to survive the completion, expiration or cancellation of this Agreement, shall survive termination of this Agreement.

15. **Notices.** Notices to the City of Tukwila shall be sent to the following address:

> City Clerk, City of Tukwila
> 6200 Southcenter Blvd.
> Tukwila, Washington 98188
>
> Notices to the Contractor shall be sent to the address provided by the Contractor upon the signature line below.

16. **Applicable Law: Venue: Attorney's Fees.** This Agreement shall be governed by and construed in accordance with the laws of the State of Washington. In the event any suit, arbitration, or other proceeding is instituted to enforce any term of this Agreement, the parties specifically understand and agree that venue shall be properly laid in King County, Washington. The prevailing party in any such action shall be entitled to its attorney's fees and costs of suit.

DATED this 26th day of February, 2024.

CITY OF TUKWILA

*Thomas McLeod*
8EE24380545B44C

Thomas McLeod, Mayor    4/5/2024 | 4:35 PM PDT

ATTEST/AUTHENTICATED:

3D04AB9746EA4EB

Andy Youn, City Clerk

APPROVED AS TO FORM:

*Kari L. Sand*
6E499CA4166E462

Office of the City Attorney

CONTRACTOR:

By: *Felix Felipa*
1566AC02A49E41E...

Printed Name: Felix Felipa

Title: Project Manager

Address: 6101 Associated Blvd suite 102
Everett Wa 98203

# Exhibit A – Scope of Work & Pricing

## City of Tukwila Pricing (Confidential) - Riverton

| Riverton Tent - In Parking Area | Quantity | Rate | 1st 28-Day Period | Each Following 28-Day Period | Final 28-Day Period |
|---|---|---|---|---|---|
| 12.5m x 22.5m x 4m (41'x74') Clearspan Structure | 1 | $ 6,100.00 | $ 6,100.00 | $ 4,575.00 | $ 6,100.00 |
| Solid Wall, 4m tall surround, (HVAC, Solid Panels, Doors) | 1 | $ 4,050.00 | $ 4,050.00 | $ 3,037.50 | $ 4,050.00 |
| Double Glass Door w/Filler Wall Surround | 2 | $ 890.00 | $ 1,780.00 | $ 1,335.00 | $ 1,780.00 |
| Lay Down Sub Floor, PVC Non-Slip Finish | 1 | $ 3,100.00 | $ 3,100.00 | $ 2,325.00 | $ 1,550.00 |
| Entrance Transitions, ingress/egress | 2 | $ 100.00 | $ 200.00 | $ 150.00 | $ 200.00 |
| Interior LED Hi-Bay Lighting & Exterior LED Light, Fans | 1 | $ 796.00 | $ 796.00 | $ 597.00 | $ 796.00 |
| Diesel Heat w/thermostat control and ducting | 1 | $ 1,400.00 | $ 1,400.00 | $ 1,400.00 | $ 1,400.00 |
| Power Distribution, 4 - 20 Amp, 2 - 15 Amp Circuits | 1 | $ 750.00 | $ 750.00 | $ 750.00 | $ 750.00 |
| Light Switch Outfit | 1 | $ 500.00 | $ - | $ 500.00 | $ 500.00 |
| Hybrid Generator, 20kw, includes emission surcharges | 1 | $ 6,700.00 | $ 6,700.00 | $ 6,700.00 | $ 6,700.00 |
| Transcube, 251 gallon fuel cube | 2 | $ 800.00 | $ 1,600.00 | $ 1,600.00 | $ 1,600.00 |
| Fire and Safety Package | 2 | $ 125.00 | $ 250.00 | $ 187.50 | $ 250.00 |
| Storage Container | 1 | $ 283.12 | $ 283.12 | $ 400.00 | $ 400.00 |
| Machinery to Move Container | 1 | $ 1,051.88 | $ 1,051.88 | | |
| Wall Replacement | 1 | $ 100.00 | $ 100.00 | $ - | $ - |
| Emergency Wall Add On | 1 | $ 187.50 | $ 187.50 | $ 187.50 | $ 187.50 |
| Diesel Fuel (Refills) 1st Month | 1 | $ 5,498.59 | $ 5,498.59 | | |
| Diesel Fuel (Refills) Estimate Future Months | 1 | $ - | $ - | $ 8,040.00 | $ 8,040.00 |
| 14" x 16" Base Plates | 95 | $ 4.25 | $ 403.75 | $ 403.75 | $ 403.75 |
| 8' x 1.5" Drape Uprights | 95 | $ 4.25 | $ 403.75 | $ 403.75 | $ 403.75 |
| 3'-5' Telescoping Crossbars | 60 | $ 4.25 | $ 255.00 | $ 255.00 | $ 255.00 |
| 6'-10' Telescoping Crossbars | 89 | $ 4.25 | $ 378.25 | $ 378.25 | $ 378.25 |
| 8' x 4' Banjo Drape (5 on Family / 3 on Singles) | 219 | $ 4.25 | $ 930.75 | $ 930.75 | $ 465.38 |
| **Equipment Subtotal** | | | $ 36,218.59 | $ 34,156.00 | $ 36,209.63 |
| **Install/Removal Services** | | | | | |
| Transportation | 1 | $ 1,800.00 | $ 1,800.00 | | $ 1,800.00 |
| Storage Container Delivery | 1 | $ 233.58 | $ 233.58 | | $ 330.00 |
| Additional Delivery for Wall | 1 | $ 165.00 | $ 165.00 | | $ - |
| Materials & Consumables | 1 | $ 730.00 | $ 730.00 | | $ - |
| Foreman, per person per hour | 16 | $ 95.00 | $ 1,520.00 | | $ 1,064.00 |
| Experienced Helper, per person per hour | 80 | $ 65.00 | $ 5,200.00 | | $ 3,640.00 |
| Electrician, per person per hour, estimate | 0 | $ 135.00 | $ - | | $ - |
| Machinery (rough estimate) | 1 | $ 1,800.00 | $ 1,800.00 | | $ 1,800.00 |
| Main Bussing Fee (TBD) | 1 | $ 250.00 | $ 250.00 | | $ - |
| Tent Bonding Fee | 1 | $ 50.00 | $ 50.00 | | $ - |

.com PARTY RENTAL

| | Qty | Rate | | Amount | |
|---|---|---|---|---|---|
| Temporary Canopy Permit (TBD) | 1 | $ - | $ - | $ - | |
| Temporary Electrical Permit (TBD) | 1 | $ - | $ - | $ - | |
| Locate Utilities, for Staking the Tent (rough estimate) | 1 | $ 320.00 | $ 320.00 | $ - | |
| Transportation (Pipe & Drape) | 1 | $ 100.00 | $ 100.00 | $ 100.00 | |
| Foreman, per person per hour (Pipe & Drape) | 4 | $ 95.00 | $ 380.00 | $ 285.00 | |
| Experienced Helper, per person per hour (Pipe & Drape) | 8 | $ 65.00 | $ 520.00 | $ 390.00 | |
| **Services Subtotal** | | | $ 13,068.58 | $ - | $ 9,409.00 |
| | | | | | |
| **Subtotal** | | | $ 49,287.17 | $ 34,156.00 | $ 45,618.63 |
| **Tax, 10.10%** | | | $ 4,978.00 | $ 3,449.76 | $ 4,607.48 |
| **Total** | | | $ 54,265.17 | $ 37,605.76 | $ 50,226.11 |

* Pricing is estimated, depends on site visit and exact specifications from Customer
* Quote is valid for 30 days from 2.5.2024
* Bi-Weekly Maintenance Checks to be Invoiced out Separately
* Estimate for refueling diesel heater $2400 per month
* Estimate for refueling Hybrid generator $1100 per month



Exhibit B - Site Layout

41' x 74' Tent Structure
Divided into 2 spaces:
41' x 33'
41' x 44'

PARTY RENTAL

CORT

Date: 2/9/2024
Project: Riverton Church
Owner: Pete Mayer
Designer: Phil Heidt

EXIT

EXIT

HEAT

FUEL

Battery Generator

Feet



# AGREEMENT FOR CONTRACT SERVICES
## Exhibit C: Contract Coding

| Item # | Description (30 characters) | GL Key | GL Object | JL Key | JL Object | Amount ($) |
|--------|------------------------------|--------|-----------|--------|-----------|------------|
| 1 | Tent Installation | | | | | 14,388.51 |
| 2 | 1st 28-Day Period Rental | | | | | 39,876.67 |
| 3 | 2nd – 5th 28-Day Period Rental | | | | | 150,423.04 |
| 4 | Final 28-Day Period Rental | GF000510 | 541007 | 12301001 | 5000000 | 39,866.80 |
| 5 | Tent Removal | | | | | 10,359.31 |
| 6 | Diesel Refueling | | | | | 15,854.40 |
| 7 | Generator Refueling | | | | | 7,266.60 |
| 8 | Maintenance Checks | | | | | 6,000.00 |
| | | | | | **Total:** | $284,035.33 |

Notes:
- Contractor shall be paid via check mailed by United States Postal Service
- Contractor shall be paid only upon issuance of written invoice(s) to the City
- Verification of work shall be provided by Innovative Impact Strategies



### *City of Tukwila*
6200 Southcenter Boulevard, Tukwila WA 98188

Agreement Number: 23-166(b)
Council Approval 5/6/24

## CONTRACT FOR SERVICES

### Amendment #2

### Between the City of Tukwila and Innovative Impact Strategies, LLC.

That portion of Contract No. **23-166** between the City of Tukwila and **Innovative Impact Strategies, LLC.** is hereby amended as follows:

**Section 2**: Scope of Services. The Consultant agrees to perform the services, identified on the amended Exhibit "A" attached hereto, including the provision of all labor, materials, equipment and supplies.

**Section 4**: Payment. The not to exceed amount referenced in Subsection A is hereby increased to $400,000.

All other provisions of the contract shall remain in full force and effect.

Dated this 21st day of May, 2024.

CITY OF TUKWILA

DocuSigned by:
*Thomas McLeod*
————————————————
8E52438D545B44C...
Thomas McLeod, Mayor    5/22/2024 | 1:58 PM PDT

CONTRACTOR

DocuSigned by:
*Colin DeForrest*
————————————————
EE09718AF4C5040A...
Colin DeForrest, Owner

ATTEST/AUTHENTICATED:

DocuSigned by:
————————————————
3D04AB9746E44E8...
Andy Youn, City Clerk

APPROVED AS TO FORM:

DocuSigned by:
*Kari L. Sand*
————————————————
5E499CA4165E452...
Office of the City Attorney

Exhibit A – Amended Scope of Services

**Asylee Seeker Response Transition Proposal**
*A proposal to transition from an emergency response framework to a routine operational state that can be adequately supported and sustained over time (akin to moving from response to recovery).*

**City Objectives**
1) To develop a demobilization plan that includes the transition of the City's response to the asylee seeker humanitarian crisis from a modified ICS structure to routine operations.
2) To temporarily engage i2 Strategies in providing advance planning and coordination services associated with the City's response to the asylum seeker crisis.
3) To advocate for and develop a strategic response framework that the State can operationalize and sustain.
4) To utilize the 2025-26 budget process to develop a staffing proposal that provides an adequate level of support to address asylee seeker related matters and other homelessness response needs while also potentially supplementing and supporting other Human Services needs in the City of Tukwila.

**I2 Strategies Proposed Amended Scope of Work**
1) Routinely coordinate with Riverton Park United Methodist Church on asylee related matters
2) Routinely collaborate with City of Tukwila departments, regional, state and national partners, including DSHS ORIA, City of Seattle Office of Immigrant and Refugee Affairs, Thrive International, King County Adult Services Division- Department of Community and Human Services and Department of Homeland Security regarding asylee related matters impacting the City of Tukwila.
3) Mitigate impacts associated with anticipated asylee seeker displacement from short-term emergency sheltering opportunities and the effects of inclement weather.
4) Engage in planning for the de-mobilization of the temporary heated walled tent (post 180-day plan) and develop a sustainable and desired "future state" at RPUMC.
5) Assist the City in strategically prioritizing and deploying State and County funding in support of the unsheltered, including temporary housing, case management, services, etc.
6) Coordinate with City departments and others for the expansion of tiny homes (e.g. planning, permitting/land use, coordination with partners and vendors, etc) and/or other transitional housing options (e.g. hotel stays & master leases, etc).  Assist in the development of policies and proposed amendments to city code related to emergency sheltering and encampments.
7) Develop plans, strategies, and proposals to invest anticipated State and County appropriations that support the City's policy goals and priorities for the unsheltered.
8) Recommend policies and legislative actions to address immigration and unsheltered individuals.
9) Develop mitigation plans and humane responses to lessen the impact of future emergencies related to asylee seekers, immigrants and refugees.
10) Other related work as mutually agreed to.



## *City of Tukwila*

6200 Southcenter Boulevard, Tukwila WA 98188

Agreement Number: 23-166(a)
Approved per Emergency
Proclamation 10/06/23

## CONTRACT FOR SERVICES

### Amendment #1

### Between the City of Tukwila and Innovative Impact Strategies, LLC.

That portion of Contract No. **23-166** between the City of Tukwila and **Innovative Impact Strategies, LLC.** is hereby amended as follows:

## Section 4:

The not to exceed amount referenced in Subsection A is hereby increased to $100,000.

All other provisions of the contract shall remain in full force and effect.

Dated this 13th day of November, 2023.

CITY OF TUKWILA

*Allan Ekberg*
1F89FE091328402...
Allan Ekberg, Mayor  11/15/2023 | 4:03 PM PST

CONTRACTOR:

By: *Colin DeForrest* 11/13/2023 | 2:52 PM PST
EE0B14AF-ACB040A...

Printed Name: Colin DeForrest

Title: Owner

ATTEST/AUTHENTICATED:

*Christy O'Flaherty*
8867B4B3CB594E7...
Christy O'Flaherty, City Clerk

APPROVED AS TO FORM:

*Kari L. Sand*
5E499CA4165E452...
Office of the City Attorney

*City of Tukwila*

6200 Southcenter Boulevard, Tukwila WA 98188

Contract Number: 23-166
Council Approval N/A

## PROFESSIONAL SERVICES AGREEMENT
*(Includes consultants, architects, engineers, accountants, and other professional services)*

**THIS AGREEMENT** is entered into between the City of Tukwila, Washington, hereinafter referred to as "the City", and **Innovative Impact Strategies, LLC**, hereinafter referred to as "the Consultant", in consideration of the mutual benefits, terms, and conditions hereinafter specified.

1. **Project Designation**.  The Consultant is retained by the City to perform Homeless Services Consulting services in connection with the project titled **Asylee Humanitarian Event Consulting Services**.

2. **Scope of Services**.  The Consultant agrees to perform the services, identified on Exhibit "A" attached hereto, including the provision of all labor, materials, equipment and supplies.

3. **Duration of Agreement; Time for Performance**.  This Agreement shall be in full force and effect for a period commencing upon execution and ending 12/31/2024 unless sooner terminated under the provisions hereinafter specified.  Work under this Agreement shall commence upon written notice by the City to the Consultant to proceed.  The Consultant shall perform all services and provide all work product required pursuant to this Agreement no later than **12/31/2024** unless an extension of such time is granted in writing by the City.

4. **Payment**.  The Consultant shall be paid by the City for completed work and for services rendered under this Agreement as follows:

   A. Payment for the work provided by the Consultant shall be made as provided on Exhibit "B" attached hereto, provided that the total amount of payment to the Consultant shall not exceed **$39,999.00** without express written modification of the Agreement signed by the City.

   B. The Consultant may submit vouchers to the City once per month during the progress of the work for partial payment for that portion of the project completed to date.  Such vouchers will be checked by the City and, upon approval thereof, payment shall be made to the Consultant in the amount approved.

   C. Final payment of any balance due the Consultant of the total contract price earned will be made promptly upon its ascertainment and verification by the City after the completion of the work under this Agreement and its acceptance by the City.

   D. Payment as provided in this section shall be full compensation for work performed, services rendered, and for all materials, supplies, equipment and incidentals necessary to complete the work.

   E. The Consultant's records and accounts pertaining to this Agreement are to be kept available for inspection by representatives of the City and the state of Washington for a period of three (3) years after final payments.  Copies shall be made available upon request.

5.    **Ownership and Use of Documents**.  All documents, drawings, specifications and other materials produced by the Consultant in connection with the services rendered under this Agreement shall be the property of the City whether the project for which they are made is executed or not.  The Consultant shall be permitted to retain copies, including reproducible copies, of drawings and specifications for information, reference and use in connection with the Consultant's endeavors.  The Consultant shall not be responsible for any use of the said documents, drawings, specifications or other materials by the City on any project other than the project specified in this Agreement.

6.    **Compliance with Laws**.  The Consultant shall, in performing the services contemplated by this Agreement, faithfully observe and comply with all federal, state, and local laws, ordinances and regulations, applicable to the services rendered under this Agreement.

7.    **Indemnification**.  The Consultant shall defend, indemnify and hold the City, its officers, officials, employees and volunteers harmless from any and all claims, injuries, damages, losses or suits including attorney fees, arising out of or resulting from the acts, errors or omissions of the Consultant in performance of this Agreement, except for injuries and damages caused by the sole negligence of the City.

Should a court of competent jurisdiction determine that this Agreement is subject to RCW 4.24.115, then, in the event of liability for damages arising out of bodily injury to persons or damages to property caused by or resulting from the concurrent negligence of the Consultant and the City, its officers, officials, employees, and volunteers, the Consultant's liability hereunder shall be only to the extent of the Consultant's negligence.  It is further specifically and expressly understood that the indemnification provided herein constitutes the Consultant's waiver of immunity under Industrial Insurance, Title 51 RCW, solely for the purposes of this indemnification.  This waiver has been mutually negotiated by the parties.  The provisions of this section shall survive the expiration or termination of this Agreement.

8.    **Insurance**.  The Consultant shall procure and maintain for the duration of the Agreement, insurance against claims for injuries to persons or damage to property which may arise from or in connection with the performance of the work hereunder by the Consultant, its agents, representatives, or employees.  Consultant's maintenance of insurance as required by the agreement shall not be construed to limit the liability of the Consultant to the coverage provided by such insurance, or otherwise limit the City's recourse to any remedy available at law or in equity.

A.  **Minimum Amounts and Scope of Insurance.**  Consultant shall obtain insurance of the types and with the limits described below:

1.  Automobile Liability insurance with a minimum combined single limit for bodily injury and property damage of $1,000,000 per accident.  Automobile Liability insurance shall cover all owned, non-owned, hired and leased vehicles.  Coverage shall be written on Insurance Services Office (ISO) form CA 00 01 or a substitute form providing equivalent liability coverage.  If necessary, the policy shall be endorsed to provide contractual liability coverage.

2.  Commercial General Liability insurance with limits no less than $2,000,000 each occurrence, $2,000,000 general aggregate. Commercial General Liability insurance shall be at least as broad as ISO occurrence form CG 00 01 and shall cover liability arising from premises, operations, stop-gap independent contractors and personal injury and advertising injury.  The City shall be named as an additional insured under the Consultant's Commercial General Liability insurance policy with respect to the work performed for the City using an additional insured endorsement at least as broad as ISO endorsement form CG 20 26.

3.  Workers' Compensation coverage as required by the Industrial Insurance laws of the State of Washington.

    4. <u>Professional Liability</u> with limits no less than $2,000,000 per claim and $2,000,000 policy aggregate limit. Professional Liability insurance shall be appropriate to the Consultant's profession.

B. **Public Entity Full Availability of Contractor Limits.** If the Contractor maintains higher insurance limits than the minimums shown above, the Public Entity shall be insured for the full available limits of Commercial General and Excess or Umbrella liability maintained by the Contractor, irrespective of whether such limits maintained by the Contractor are greater than those required by this Contract or whether any certificate of insurance furnished to the Public Entity evidences limits of liability lower than those maintained by the Contractor.

C. **Other Insurance Provision.** The Consultant's Automobile Liability and Commercial General Liability insurance policies are to contain, or be endorsed to contain that they shall be primary insurance with respect to the City. Any Insurance, self-insurance, or insurance pool coverage maintained by the City shall be excess of the Consultant's insurance and shall not be contributed or combined with it.

D. **Acceptability of Insurers.** Insurance is to be placed with insurers with a current A.M. Best rating of not less than A:VII.

E. **Verification of Coverage.** Consultant shall furnish the City with original certificates and a copy of the amendatory endorsements, including but not necessarily limited to the additional insured endorsement, evidencing the insurance requirements of the Contractor before commencement of the work. Upon request by the City, the Consultant shall furnish certified copies of all required insurance policies, including endorsements, required in this Agreement and evidence of all subcontractors' coverage.

F. **Notice of Cancellation.** The Consultant shall provide the City with written notice of any policy cancellation, within two business days of their receipt of such notice.

G. **Failure to Maintain Insurance.** Failure on the part of the Consultant to maintain the insurance as required shall constitute a material breach of contract, upon which the City may, after giving five business days notice to the Consultant to correct the breach, immediately terminate the contract or, at its discretion, procure or renew such insurance and pay any and all premiums in connection therewith, with any sums so expended to be repaid to the City on demand, or at the sole discretion of the City, offset against funds due the Consultant from the City.

9.    <u>**Independent Contractor**</u>. The Consultant and the City agree that the Consultant is an independent contractor with respect to the services provided pursuant to this Agreement. Nothing in this Agreement shall be considered to create the relationship of employer and employee between the parties hereto. Neither the Consultant nor any employee of the Consultant shall be entitled to any benefits accorded City employees by virtue of the services provided under this Agreement. The City shall not be responsible for withholding or otherwise deducting federal income tax or social security or for contributing to the state industrial insurance program, otherwise assuming the duties of an employer with respect to the Consultant, or any employee of the Consultant.

10.   <u>**Covenant Against Contingent Fees**</u>. The Consultant warrants that he has not employed or retained any company or person, other than a bonafide employee working solely for the Consultant, to solicit or secure this contract, and that he has not paid or agreed to pay any company or person, other than a bonafide employee working solely for the Consultant, any fee, commission, percentage, brokerage fee, gifts, or any other consideration contingent upon or resulting from the award or making of this contract. For breach or violation of this warrant, the City shall have the right to annul this contract without liability, or in its discretion to deduct from the contract price or consideration, or otherwise recover, the full amount of such fee, commission, percentage, brokerage fee, gift, or contingent fee.

11. **Discrimination Prohibited.**  Contractor, with regard to the work performed by it under this Agreement, will not discriminate on the grounds of race, religion, creed, color, national origin, age, veteran status, sex, sexual orientation, gender identity, marital status, political affiliation, the presence of any disability, or any other protected class status under state or federal law, in the selection and retention of employees or procurement of materials or supplies.

12. **Assignment.**  The Consultant shall not sublet or assign any of the services covered by this Agreement without the express written consent of the City.

13. **Non-Waiver.**  Waiver by the City of any provision of this Agreement or any time limitation provided for in this Agreement shall not constitute a waiver of any other provision.

14. **Termination.**

   A.  The City reserves the right to terminate this Agreement at any time by giving ten (10) days written notice to the Consultant.

   B.  In the event of the death of a member, partner or officer of the Consultant, or any of its supervisory personnel assigned to the project, the surviving members of the Consultant hereby agree to complete the work under the terms of this Agreement, if requested to do so by the City.  This section shall not be a bar to renegotiations of this Agreement between surviving members of the Consultant and the City, if the City so chooses.

15. **Applicable Law; Venue; Attorney's Fees.**  This Agreement shall be subject to, and the Consultant shall at all times comply with, all applicable federal, state and local laws, regulations, and rules, including the provisions of the City of Tukwila Municipal Code and ordinances of the City of Tukwila.  In the event any suit, arbitration, or other proceeding is instituted to enforce any term of this Agreement, the parties specifically understand and agree that venue shall be properly laid in King County, Washington.  The prevailing party in any such action shall be entitled to its attorney's fees and costs of suit.  Venue for any action arising from or related to this Agreement shall be exclusively in King County Superior Court.

16. **Severability and Survival.**  If any term, condition or provision of this Agreement is declared void or unenforceable or limited in its application or effect, such event shall not affect any other provisions hereof and all other provisions shall remain fully enforceable.  The provisions of this Agreement, which by their sense and context are reasonably intended to survive the completion, expiration or cancellation of this Agreement, shall survive termination of this Agreement.

17. **Notices.**  Notices to the City of Tukwila shall be sent to the following address:

   City Clerk
   City of Tukwila
   6200 Southcenter Boulevard
   Tukwila, WA  98188

Notices to Consultant shall be sent to the following address:

   **Colin DeForrest – Innovative Impact Strategies, LLC**
   **7816 119th Street Court East**
   **Puyallup, WA 98373**

18. **Entire Agreement; Modification.**  This Agreement, together with attachments or addenda, represents the entire and integrated Agreement between the City and the Consultant and supersedes all prior negotiations, representations, or agreements written or oral.  No amendment or modification of this Agreement shall be of any force or effect unless it is in writing and signed by the parties.

DATED this 30th day of October, 2023.

CITY OF TUKWILA

*Allan Ekberg*
1F89FE09132B402...

Allan Ekberg, Mayor    10/30/2023 | 4:54 PM PDT

CONSULTANT:

By: *Colin DeForrest*    10/30/2023 | 12:32 P
EE0914A-ACB040A...

Printed Name: Colin DeForrest

Title: Owner

ATTEST/AUTHENTICATED:

*Christy O'Flaherty*
88678483CB594E7...

Christy O'Flaherty, City Clerk

APPROVED AS TO FORM:

*Kari L. Sand*
5E499CA4165E452...

Office of the City Attorney

**EXHIBITS A & B**

## INNOVATIVE IMPACT STRATEGIES – CITY OF TUKWILA

*Homeless Services Consulting and Response Services*

## Consultant Contract and Scope of Work

October 2023

City of Tukwila has retained Innovative Impact Strategies, LLC (consultant) to provide homeless service consulting services to the city of Tukwila.  This will include tasks identified below. Specific attention will be given to the homeless encampment of around 200 asylum seeking individuals (including families and children) located on Riverton Park United Methodist Church (RPUMC). Assistance will be provided for the emergency declaration and response at this site.

This work will begin October 2023. Work will be completed by i2-strategies staff, including - Colin DeForrest (principal), or Stephanie Martinez, (Senior Consultant), or other i2-strategies staff. Staff will perform all work at the rates outlined below, plus reimbursement for any purchases or fees related to onsite work under the direction of city of Tukwila management.  Additional consultant support, if required, may be negotiated, extended or scoped separately.

- **Consultant and Subject Matter Expert Services - $150/hour**
- **Coordinator and Monitoring and Maintenance Services - $60/hour**
- **Outreach and Translation Services - $50/hour**

The following outlines tasks and deliverables to be produced by consultant in coordination with city of Tukwila leadership:

**Task 1: SITE ASSESSMENT AND ONSITE SNAPSHOT OF RPUMC ASYLUM ENCAMPMENT**

- Regularly visit RPUMC encampment site.
- Site Monitoring services
- Assess site and surroundings.
- Create an "Onsite Snapshot" of the site which includes:
    - Bynames list of all individuals living at the site.
    - Number of children at the site (under 18 years old).
    - Number of families at the site
    - Number of workable individuals at the site.
    - Other agreed upon data.
- Site tagging of all tents and structures at the site.
    - Match individuals and families with each tent or structure
    - Identify any concerning or unsafe situations.

**Task 2: SITE LAYOUT AND DESIGN RECOMMENDATIONS**

- Create a temporary site layout and design plan for the RPUMC encampment.
    - Identify maximum capacity.
    - Safely space sites and create access lanes.
- Create a safe site for all.
    - Individuals and families living at the site.
    - The larger surrounding community
- Identify Crime Prevention through Environmental Design (CPTED) techniques to implement at site(s).
    - Site lines
    - Access control
    - Vegetation management
    - Clear perimeter boundaries
    - Lighting
    - Other

**Task 3: COMMUNITY AND PARTNER SUPPORT AND ENGAGEMENT**

- Work directly and closely with community partners like Pastor Jan and RPUMC staff as well as other partners from the community.
- Work closely with city of Tukwila staff to ensure we are always on the same page.
    - As needed, assist the city of Tukwila's designated liaison with connecting to partners and other governmental agencies.
    - Support city of Tukwila staff in all ways possible.

**Task 4:  ONGOING SUBJECT MATTER EXPERT SUPPORT AS IDENTIFIED AND NEEDED BY THE CITY OF TUKWILA**

- Additional site logistics, site design, and implementation if new sites are identified.
- Additional consulting support if further emergency declaration steps are identified. This work will be tailored to the needs of the City of Tukwila.
- Onsite Monitoring and Maintenance services at any City of Tukwila involved sites.
- Ongoing homeless services response support including outreach, navigation and translation services.

Innovative Impact Strategies, LLC                    City of Tukwila


By:  Colin DeForrest                                By:  Allan Ekberg

DocuSigned by:
*Colin DeForrest*
x_____Date 10/30/2023  |  12:32 PM PDT
EEU814A-ACBU4UA...                          x_____Date_____

# EXHIBIT 3

## SSP Application Information

| Applicant Name: | DEPARTMENT OF SOCIAL & HEALTH SERVICES |
|---|---|
| Applicant UEI: | SEYQXMXJLUP5 |

| Facility address(es) where services will be provided to noncitizen migrants:<br><br>To add more facilities, right click row 27 in the worksheet and select "Insert row" as appropriate | Street (Input facility address where services will be provided to noncitizen migrants) (e.g., 123 Main Street, Suite 456) | City (e.g., Springfield) | State (e.g., Missouri) | Zip Code (e.g., 12345) | County (e.g., Brown) |
|---|---|---|---|---|---|
| City of Tukwila (Riverton Park United Methodist Church) | 3118 South 140th Street | Tukwila | Washington | 98168 | King |
| Mary's Place Shelter | 12845 Ambaum Blvd SW | Burien | Washington | 98146 | King |
| Mary's Place Shelter | 10621 NE 12th Street | Bellevue | Washington | 98004 | King |
| Mary's Place Shelter | 720 Blanchard Street | Seattle | Washington | 98121 | King |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## SSP Application Certifications

| | Enter AOR Name and Date to sign digitally |
|---|---|
| 1. I certify that all entities represented by this application have, or will have, internal controls and processes in place to clearly identify migrants who will be receiving services to be funded by SSP dollars and to ensure said migrants were processed and released from DHS apart from other populations served. | Sarah Peterson, 6/21/2024 |
| 2. For reimbursement funding: I certify that all entities represented by this application have or will have verified status and release dates of served noncitizen migrants by Alien Registration Number (A-number) or evidence of DHS processing (e.g., I-94, I-385, I-860, I-862) for any A-numbers being submitted with this application. | Sarah Peterson, 6/21/2024 |
| 3. **[IF APPLICABLE]** For advanced funding: Specify the process below by which all entities represented by this application will collect and track A numbers or evidence of DHS processing (e.g., I-94, I-385, I-860, I-862) and release dates for all noncitizen migrants served by SSP funding. | N/A |

**[IF APPLICABLE]** Please specify the advanced funding process for Certification #3 here:

**End of Sheet**

# EXHIBIT 4

# Award Letter

U.S. Department of Homeland Security
Washington, D.C. 20472

Effective date: 09/26/2024

Christina Choate
DEPARTMENT OF SOCIAL & HEALTH SERVICES
PO BOX 45842
OLYMPIA, WA 98504

EMW-2024-SP-05140

Dear Christina Choate,

Congratulations on behalf of the Department of Homeland Security, your application submitted for the FY 2024 Shelter and Services Program, has been approved in the amount of $4,039,516.00 in Federal funding. This award of federal assistance is executed as a Grant.

Before you request and receive any of the Federal funds awarded to you, you must establish acceptance of the award through the FEMA Grants Outcomes (FEMA GO) system. By accepting this award, you acknowledge that the terms of the following documents are incorporated into the terms of your award:

- Award Summary - included in this document
- Agreement Articles - included in this document
- Obligating Document - included in this document
- FY 2024 Shelter and Services Program Notice of Funding Opportunity

Please make sure you read, understand, and maintain a copy of these documents in your official file for this award.

Sincerely,

PAMELA WILLIAMS
Assistant Administrator, Grant Programs
Region 4

# Award Summary

**Program:** Fiscal Year 2024 Shelter and Services Program
**Recipient:** DEPARTMENT OF SOCIAL & HEALTH SERVICES
**UEI-EFT:** SEYQXMXJLUP5
**DUNS number:** 127347115
**Award number:** EMW-2024-SP-05140

## Summary description of award

The Fiscal Year (FY) 2024 Shelter and Services Program (SSP) provides grant funding to non-federal entities that serve noncitizen migrants recently released from DHS custody to temporarily provide shelter, food, transportation, acute medical care, personal hygiene supplies, and labor necessary to manage cases to provide these services, and to provide funding to non-federal entities to increase their capacity to temporarily shelter noncitizen migrants recently released from DHS custody, including renovations and modifications to existing facilities.

## Construction budget summary table

The amount of the construction budget is detailed in the attached Obligating Document for Award.

The following are the budgeted estimates for Cost classification within this award

| Cost classification | Total cost |
|---|---|
| Administrative and legal expenses | $0.00 |
| Land, structures, rights-of-way, appraisals, etc. | $0.00 |
| Relocation expenses and payments | $0.00 |
| Architectural and engineering fees | $0.00 |
| Other architectural and engineering fees | $0.00 |
| Project inspection fees | $0.00 |
| Site work | $0.00 |
| Demolition and removal | $0.00 |
| Construction | $0.00 |
| Equipment | $0.00 |
| Miscellaneous | $0.00 |
| **SUBTOTAL** | $0.00 |
| Contingencies | $0.00 |
| **SUBTOTAL** | $0.00 |
| Project (program) income | $0.00 |
| **TOTAL PROJECT COSTS** | $0.00 |

## Amount awarded table

The amount of the award is detailed in the attached Obligating Document for Award.

The following are the budgeted estimates for object classes for this award (including Federal share plus your cost share, if applicable):

| Object Class | Total |
|---|---|
| Personnel | $186,532.20 |
| Fringe benefits | $0.00 |
| Travel | $1,180,847.72 |
| Equipment | $638,875.00 |
| Supplies | $292,000.00 |
| Contractual | $1,197,785.97 |
| Construction | $0.00 |
| Other | $543,475.11 |
| Indirect charges | $0.00 |
| Federal | $4,039,516.00 |
| Non-federal | $0.00 |
| Total | $4,039,516.00 |
| Program Income | $0.00 |

## Approved scope of work

After review of your application, FEMA has approved the below scope of work. Justifications are provided for any differences between the scope of work in the original application and the approved scope of work under this award. You must submit scope or budget revision requests for FEMA's prior approval, via an amendment request, as appropriate per 2 C.F.R. § 200.308 and the FY2024 SSP NOFO.

**Changes to program income:**

Below are the approved changes to program income. Justifications are provided for the differences in the original application and the approved funding under this award.

## Program Income

$0.00

CHANGE FROM APPLICATION

**Program income** changed from **$0.00 to $0.00**

JUSTIFICATION

**Not applicable in SSP-C.**

**Approved request details:**

# Project

## Other

DESCRIPTION

City of Tukwila to contract with a public information officer to help with community and external communications $3,700.00 per unit x13 months = $48,100.00 Additional RFI required.

|        | QUANTITY | UNIT PRICE | TOTAL  | BUDGET CLASS |
|--------|----------|------------|--------|--------------|
| Cost 1 | 1        | $0.00      | $0.00  | Other        |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **13** to **1**
**Unit price** from **$3,700.00** to **$0.00**

JUSTIFICATION
Budget updated to reflect award

## Other

DESCRIPTION

hygiene and sanitation outreach materials Additional RFI required.

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 0 | $0.00 | $0.00 | Other |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **10,000** to **0**
**Unit price** from **$1.00** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

# Project

## Other

DESCRIPTION

Staff time dedicated to manage the grant for the City of Tukwila $74,590.00 Additional RFI required.

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 1 | $0.00 | $0.00 | Other |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **4** to **1**
**Unit price** from **$50,000.00** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Other

DESCRIPTION

Site Director for Family Shelters housing noncitizen migrants for Mary's Place - management and administrative costs $52.76 per unit x 0.48 NCMs x 975 hours = $51,441.00

|        | QUANTITY | UNIT PRICE | TOTAL  | BUDGET CLASS |
|--------|----------|------------|--------|--------------|
| Cost 1 | 0        | $0.00      | $0.00  | Other        |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **975** to **0**
**Unit price** from **$52.76** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Other

DESCRIPTION

Staff at the City of Tukwila dedicated to manage the grant.

|        | QUANTITY | UNIT PRICE | TOTAL  | BUDGET CLASS |
|--------|----------|------------|--------|--------------|
| Cost 1 | 1        | $0.00      | $0.00  | Other        |

CHANGE FROM APPLICATION

**Unit price** from **$153,864.00** to **$0.00**

JUSTIFICATION
Not recommended for funding.

## Other

DESCRIPTION

Washington Management Services Position to manage the grant, invoices, and reporting @ $13,293 monthly salary plus benefits and expenses strating 10/01/2024 - 09/30/2026 (Submitted as $13293.00 per unit for a duration of 26 months, total $345618.00, adjusted to M&A Cap based upon award allocation) $201,975.80

|        | QUANTITY | UNIT PRICE | TOTAL  | BUDGET CLASS |
|--------|----------|------------|--------|--------------|
| Cost 1 | 0        | $0.00      | $0.00  | Other        |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **26** to **0**
**Unit price** from **$13,293.00** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Other

DESCRIPTION

Staff to manage grant funds, tracking systems across various bodies of work. Program Project Manager for 2 years plus estimated benefits. (Submitted as $79.80 for a duration of 1300 (?), totaling $103740.00, adjusted for M&A Cap) $61,082.47

|        | QUANTITY | UNIT PRICE | TOTAL  | BUDGET CLASS |
|--------|----------|------------|--------|--------------|
| Cost 1 | 0        | $0.00      | $0.00  | Other        |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **4,160** to **0**
**Unit price** from **$79.80** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Other

DESCRIPTION

WA Fiscal Specialist .5 FTE x $6,337 monthly salary plus benefits and expenses Not recommended for funding.

|        | QUANTITY | UNIT PRICE | TOTAL  | BUDGET CLASS |
|--------|----------|------------|--------|--------------|
| Cost 1 | 26       | $0.00      | $0.00  | Other        |

CHANGE FROM APPLICATION

**Description changed**
**Unit price** from **$6,337.00** to **$0.00**

JUSTIFICATION
Not recommended for funding.

# Project

## Contractual

DESCRIPTION

Nights of Lodging in a Hotel/motel service WA will partner with one subrecipient to provide emergency hotel stays for prioritized noncitizen migrants beginning July 1, 2024 to June 30, 2025. This partnership anticipates serving between 500 - 600 people. (50 rooms x 3 people per room x 4 quarters). (Submitted as $125 per night, 50 NCMs per day for 365 days totalling $3,212,000.00, adjusted to account for remainder of award allocation) $25,237.66 Additional RFI required.

|        | QUANTITY | UNIT PRICE  | TOTAL       | BUDGET CLASS |
|--------|----------|-------------|-------------|--------------|
| Cost 1 | 1        | $25,237.66  | $25,237.66  | Contractual  |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Additional RFI required.

## Other

DESCRIPTION

Unallocated but awarded funds due to M&A adjustments $5,878.02

| | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 1 | $5,878.02 | $5,878.02 | Other |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION

Budget updated to reflect award.

## Other

DESCRIPTION

Washington Management Services Position to manage the grant, invoices, and reporting @ $13,293 monthly salary plus benefits and expenses starting 10/01/2024 - 09/30/2026 (Submitted as $13293.00 per unit for a duration of 26 months, total $345618.00, adjusted to M&A Cap based upon award allocation) $201,975.80 Additional RFI required.

| | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 1 | $201,975.80 | $201,975.80 | Other |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION

Additional RFI required.

# Project

## Other

DESCRIPTION

Translation services at $70/hr. for interpretation services in 4 languages for 900 $70.00 per unit x 900 hours = $63,000.00 Additional RFI required.

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 0 | $0.00 | $0.00 | Other |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **900** to **0**
**Unit price** from **$70.00** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Other

DESCRIPTION

Cost for translation and interpretation costs for City of Tukwila to help with community and external communications at RP United Methodist Church. Additional RFI required.

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 0 | $0.00 | $0.00 | Other |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **1** to **0**
**Unit price** from **$10,000.00** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

# Project

## Equipment

DESCRIPTION

Provide meals to 150 people a day for a year at Mary's Place $4.50 per unit x 150 NCMs x 365 days = $246,375.00

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 54,750 | $4.50 | $246,375.00 | Equipment |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Budget updated to reflect award.

## Other

DESCRIPTION

Site Director for Family Shelters housing noncitizen migrants for Mary's Place - management and administrative costs $52.76 per unit x 0.48 NCMs x 975 hours = $51,441.00

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 975 | $52.76 | $51,441.00 | Other |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Budget updated to reflect award.

## Contractual

DESCRIPTION

WA DSHS will contract with Mary's Place to provide shelter beds to 150 noncitizen migrants a day between July 1, 2024 and June 30, 2025. Non-congregate shelter beds charged at the congregate rate. As of April 23, 2024, Mary's Place had 355 noncitizen migrants staying in their family shelters, representing approximate 48% of their total shelter guests. This is an increase from 2023, when noncitizen migrants represented 25% of their shelter population. Noncitizen migrants on average stay for 65 days. $12.50 per unit x 150 NCMs x 365 days = $684,375.00

| | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 54,750 | $12.50 | $684,375.00 | Contractual |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION

Budget updated to reflect award.

## Contractual

DESCRIPTION

Other allowable lodging related activities - utility costs per person per day $1.80150 per unit x150 NCMs x 365 days = $98,550.00

| | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 54,750 | $1.80 | $98,550.00 | Contractual |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION

Budget updated to reflect award.

# Project

## Supplies

DESCRIPTION

Diapers estimate 150 for one year supply $780 for Public Health $780.00 price per unit x 150.00 NCMs = $117,000.00

|        | QUANTITY | UNIT PRICE | TOTAL        | BUDGET CLASS |
|--------|----------|------------|--------------|--------------|
| Cost 1 | 150      | $780.00    | $117,000.00  | Supplies     |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Budget updated to reflect award.

## Travel

DESCRIPTION

Staff to coordinate housing, testing, and limited care related to isolation and quarantine to stop identified communicable disease outbreaks. Budget assumes outbreaks per year for 3 years. 20 hours of staff time per outbreak. For Public Health $112.00 per unit x 12.00 quantity of units x 120 hours = $161,280.00 Additional RFI required.

|        | QUANTITY | UNIT PRICE | TOTAL        | BUDGET CLASS |
|--------|----------|------------|--------------|--------------|
| Cost 1 | 1,440    | $112.00    | $161,280.00  | Travel       |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Additional RFI required.

## Personnel

DESCRIPTION

Medical care for assessment and stabilization - ground-based ambulance support to transport pregnant people needing stabilization due to pre-eclampsia diagnosed during screening, estimate 10 rides per year times 3 years. For Public Health $850.00 per unit price x 30.00 quantity of units = $25,500.00

|        | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|--------|----------|------------|-------|--------------|
| Cost 1 | 30 | $850.00 | $25,500.00 | Personnel |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Budget updated to reflect award.

## Other

DESCRIPTION

Secondary services clothing - maternity clothes for 150 pregnant people $75 per person to be distributed by pregnancy screening team - for Public Health $75.00 per unit x 150 NCMs = $11,250.00

|        | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|--------|----------|------------|-------|--------------|
| Cost 1 | 150 | $75.00 | $11,250.00 | Other |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Budget updated to reflect award.

## Equipment

DESCRIPTION

Baby formula for 20 babies a year for one year of supplement at 1,500 for Public Health
$1,500.00 per unit x 20.00 quantity of units = $30,000.00

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 20 | $1,500.00 | $30,000.00 | Equipment |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Budget updated to reflect award.

## Other

DESCRIPTION

Translation services at $70/hr. for interpretation services in 4 languages for 900 $70.00 per unit x
900 hours = $63,000.00 Additional RFI required.

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 900 | $70.00 | $63,000.00 | Other |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Additional RFI required.

## Contractual

DESCRIPTION

Motel rooms that meet infection prevention standards for isolation/quarantine to stop the spread of communicable disease outbreaks. Estimate assumes 4 outbreaks per year, 6 rooms for 21 days per outbreak for 3 years. Public Health $125.00 per unit x 24.00 quantity of units x 21 days = $63,000.00

|        | QUANTITY | UNIT PRICE | TOTAL       | BUDGET CLASS |
|--------|----------|------------|-------------|--------------|
| Cost 1 | 504      | $125.00    | $63,000.00  | Contractual  |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Budget updated to reflect award.

## Other

DESCRIPTION

Staff to manage grant funds, tracking systems across various bodies of work. Program Project Manager for 2 years plus estimated benefits. (Submitted as $79.80 for a duration of 1300 (?), totaling $103740.00, adjusted for M&A Cap) $58,028.34 Additional RFI required.

|        | QUANTITY | UNIT PRICE  | TOTAL       | BUDGET CLASS |
|--------|----------|-------------|-------------|--------------|
| Cost 1 | 1        | $58,028.34  | $58,028.34  | Other        |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Additional RFI required.

## Personnel

DESCRIPTION

Public Health Seattle King County mobile teams perform health screenings for noncitizen migrants at residing in emergency shelters and hotels in King County. This rate is based on the WA Health Care Authority encounter rate. $500.10 per unit x 322 NCMs = $161,032.20
Additional RFI required.

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 322 | $500.10 | $161,032.20 | Personnel |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Additional RFI required.

## Supplies

DESCRIPTION

Hygiene kits (soap, shampoo, combs, brushes, deodorant, baby wipes, body wipes, storage bag) for Public Health $35.00 per unit x 5000.00 quantity of units = $175,000.00

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 5,000 | $35.00 | $175,000.00 | Supplies |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Budget updated to reflect award.

## Other

DESCRIPTION

secondary services- clothing - baby clothing for 150 babies $20 in clothing to be distributed by the pregnancy screening team. For Public Health $30.00 per unit x 150 NCMs = $4,500.00

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 150 | $30.00 | $4,500.00 | Other |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Budget updated to reflect award.

## Travel

DESCRIPTION

Staff to coordinate access to acute medical care. Program manager for 2 years and estimated benefits. For Public Health. One program manager to work 40 hours per week for two years at $79.68 per hour. (1 FTE x $79.68/hour*40 hours * 52 weeks per year) x 2 years = $331,468.8 $79.68 price per unit x 4160 hours = $331,468.80

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 4,160 | $79.68 | $331,468.80 | Travel |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Budget updated to reflect award.

## Other

DESCRIPTION

Labor for secondary services - communications messaging and materials development and testing to address acute public health needs. 1 hour per week for two years. $72.46 per unit x 104 hours = $7,535.84 Additional RFI required.

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 104 | $72.46 | $7,535.84 | Other |

CHANGE FROM APPLICATION
**Item created**

JUSTIFICATION
Additional RFI required.

## Other

DESCRIPTION

hygiene and sanitation outreach materials Additional RFI required.

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 10,000 | $1.00 | $10,000.00 | Other |

CHANGE FROM APPLICATION
**Item created**

JUSTIFICATION
Additional RFI required.

# Project

## Contractual

DESCRIPTION

City of Tukwila has rented a large "FEMA" styled tent to house 75 asylum seekers at the Riverton Park United Methodist Church (RPUMC). These costs include installation and shelter provided from 02/27/2024 to 08/27/2024. See attached contract. $47,339.22 x 6 months = $284,035.32 Additional RFI required.

|        | QUANTITY | UNIT PRICE  | TOTAL        | BUDGET CLASS |
|--------|----------|-------------|--------------|--------------|
| Cost 1 | 6        | $47,339.22  | $284,035.32  | Contractual  |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION

Additional RFI required. EHP Review Required

## Equipment

DESCRIPTION

Support for Tukwila Food Pantry operated at the Riverton Park United Methodist Church serving noncitizen migrants Additional RFI required.

|        | QUANTITY | UNIT PRICE | TOTAL        | BUDGET CLASS |
|--------|----------|------------|--------------|--------------|
| Cost 1 | 36,500   | $5.00      | $182,500.00  | Equipment    |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION

Additional RFI required.

## Equipment

DESCRIPTION

Contract meals for noncitizen migrants residing at the Riverton United Methodist Church and other hotels supporting migrants in Tukwila. This service will be contracted with a third party. Total of 12,000 meals to be served. $15 per unit x 100 NCMs x 120 days = $180,000 Additional RFI required.

|        | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|--------|----------|------------|-------|--------------|
| Cost 1 | 12,000 | $15.00 | $180,000.00 | Equipment |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Additional RFI required.

## Travel

DESCRIPTION

City of Tukwila contracted with Innovative Impact Strategies, LLC (i2) to provide support to the RPUMC. RPUMC is currently hosting between 250 and 300 noncitizen migrants in their church building and on their property RPUMC estimates that they have served 1,500 - 2,000 noncitizen migrants since Jan. 2022. I2 Strategies is providing site assessment and oversight for the encampment at the RPUMC. Services for I2 Strategies will be needed from 10/06/2023 to 06/30/2025. Washington is currently building the WA Migrant and Asylum-Seeker Support Project to transition noncitizen migrants into a more formal and organized network of services. Contract is attached. $32,766.62 x 21 months = $688,098.92

|        | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|--------|----------|------------|-------|--------------|
| Cost 1 | 1 | $688,098.92 | $688,098.92 | Travel |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Budget updated to reflect award.

## Other

DESCRIPTION

City of Tukwila to contract with a public information officer to help with community and external communications $3,700.00 per unit x13 months = $48,100.00 Additional RFI required.

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 1 | $48,100.00 | $48,100.00 | Other |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Additional RFI required

## Contractual

DESCRIPTION

Fencing cost at the Riverton Park Methodist Church Installation Additional RFI required.

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 1 | $19,640.00 | $19,640.00 | Contractual |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Additional RFI required. EHP Review Required

## Contractual

DESCRIPTION

Garbage and refuse collection, site cleanup and disposal of debris. City of Tukwila

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 13 | $1,765.23 | $22,947.99 | Contractual |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Budget updated to reflect award.

## Other

DESCRIPTION

Staff time dedicated to manage the grant for the City of Tukwila $71,766.11 (reduced from $74,590.00 to be under M&A cap) Additional RFI required.

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 1 | $71,766.11 | $71,766.11 | Other |

CHANGE FROM APPLICATION

**Item created**

JUSTIFICATION
Additional RFI required

## Other

DESCRIPTION

Cost for translation and interpretation costs for City of Tukwila to help with community and external communications at RP United Methodist Church. Additional RFI required.

|        | QUANTITY | UNIT PRICE  | TOTAL       | BUDGET CLASS |
|--------|----------|-------------|-------------|--------------|
| Cost 1 | 1        | $10,000.00  | $10,000.00  | Other        |

CHANGE FROM APPLICATION
**Item created**

JUSTIFICATION
Additional RFI required.

# Project

## Personnel

DESCRIPTION

1 FTE midwife to provide health screenings for pregnant people. Annual salary is $250,000 ($120/hr.) inclusive of benefits for 3 years. For Public Health

|        | QUANTITY | UNIT PRICE | TOTAL  | BUDGET CLASS |
|--------|----------|------------|--------|--------------|
| Cost 1 | 6,240    | $0.00      | $0.00  | Personnel    |

CHANGE FROM APPLICATION
**Unit price** from **$120.00** to **$0.00**

JUSTIFICATION
Not recommended for funding.

## Other

DESCRIPTION

Labor for secondary services - communications messaging and materials development and testing to address acute public health needs. 1 hour per week for two years. $72.46 per unit x 104 hours = $7,535.84 Additional RFI required.

|        | QUANTITY | UNIT PRICE | TOTAL  | BUDGET CLASS |
|--------|----------|------------|--------|--------------|
| Cost 1 | 0        | $0.00      | $0.00  | Other        |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **104** to **0**
**Unit price** from **$72.46** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Contractual

DESCRIPTION

Motel rooms that meet infection prevention standards for isolation/quarantine to stop the spread of communicable disease outbreaks. Estimate assumes 4 outbreaks per year, 6 rooms for 21 days per outbreak for 3 years. Public Health $125.00 per unit x 24.00 quantity of units x 21 days = $63,000.00

|        | QUANTITY | UNIT PRICE | TOTAL  | BUDGET CLASS |
|--------|----------|------------|--------|--------------|
| Cost 1 | 0        | $0.00      | $0.00  | Contractual  |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **504** to **0**
**Unit price** from **$125.00** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Equipment

DESCRIPTION

Contract meals for noncitizen migrants residing at the Riverton United Methodist Church and other hotels supporting migrants in Tukwila. This service will be contracted with a third party. Total of 12,000 meals to be served. $15 per unit x 100 NCMs x 120 days = $180,000 Additional RFI required.

|        | QUANTITY | UNIT PRICE | TOTAL  | BUDGET CLASS |
|--------|----------|------------|--------|--------------|
| Cost 1 | 0        | $0.00      | $0.00  | Equipment    |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **12,000** to **0**
**Unit price** from **$15.00** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Personnel

DESCRIPTION

Medical care for assessment and stabilization - ground-based ambulance support to transport pregnant people needing stabilization due to pre-eclampsia diagnosed during screening, estimate 10 rides per year times 3 years. For Public Health $850.00 per unit price x 30.00 quantity of units = $25,500.00

|        | QUANTITY | UNIT PRICE | TOTAL  | BUDGET CLASS |
|--------|----------|------------|--------|--------------|
| Cost 1 | 0        | $0.00      | $0.00  | Personnel    |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **30** to **0**
**Unit price** from **$850.00** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Equipment

DESCRIPTION

Provide meals to 150 people a day for a year at Mary's Place $4.50 per unit x 150 NCMs x 365 days = $246,375.00

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 0 | $0.00 | $0.00 | Equipment |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **54,750** to **0**
**Unit price** from **$4.50** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Travel

DESCRIPTION

Staff to coordinate access to acute medical care. Program manager for 2 years and estimated benefits. For Public Health. One program manager to work 40 hours per week for two years at $79.68 per hour. (1 FTE x $79.68/hour*40 hours * 52 weeks per year) x 2 years = $331,468.8 $79.68 price per unit x 4160 hours = $331,468.80

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 0 | $0.00 | $0.00 | Travel |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **4,160** to **0**
**Unit price** from **$79.68** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Supplies

DESCRIPTION

Diapers estimate 150 for one year supply $780 for Public Health $780.00 price per unit x 150.00 NCMs = $117,000.00

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 0 | $0.00 | $0.00 | Supplies |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **150** to **0**
**Unit price** from **$780.00** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Contractual

DESCRIPTION

WA DSHS will contract with Mary's Place to provide shelter beds to 150 noncitizen migrants a day between July 1, 2024 and June 30, 2025. Non-congregate shelter beds charged at the congregate rate. As of April 23, 2024, Mary's Place had 355 noncitizen migrants staying in their family shelters, representing approximate 48% of their total shelter guests. This is an increase from 2023, when noncitizen migrants represented 25% of their shelter population. Noncitizen migrants on average stay for 65 days. $12.50 per unit x 150 NCMs x 365 days = $684,375.00

|        | QUANTITY | UNIT PRICE | TOTAL  | BUDGET CLASS |
|--------|----------|------------|--------|--------------|
| Cost 1 | 0        | $0.00      | $0.00  | Contractual  |

CHANGE FROM APPLICATION

**Description changed**
**Budget class** from **Other** to **Contractual**
**Quantity** from **54,750** to **0**
**Unit price** from **$12.50** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Personnel

DESCRIPTION

Public Health Seattle King County mobile teams perform health screenings for noncitizen migrants at residing in emergency shelters and hotels in King County. This rate is based on the WA Health Care Authority encounter rate. $500.10 per unit x 322 NCMs = $161,032.20 Additional RFI required.

|        | QUANTITY | UNIT PRICE | TOTAL  | BUDGET CLASS |
|--------|----------|------------|--------|--------------|
| Cost 1 | 0        | $0.00      | $0.00  | Personnel    |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **322** to **0**
**Unit price** from **$500.10** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Other

DESCRIPTION

secondary services- clothing - baby clothing for 150 babies $20 in clothing to be distributed by the pregnancy screening team. For Public Health $30.00 per unit x 150 NCMs = $4,500.00

|        | QUANTITY | UNIT PRICE | TOTAL  | BUDGET CLASS |
|--------|----------|------------|--------|--------------|
| Cost 1 | 0        | $0.00      | $0.00  | Other        |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **150** to **0**
**Unit price** from **$30.00** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Equipment

DESCRIPTION

Support for Tukwila Food Pantry operated at the Riverton Park United Methodist Church serving noncitizen migrants Additional RFI required.

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 0 | $0.00 | $0.00 | Equipment |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **36,500** to **0**
**Unit price** from **$5.00** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Contractual

DESCRIPTION

City of Tukwila has rented a large "FEMA" styled tent to house 75 asylum seekers at the Riverton Park United Methodist Church (RPUMC). These costs include installation and shelter provided from 02/27/2024 to 08/27/2024. See attached contract. $47,339.22 x 6 months = $284,035.32 Additional RFI required.

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 0 | $0.00 | $0.00 | Contractual |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **6** to **0**
**Unit price** from **$47,339.22** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Contractual

DESCRIPTION

Other allowable lodging related activities - utility costs per person per day $1.80150 per unit x150 NCMs x 365 days = $98,550.00

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 0 | $0.00 | $0.00 | Contractual |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **54,750** to **0**
**Unit price** from **$1.80** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Contractual

DESCRIPTION

Fencing cost at the Riverton Park Methodist Church Installation Additional RFI required.

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 0 | $0.00 | $0.00 | Contractual |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **1** to **0**
**Unit price** from **$19,640.00** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Supplies

DESCRIPTION

Hygiene kits (soap, shampoo, combs, brushes, deodorant, baby wipes, body wipes, storage bag) for Public Health $35.00 per unit x 5000.00 quantity of units = $175,000.00

| | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 0 | $0.00 | $0.00 | Supplies |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **5,000** to **0**
**Unit price** from **$35.00** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Travel

DESCRIPTION

City of Tukwila contracted with Innovative Impact Strategies, LLC (i2) to provide support to the RPUMC. RPUMC is currently hosting between 250 and 300 noncitizen migrants in their church building and on their property RPUMC estimates that they have served 1,500 - 2,000 noncitizen migrants since Jan. 2022. I2 Strategies is providing site assessment and oversight for the encampment at the RPUMC. Services for I2 Strategies will be needed from 10/06/2023 to 06/30/2025. Washington is currently building the WA Migrant and Asylum-Seeker Support Project to transition noncitizen migrants into a more formal and organized network of services. Contract is attached. $32,766.62 x 21 months = $688,098.92

|        | QUANTITY | UNIT PRICE | TOTAL  | BUDGET CLASS |
|--------|----------|------------|--------|--------------|
| Cost 1 | 0        | $0.00      | $0.00  | Travel       |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **21** to **0**
**Unit price** from **$32,766.62** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Contractual

DESCRIPTION

Nights of Lodging in a Hotel/motel service WA will partner with one subrecipient to provide emergency hotel stays for prioritized noncitizen migrants beginning July 1, 2024 to June 30, 2025. This partnership anticipates serving between 500 - 600 people. (50 rooms x 3 people per room x 4 quarters). (Submitted as $125 per night, 50 NCMs per day for 365 days totalling $3212000.00, adjusted to account for remainder of award allocation) $25,237.66 Additional RFI required.

|        | QUANTITY | UNIT PRICE | TOTAL  | BUDGET CLASS |
|--------|----------|------------|--------|--------------|
| Cost 1 | 0        | $0.00      | $0.00  | Contractual  |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **18,250** to **0**
**Unit price** from **$125.00** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Travel

DESCRIPTION

Staff to coordinate housing, testing, and limited care related to isolation and quarantine to stop identified communicable disease outbreaks. Budget assumes outbreaks per year for 3 years. 20 hours of staff time per outbreak. For Public Health $112.00 per unit x 12.00 quantity of units x 120 hours = $161,280.00 Additional RFI required.

|        | QUANTITY | UNIT PRICE | TOTAL  | BUDGET CLASS |
|--------|----------|------------|--------|--------------|
| Cost 1 | 0        | $0.00      | $0.00  | Travel       |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **1,440** to **0**
**Unit price** from **$112.00** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Other

DESCRIPTION

Secondary services clothing - maternity clothes for 150 pregnant people $75 per person to be distributed by pregnancy screening team - for Public Health $75.00 per unit x 150 NCMs = $11,250.00

|        | QUANTITY | UNIT PRICE | TOTAL  | BUDGET CLASS |
|--------|----------|------------|--------|--------------|
| Cost 1 | 0        | $0.00      | $0.00  | Other        |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **150** to **0**
**Unit price** from **$75.00** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Contractual

DESCRIPTION

Garbage and refuse collection, site cleanup and disposal of debris. City of Tukwila

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 0 | $0.00 | $0.00 | Contractual |

CHANGE FROM APPLICATION

**Quantity** from **13** to **0**
**Unit price** from **$1,765.23** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Contractual

DESCRIPTION

WA will provide emergency hotel stays not to exceed GSA rates for prioritized noncitizen migrants across the state through subrecipeint partners beginning July 1, 2024 to Sept. 30, 2026. Migrants will receive up to 90-days of emergency shelter. This is an emergency project that anticipates supporting between 2,000 and 2,500 noncitizen migrants. In CY 2023, Washington reported having 3,841 recently arrived noncitizen migrants that received state cash or food assistance and who experienced homelessness. This represented a 400% growth rate from CY 2022. Washington currently has an open procurement to identify subrecipient partners to manage emergency shelters for noncitizen migrants. Rate of hotels is for King County GSA.

|  | QUANTITY | UNIT PRICE | TOTAL | BUDGET CLASS |
|---|---|---|---|---|
| Cost 1 | 1 | $0.00 | $0.00 | Contractual |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **18,250** to **1**
**Unit price** from **$176.00** to **$0.00**

JUSTIFICATION
Not recommended for funding.

## Equipment

DESCRIPTION

Baby formula for 20 babies a year for one year of supplement at 1,500 for Public Health
$1,500.00 per unit x 20.00 quantity of units = $30,000.00

|        | QUANTITY | UNIT PRICE | TOTAL  | BUDGET CLASS |
|--------|----------|------------|--------|--------------|
| Cost 1 | 0        | $0.00      | $0.00  | Equipment    |

CHANGE FROM APPLICATION

**Description changed**
**Quantity** from **20** to **0**
**Unit price** from **$1,500.00** to **$0.00**

JUSTIFICATION
Budget updated to reflect award.

## Personnel

DESCRIPTION

Public Health Seattle King County mobile teams to provide services to 250 noncitizen migrant
asylum seekers who are not served by the health care system

|        | QUANTITY | UNIT PRICE | TOTAL  | BUDGET CLASS |
|--------|----------|------------|--------|--------------|
| Cost 1 | 250      | $0.00      | $0.00  | Personnel    |

CHANGE FROM APPLICATION

**Unit price** from **$300.00** to **$0.00**

JUSTIFICATION
Not recommended for funding.

Of the total Federal funds, $1480009.29 has been placed on hold. See the following terms in the
Agreement Articles for more details:

| Article number | Title | Payment hold |
|---|---|---|
| Article 48 | Funding Hold: Environmental Planning and Historical Preservation | $303675.32 |
| Article 49 | Funding Hold: Management & Administration Information Required | $331770.25 |
| Article 50 | Detailed Cost Breakdown & Justification Required | $844563.72 |

# Agreement Articles

**Program:** Fiscal Year 2024 Shelter and Services Program
**Recipient:** DEPARTMENT OF SOCIAL & HEALTH SERVICES
**UEI-EFT:** SEYQXMXJLUP5
**DUNS number:** 127347115
**Award number:** EMW-2024-SP-05140

# Table of contents

| | |
|---|---|
| **Article 1** | **Assurances, Administrative Requirements, Cost Principles, Representations, and Certifications** |
| **Article 2** | **General Acknowledgements and Assurances** |
| **Article 3** | **Acknowledgement of Federal Funding from DHS** |
| **Article 4** | **Activities Conducted Abroad** |
| **Article 5** | **Age Discrimination Act of 1975** |
| **Article 6** | **Americans with Disabilities Act of 1990** |
| **Article 7** | **Best Practices for Collection and Use of Personally Identifiable Information** |
| **Article 8** | **Civil Rights Act of 1964 – Title VI** |
| **Article 9** | **Civil Rights Act of 1968** |
| **Article 10** | **Copyright** |
| **Article 11** | **Debarment and Suspension** |
| **Article 12** | **Drug-Free Workplace Regulations** |
| **Article 13** | **Duplicative Costs** |
| **Article 14** | **Education Amendments of 1972 (Equal Opportunity in Education Act) – Title IX** |
| **Article 15** | **E.O. 14074 – Advancing Effective, Accountable Policing and Criminal Justice Practices to Enhance Public Trust and Public Safety** |
| **Article 16** | **Energy Policy and Conservation Act** |
| **Article 17** | **False Claims Act and Program Fraud Civil Remedies** |
| **Article 18** | **Federal Debt Status** |
| **Article 19** | **Federal Leadership on Reducing Text Messaging while Driving** |
| **Article 20** | **Fly America Act of 1974** |
| **Article 21** | **Hotel and Motel Fire Safety Act of 1990** |
| **Article 22** | **John S. McCain National Defense Authorization Act of Fiscal Year 2019** |
| **Article 23** | **Limited English Proficiency (Civil Rights Act of 1964, Title VI)** |
| **Article 24** | **Lobbying Prohibitions** |
| **Article 25** | **National Environmental Policy Act** |
| **Article 26** | **Nondiscrimination in Matters Pertaining to Faith-Based Organizations** |

| | |
|---|---|
| **Article 27** | **Non-Supplanting Requirement** |
| **Article 28** | **Notice of Funding Opportunity Requirements** |
| **Article 29** | **Patents and Intellectual Property Rights** |
| **Article 30** | **Procurement of Recovered Materials** |
| **Article 31** | **Rehabilitation Act of 1973** |
| **Article 32** | **Reporting of Matters Related to Recipient Integrity and Performance** |
| **Article 33** | **Reporting Subawards and Executive Compensation** |
| **Article 34** | **Required Use of American Iron, Steel, Manufactured Products, and Construction Materials** |
| **Article 35** | **SAFECOM** |
| **Article 36** | **Terrorist Financing** |
| **Article 37** | **Trafficking Victims Protection Act of 2000 (TVPA)** |
| **Article 38** | **Universal Identifier and System of Award Management** |
| **Article 39** | **USA PATRIOT Act of 2001** |
| **Article 40** | **Use of DHS Seal, Logo and Flags** |
| **Article 41** | **Whistleblower Protection Act** |
| **Article 42** | **Environmental Planning and Historic Preservation (EHP) Review** |
| **Article 43** | **Applicability of DHS Standard Terms and Conditions to Tribes** |
| **Article 44** | **Acceptance of Post Award Changes** |
| **Article 45** | **Disposition of Equipment Acquired Under the Federal Award** |
| **Article 46** | **Prior Approval for Modification of Approved Budget** |
| **Article 47** | **Indirect Cost Rate** |
| **Article 48** | **Funding Hold: Environmental Planning and Historical Preservation** |
| **Article 49** | **Funding Hold: Management & Administration Information Required** |
| **Article 50** | **Detailed Cost Breakdown & Justification Required** |

**Article 1**    **Assurances, Administrative Requirements, Cost Principles, Representations, and Certifications**
I. Recipients must complete either the Office of Management and Budget (OMB) Standard Form 424B Assurances – Non- Construction Programs, or OMB Standard Form 424D Assurances – Construction Programs, as applicable. Certain assurances in these documents may not be applicable to your program and the DHS financial assistance office (DHS FAO) may require applicants to certify additional assurances. Applicants are required to fill out the assurances as instructed by the federal awarding agency.

**Article 2**    **General Acknowledgements and Assurances**
Recipients are required to follow the applicable provisions of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards in effect as of the federal award date and located at 2 C.F.R. Part 200 and adopted by DHS at 2 C.F.R. § 3002.10. All recipients and subrecipients must acknowledge and agree to provide DHS access to records, accounts, documents, information, facilities, and staff pursuant to 2 C.F.R. § 200.337. I. Recipients must cooperate with any DHS compliance reviews or compliance investigations. II. Recipients must give DHS access to examine and copy records, accounts, and other documents and sources of information related to the federal financial assistance award and permit access to facilities and personnel. III. Recipients must submit timely, complete, and accurate reports to the appropriate DHS officials and maintain appropriate backup documentation to support the reports. IV. Recipients must comply with all other special reporting, data collection, and evaluation requirements required by law, federal regulation, Notice of Funding Opportunity, federal award specific terms and conditions, and/or federal awarding agency program guidance. V. Recipients must complete the DHS Civil Rights Evaluation Tool within thirty (30) days of receiving the Notice of Award for the first award under which this term applies. Recipients of multiple federal awards from DHS should only submit one completed tool for their organization, not per federal award. After the initial submission, recipients are required to complete the tool once every two (2) years if they have an active federal award, not every time a federal award is made. Recipients must submit the completed tool, including supporting materials, to CivilRightsEvaluation@hq.dhs.gov. This tool clarifies the civil rights obligations and related reporting requirements contained in these DHS Standard Terms and Conditions. Subrecipients are not required to complete and submit this tool to DHS. The evaluation tool can be found at https://www.dhs.gov/publication/dhs- civil-rights-evaluation-tool. DHS Civil Rights Evaluation Tool | Homeland Security. The DHS Office for Civil Rights and Civil Liberties will consider, in its discretion, granting an extension to the 30-day deadline if the recipient identifies steps and a timeline for completing the tool. Recipients must request extensions by emailing the request to CivilRightsEvaluation@hq.dhs.gov prior to expiration of the 30-day deadline.

**Article 3**    **Acknowledgement of Federal Funding from DHS**
Recipients must acknowledge their use of federal award funding when issuing statements, press releases, requests for proposal, bid invitations, and other documents describing projects or programs funded in whole or in part with federal award funds.

**Article 4**    **Activities Conducted Abroad**
Recipients must coordinate with appropriate government authorities when performing project activities outside the United States obtain all appropriate licenses, permits, or approvals.

**Article 5**    **Age Discrimination Act of 1975**
Recipients must comply with the requirements of the Age Discrimination Act of 1975, Pub. L. No. 94-135 (codified as amended at 42 U.S.C. § 6101 et seq.), which prohibits discrimination on the basis of age in any program or activity receiving federal financial assistance.

**Article 6**    **Americans with Disabilities Act of 1990**
Recipients must comply with the requirements of Titles I, II, and III of the Americans with Disabilities Act, Pub. L. No. 101-336 (1990) (codified as amended at 42 U.S.C. §§ 12101– 12213), which prohibits recipients from discriminating on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities.

**Article 7**    **Best Practices for Collection and Use of Personally Identifiable Information**
Recipients who collect personally identifiable information (PII) as part of carrying out the scope of work under a federal award are required to have a publicly available privacy policy that describes standards on the usage and maintenance of the PII they collect. DHS defines PII as any information that permits the identity of an individual to be directly or indirectly inferred, including any information that is linked or linkable to that individual. Recipients may also find the DHS Privacy Impact Assessments: Privacy Guidance and Privacy Template as useful resources respectively.

**Article 8**    **Civil Rights Act of 1964 – Title VI**
Recipients must comply with the requirements of Title VI of the Civil Rights Act of 1964, Pub. L. No. 88-352 (codified as amended at 42 U.S.C. § 2000d et seq.), which provides that no person in the United States will, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. DHS implementing regulations for the Act are found at 6 C.F.R. Part 21. Recipients of an award from the Federal Emergency Management Agency (FEMA) must also comply with FEMA's implementing regulations at 44 C.F.R. Part 7.

**Article 9**      **Civil Rights Act of 1968**
Recipients must comply with Title VIII of the Civil Rights Act of 1968, Pub. L. No. 90-284 (codified as amended at 42 U.S.C. § 3601 et seq.) which prohibits recipients from discriminating in the sale, rental, financing, and advertising of dwellings, or in the provision of services in connection. therewith, on the basis of race, color, national origin, religion, disability, familial status, and sex, as implemented by the U.S. Department of Housing and Urban Development at 24 C.F.R. Part 100. The prohibition on disability discrimination includes the requirement that new multifamily housing with four or more dwelling units— i.e., the public and common use areas and individual apartment units (all units in buildings with elevators and ground-floor units in buildings without elevators)—be designed and constructed with certain accessible features. (See 24 C.F.R. Part 100, Subpart D.)

**Article 10**     **Copyright**
Recipients must affix the applicable copyright notices of 17 U.S.C. §§ 401 or 402 to any work first produced under federal awards and also include an acknowledgement that the work was produced under a federal award (including the federal award number and federal awarding agency). As detailed in 2 C.F.R. § 200.315, a federal awarding agency reserves a royalty-free, nonexclusive, and irrevocable right to reproduce, publish, or otherwise use the work for federal purposes and to authorize others to do so.

**Article 11**     **Debarment and Suspension**
Recipients must comply with the non-procurement debarment and suspension regulations implementing Executive Orders (E.O.) 12549 and 12689 set forth at 2 C.F.R. Part 180 as implemented by DHS at 2 C.F.R. Part 3000. These regulations prohibit recipients from entering into covered transactions (such as subawards and contracts) with certain parties that are debarred, suspended, or otherwise excluded from or ineligible for participation in federal assistance programs or activities.

**Article 12**     **Drug-Free Workplace Regulations**
Recipients must comply with drug-free workplace requirements in Subpart B (or Subpart C, if the recipient is an individual) of 2 C.F.R. Part 3001, which adopts the Government- wide implementation (2 C.F.R. Part 182) of the Drug-Free Workplace Act of 1988 (41 U.S.C. §§ 8101-8106).

**Article 13**     **Duplicative Costs**
Recipients are prohibited from charging any cost to this federal award that will be included as a cost or used to meet cost sharing or matching requirements of any other federal award in either the current or a prior budget period. (See 2 C.F.R. § 200.403(f)). However, recipients may shift costs that are allowable under two or more federal awards where otherwise permitted by federal statutes, regulations, or the federal financial assistance award terms and conditions.

| | |
|---|---|
| **Article 14** | **Education Amendments of 1972 (Equal Opportunity in Education Act) – Title IX**<br>Recipients must comply with the requirements of Title IX of the Education Amendments of 1972, Pub. L. No. 92-318 (codified as amended at 20 U.S.C. § 1681 et seq.), which provide that no person in the United States will, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving federal financial assistance. DHS implementing regulations are codified at 6 C.F.R. Part 17. Recipients of an award from the Federal Emergency Management Agency (FEMA) must also comply with FEMA's implementing regulations at 44 C.F.R. Part 19. |
| **Article 15** | **E.O. 14074 – Advancing Effective, Accountable Policing and Criminal Justice Practices to Enhance Public Trust and Public Safety**<br>Recipient State, Tribal, local, or territorial law enforcement agencies must comply with the requirements of section 12(c) of E.O. 14074. Recipient State, Tribal, local, or territorial law enforcement agencies are also encouraged to adopt and enforce policies consistent with E.O. 14074 to support safe and effective policing. |
| **Article 16** | **Energy Policy and Conservation Act**<br>Recipients must comply with the requirements of the Energy Policy and Conservation Act, Pub. L. No. 94-163 (1975) (codified as amended at 42 U.S.C. § 6201 et seq.), which contain policies relating to energy efficiency that are defined in the state energy conservation plan issued in compliance with this Act. |
| **Article 17** | **False Claims Act and Program Fraud Civil Remedies**<br>Recipients must comply with the requirements of the False Claims Act, 31 U.S.C. §§ 3729- 3733, which prohibit the submission of false or fraudulent claims for payment to the Federal Government. (See 31 U.S.C. §§ 3801-3812, which details the administrative remedies for false claims and statements made.) |
| **Article 18** | **Federal Debt Status**<br>All recipients are required to be non-delinquent in their repayment of any federal debt. Examples of relevant debt include delinquent payroll and other taxes, audit disallowances, and benefit overpayments. (See OMB Circular A-129.) |
| **Article 19** | **Federal Leadership on Reducing Text Messaging while Driving**<br>Recipients are encouraged to adopt and enforce policies that ban text messaging while driving recipient-owned, recipient-rented, or privately owned vehicles when on official government business or when performing any work for or on behalf of the Federal Government. Recipients are also encouraged to conduct the initiatives of the type described in Section 3(a) of E.O. 13513. |

**Article 20**      **Fly America Act of 1974**
Recipients must comply with Preference for U.S. Flag Air Carriers (a list of certified air carriers can be found at: Certificated Air Carriers List | US Department of Transportation, https://www.transportation.gov/policy/aviation-policy/certificated-air-carriers-list)for international air transportation of people and property to the extent that such service is available, in accordance with the International Air Transportation Fair Competitive Practices Act of 1974, 49 U.S.C. § 40118, and the interpretative guidelines issued by the Comptroller General of the United States in the March 31, 1981, amendment to Comptroller General Decision B-138942.

**Article 21**      **Hotel and Motel Fire Safety Act of 1990**
Recipients must ensure that all conference, meeting, convention, or training space funded entirely or in part by federal award funds complies with the fire prevention and control guidelines of Section 6 of the Hotel and Motel Fire Safety Act of 1990, 15 U.S.C. § 2225a.

**Article 22**      **John S. McCain National Defense Authorization Act of Fiscal Year 2019**
Recipients, subrecipients, and their contractors and subcontractors are subject to the prohibitions described in section 889 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232 (2018) and 2 C.F.R. §§ 200.216, 200.327, 200.471, and Appendix II to 2 C.F.R. Part 200. The statute – as it applies to DHS recipients, subrecipients, and their contractors and subcontractors – prohibits obligating or expending federal award funds on certain telecommunications and video surveillance products and contracting with certain entities for national security reasons.

**Article 23**      **Limited English Proficiency (Civil Rights Act of 1964, Title VI)**
Recipients must comply with Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.) prohibition against discrimination on the basis of national origin, which requires that recipients of federal financial assistance take reasonable steps to provide meaningful access to persons with limited English proficiency (LEP) to their programs and services. For additional assistance and information regarding language access obligations, please refer to the DHS Recipient Guidance: https://www.dhs.gov/guidance-published-help- department-supported-organizations-provide-meaningful-access-people-limited and additional resources on http://www.lep.gov.

**Article 24**      **Lobbying Prohibitions**
Recipients must comply with 31 U.S.C. § 1352 and 6 C.F.R. Part 9, which provide that none of the funds provided under a federal award may be expended by the recipient to pay any person to influence, or attempt to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any federal action related to a federal award or contract, including any extension, continuation, renewal, amendment, or modification. Per 6 C.F.R. Part 9, recipients must file a lobbying certification form as described in Appendix A to 6 C.F.R. Part 9 or available on Grants.gov as the Grants.gov Lobbying Form and file a lobbying disclosure form as described in Appendix B to 6 C.F.R. Part 9 or available on Grants.gov as the Disclosure of Lobbying Activities (SF-LLL).

**Article 25**    **National Environmental Policy Act**
Recipients must comply with the requirements of the National Environmental Policy Act of 1969, Pub. L. No. 91-190 (1970) (codified as amended at 42 U.S.C. § 4321 et seq.) (NEPA) and the Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of NEPA, which require recipients to use all practicable means within their authority, and consistent with other essential considerations of national policy, to create and maintain conditions under which people and nature can exist in productive harmony and fulfill the social, economic, and other needs of present and future generations of Americans.

**Article 26**    **Nondiscrimination in Matters Pertaining to Faith-Based Organizations**
It is DHS policy to ensure the equal treatment of faith-based organizations in social service programs administered or supported by DHS or its component agencies, enabling those organizations to participate in providing important social services to beneficiaries. Recipients must comply with the equal treatment policies and requirements contained in 6 C.F.R. Part 19 and other applicable statues, regulations, and guidance governing the participations of faith- based organizations in individual DHS programs.

**Article 27**    **Non-Supplanting Requirement**
Recipients of federal awards under programs that prohibit supplanting by law must ensure that federal funds supplement but do not supplant non-federal funds that, in the absence of such federal funds, would otherwise have been made available for the same purpose.

**Article 28**    **Notice of Funding Opportunity Requirements**
All the instructions, guidance, limitations, scope of work, and other conditions set forth in the Notice of Funding Opportunity (NOFO) for this federal award are incorporated by reference. All recipients must comply with any such requirements set forth in the NOFO. If a condition of the NOFO is inconsistent with these terms and conditions and any such terms of the Award, the condition in the NOFO shall be invalid to the extent of the inconsistency. The remainder of that condition and all other conditions set forth in the NOFO shall remain in effect.

**Article 29**    **Patents and Intellectual Property Rights**
Recipients are subject to the Bayh-Dole Act, 35 U.S.C. § 200 et seq. and applicable regulations governing inventions and patents, including the regulations issued by the Department of Commerce at 37 C.F.R. Part 401 (Rights to Inventions Made by Nonprofit Organizations and Small Business Firms under Government Awards, Contracts, and Cooperative Agreements) and the standard patent rights clause set forth at 37 C.F.R. § 401.14.

**Article 30**     **Procurement of Recovered Materials**
States, political subdivisions of states, and their contractors must comply with
Section 6002 of the Solid Waste Disposal Act, Pub. L. No. 89-272 (1965) (codified
as amended by the Resource Conservation and Recovery Act at 42 U.S.C. § 6962)
and 2 C.F.R. § 200.323. The requirements of Section 6002 include procuring only
items designated in guidelines of the Environmental Protection Agency (EPA) at 40
C.F.R. Part 247 that contain the highest percentage of recovered materials
practicable, consistent with maintaining a satisfactory level of competition.

**Article 31**     **Rehabilitation Act of 1973**
Recipients must comply with the requirements of Section 504 of the Rehabilitation
Act of 1973, Pub. L. No. 93-112 (codified as amended at 29 U.S.C. § 794), which
provides that no otherwise qualified handicapped individuals in the United States
will, solely by reason of the handicap, be excluded from participation in, be denied
the benefits of, or be subjected to discrimination under any program or activity
receiving federal financial assistance.

**Article 32**     **Reporting of Matters Related to Recipient Integrity and Performance**
If the total value of any currently active grants, cooperative agreements, and
procurement contracts from all federal awarding agencies exceeds $10,000,000
for any period of time during the period of performance of the federal award, then
the recipient must comply with the requirements set forth in the government-wide
Award Term and Condition for Recipient Integrity and Performance Matters located
at 2 C.F.R. Part 200, Appendix XII, the full text of which is incorporated by
reference.

**Article 33**     **Reporting Subawards and Executive Compensation**
For federal awards that equal or exceed $30,000, recipients are required to comply
with the requirements set forth in the government-wide award term on Reporting
Subawards and Executive Compensation set forth at 2 C.F.R. Part 170, Appendix
A, the full text of which is incorporated by reference.

**Article 34    Required Use of American Iron, Steel, Manufactured Products, and Construction Materials**

Recipients of an award of Federal financial assistance from a program for infrastructure are hereby notified that none of the funds provided under this award may be used for a project for infrastructure unless: (1) all iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States; (2) all manufactured products used in the project are produced in the United States—this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard for determining the minimum amount of domestic content of the manufactured product has been established under applicable law or regulation; and (3) all construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States. The Buy America preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project but are not an integral part of the structure or permanently affixed to the infrastructure project. Waivers When necessary, recipients may apply for, and the agency may grant, a waiver from these requirements. The agency should notify the recipient for information on the process for requesting a waiver from these requirements. (a) When the Federal agency has determined that one of the following exceptions applies, the awarding official may waive the application of the domestic content procurement preference in any case in which the agency determines that: (1) applying the domestic content procurement preference would be inconsistent with the public interest; (2) the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or (3) the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent. A request to waive the application of the domestic content procurement preference must be in writing. The agency will provide instructions on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Made in America Office. There may be instances where an award qualifies, in whole or in part, for an existing waiver described at "Buy America" Preference in FEMA Financial Assistance Programs for Infrastructure | FEMA.gov. Definitions The definitions applicable to this term are set forth at 2 C.F.R. § 184.3, the full text of which is incorporated by reference.

| **Article 35** | **SAFECOM** |
|---|---|
| | Recipients receiving federal financial assistance awards made under programs that provide emergency communication equipment and its related activities must comply with the SAFECOM Guidance for Emergency Communication Grants, including provisions on technical standards that ensure and enhance interoperable communications. The SAFECOM Guidance is updated annually and can be found at Funding and Sustainment | CISA. |
| **Article 36** | **Terrorist Financing** |
| | Recipients must comply with E.O. 13224 and applicable statutory prohibitions on transactions with, and the provisions of resources and support to, individuals and organizations associated with terrorism. Recipients are legally responsible for ensuring compliance with the E.O. and laws. |
| **Article 37** | **Trafficking Victims Protection Act of 2000 (TVPA)** |
| | Recipients must comply with the requirements of the government-wide financial assistance award term which implements Trafficking Victims Protection Act of 2000, Pub. L. No. 106-386, § 106 (codified as amended at 22 U.S.C. § 7104). The award term is located at 2 C.F.R. § 175.15, the full text of which is incorporated by reference. |
| **Article 38** | **Universal Identifier and System of Award Management** |
| | Recipients are required to comply with the requirements set forth in the government-wide financial assistance award term regarding the System for Award Management and Universal Identifier Requirements located at 2 C.F.R. Part 25, Appendix A, the full text of which is incorporated reference. |
| **Article 39** | **USA PATRIOT Act of 2001** |
| | Recipients must comply with requirements of Section 817 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), which amends 18 U.S.C. §§ 175–175c. |
| **Article 40** | **Use of DHS Seal, Logo and Flags** |
| | Recipients must obtain written permission from DHS prior to using the DHS seals, logos, crests, or reproductions of flags, or likenesses of DHS agency officials. This includes use of DHS component (e.g., FEMA, CISA, etc.) seals, logos, crests, or reproductions of flags, or likenesses of component officials. |
| **Article 41** | **Whistleblower Protection Act** |
| | Recipients must comply with the statutory requirements for whistleblower protections at 10 U.S.C § 470141 U.S.C. § 4712. |

**Article 42**  **Environmental Planning and Historic Preservation (EHP) Review**
DHS/FEMA funded activities that may require an Environmental Planning and Historic Preservation (EHP) review are subject to the FEMA EHP review process. This review does not address all federal, state, and local requirements. Acceptance of federal funding requires the recipient to comply with all federal, state and local laws. DHS/FEMA is required to consider the potential impacts to natural and cultural resources of all projects funded by DHS/FEMA grant funds, through its EHP review process, as mandated by: the National Environmental Policy Act; National Historic Preservation Act of 1966, as amended; National Flood Insurance Program regulations; and any other applicable laws and executive orders. General guidance for FEMA's EHP process is available on the DHS/FEMA Website at: https://www.fema.gov/grants/guidance-tools/environmental-historic. Specific applicant guidance on how to submit information for EHP review depends on the individual grant program and applicants should contact their grant Program Officer to be put into contact with EHP staff responsible for assisting their specific grant program. The EHP review process must be completed before funds are released to carry out the proposed project; otherwise, DHS/FEMA may not be able to fund the project due to noncompliance with EHP laws, executive orders, regulations, and policies. If ground disturbing activities occur during construction, applicant will monitor ground disturbance, and if any potential archaeological resources are discovered the applicant will immediately cease work in that area and notify the pass-through entity, if applicable, and DHS/FEMA.

**Article 43**  **Applicability of DHS Standard Terms and Conditions to Tribes**
The DHS Standard Terms and Conditions are a restatement of general requirements imposed upon recipients and flow down to sub-recipients as a matter of law, regulation, or executive order. If the requirement does not apply to Indian tribes or there is a federal law or regulation exempting its application to Indian tribes, then the acceptance by Tribes of, or acquiescence to, DHS Standard Terms and Conditions does not change or alter its inapplicability to an Indian tribe. The execution of grant documents is not intended to change, alter, amend, or impose additional liability or responsibility upon the Tribe where it does not already exist.

**Article 44**  **Acceptance of Post Award Changes**
In the event FEMA determines that an error in the award package has been made, or if an administrative change must be made to the award package, recipients will be notified of the change in writing. Once the notification has been made, any subsequent requests for funds will indicate recipient acceptance of the changes to the award. Please call FEMA Grant Management Operations at (866) 927-5646 or via e-mail to: ASK-GMD@fema.dhs.gov if you have any questions.

**Article 45**  **Disposition of Equipment Acquired Under the Federal Award**
For purposes of original or replacement equipment acquired under this award by a non-state recipient or non-state sub-recipients, when that equipment is no longer needed for the original project or program or for other activities currently or previously supported by a federal awarding agency, you must request instructions from FEMA to make proper disposition of the equipment pursuant to 2 C.F.R. section 200.313. State recipients and state sub-recipients must follow the disposition requirements in accordance with state laws and procedures.

**Article 46**   **Prior Approval for Modification of Approved Budget**
Before making any change to the FEMA approved budget for this award, you must request prior written approval from FEMA where required by 2 C.F.R. section 200.308. For purposes of non-construction projects, FEMA is utilizing its discretion to impose an additional restriction under 2 C.F.R. section 200.308(f) regarding the transfer of funds among direct cost categories, programs, functions, or activities. Therefore, for awards with an approved budget where the federal share is greater than the simplified acquisition threshold (currently $250,000), you may not transfer funds among direct cost categories, programs, functions, or activities without prior written approval from FEMA where the cumulative amount of such transfers exceeds or is expected to exceed ten percent (10%) of the total budget FEMA last approved. For purposes of awards that support both construction and non-construction work, FEMA is utilizing its discretion under 2 C.F.R. section 200.308(h)(5) to require the recipient to obtain prior written approval from FEMA before making any fund or budget transfers between the two types of work. You must report any deviations from your FEMA approved budget in the first Federal Financial Report (SF-425) you submit following any budget deviation, regardless of whether the budget deviation requires prior written approval.

**Article 47**   **Indirect Cost Rate**
2 C.F.R. section 200.211(b)(15) requires the terms of the award to include the indirect cost rate for the federal award. If applicable, the indirect cost rate for this award is stated in the budget documents or other materials approved by FEMA and included in the award file.

**Article 48**   **Funding Hold: Environmental Planning and Historical Preservation**
The recipient is required to obtain the required DHS/FEMA Environmental Planning and Historical Preservation (EHP) compliance approval for this project pursuant to the Notice of Funding Opportunity (NOFO) prior to commencing work for this project. DHS/FEMA will notify you when the EHP compliance review is complete, and work may begin. If the recipient requests a payment for one of the activities requiring EHP compliance review, FEMA may not make a payment for that work while the EHP compliance review is still pending. If FEMA discovers that work has been commenced under one of those activities prematurely, FEMA may disallow costs incurred prior to completion of the EHP compliance review and the receipt of DHS/FEMA approval to begin the work.

Please contact your DHS/FEMA Program Office to receive specific guidance regarding EHP compliance. If you have questions about this term and condition or believe it was placed in error, please contact the relevant Program Office. EHP is required: This grant includes an activity (Renovation/Modification to Facility) that requires the recipient to submit an EHP Screening form. The form and instructions are available at: https://www.fema.gov/sites/default/files/documents/fema_ehp-screening_form_ff-207-fy-21-100_3-31-2026.pdf

**Article 49**    **Funding Hold: Management & Administration Information Required**
FEMA has placed a funding hold on this award, and $331,770.25 budgeted for Management & Administration costs is on hold in the FEMA financial systems. The DEPARTMENT OF SOCIAL & HEALTH SERVICES is prohibited from obligating, expending, or drawing down the federal funds identified in this Article.

To release the funding hold, the recipient must provide a detailed cost breakdown and justification for its Management & Administration costs. FEMA will rescind the funding hold upon its review and approval of the detailed cost breakdown and justification.

If you believe this funding hold was placed in error, please contact the relevant Program Analyst or Grants Management Specialist.

**Article 50**    **Detailed Cost Breakdown & Justification Required**
FEMA has placed a funding hold on $844,563.72 in the FEMA financial systems. Your organization is prohibited from obligating, expending, or drawing down the federal funds associated with the following cost items: Acute Medical Care/Personnel: $161,032.20; Food/Equipment: $362,500.00; Labor for Primary Services/Travel: $161,280.00; Shelter/Contractual: $25,237.66 ; Secondary Services: Translation Services/Other: $73,000.00; Secondary Services: Labor for Secondary Services/Other: $7,535.84; Secondary Services: Outreach Information/Other: $48,100.00, Unallocated/ Other: $5,878.02. Specific descriptions and calculations needed to justify how each total was developed. Additional information required. Budget details provided were not sufficient to determine if costs are allowable, allocable, and reasonable. To release the funding hold, the recipient must provide a detailed cost breakdown and justification for the cost items listed above. FEMA will rescind the funding hold upon its review and approval of the detailed cost breakdown and justification.

# Obligating document

| 1. Agreement No. EMW-2024-SP-05140 | 2. Amendment No. N/A | 3. Recipient No. 916001088 | 4. Type of Action AWARD | 5. Control No. WX04607N2024T |
|---|---|---|---|---|

| 6. Recipient Name and Address | 7. Issuing FEMA Office and Address | 8. Payment Office and Address |
|---|---|---|
| DEPARTMENT OF SOCIAL & HEALTH SERVICES 1115 WASHINGTON ST SE OLYMPIA, WA 98501 | Grant Programs Directorate 500 C Street, S.W. Washington DC, 20528-7000 1-866-927-5646 | FEMA, Financial Services Branch 500 C Street, S.W., Room 723 Washington DC, 20742 |

| 9. Name of Recipient Project Officer Christina Choate | 9a. Phone No. 3607912894 | 10. Name of FEMA Project Coordinator Shelter and Services Program Grant Program | 10a. Phone No. 1-877-585-3242 |
|---|---|---|---|

| 11. Effective Date of This Action 09/26/2024 | 12. Method of Payment OTHER - FEMA GO | 13. Assistance Arrangement COST REIMBURSEMENT | 14. Performance Period 10/01/2023 to 09/30/2026 Budget Period 10/01/2023 to 09/30/2026 |
|---|---|---|---|

**15. Description of Action a. (Indicate funding data for awards or financial changes)**

| Program Name Abbreviation | Assistance Listing No. | Accounting Data (ACCS Code) | Prior Total Award | Amount Awarded This Action + or (-) | Current Total Award | Cumulative Non-Federal Commitment |
|---|---|---|---|---|---|---|
| SSP | 97.141 | 2024-FA-PA12 - P410-xxxx-4101-D | $0.00 | $4,039,516.00 | $4,039,516.00 | See Totals |
| | | | Totals $0.00 | $4,039,516.00 | $4,039,516.00 | $0.00 |

**b. To describe changes other than funding data or financial changes, attach schedule and check here:**
N/A

~~16. FOR NON-DISASTER PROGRAMS: RECIPIENT IS REQUIRED TO SIGN AND RETURN THREE (3) COPIES OF THIS DOCUMENT TO FEMA (See Block 7 for address)~~
This field is not applicable for digitally signed grant agreements

| 17. RECIPIENT SIGNATORY OFFICIAL (Name and Title) | DATE |
|---|---|

| 18. FEMA SIGNATORY OFFICIAL (Name and Title) PAMELA WILLIAMS, Assistant Administrator, Grant Programs Region 4 | DATE 09/26/2024 |
|---|---|

# EXHIBIT 5



Secretary

**U.S. Department of Homeland Security**
Washington, DC 20528

## Homeland Security

January 28, 2025

MEMORANDUM FOR COMPONENT AND OFFICE HEADS

FROM:  Kristi Noem
       Secretary

SUBJECT:  **Direction on Grants to Non-governmental Organizations**

---

Over the last four years, the Department of Homeland Security has spent billions of dollars funding illegal immigration. Much of this funding was given to non-profit organizations, which purported to provide a variety of services to illegal aliens. Effective immediately, all Department grant disbursements and assessments of grant applications that: (a) go to non-profit organizations or for which non-profit organizations are eligible, and (b) touch in any way on immigration, are on hold pending review, except to the extent required by controlling legal authority.

The reasons for this freeze include (1) concerns that these grants may be funding illegal activities, such as encouraging or inducing illegal immigration, 8 U.S.C. § 1324(a)(1)(A)(iv), or illegal harboring of illegal aliens, 8 U.S.C. § 1324(a)(1)(A)(ii)–(iii); (2) concerns that there may be racially discriminatory language in certain grants; and (3) concerns that these grants may not be an efficient use of government resources.

Within 7 days, each component shall provide a report to the Undersecretary for Management with a summary of every grant covered by this memorandum and its status. Also within 7 days, any component that invokes the exception above for grants required by controlling legal authority must obtain the express written consent of the General Counsel or his delegee. Finally, within 7 days, the chief counsel of each component shall provide a report to the General Counsel regarding all available legal tools to investigate whether grantees have or are using Department grant funds for illegal purposes, including any statutory, regulatory, or contractual authority to request or demand documents.

The Department is committed to allocating grant funds in a manner that will achieve maximum effectiveness for the intended purposes and in fulfillment of the Department's statutory mission. This hold does not in any way apply to disbursement of essential disaster relief funds, but it does apply to the Shelter and Services Program, and any similar program.

# EXHIBIT 6



U.S. Department of Homeland Security
Washington, DC  20472

February 14, 2025

| | |
|---|---|
| MEMORANDUM FOR: | Christopher Logan<br>Senior Official Performing the Duties of Deputy Administrator for Resilience |
| | Keith Turi<br>Acting Associate Administrator for Response and Recovery |
| | Monroe Neal<br>Acting Chief Financial Officer |
| | Regional Administrators |
| FROM: | Cameron Hamilton<br>Senior Official Performing the Duties of the Administrator |
| SUBJECT: | Grant Processing Guidance |

On January 28, 2025, Secretary Noem issued the *Direction on Grants to Non-governmental Organizations* memorandum that directs,

> "effective immediately, all Department grant disbursements and assessment of grant applications that: (a) go to non-profit organizations or for which non-profit organizations are eligible, and (b) touch in any way on immigration, are on hold pending review, except to the extent required by the controlling legal authority." … "This hold does not in any way apply to the disbursement of essential disaster relief funds, but it does apply to the Shelter and Services Program, and any other similar program."

As such, I am directing the Agency to implement additional process steps to ensure that Secretary Noem has the opportunity to review relevant obligations, disbursements, and payments as follows:

## **Grant Obligations, Disbursements, and Payments Requiring Secretary Noem's Review**

*(1) Funding for all Non-Governmental Organizations*

Effective immediately, all new obligations to non-governmental organizations and private non-profits, excluding **fire departments** and organizations comprising the **National Urban Search and Rescue System**, must be reviewed by Secretary Noem prior to issuance. In addition, for funds already obligated, all disbursements and payments must be reviewed by Secretary Noem prior to issuance. If and when you becomes aware that a government recipient or sub-receipient has used FEMA funds to pay a non-government organization, I am directing you to report that information to the Secretary.

*(2) Funding for Non-Congregate Sheltering*

Multiple states have used FEMA funding to provide non-congregate sheltering to illegal aliens. Therefore, effective immediately, all new non-congregate sheltering obligations must be reviewed by Secretary Noem prior to obligation. In addition, for funds already obligated, all disbursements and payments must be reviewed by Secretary Noem prior to issuance.

**Grant Obligations to be Provided for Secretary Noem's Visibility**

In addition to the guidance above, I am directing the Agency to ensure full transparency with Secretary Noem. As such, FEMA will leverage the transmittal process specified by Section 507 of the Department of Homeland Security Appropriations Act to notify the DHS Office of the Chief Finance Officer of all pending obligations over $1M. FEMA will notify additional DHS offices or points of contact at Secretary Noem's request.

**Additional Review of Disaster Assistance Programs**

I am directing the Office of Response and Recovery to conduct a review of all disaster relief programs that may indirectly or incidentally aid illegal aliens, or NGOs that provide assistance to illegal aliens. This review shall include the identification of these programs and potential policy changes.

**Hold of Funds Under Shelter and Services Program, Case Management Pilot Program, and Emergency Food and Shelter Program-Humanitarian**

Grants under the Shelter and Services Program (SSP), Case Management Pilot Program (CMPP), and Emergency Food and Shelter Program-Humanitarian (EFSP-H) are on hold, pending a compliance review, per Secretary Noem's direction. No new obligation, disbursement or payment of funds previously obligated may be issued pending additional guidance from Secretary Noem.

**Implementation**

I am directing the Offices of Response and Recovery and Resilience (1)to identify all pending obligations, disbursements, and payments that may require Secretary Noem's review and (2)to proceed with existing processes for obligations, disbursements, and payments that do not require Secretary Noem's review no later than close of business Tuesday, February 18.

I am directing the Office of the Chief Financial Officer, with the Offices of Response and Recovery and Resilience, to begin transmitting pending obligations, disbursements, and payments to Secretary Noem no later than close of business Friday, February 21.

**Conclusion**

This guidance is necessary to ensure that funding is obligated, disbursed, and paid in line with Secretary Noem's direction, and that we can continue to support the communities and disaster survivors who rely on us for assistance. On a weekly basis, I will engage DHS Leadership to determine whether additional or modified criteria must be applied. Therefore, you must ensure that the processes you implement are adaptable to new or adjusted review criteria.

# EXHIBIT 7

Secretary
**U.S. Department of Homeland Security**
Washington, DC 20528

 Homeland
Security

February 19, 2025

MEMORANDUM FOR ALL AGENCIES AND OFFICES

FROM:      Kristi Noem
           Secretary

SUBJECT:   **Restricting Grant Funding for Sanctuary Jurisdictions**

_____

Following the horrific attacks on this country on September 11, 2001, the American people
trusted their leaders to make sure it would never happen again. Among the circumstances that led
to those attacks was the failure to treat immigration as a national security issue. The 9/11
Commission Report, for example, recognized that "the institutions charged with protecting our
borders . . . did not understand how grave th[e] threat could be." 9/11 Commission Report at xvi.
The Commission also specifically noted that there were, at that time, "9 million people . . . in the
United States outside the legal immigration system." *Id.* at 390. A second factor recognized by
the Commission was the failure of different law enforcement entities to share information. The
Report recognized "pervasive problems of managing and sharing information across a large and
unwieldy government." *Id.* at xvi.

The year after those terrible attacks, President George W. Bush signed into the law the Homeland
Security Act of 2002. The Act created the Department of Homeland Security (DHS), and it
transferred into that new agency a number of important national security components, including
those responsible for immigration enforcement. Congress expressly found that "State and local
personnel have capabilities and opportunities to gather information on suspicious activities and
terrorist threats not possessed by Federal agencies." 6 U.S.C. § 481(b)(8). Congress also found
that "[t]he Federal Government relies on State and local personnel to protect against terrorist
attack." *Id.* § 481(b)(2).

The bottom line is that partnership is an essential element of our national security and public
safety mission. And that mission undoubtedly includes immigration enforcement. State and local
governments that refuse to cooperate with, refuse to share information with, or even actively
obstruct federal immigration enforcement reject these ideals and the history we share in common
as Americans. If any government entity chooses to thumb its nose at the Department of
Homeland Security's national security and public safety mission, it should not receive a single
dollar of the Department's money unless Congress has specifically required it.

For purposes of this memorandum, "sanctuary jurisdictions" include the following:

- Jurisdictions that fail to comply with the information sharing requirements of 8 U.S.C.
  §§ 1373 and 1644.

Prohibiting Grant Funding for Sanctuary Jurisdictions
Page 2

- Jurisdictions that violate other relevant laws, including prohibitions on encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv), prohibitions on transporting or moving illegal aliens, *id.* § 1324(a)(1)(A)(ii), prohibitions on harboring, concealing, or shielding from detection illegal aliens, *id.* § 1324(a)(1)(A)(iii), and any applicable conspiracy, aiding or abetting, or attempt liability respecting these statutes.

- Jurisdictions that fail to honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of alien pursuant to a valid detainer. A jurisdiction, however, is not a sanctuary jurisdiction merely because it lacks the necessary resources to assist in a particular instance.

- Any jurisdiction that fails to provide access to detainees, such as when an immigration officer seeks to interview a person who might be a removable alien.

- Any jurisdiction that leaks the existence of an enforcement operation.

All components are to review all federal financial assistance awards to determine if Department funds, directly or indirectly, are going to sanctuary jurisdictions. To the extent consistent with relevant legal authorities and the applicable terms and conditions of each award, each component must cease providing federal funding to sanctuary jurisdictions. Components should also make appropriate criminal referrals to the Department of Justice where illegal conduct is discovered.

For questions regarding applicable legal authorities, components must consult with the General Counsel or his designee. For questions regarding whether a particular jurisdiction is a sanctuary jurisdiction, components must consult with the Director of Immigration and Customs Enforcement and the Commissioner of Customs and Border Protection or their designees.

Within 30 days, each component shall provide a report to the Undersecretary for Management with a summary of actions taken to comply with this memorandum.

# EXHIBIT 8



U.S. Department of Homeland Security
Washington, DC 20472

March 20, 2025

**DECISION**

| | |
|---|---|
| MEMORANDUM FOR: | Kristi Noem<br>Secretary of the Department of Homeland Security |
| FROM: | Cameron Hamilton<br>Senior Official Performing the Duties of the Administrator<br>Federal Emergency Management Agency |
| SUBJECT: | **Approval of FEMA-Administered Grant Disbursements** |

**Purpose:** To seek approval on the review process and parameters of grant programs administered by the Federal Emergency Management Agency (FEMA) to align with Administration and Secretary priorities on non-governmental organizations, immigration, and sanctuary jurisdictions.

**Background:** On Jan. 28, 2025, the Secretary of the Department of Homeland Security (DHS) issued a memo to components and agency heads entitled *"Direction on Grants to Non-governmental Organizations,"* which required the development and implementation of a process to review payments and obligations for grants that *"(1) go to non-profit organizations or for which non-profit organizations are eligible and (2) touch in any way on immigration."* In accordance with this instruction, FEMA is recommending the implementation of additional processes to review certain grants prior to releasing funds, as outlined in this memo.

The Secretary also issued a memo on Feb. 19, 2025, *"Restricting Grant Funding for Sanctuary Jurisdictions,"* instructing all components to "review all federal financial assistance awards to determine if Department funds, directly or indirectly, are going to sanctuary jurisdictions." In compliance with this memo, FEMA is providing recommendations for which grant programs sanctuary jurisdiction conditions should apply.

**Appendix A** provides a programmatic overview of all FEMA programs.

**Action: FEMA Recommendations for Approval**

1. The grant programs for which sanctuary jurisdiction conditions or restrictions should be applied;
2. The methodology FEMA will use to assess disaster and non-disaster grant programs in accordance with the Secretary's direction on non-governmental organizations (NGOs) and immigration; and
3. FEMA's recommended determinations for each grant program.

## Action Item 1: FEMA Proposed Sanctuary Jurisdiction Programs and Applicability

FEMA recommends applying conditions or restrictions on FEMA administered non-disaster preparedness grant programs that go to a sanctuary jurisdiction as designated by U.S. Immigration and Customs Enforcement (ICE) and:

a. where the purpose of the grant has a nexus to immigration activities, law enforcement, or national security; or,
b. where statute does not limit how FEMA implements the program.

Based on the criteria above, FEMA recommends the conditions or restrictions be placed on all open and future awards for the following 12 programs[1]:

1. Case Management Pilot Program (CMPP);
2. Emergency Management Performance Grant (EMPG);
3. Homeland Security Grant Program – Operation Stonegarden (OPSG);
4. Homeland Security Grant Program – State Homeland Security Program (SHSP);
5. Homeland Security Grant Program – Urban Area Security Initiative;
6. Homeland Security National Training Program - Continuing Training Grants - Competitive (HSNTP-CTG);
7. Port Security Grant Program (PSGP);
8. Presidential Residence Protection Assistance Grant Program (PRPA);
9. Regional Catastrophic Preparedness Grant Program (RCPGP);
10. Shelter and Services Program (SSP);
11. Targeted Violence and Terrorism Prevention Grant Program (TVTP); and
12. Transit Security Grant Program (TSGP); and

As noted above, application of conditions or restrictions will vary based on the structure or authority of each respective program.[2] FEMA will assess each grant and submit proposed program implementation recommendations to the General Counsel for a legal determination as appropriate. These program implementation recommendations will include how the conditions or restrictions apply to prime awards, sub-awards, and existing awards and payments.

FEMA recommends conditions or restrictions on sanctuary jurisdictions not apply to disaster grants, non-disaster mitigation grants, and grants to fire departments and organizations that comprise the National Urban Search and Rescue Response System.

To implement guidance from the Secretary's memo, *"Restricting Grant Funding for Sanctuary Jurisdictions,"* FEMA has categorized disaster and non-disaster programs into two risk profiles using the above criteria. FEMA recommends approval of the proposed methodology:

---

1 While the Tribal Homeland Security Grant Program meets the criteria outlined above, FEMA did not include it for sanctuary jurisdiction conditions or restrictions due to Tribal sovereignty.
2 See Appendix A for additional information on program eligibility.

### Image A: Proposed Sanctuary Jurisdictions Risk Methodology

| Sanctuary Jurisdiction Does Not Apply | Sanctuary Jurisdiction Applies |
|---|---|
| • Grant programs that: <br>    • Do not go to sanctuary jurisdiction; or <br>    • Are disaster or non-disaster mitigation grants; or <br>    • Are non-disaster grants with no nexus to immigration activities, law enforcement, or national security; or <br>    • Are limited by statute. <br>• These programs/projects should move forward without additional review. | • Grant programs that: <br>    • Go to a designated sanctuary jurisdiction; or <br>    • Are non-disaster grants; and <br>    • Have a nexus to immigration activities, law enforcement, or national security; or <br>    • Are not limited by statute. <br>• These programs/projects require additional review by DHS review. |
| Clears through existing program controls and review processes | Project identified as meeting S1 criteria, requires DHS review |

Approve/date _~~[signature]~~_ 3-25-25     Disapprove/date _____

Modify/date _____     Needs discussion/date _____

## Action Item 2: FEMA Proposed NGO/Immigration Grant Risk Assessment Methodology

To implement guidance from the Secretary's memo, *"Direction on Grants to Non-governmental Organizations,"* FEMA has categorized all disaster and non-disaster grant programs into three risk profiles. In considering the risk level, FEMA will evaluate whether the intent and primary purpose of the grant relates to the nexus of immigration. The intent is to ensure that FEMA's grant programs do not encourage or induce illegal immigration or illegal harboring of illegal aliens or any other unlawful activity. This information will lead to the determination of their risk profile as outlined in Image B. FEMA recommends approval of the proposed methodology:

### Image B: Proposed NGO/Immigration Risk Assessment Methodology

| Low Risk | Medium Risk | High Risk |
|---|---|---|
| • Low likelihood that grant disbursements (1) go to NGOs, and (2) touch in any way on immigration. <br>• These programs/projects should move forward without additional review. | • Further analysis required to determine likelihood. Indeterminate risk that grant disbursements (1) go to NGOs, and (2) touch in any way on immigration. <br>• These programs/projects are pending review by FEMA to assess low or high risk, with concurrence from DHS. | • High likelihood that grant disbursements (1) go to NGOs, and (2) touch in any way on immigration. <br>• These programs/projects require additional review by DHS. |
| Clears through existing program controls and review processes | Requires FEMA review to assess high or low risk with concurrence from DHS | Project identified as meeting S1 criteria, requires DHS review |

Approve/date _____ →  Disapprove/date _____
3-25-25

Modify/date _____     Needs discussion/date_____

### **Action Item 3: Approval of FEMA's Recommended Determinations**

In accordance with the above methodologies for non-disaster and disaster grants, FEMA recommends approval of the determinations by grant program as outlined in the table below. The recommended determinations are:

- **Green:** Cleared by FEMA to undergo the existing program controls and review processes. Programs have been identified to have a low likelihood of grant disbursements to NGOs **and** low likelihood of a nexus to immigration, and the sanctuary jurisdiction restriction do not apply. Grants with a "green" assessment are approved to move forward with payment consistent with FEMA's existing processes without additional review by DHS.
- **Yellow:** Pending review by FEMA to conduct additional analysis on the projects and awards to determine likelihood of grant disbursements to NGOs with an immigration nexus. Sanctuary jurisdiction restrictions do not apply. As FEMA completes the analysis, FEMA will submit decision memos to DHS to recommend a grant program be moved to green or red status. FEMA will also submit yellow payments weekly for DHS consideration and approval if payment can move forward.
- **Red:** For DHS review and approval of payment requests or evaluation for termination of grant program. Programs have been identified to have a high likelihood of grant disbursements to NGOs and immigration nexus, and/or meets the sanctuary jurisdiction restrictions. FEMA will conduct an assessment and provide recommendations to DHS on whether payments should be denied or approved. In the recommendation, FEMA will review the sanctuary jurisdictions identified by U.S. Immigration and Customs Enforcement (ICE) and specifically notate the jurisdictional restrictions. The recommendation will consider, among other things, the purpose and intent of the grant, the benefits to the DHS mission and risks, and the context of which organization is receiving the award. For example, is the individual grant award going to a county government who is not on the ICE sanctuary jurisdiction list, but the state is on the list. FEMA will also provide recommendations on if programs and/or individual grant awards should be terminated based on the Secretary's guidance.

Approve/date _____ →Disapprove/date_____
3-25-25

Modify/date _____     Needs discussion/date_____

**TABLE A: All FEMA Grant Programs and Recommended Review**

| AFT | Program | # of Open Awards | ULO Balance* | Risk of NGO / Immigration | Apply Sanctuary Jurisdiction | Recommended Determination |
|---|---|---|---|---|---|---|
| DRF | Community Disaster Loans (CDL) | 44 | $93,791,763 | Low | No | Cleared by FEMA |
| DRF | Disaster Unemployment Assistance (DUA) | 18 | $49,847,337 | Low | No | Cleared by FEMA |
| DRF | Fire Management Assistance Grants (FMAG) – previously included as part of Public Assistance – Grants to State & Local | 124 | $52,479,916 | Low | No | Cleared by FEMA |
| DRF | Hazard Mitigation Grant Program (HMGP) | 386 | $4,414,617,261 | Low | No | Cleared by FEMA |
| DRF | Hazard Mitigation Grant Program Post Fire (HMGP Post Fire) | 269 | $58,007,937 | Low | No | Cleared by FEMA |
| DRF | Individual and Households Program (IHP) | N/A | $380,898,640 | Low | No | Cleared by FEMA |
| DRF | Public Assistance – Grants to State & Local | 44,266 | $73,241,454,318 | Low | No | Cleared by FEMA |
| DRF | Urban Search and Rescue (US&R) | NA | $141,254,817 | Low | No | Cleared by FEMA |
| FA | Alliance for System Safety of Unmanned Aircraft Systems through Research Excellence (ASSURE) | 4 | $4,669,770 | Low | No | Cleared by FEMA |
| FA | Assistance to Firefighter Grants (AFG) | 3801 | $464,132,184 | Low | No | Cleared by FEMA |
| FA | Building Resilient Infrastructure and Communities (BRIC) | 1365 | $1,154,059,629** | Low | No | Cleared by FEMA |
| FA | Chemical Stockpile Emergency Preparedness Program (CSEPP) | 9 | $26,180,310 | Low | No | Cleared by FEMA |
| FA | Community Assistance Program State Support Services Element (CAP-SSSE) | 76 | $11,587,984 | Low | No | Cleared by FEMA |

| AFT | Program | # of Open Awards | ULO Balance* | Risk of NGO / Immigration | Apply Sanctuary Jurisdiction | Recommended Determination |
|---|---|---|---|---|---|---|
| FA | Cooperating Technical Partners (CTP) | 480** | $239,537,976** | Low | No | Cleared by FEMA |
| FA | Emergency Management Baseline Assessments Grant (EMBAG) | 3** | $127,416** | Low | No | Cleared by FEMA |
| FA | Emergency Operations Center (EOC) | 95 | $228,725,861 | Low | No | Cleared by FEMA |
| FA | Fire Prevention and Safety (FP&S) | 373 | $80,643,658 | Low | No | Cleared by FEMA |
| FA | Flood Mitigation Assistance (FMA) | 473 | $909,252,393 | Low | No | Cleared by FEMA |
| FA | Flood Mitigation Assistance Swift Current (FMA Swift) | 14 | $0** | Low | No | Cleared by FEMA |
| FA | Homeland Security Preparedness Technical Assistance Program (HSPTAP) | 4 | $406,557 | Low | No | Cleared by FEMA |
| FA | Homeland Security National Training Program (HSNTP) - National Domestic Preparedness Consortium (NDPC) | 17 | $134,067,348 | Low | No | Cleared by FEMA |
| FA | HSNTP– National Cybersecurity Preparedness Consortium | 5 | $16,906,852 | Low | No | Cleared by FEMA |
| FA | Intercity Bus Security Grant Program (IBSGP) | 59 | $2,905,029 | Low | No | Cleared by FEMA |
| FA | National Dam Safety Program and Rehabilitation of High Hazard Potential Dams Grant Program (HHPD) | 207 | $244,022,266 | Low | No | Cleared by FEMA |
| FA | National Earthquake Hazards Reduction Program (NEHRP) and Multi-State and National Earthquake Assistance (MSNEA) Grant Program | 62 | $4,876,775 | Low | No | Cleared by FEMA |
| FA | National Fire Academy Training Assistance (NFATA) | 10 | $1,446,388 | Low | No | Cleared by FEMA |

| AFT | Program | # of Open Awards | ULO Balance* | Risk of NGO / Immigration | Apply Sanctuary Jurisdiction | Recommended Determination |
|---|---|---|---|---|---|---|
| FA | National Incident Management System (NIMS) | 3 | $2,208,411** | Low | No | Cleared by FEMA |
| FA | National Urban Search and Rescue (US&R) | 153 | $66,105,406 | Low | No | Cleared by FEMA |
| FA | Next Generation Warning System Grant Program (NGWSGP)[1] | 3 | $134,196,015 | Low | No | Cleared by FEMA |
| FA | Pre-Disaster Mitigation (PDM) | 99 | $504,369,174 | Low | No | Cleared by FEMA |
| FA | Safeguarding Tomorrow Revolving Loan Fund/Safeguarding Tomorrow through Ongoing Risk Mitigation Act (STORM) | 9 | $51,397,697 | Low | No | Cleared by FEMA |
| FA | Staffing For Adequate Fire and Emergency Response (SAFER) | 1125 | $1,148,541,961** | Low | No | Cleared by FEMA |
| FA | State and Local Cybersecurity Grant Program (SLCGP) | 161 | $760,367,208 | Low | No | Cleared by FEMA |
| FA | State Fire Training Systems Grants (SFT) | 59 | $876,377 | Low | No | Cleared by FEMA |
| FA | Tribal Cybersecurity Grant Program (TCGP) | 31 | $17,620,204 | Low | No | Cleared by FEMA |
| FA | Tribal Homeland Security Grant Program (THSGP) | 77 | $42,539,321 | Low | No | Cleared by FEMA |
| DRF | Crisis Counseling Program (CCP) | 63 | $53,020,947 | Medium | No | Pending Review |

[1] The Corporation for Public Broadcasting has filed a lawsuit in the District of Columbia District Court on March 13, 2025, contending that FEMA's manual payment review process for NGWSGP awards was arbitrary and capricious in violation of the Administrative Procedures Act. If FEMA's recommended approach to categorizing the NGWSGP as "Cleared by FEMA" is approved, FEMA will make appropriate payments to the CPB using the manual payment review process.

| AFT | Program | # of Open Awards | ULO Balance* | Risk of NGO / Immigration | Apply Sanctuary Jurisdiction | Recommended Determination |
|---|---|---|---|---|---|---|
| DRF | Disaster Case Management (DCM) | 44 | $182,577,136 | Medium | No | Pending Review |
| DRF | Disaster Legal Services (DLS) | 11 | $95,000 | Medium | No | Pending Review |
| DRF | Public Assistance – NGOs | 7,234 | $8,498,374,550 | Medium | No | Pending Review |
| DRF | Public Assistance – Non-Congregate Sheltering | 284 | $1,297,129,208 | Medium | No | Pending Review |
| FA | Emergency Food and Shelter Program (EFSP) | 12 | $251,590,333 | Medium | No | Pending Review |
| FA | Nonprofit Security Grant Program (NSGP)[2] | 400 | $943,940,157 | Medium | No | Pending Review |
| FA | Emergency Management Performance Grant (EMPG) | 206 | $476,990,846 | Low | Yes | DHS Review |
| FA | Homeland Security Grant Program – Operation Stonegarden (OPSG) | 87 | $170,946,880 | Low | Yes | DHS Review |
| FA | Homeland Security Grant Program – State Homeland Security Program (SHSP) | 203 | $761,745,900 | Low | Yes | DHS Review |
| FA | Homeland Security Grant Program – Urban Area Security Initiative (UASI) | 104 | $1,919,725,009 | Low | Yes | DHS Review |
| FA | Homeland Security National Training Program (HSNTP) - Continuing Training Grants Program - Competitive (CTG) | 15 | $15,525,591 | Low | Yes | DHS Review |
| FA | Port Security Grant Program (PSGP) | 787 | $266,441,010 | Low | Yes | DHS Review |
| FA | Presidential Residence Protection Assistance (PRPA) | 2 | $2,241,788** | Low | Yes | DHS Review |
| FA | Regional Catastrophic Preparedness Grant Program (RCPGP) | 41 | $36,087,421 | Low | Yes | DHS Review |

[2] While State Administrative Agencies (SAA) are the direct recipients of NSGP funding, awards are passed through to nonprofit organizations that are not subject to the sanctuary jurisdiction conditions or restrictions as described in the criteria above. Management and Administration costs are allowable under this grant program and may be retained by SAAs.

| AFT | Program | # of Open Awards | ULO Balance* | Risk of NGO / Immigration | Apply Sanctuary Jurisdiction | Recommended Determination |
|---|---|---|---|---|---|---|
| FA | Targeted Violence and Terrorism Prevention Grant Program (TVTP) | 122 | $34,939,702 | Medium | Yes | DHS Review |
| FA | Transit Security Grant Program (TSGP) / Intercity Passenger Rail (IPR)*** | 84 | $283,147,532 | Low | Yes | DHS Review |
| FA | Case Management Pilot Program (CMPP) | 4 | $47,201,306 | High | Yes | DHS Review for Termination |
| FA | Emergency Food and Shelter Program – Humanitarian (EFSP-H)[3] | 3** | $46,050,064** | High | No | DHS Review for Termination |
| FA | Shelter and Services Program (SSP) | 156** | $887,107,461 | High | Yes | DHS Review for Termination |
| **TOTAL** | | | **$100.859B** | | | |

\* ULOs are as of Jan. 28, 2025.

\*\* Chart updated with revised figures. After further review, inaccuracies were identified in previous data that have now been corrected.[4] Previous FMA Swift Current number reflected unobligated amount rather than unliquidated.

\*\*\* Sanctuary jurisdiction conditions would apply to Transit Security Grant Program (TSGP) and not Intercity Passenger Rail (IPR).

---

[3] For EFSP-H, all spending periods for subawards have expired and the provision of services under the sunset program has ended. The remaining amount is funding reserved for management and administration (approximately $4 million) for the grantee and funds returned by the board.

**TABLE B: Summary of Unliquidated Obligation (ULO) by Recommended Risk Determination**

FEMA is reviewing all grants at a programmatic level, and also at the individual grant award level to understand the existing information available, and where additional research within the system can be conducted or where information from recipients will need to be collected. As the policy decisions and process are under development, FEMA has begun and will continue the individual grant award manual payment review process in preparation for the approach and methodology being approved. This manual review process requires significant staff time, but once the backlog is cleared, the process will operate on a much shorter processing time.

| Risk Determination | Disaster Grants ULO | Non-Disaster Grant ULO | Total | Backlog Processing Time* |
|---|---|---|---|---|
| Cleared by FEMA | $78,432,351,989 | $6,251,770,170 | $84,684,122,159 | 45 days |
| Pending FEMA Review | $10,031,196,841 | $1,195,530,490 | $11,226,727,331 | 90 days |
| Recommend DHS Review | N/A | $3,967,791,679 | $3,967,791,679 | 60 days |
| Recommended Terminated Programs | N/A | $980,358,831 | $980,358,831 | 60 days |
| Total | $88,463,548,830 | $12,395,451,170 | $100.859B | |

*This estimate includes the approximately 1,450 payment requests already submitted in FEMA grants systems only. It is not inclusive of the total ULO because payment requests will continue to be submitted for these programs as the work is completed throughout the period of performance, which for some programs may be up to three years.

**Appendix A**
**Federal Emergency Management Agency Grant Programs Overview**
**Background/Purpose**

On Feb. 19, 2025, Secretary Noem issued a memorandum *Restricting Grant Funding for Sanctuary Jurisdictions* and directed all components to review all federal financial assistance awards to determine if Department funds, directly or indirectly, are going to sanctuary jurisdictions (hereinafter "S1 Memo"). Appendix A below provides an overview of each FEMA administered grant program, to include the purpose of each grant program and the award criteria (i.e. whether the award criteria are discretionary or governed by statutory or regulatory competition, allocation, or eligibility criteria).

<div style="background-color: green; color: black; font-weight: bold; text-align: center;">Recommended Determination: Cleared by FEMA</div>

1. **Community Disaster Loans (42 U.S.C. §§ 5121, et seq.)**

   Purpose: Provides funding for local governments to operate their essential community services after substantial revenue loss caused by a disaster.

   Award Criteria: Statutory and regulatory eligibility criteria.

2. **Disaster Unemployment Assistance (42 U.S.C. §§ 5121, et seq.)**

   Purpose: Assistance to individuals unemployed as a result of a major disaster administered through a grant to the declared state or tribe.

   Award Criteria: Statutory and regulatory eligibility criteria.

3. **Fire Management Assistance Grants (42 U.S.C. §§ 5121, et seq.)**

   Purpose: The mitigation, management, and control of any fire on public or private forest land or grassland that threatens such destruction as would constitute a major disaster.

   Award Criteria: Statutory and regulatory eligibility criteria.

4. **Hazard Mitigation Grant Program (42 U.S.C. § 5170c)**

   Purpose: To help communities implement hazard mitigation measures, such as elevation, acquisition, and flood control projects, to reduce or eliminate long-term risk to people and property from natural hazards following a presidential major disaster declaration under the Stafford Act.

   Award Criteria: Statutory and regulatory eligibility criteria.

5. **Hazard Mitigation Grant Program – Post Fire (42 U.S.C. § 5170c(a); 42 U.S.C. § 5187(d))**

<u>Purpose</u>: Makes assistance available to help communities implement hazard mitigation measures after wildfire disasters.

<u>Award Criteria</u>: Statutory and regulatory eligibility criteria. States, federally recognized tribes and territories affected by fires resulting in a Fire Management Assistance Grant (FMAG) declaration on or after Oct. 5, 2018, are eligible to apply.

6. **Individual and Households Programs (IHP) (42 U.S.C. §§ 5121, et seq.)**

<u>Purpose</u>: Provides financial and direct services to eligible individuals and households affected by a disaster, who have uninsured or under-insured necessary expenses and serious needs. IHP assistance is not a substitute for insurance and cannot compensate for all losses caused by a disaster. The assistance is intended to meet your basic needs and supplement disaster recovery efforts.

<u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

7. **Urban Search & Rescue (US&R) (42 U.S.C. §§ 5121, et seq)**

<u>Purpose:</u> Provides reimbursement for lifesaving rescue operations that were performed by Federal Urban Search and Rescue teams during declared disaster.

<u>Award Criteria</u>**:** Statutory and regulatory eligibility criteria.

8. **Public Assistance – State and Local (42 U.S.C. §§ 5121, et seq.)**

<u>Purpose</u>: Financial assistance to states, tribal, territorial, and local governments for debris removal, for emergency work to support public safety, and for the repair, restoration, reconstruction, or replacement of a public facility damaged or destroyed by a major disaster.

<u>Award Criteria</u>: Noncompetitive, but with statutory and regulatory eligibility criteria.

9. **Homeland Security National Training Program (HSNTP) – Alliance for System Safety of Unmanned Aircraft Systems through Research Alliance (Title III of the Department of Homeland Security Appropriations Act, 2024, (Pub. L. No. 118-47); Joint Explanatory Statement accompanying the Department of Homeland Security Appropriations Act, 2024)**

<u>Purpose</u>: Provides funding for Mississippi State University's Federal Aviation Administration Center of Excellence for Unmanned Aircraft Systems (ASSURE) to support and target training solutions for state, local, tribal and territorial partners, which supports the objective of the National Preparedness System to facilitate an integrated, whole community, risk-informed, capabilities-based approach to preparedness.

Award Criteria: Discretionary, limited statutory award criteria. Award goes to Mississippi State University's Federal Aviation Administration Center of Excellence for Unmanned Aircraft Systems.

## 10. Assistance to Firefighters (15 U.S.C. § 2229)

Purpose: Financial assistance to fire departments, EMS organizations, and state fire training academies to enhance their ability to protect the health and safety of the public, as well as that of firefighting and EMS personnel against fire, fire-related, and other hazards.

Award Criteria: Competitive award with statutorily mandated criteria and peer review and statutory allocation requirements.

## 11. Building Resilient Infrastructure and Communities (42 U.S.C. §§ 5133, 5136)

Purpose: Makes federal funds available to states, the District of Columbia, U.S. territories, federally recognized Tribal governments, and local governments for hazard mitigation activities. BRIC aims to shift the focus of federal investments away from reactive, post-disaster spending and toward research-supported, proactive investments in community resilience. These investments aim to reduce future disaster losses, including loss of life and property as well as future spending from the Disaster Relief Fund (DRF). BRIC focuses on cost-effective mitigation measures including protecting public infrastructure so that critical services can withstand or more rapidly recover from future disasters, as well as other projects and activities to increase resilience throughout the nation.

Award Criteria: For the FY23 NOFO, there was a State/Territory allocation, a Tribal Set-Aside, and a National Competition with the remaining funds that are not awarded from the State/Territory Allocation and Tribal Set-Aside.

## 12. Chemical Stockpile Emergency Preparedness Program (50 U.S.C. § 1521)

Purpose: To assist state, local, and tribal governments in carrying out functions related to emergency preparedness and response in connection with the disposal of the lethal chemical agents and munitions in the United States' lethal chemical agents and munitions that existed on Nov. 8, 1985.

Award Criteria: Eligibility limited to communities in close proximity to military installations storing chemical weapons. FEMA currently awards a cooperative agreement to Kentucky who in turn pass-through subawards to local governments.

## 13. Community Assistance Program – State Support Services Element (CAP-SSSE) (42 U.S.C. §§ 4101, 4102)

<u>Purpose</u>: CAP-SSSE is a cooperative agreement which provides funding to state National Flood Insurance Program (NFIP) Coordinators to monitor community adoption and enforcement of the minimum floodplain management standards required for participation in the NFIP. CAP-SSSE funding is used to provide technical assistance to NFIP communities, evaluate community performance in implementing floodplain management activities, and conduct community assistance contacts and visits to ensure communities are compliant with NFIP minimum requirements and flood insurance remains available for sale within the communities.

<u>Award Criteria</u>: Discretionary, non-competitive award to State NFIP Coordinators, which may subaward funding to local or municipal floodplain management authorities.

### 14. Cooperating Technical Partners (CTP) Program (42 U.S.C. § 4101)

<u>Purpose</u>: To provide assistance to state, local, tribal, university, and nonprofit organizations to increase local involvement in and ownership of flood hazard identification and assessment programs. Recipients assist in the development and maintenance of flood risk data, which is used to develop or amend Flood Insurance Rate Maps and provide the baseline for communities to prepare for and mitigate against flood risks.

<u>Award Criteria</u>: Discretionary. No statutory criteria.

### 15. Emergency Management Baseline Assessment Grant (6 U.S.C. § 112 (b)(2))

<u>Purpose</u>: To assist the updating and enhancement of a set of standards for emergency preparedness and response and a related assessment methodology for the evaluation of state, local, and territorial emergency management operations.

<u>Award Criteria</u>: Discretionary, no statutory award criteria.

### 16. Emergency Operations Center Grant Program (42 U.S.C. § 5196c)

<u>Purpose:</u> Grants made available to State Administrative Agencies (SAAs) for equipping, upgrading, and constructing state, local, and tribal emergency operations centers.

<u>Award Criteria</u>: Eligible Emergency Operations Center projects identified in the Joint Explanatory Statement.

### 17. Fire Prevention and Safety (15 U.S.C. § 2229)

<u>Purpose</u>: Financial assistance to fire prevention programs and support for firefighter health and safety research and development.

<u>Award Criteria</u>: Competitive award with statutorily mandated criteria and peer review and statutory allocation requirements.

**18. Flood Mitigation Assistance (42 U.S.C. § 4104c)**

<u>Purpose</u>: To fund mitigation projects such as elevation, acquisition, floodproofing, and planning that reduces or eliminates long-term risk of flood damage to structures insured under the NFIP.

<u>Award Criteria</u>: Statutory eligibility criteria. Award determinations and funding allocations among eligible jurisdictions are made on a competitive basis with discretion to add criteria.

**19. Flood Mitigation Assistance – Swift Current (42 U.S.C. § 4104c)**

<u>Purpose:</u> Provides funding to mitigate buildings insured through the National Flood Insurance Program (NFIP) after a major disaster declaration following a flood-related disaster event to reduce risk against future flood damage. Funds are made available to states, territories, and federally recognized tribal governments that receive a major disaster declaration following a flood-related disaster event and meet all other eligibility criteria.

<u>Award Criteria</u>: Funding is only available to property owners that have a current flood insurance policy under the National Flood Insurance Program (NFIP) and a history of repetitive or substantial damage from flooding.

**20. Homeland Security Preparedness Technical Assistance Program (6 U.S.C. § 112 (b)(2))**

<u>Purpose</u>: To help private organization recipients to conduct planning, coordination, and training activities related to emergency management and preparedness.

<u>Award Criteria</u>: Discretionary, no statutory award criteria.

**21. Homeland Security National Training Program (HSNTP) - National Domestic Preparedness Consortium (NDPC) (6 U.S.C. §§ 1102 and 112 (b)(2))**

<u>Purpose</u>: To assist statutorily designated National Domestic Preparedness Consortium members to identify, develop, test, and deliver training to state, local, and tribal emergency response providers; provide on-site and mobile training; and facilitate delivery of training.

<u>Award Criteria</u>: Discretionary, limited statutory award criteria. Awards may only go to one of the six non-Federal members of the National Domestic Preparedness Consortium named in statute, which consist of five state universities and one private entity.

**22. National Cyber Security Preparedness Consortium (National Cybersecurity Preparedness Consortium Act, 2021 (Pub. L. No. 117-122))**

<u>Purpose</u>: Delivers over 40 training courses for more than 1,000 SLTT emergency managers, cyber network managers, and critical infrastructure professionals, annually to strengthen local, state, and national cyber and information systems and defend against and recover from cyber-attacks including attacks with cascading physical consequences.

<u>Award Criteria</u>: Awards may only go to one of the six non-federal members of the National Domestic Preparedness Consortium named in statute, which consist of five state universities and one private entity.

**23. Intercity Bus Security Grant Program (6 U.S.C. § 1182)**

<u>Purpose</u>: To make awards to eligible private operators providing transportation by an over-the-road bus for security improvements.

<u>Award Criteria</u>: Discretionary, competitive award based on statutory criteria that require funding decisions to prioritize security risks. The eligible applicants are private bus operators and not states or local governments.

**24. National Dam Safety Program (33 U.S.C. § 467f)**

<u>Purpose</u>: To enable states to increase dam safety through increased inspections, emergency action planning, improved state and federal coordination, training and workshops, and purchasing of equipment.

<u>Award Criteria</u>: Awards are based on eligibility criteria that are set by statute with funding allocations based on a statutory formula.

**25. Rehabilitation of High Hazard Potential Dam Program (33 U.S.C. § 467f-2)**

<u>Purpose</u>: Provide technical, planning, design, and construction assistance in the form of grants for rehabilitation, repair, and removal of eligible high hazard potential dams.

<u>Award Criteria</u>: For FY 2024, FEMA made funding available in allocations for 32 states and one territory.

**26. National Earthquake Hazards Reduction Program – Multi-State and National Earthquake Assistance (MSNEA) (42 U.S.C. § 7704(a)(2)(B), (b)(2)(A)(i))**

<u>Purpose</u>: The National Earthquake Hazards Reduction Program (NEHRP) Multi-State and National Earthquake Assistance (MSNEA) grant program makes funds available to nonprofit organizations and institutions of higher education that possess the critical skills necessary to develop and implement regional (multi-state) and/or national earthquake risk mitigation activities.

<u>Award Criteria</u>: Discretionary. The program's authorizing statutes do not prescribe specific criteria for recipients. FEMA awards competitive grants to nonprofit organizations and institutions of higher education that possess the critical skills necessary to develop and implement regional (multi-state) and/or national earthquake risk mitigation activities, on behalf of states and territories participating in the FEMA NEHRP State Assistance program.

**27. National Earthquake Hazards Reduction Program – Individual State Earthquake Assistance (ISEA) (42 U.S.C. § 7704(b)(2)(A)(ix) and 42 U.S.C. § 7704(b) (2)(B))**

<u>Purpose:</u> FEMA awards non-competitive grants to eligible states and territories with high to very high seismic risks to fund one or more of the following allowable activities. The purpose is to support the establishment of earthquake hazards reduction programming and the implementation of earthquake safety, mitigation, and resilience activities at the state and local level.

<u>Award Criteria:</u> Statutory and regulatory eligibility criteria. Eligibility is limited to states and territories that have been determined to have a high or very high risk of earthquakes. Eligibility is further limited to those states and territories who can provide the statutory 25% non-federal cost share.

**28. National Fire Academy Training Assistance (Section 7 of the Federal Fire prevention and Control Act 15 U.S.C. 2206 (i)(1))**

<u>Purpose:</u> Provides travel stipends (air or mileage) to SLTT fire and EMS personnel who attend resident classes at the National Fire Academy.

<u>Award Criteria:</u> Assistance to individuals reimbursing for part of cost to attend trainings in Emmitsburg, MD

**29. National Incident Management System (NIMS) / Emergency Management Assistance Compact Program (EMAC) Program (6 U.S.C. § 761)**

<u>Purpose:</u> To assist the administrator of the Emergency Management Assistance Compact (EMAC) to administer EMAC operations, to implement NIMS, and to continue coordination with FEMA and state, local, and tribal governments.

<u>Award Criteria:</u> Eligibility limited to administration of the Emergency Management Assistance Compact (EMAC).

**30. National Urban Search and Rescue (US&R) Response System (42 U.S.C. § 5165f, 6 U.S.C. § 722)**

<u>Purpose:</u> The purpose of these Readiness Cooperative Agreements is to support the continued development and maintenance of a national urban search and rescue capability among the 28 task forces within the National Urban Search and Rescue Response System.

<u>Award Criteria:</u> Statutory and regulatory eligibility criteria. Only the 28 sponsoring agencies currently designated by FEMA as members of the National Urban Search and Rescue Response System are eligible for readiness and response cooperative agreements.

**31. Next Generation Warning System (Annual DHS Appropriations Acts)**

Purpose: Enables public television broadcasters to upgrade to the Advanced Television Systems Committee broadcast standard (ATSC 3.0) that enables public projects that improve the ability of remote rural areas to receive alerts and warnings.

Award Criteria: The Corporation for Public Broadcasting is the only awardee of the grant. Per the FY24 NOFO, the awardee will then manage a competitive process to solicit sub-grant applications from eligible subrecipients to use these funds in accordance with the requirements and priorities set forth in the NOFO.

## 32. Pre-Disaster Mitigation (42 U.S.C. § 5133)

Purpose: Makes federal funds available to state, local, tribal, and territorial governments to plan for and implement sustainable cost-effective measures designed to reduce the risk to individuals and property from future natural hazards, while also reducing reliance on federal funding from future disasters.

Award Criteria: The FY 2024 PDM Grant Program provided funding to projects identified in the 2024 DHS Appropriations Act's Joint Explanatory Statement (JES) in the table starting on page 59 entitled "Homeland Security Community Project Funding/Congressionally Directed Spending."

## 33. Safeguarding Tomorrow Through Ongoing Risk Mitigation Loan Fund Program (42 U.S.C. § 5135)

Purpose: Provides capitalization grants to states, eligible federally recognized tribal governments, territories and the District of Columbia to establish revolving loan funds that provide hazard mitigation assistance for local governments to reduce risks from natural hazards and disasters.

Award Criteria: Awards are based on eligibility criteria that are set by statute with funding allocations based on a statutory formula.

## 34. Staffing for Adequate Fire and Emergency Response (15 U.S.C. § 2229a)

Purpose: Financial assistance for increasing the number of firefighters to help communities meet industry standards and attain 24-hour staffing to provide adequate protection from fire and fire-related hazards.

Award Criteria: Competitive award program with statutorily mandated minimum application criteria and peer review.

## 35. State and Local Cybersecurity Grant Program (6 U.S.C. § 665g)

Purpose: To assist state, local, and territorial governments with managing and reducing systemic cyber risk.

Award Criteria: Mandatory, allocations to each state and territory based on statutory formula with the remainder to the states based on population.

**36. State Fire Training Systems Grants (15 U.S.C. § 2206(f))**

Purpose: To assist state fire service systems in providing training programs.

Award Criteria: Discretionary, no statutory award criteria.

**37. Tribal Cybersecurity Grant Program (6 U.S.C. § 665g)**

Purpose: To assist tribal governments with managing and reducing systemic cyber risk.

Award Criteria: Statutory requirement that the Secretary of DHS shall consult with the Secretary of the Interior and tribal governments in determining whether the grant would be competitive or allocated equally among the tribal governments of the federally recognized tribal nations.

**38. Tribal Homeland Security Grant Program (6 U.S.C. § 606)**

Purpose: Financial assistance to tribal governments to build and sustain capabilities related to preventing, preparing for, protecting against, and responding to acts of terrorism.

Award Criteria: Competitive award based on statutory criteria.

**39. Intercity Passenger Rail (6 U.S.C. § 1163)**

Purpose: To assist Amtrak in protecting critical surface transportation infrastructure and the traveling public from acts of terrorism and to increase the resilience of the Amtrak rail system.

Award Criteria: Sole source award to Amtrak. No funding is granted to states or local governments.

**Recommended Determination: Pending Review**

**1. Crisis Counseling Program (42 U.S.C. §§ 5121, et seq.)**

Purpose: Assistance to provide professional counseling services or training of disaster workers to survivors of major disasters to relieve mental health problems caused or aggravated by major disasters or their aftermath.

Award Criteria: Statutory and regulatory eligibility criteria.

**2. Disaster Case Management (42 U.S.C. §§ 5121, et seq.)**

Purpose: Case management services to survivors of major disasters to identify and address unmet needs.

Award Criteria: Statutory and regulatory eligibility criteria.

3. **Disaster Legal Services (DLS) (42 U.S.C. §§ 5121, et seq.)**

<u>Purpose</u>: Provides confidential, free legal assistance to survivors who need legal help due to a major disaster, but who do not have the means to secure adequate legal services. For individuals seeking DLS, there is no formal application process. Individuals can access these services by contacting the phone number designated for the specific major disaster, which is established once the program has been authorized. In addition to this phone number, individuals can visit FEMA Disaster Recovery Centers where DLS attorneys may be physically located.

<u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

4. **Public Assistance – Non-Governmental Organizations (42 U.S.C. §§ 5121, et seq.)**

<u>Purpose</u>: Financial Assistance to NGOs that perform essential community services for emergency work to ensure public safety, and for the repair, restoration, reconstruction, or replacement of an eligible facility damaged or destroyed by a major disaster.

<u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

5. **Public Assistance – Non-Congregate Sheltering (42 U.S.C. §§ 5121, et seq.)**

<u>Purpose</u>: Financial Assistance to state, local, tribal and territorial governments for eligible sheltering expenses caused by a disaster.

<u>Award Criteria</u>: Statutory and regulatory eligibility criteria.

6. **Emergency Food and Shelter Program (42 U.S.C. §§ 11331-11346)**

<u>Purpose</u>: To supplement and expand ongoing efforts to provide shelter, food and supportive services for hungry and homeless people across the nation.

<u>Award Criteria</u>: Mandatory, subaward determinations made by external board based on statutory criteria.

7. **Nonprofit Security Grant Program (6 U.S.C. § 609a)**

<u>Purpose</u>: To assist non-profit organizations in target hardening and other physical security enhancements and activities.

<u>Award Criteria</u>: By statute, only nonprofits that are located within a FEMA designated Urban Area for purposes of the Urban Area Security Initiative (UASI) program are eligible to apply for funding. The criteria for competitive award include a risk prioritization that is statutorily required, providing limited discretion to add grant conditions. There is no discernible connection between an award for a nonprofit organization and 8 U.S.C. §§ 1324(a)(1)(A)(ii)-(iv), 1373, and 1644 and the other criteria established in the S1 Memo.

**Recommended Determination: DHS Review**

1. **Emergency Management Performance Grant (6 U.S.C. § 762)**

   Purpose: To assist state, local, tribal, and territorial governments "in preparing for all hazards" and all phases of emergency management.

   Award Criteria: Mandatory, allocations to each state based on a statutory formula.

2. **State Homeland Security Grant Program (6 U.S.C. §§ 601 – 613)**

   Purpose: Assists states and local and tribal governments in building and sustaining capabilities related to preventing, preparing for, protecting against, and responding to acts of terrorism.

   Award Criteria: Statutory minimum allocation for each state with remaining awarded based on risk calculated using statutory criteria.

3. **Urban Area Security Initiative (6 U.S.C. §§ 601 – 613, DHS Appropriations Acts)**

   Purpose: Financial assistance to high-risk urban areas in building and sustaining capabilities related to preventing, preparing for, protecting against, and responding to acts of terrorism.

   Award Criteria: Awards based on risk calculated using statutorily required criteria. Discretion in determining how many high-risk urban areas shall receive funding through a State, but that discretion is often limited or guided by Congress through the annual appropriations process.

4. **Operation Stonegarden (6 U.S.C. §§ 601 – 613, DHS Appropriations Acts)**

   Purpose: Operation Stonegarden funds target expenditure by local governments for the purpose of border protection and border security.

   Award Criteria: Discretionary, competitive awards to states with 100% of funds sub-awarded to local law enforcement. The Department adopts the requirement for competition and criteria for award that is provided for in the legislative history of the appropriations act funding the program.

5. **Homeland Security National Training Program - Continuing Training Grants – Competitive (Annual DHS Appropriations Acts)**

   Purpose: To help training partners develop and deliver training to prepare whole communities to prevent, protect against, mitigate, respond to, and recover from acts of terrorism and natural, man-made, and technological hazards.

   Award Criteria: Discretionary, no statutory award criteria. Per the FY24 NOFO, the Joint Explanatory Statement accompanying the FY 2024 DHS Appropriations Act (Pub. L. No.

118-47) directs Continuing Training Grants to be competitively awarded for FEMA-certified rural and tribal training.

**6. Port Security Grant Program (46 U.S.C. § 70107)**

Purpose: Assistance to port authorities, facility operators, and state and local governments for maritime transportation infrastructure security.

Award Criteria: Statute requires that funds be allocated based on risk, but otherwise discretionary.

**7. Presidential Residence Protection Assistance Program (Annual DHS Appropriations Acts)**

Purpose: Provides funds to reimburse state and local enforcement agencies (LEAs) and emergency management agencies (EMAs) for extraordinary law enforcement or other emergency personnel costs incurred while protecting any non-governmental residence of the President that is designated or identified to be secured by the U.S. Secret Service.

**8. Regional Catastrophic Preparedness Grant Program. (Annual DHS Appropriations Acts)**

Purpose: Supports the building of core capabilities essential to achieving the National Preparedness Goal of a secure and resilient nation by providing resources to close known capability gaps in Housing and Logistics and Supply Chain Management, encouraging innovative regional solutions to issues related to catastrophic incidents, and building on existing regional efforts.

Award Criteria: Discretionary program with no statutory award criteria. This program is administered through a competitive selection process.

**9. Targeted Violence and Terrorism Prevention (6 U.S.C. § 112 (b)(2); Annual DHS Appropriations Acts)**

Purpose: To help prepare for, prevent and respond to emergent threats from violent extremism through planning, developing, implementing, or expanding educational outreach, community engagement, social service programs, training and exercises.

Award Criteria: Discretionary program with no statutory award criteria. This program is administered through a competitive selection process.

**10. Transit Security Grant Program (6 U.S.C. § 1135)**

Purpose: The purpose of the grant is to build and sustain transit agency security capabilities that protect national security.

Award Criteria: Discretionary, competitive awards based on statutory criteria that require prioritization of funding based on risk.

**Recommended Determination: DHS Review for Termination**

1. **Case Management Pilot Program (Annual DHS Appropriation Acts)**

   <u>Purpose:</u> Makes funds available to local governments and/or nonprofits to provide voluntary case management and other services to aliens in immigration removal proceedings.

   <u>Award Criteria:</u> Discretionary; the CMPP National Board makes funds available to local governments and/or nonprofits (subrecipients) to provide case management and culturally, trauma-informed, and linguistically responsive services to eligible noncitizens who affirmatively volunteer to participate in the program.

2. **Emergency Food and Shelter Program – Humanitarian (42 U.S.C. §§ 11331-11346)**

   <u>Purpose:</u> To provide shelter and other services to families and individuals encountered by the Department of Homeland Security.

   <u>Award Criteria</u>: Mandatory, subaward determinations made by external board based on statutory criteria.

3. **Shelter and Services Program. (Annual DHS Appropriations Acts)**

   <u>Purpose:</u> To provide funds to non-federal entities for sheltering and related activities to aliens following their release from DHS. The intent is to support Customs and Border Protection in the safe, orderly, and humane release of aliens from short-term holding facilities.

   <u>Award Criteria:</u> SSP-Competitive: Competitive grants made available to local governments, federally recognized tribal governments, nonprofit organizations, and states that serve aliens recently released from DHS custody to provide shelter, food, transportation, acute medical care, personal hygiene supplies, and case management services and to increase the non-federal entities capacity to shelter aliens recently released from DHS custody, including renovations and modifications to existing facilities.

   SSP-Allocated: Funding in the FY24 NOFO is allocated to eligible applicants listed in a table in the NOFO. The allocations were based on release and destination data received from CBP over the time period of July 1, 2023, to Dec. 31, 2023, along with operational information available to CBP.

# EXHIBIT 9

**U.S. Department of Homeland Security**
Washington, DC  20472



March 11, 2025

Christina Choate
State of Washington
Department of Social & Health Services
P.O. Box 45842
Olympia, WA 98501

Re:     Remedy for Noncompliance Letter, Shelter and Services Program (SSP)

       Grant Number: EMW-2024-SP-05140
       Period of Performance: October 1, 2023 – September 30, 2026
       Award amount: $4,039,516.00

Dear Christina Choate:

The purpose of this letter is to notify you that DHS/FEMA is temporarily withholding payments to your organization for the grant award(s) named above, pursuant to 2 C.F.R. § 200.339(a) and is instituting specific conditions on your award pursuant to 2 C.F.R. § 200.208.

**Findings**
The Department of Homeland Security has significant concerns that SSP funding is going to entities engaged in or facilitating illegal activities. The Department is concerned that entities receiving payment under this program may be guilty of encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv); transporting or moving illegal aliens, *id*. § 1324(a)(1)(A)(ii); harboring, concealing, or shielding from detection illegal aliens, *id*. § 1324(a)(1)(A)(iii); or applicable conspiracy, aiding or abetting, or attempt liability respecting these statutes.

DHS/FEMA is required to administer its grant awards so as to ensure that federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, applicable federal statutes, and regulations. 2 C.F.R. § 200.300(a). The terms and conditions of the award allow the Department to institute appropriate remedies for noncompliance which include temporarily withholding payments or suspending or terminating the award for a failure to comply with the conditions of the award or applicable federal statutes. See 2 C.F.R. §§ 200.208; 200.340; and 200.339(a).

**Remedy Action(s) and Specific Condition(s)**
Non-federal entities receiving financial assistance from DHS/FEMA are required to comply with

requirements in the terms and conditions of their awards or subawards, including the terms set forth in applicable federal statutes, regulations, Notice of Funding Opportunities, and policies. Throughout the award lifecycle or even after an award has been closed, DHS/FEMA may discover potential or actual noncompliance on the part of a recipient or subrecipient. This potential or actual noncompliance may be discovered through routine monitoring, audits, closeout, or reporting from various sources. In the case of any potential or actual noncompliance, DHS/FEMA may place special conditions on an award per 2 C.F.R. § 200.208 and § 200.339, DHS/FEMA may place a hold on funds until the matter is corrected, or additional information is provided per 2 C.F.R. § 200.339, or it may do both.

Based on the concerns described above, DHS/FEMA will conduct additional monitoring and review of your award(s) as permitted by the terms and conditions of the award(s) to ensure compliance with all terms and conditions of your award(s). During this time, payments under the grant award(s) will be temporarily held. Further, you are not permitted to incur any additional costs under the grant until notified further by DHS/FEMA.

To assist DHS/FEMA in conducting this review, please respond within 30 days with the following information that your organization has not already submitted to DHS/FEMA:

1. All documents regarding the aliens with whom your organization and your subrecipients and contracts interacted with in carrying out the scope of your SSP award, including their names and contact information; and a detailed and descriptive list of specific services provided, and proof of provision of these services; or
2. A written statement that your organization has already submitted all of the information identified in No. 1, above, to DHS/FEMA.

Additionally, to ensure compliance with all applicable federal laws and regulations in the execution of your SSP award, FEMA will be imposing an additional special condition that requires you, and the executive officers of any subrecipient or contractor that receives funding under the award, to sign an affidavit attesting that you and they have not participated in, and have no knowledge or suspicion that anyone in your or their organizations participated in, any crime cognizable under 8 U.S.C. §§ 1324(a)(1)(A)(iv); 1324(a)(1)(A)(ii); or 1324(a)(1)(A)(iii).  Additional details regarding this new requirement will be forthcoming shortly. Upon the conclusion of that monitoring, FEMA will notify you of the results and any other remedies for noncompliance or specific conditions, as appropriate.

**Opportunity to Appeal**
Your organization has the right to appeal this action within 60 days of the date of this letter. The appeal must include the following information:

1. Grant number(s).
2. Recipient name.
3. A written explanation, on your organization's letterhead, explaining why you believe FEMA's decision to temporarily withhold payments to your organization for the grant award(s) named above, pursuant to 2 C.F.R. § 200.339(a), or to prohibit your organization from incurring additional costs under the grant, is not correct.

2

4. Copies of any documents or statements that support your position that FEMA's decision to temporarily withhold payments to your organization for the grant award(s) named above, pursuant to 2 C.F.R. § 200.339(a) is not correct.

Written appeals should be sent directly to FEMA-SSP@fema.dhs.gov.

The FEMA Grant Programs Directorate is available to respond to any questions you may have. Please send all information and communications regarding this notification to FEMA-SSP@fema.dhs.gov.

Sincerely,

Cameron Hamilton
Senior Official Performing the Duties of the Administrator

# EXHIBIT 10

**U.S. Department of Homeland Security**
Washington, DC  20472



April 1, 2025

Christina Choate
State of Washington
Department of Social & Health Services
P.O. Box 45842
Olympia, WA 98501

Re:     Termination Notice: Shelter and Services Program Grant Award

        Grant Number: EMW-2024-SP-05140
        Award amount: $4,039,516.00

Dear Christina Choate:

This letter serves as official notice that the Department of Homeland Security (DHS)/Federal
Emergency Management Agency (FEMA) is terminating your Shelter and Services Program (SSP)
grant award identified above, effective immediately. DHS/FEMA is making this termination
pursuant to the terms and conditions of the grant award. These terms and conditions include the SSP
Notice of Funding Opportunity (NOFO) that applies to your grant and 2 C.F.R. § 200.340(a)(2)
(2020), which authorizes DHS/FEMA to terminate your award "to the greatest extent authorized by
law, if an award no longer effectuates the program goals or agency priorities."

Your agency received the grant award identified above to carry out the purposes of the SSP
identified in the awards' respective NOFOs. The Department, consistent with President Trump's
direction, is focused on advancing the essential mission of enforcing immigration laws and securing
the border. Consequently, grant programs that support, or have the potential to support, illegal
immigration through funding illegal activities or support for illegal aliens that is not consistent with
DHS's enforcement focus do not effectuate the agency's current priorities. The previous agency
priorities under the FYs 2023 and 2024 SSP were to provide funding to non-federal entities to
provide shelter, food, transportation, acute medical care, and personal hygiene supplies for
individuals released from DHS short-term holding facilities. The individuals receiving these services
often have no legal status and are in the United States unlawfully, such as those awaiting removal
proceedings. This, in turn, provides support for illegal aliens and is not consistent with DHS's
current priorities. For these reasons, DHS/FEMA is terminating your award.

In accordance with the terms of your award, including 2 C.F.R. §§ 200.344-345 (2020), you must
complete all closeout procedures. This includes, among other things, submitting all financial,
performance, and other required reports within 120 calendar days from the date of this letter and
promptly refunding any funding paid to date that exceed the amount set forth in your final federal
financial report. FEMA previously issued a Remedy of Noncompliance Letter on March 11, 2025,
informing you that you were not permitted to incur any additional costs under the award until further

Notice of Grant Award Termination: Shelter and Services Program
Page 2

notice from DHS/FEMA. This means that, during the closeout process, your final federal financial report must include all allowable costs incurred before the date of the Remedy of Noncompliance Letter but must not include costs incurred after the date of that Remedy of Noncompliance Letter.

FEMA will review all closeout documentation in accordance with 2 C.F.R. § 200.344. As part of its review, FEMA will determine the final allowable costs for your award. This will include evaluating whether all submitted costs incurred before the date of the Remedy of Noncompliance Letter are necessary, allocable, and reasonable. FEMA will notify you of the final allowable costs for the award and, if the payments made exceed the final allowable costs, you will need to promptly refund the difference. If, on the other hand, FEMA determines that the total allowable costs exceed the amount paid to date, then FEMA will make a final payment for that difference. FEMA will close the award when it determines that all administrative actions and required work have been completed. Closeout will not affect DHS/FEMA's ability to later disallow costs and recover funds for the grant awards based on any later post-closeout audit or review.

If you wish to object to the termination of this award, you may challenge the termination in writing and provide any information or documentation relevant to your challenge. You must submit any written objections no later than 30 days of this letter. There will be no other opportunity to appeal this action to Department of Homeland Security.

The FEMA Grant Programs Directorate is available to respond to any questions you may have. Please send all information and communications regarding this notification to FEMA-SSP@fema.dhs.gov.

Sincerely,

Cameron Hamilton
Senior Official Performing the Duties of the
Administrator

# EXHIBIT 11

**STATE OF WASHINGTON**
**DEPARTMENT OF SOCIAL AND HEALTH SERVICES**
Office of the Secretary | P.O. Box 45010, Olympia, WA 98504-5010

April 23, 2025

U.S. Department of Homeland Security
Federal Emergency Management Agency

*SENT VIA E-MAIL TO:* FEMA-SSP@fema.dhs.gov

Re: Objection to FEMA's Termination of Grant Number: EMW-2024-SP-05140

Dear Senior Official Cameron Hamilton:

I write on behalf of the Washington State Department of Social and Health Services (DSHS) to object to actions taken by the U.S. Department of Homeland Security (DHS) and Federal Emergency Management Agency (FEMA) to withhold and then terminate $4,039,516 in FFY 2024 Shelter and Services Program (SSP) funding, which was awarded to DSHS on September 26, 2024, in Grant Number EMW-2024-SP-05140 and had a period performance end date of September 30, 2026 (the "SSP Grant").

On March 11, 2025, DHS/FEMA notified DSHS that payments under its SSP Grant would be "temporarily withheld," ostensibly until DHS/FEMA completed "additional monitoring and review" of the SSP Grant and DSHS satisfied certain, newly added "specific conditions" (the "SSP Withholding Notice"). DHS/FEMA further requested that DSHS provide certain information by April 11, 2025, stated that additional information regarding the new "specific conditions" would be forthcoming, and indicated that DSHS had until May 11, 2025, to appeal DSH/FEMA's withholding action. DHS/FEMA also instructed DSHS not to incur additional costs under the SSP Grant.

On April 1, 2025, without further communication from DHS/FEMA and before the deadlines set forth in the SSP Withholding Notice had passed, DHS/FEMA notified DSHS that its SSP Grant had been terminated. DHS/FEMA stated that it had decided to terminate the SSP Grant because it "no longer effectuates the program goals or agency priorities."

The interruption in available SSP Grant funding, as well as the uncertainty caused by the manner in which DHS/FEMA carried out these actions, has caused, and will continue to cause, irreparable harm to the State of Washington and the communities it serves.

To date, DSHS has fully complied with its obligations under the SSP Grant, which effectuates a program lawfully authorized and funded by Congress to serve important federal policy goals and objectives. Thus, there was no lawful basis for DHS/FEMA to either withhold or terminate DSHS' SSP Grant.

Accordingly, and without waiving any rights to challenge DHS/FEMA's actions in any appropriate venue or any arguments or claims DSHS may raise therein, we respectfully submit this written objection to both notices and request that DHS/FEMA immediately rescind its decisions to withhold and/or

terminate DSHS' SSP Grant and make those funds immediately available to DSHS, subject to applicable and valid award terms and conditions.

We request a response to this objection and a decision on our demand for corrective action by **May 9, 2025, 9 a.m. (PST),** as to whether the termination will be rescinded.

We reserve all rights to pursue any and all available relief and to receive any and all process due.

Sincerely,

Cheryl Strange
Secretary

cc:     Lisa Yanagida, DSHS Chief of Staff, Office of the Secretary
        Barbara Serrano, DSHS Deputy Chief of Staff, Office of the Secretary
        Richard Pannkuk, DSHS Chief Financial Officer, Facilities, Finance & Analytics Administration
        Carla Reyes, DSHS Assistant Secretary, Economic Services Administration
        Sarah Peterson, DSHS Chief, Office of Refugee and Immigrant Assistance
        Alonso Cano, Assistant Attorney General, Washington Attorney General's Office
        Grace Huang, Senior Policy Advisor, Office of Governor Bob Ferguson
        Nathan Bays, Deputy Policy Director, Office of Governor Bob Ferguson

Enclosed:

Remedy for Noncompliance Letter, Shelter and Services Program (SSP), dated March 11, 2025
Termination Notice dated April 1, 2025