1

The Honorable Barbara J. Rothstein

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9

10

STATE OF WASHINGTON,

NO. 2:25-cv-01401-BJR

11

Plaintiff,

FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF

12

v.

13

14

U.S. DEPARTMENT OF HOMELAND
SECURITY,

15

KRISTI NOEM, in her official capacity as
Secretary of the U.S. Department of
Homeland Security,

16

17

FEDERAL EMERGENCY
MANAGEMENT AGENCY, and

18

19

DAVID RICHARDSON, in his official
capacity as the Senior Official Performing
the Duties of the FEMA Administrator,

20

21

Defendants.

22

23

24

25

26

1

**TABLE OF CONTENTS**

2    I.    INTRODUCTION................................................................................................ 1

3    II.   JURISDICTION AND VENUE ......................................................................... 5

4    III.  PARTIES............................................................................................................ 6

5    IV.   ALLEGATIONS ................................................................................................ 7

6          A.   Congress Created the Shelter and Services Program to Reimburse Non-
                Federal Partners, Like Washington, for Providing Shelter to Noncitizen
7               Migrants Released From DHS's Custody.................................................. 7

8               1.    Faced with significant need, Washington and local partners provided
                      shelter and essential resources to newly arrived noncitizen migrants............... 7
9

                2.    Congress created the Shelter and Services Program to ensure states,
10                    localities, and community organizations could meet the needs of
                      noncitizen migrants, after their release from DHS custody ........................... 11
11

12              3.    FEMA awards Washington more than $4 million in SSP funds to
                      continue providing shelter and services to noncitizen migrants in
13                    Washington............................................................................................ 14

14         B.   The Trump Administration Illegally Cut Funding Appropriated by Congress
                for the Shelter and Services Program ...................................................... 19

15              1.    President Trump directed DHS to eliminate federal funding from
                      "Sanctuary Jurisdictions" ...................................................................... 19
16

17              2.    Defendants imposed "special conditions" on grants made under the
                      Shelter and Services Program before announcing the Program's
18                    termination ........................................................................................... 22

19              3.    Defendants' termination of the Shelter and Services Program irreparably
                      harms Washington and its subrecipients ....................................................... 26

20   V.    CLAIMS FOR RELIEF .................................................................................. 26

21   VI.   PRAYER FOR RELIEF ................................................................................. 35

22

23

24

25

26

# I.    INTRODUCTION

1.    The State of Washington brings this complaint for declaratory and injunctive relief in response to the Trump Administration's unlawful wholesale termination of the Shelter and Services Program, a grant program established by Congress for the specific purpose of enabling non-Federal entities—like the State of Washington and its cities, counties, and non-profit partners—to provide shelter and essential services to the noncitizen migrants who settled in Washington after being processed and released by the U.S. Department of Homeland Security (DHS).

2.    Washington recognizes the value of its immigrant residents and strives to "remain[] a place where the rights and dignity of all residents are maintained and protected," regardless of immigration status. *See* Wash. Rev. Code § 43.17.425; Laws of 2019 ch. 440, E2SB 5497. These values were confirmed in practice between 2022 and 2024 when, cumulatively and consistent with national trends, more than 45,000 noncitizen migrants settled in Washington after they were processed and released by DHS.

3.    For many of these newcomers, their arrival in Washington was the culmination of a long and traumatic journey that began when they were forced to flee persecution in their home countries and seek asylum in the United States. They arrived in Washington with few resources to their name, let alone stable shelter, and without access to federal support or even permission to earn a living. Unfortunately, Washington's housing and homeless crisis response system was already over capacity at this time and stretched too thin to provide the kind of initial support that would not only meet the immediate needs of these newcomers but also allow them to find their bearings in their new home. Indeed, most of Washington's emergency shelters were already being filled each night. Lacking better options, these noncitizen migrants sought shelter wherever they could find it, sometimes in informal encampments in King County, which may have provided a measure of stability but were an unsustainable option, particularly with winter fast approaching.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

1

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

4. More resources and better coordination among service providers were desperately needed. Washington responded, launching the Washington Migrant and Asylum-Seeker Support Project in October 2024 to connect these newcomers with support and services and backing that program with more than $25 million in state funding. Washington was joined in its humanitarian commitment by local governments, including King County and the City of Tukwila, and community organizations, like the Seattle-based shelter, Mary's Place, which provided shelter space, educational and health programs, and other services to help ensure the basic needs of these new Washingtonians were met.

5. Congress also recognized that the cost of providing initial support to these newcomers was straining the budgets of non-Federal entities, including states like Washington. And it further acknowledged that expanding the shelter capacity of non-Federal entities was necessary and a far better option than needlessly detaining these newcomers—many of whom were seeking humanitarian protections—in overcrowded DHS detention facilities. In 2023, Congress responded to these concerns by creating the Shelter and Services Program (SSP) and appropriating federal funds "to support sheltering and related activities provided by non-Federal entities, . . . in support of relieving overcrowding in short-term holding facilities of U.S. Customs and Border Protection[.]" *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 STAT. 4730 (Dec. 29, 2022).

6. Congress reauthorized the grant program in 2024, once again appropriating federal funds to help non-Federal partners, like state governments, provide shelter to those who had been processed and released by DHS—a population Congress understood necessarily included many people who entered into the United States without inspection. *See* Pub. L. No. 118-47, 138 STAT. 597, 598 (March 23, 2024).

7. In recognition of the promising but costly steps Washington and its local partners had taken to provide shelter to noncitizen migrants, as well as the continuing need for additional resources, the Federal Emergency Management Agency (FEMA) awarded Washington

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

2

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

$4,039,516 in SSP funds to reimburse Washington and its local partners for the costs they had already incurred and to increase their capacity to provide more of the same.

8.    To date, Washington and its partners have neither requested nor received a single dollar from that award.

9.    Almost as soon as President Trump was sworn into office for his second term, he began an all-out assault on grant programs that were distributing federal funds to recipients and causes he dislikes. In particular, he directed DHS "to ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds" and to "[t]erminate" any grants "providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens[.]" Protecting the American People Against Invasion, Exec. Order 14159 §§ 17, 19, 90 Fed. Reg. 8443, 8446-47 (Jan. 29, 2025).

10.    Defendants took prompt action to carry out these directives against the Shelter and Services Program.

11.    First, on January 28, 2025, Secretary Kristi Noem directed DHS components to place "on hold pending review" grant programs that "touch in any way on immigration," ostensibly out of a "concern[]" that these programs were funding "illegal activities," like "inducing" or "harboring . . . illegal aliens." *See* Secretary Noem, Memorandum for Component and Office Heads (Jan. 28, 2025). No "review" was necessary for the Shelter and Services Program, however, Secretary Noem summarily ordered a hold on all funds administered under that program.

12.    Second, on February 10, 2025, Defendants quietly de-obligated approximately $885.2 million previously obligated for SSP awards in an effort to kneecap the whole program, including the entire $4,039,516 obligated for Washington's SSP award. This behind-the-scenes accounting maneuver signified that, in Defendants' view, they no longer had legal obligations under the Shelter and Services Program.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

3

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

13.     Third, on or about March 11, 2025, Defendants sent sham "notices" to SSP grant recipients, including Washington, alleging noncompliance with the terms of the SSP grant and stating that the recipients' funding would be withheld until further notice. Defendants made vague reference to their "significant concerns that SSP funding" was "going to entities engaged in or facilitating illegal activities," but provided no evidence to support their concerns about the Shelter and Services Program, generally, or Washington's use of SSP funds, specifically. Instead, recipients were given 30 days to comply with onerous information requests—including a demand to provide the "names and contact information" for every individual who received services under the award—or 60 days to lodge an appeal with FEMA.

14.     Fourth, and before either of FEMA's deadlines had expired, Defendants notified SSP grant recipients on April 1, 2025, that the Shelter and Services Program had been officially terminated. Defendants' termination notice made no mention of the "significant concerns" hinted at in the noncompliance letter but, rather, explained that they were terminating the Shelter and Services Program because the funds "provide[] support for illegal aliens," which "is not consistent with DHS's current priorities."

15.     When it authorized and appropriated funds to support the Shelter and Services Program, Congress could not have been clearer that these funds were intended "to support sheltering and related activities provided by non-Federal entities," in order to "reliev[e] overcrowding" in U.S. Customs and Border Protection's (CBP) short-term holding facilities. *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 STAT. 4730 (Dec. 29, 2022). Achieving that goal necessarily required providing support, in the form of emergency shelter and other essential services, for a population that was certain to include individuals who entered the United States without inspection, who Defendants derisively refer to as "illegal aliens."

16.     Defendants have made clear their disdain for noncitizen migrants, especially those who entered without inspection and seek humanitarian protection in the United States. Likewise, Defendants have made clear their opposition to jurisdictions, like Washington, that

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

4

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

protect the rights and dignity of all residents, regardless of immigration status, and leave the cost and responsibility of enforcing federal, civil immigration law to the federal government. And they have further made clear their view that neither should receive federal support of any kind. But Defendants' policy preference, no matter how much of a priority it might be for them, cannot override the policy priorities that Congress has expressed through statute.

17.    Here, Congress' decision to authorize and fund the Shelter and Services Program provides a clear expression of its policy judgment to, in Defendants' verbiage, "provide[] support for illegal aliens" after their release by DHS.

18.    Defendants had no lawful basis to override Congress' judgment or the plain purpose of its funding program and their actions to pause, withhold, and then terminate Washington's SSP grant violates the U.S. Constitution's Separation of Powers Doctrine, the Spending Clause, the Administrative Procedure Act, and is additionally *ultra vires*.

19.    The Court must set aside Defendants' unlawful actions and compel the restoration of the Shelter and Services Program so that, consistent with Congress' wishes, non-Federal entities, like Washington, can continue supporting their new immigrant neighbors with shelter and essential services.

## II.    JURISDICTION AND VENUE

20.    The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(a)(2). The Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202. Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702.

21.    Venue is proper in the Western District of Washington under 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States officers, employees, and/or agencies sued in their official capacities. Plaintiff State of Washington is a resident of the Western District of Washington. Venue is appropriate in the Seattle Division because a substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within this

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

5

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

1    judicial division, including in King County, where the shelter and other services Washington

2    intended to support through its SSP grant were provided.

### III.    PARTIES

3

4        22.    Plaintiff State of Washington, represented by and through its Attorney General,

5    Nicholas W. Brown, is a sovereign state of the United States of America. The Attorney General

6    is the chief legal adviser to the State. The Attorney General's powers and duties include acting

7    in federal court on behalf of the State on matters of public concern. Wash. Rev. Code

8    § 43.10.030(1); Wash. Const. art. III § 21.

9        23.    Defendant U.S. Department of Homeland Security (DHS) is a federal agency

10    headquartered in Washington, D.C. DHS administers the Shelter and Services Program (SSP),

11    including the grant awarded to Washington under that program.

12        24.    Defendant Kristi Noem is the Secretary of DHS and serves as that agency's

13    highest ranking official. She is charged with the supervision and management of all decisions

14    and actions of that agency, including decisions and actions concerning the Shelter and Services

15    Program. She is sued in her official capacity.

16        25.    Defendant Federal Emergency Management Agency (FEMA) is a federal agency

17    within DHS that coordinates operational and logistical disaster response and administers many

18    of DHS's federal grant programs, including the Shelter and Services Program.

19        26.    Defendant David Richardson is the Senior Official Performing the Duties of the

20    Administrator of FEMA and serves as FEMA's highest ranking official. He is sued in his official

21    capacity.

22

23

24

25

26

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

6

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

## IV.    ALLEGATIONS

**A.    Congress Created the Shelter and Services Program to Reimburse Non-Federal Partners, Like Washington, for Providing Shelter to Noncitizen Migrants Released From DHS's Custody**

    **1.    Faced with significant need, Washington and local partners provided shelter and essential resources to newly arrived noncitizen migrants**

27.    "Immigrants make a significant contribution to" the State of Washington and the State has, accordingly, enacted "policies that recognize" the importance of noncitizens to its economy and ensure that the state "remains a place where the rights and dignity of all residents," regardless of their immigration status, "are maintained and protected." Wash. Rev. Code § 43.17.425; Laws of 2019, ch. 440, § 1. It was with these values firmly in mind that, beginning in 2022, Washington welcomed tens of thousands of noncitizen migrants who settled in Washington after they were released from DHS custody near the southwest border.

28.    The swell of noncitizen migrants settling in Washington was connected to broader migration trends that resulted in millions of individuals entering the United States through the southwest border between 2019 and 2024,[1] many of whom sought humanitarian protection, including asylum. Detaining everyone it encountered during this period would have stretched DHS resources well past the breaking point, threatening national security, and creating inhumane and dangerous conditions of confinement in the process.[2]

29.    Accordingly, those individuals not subject to expedited removal were either transferred to another agency or released into the United States with instructions to appear at

---

[1] *See generally* U.S. Customs and Border Prot., Southwest Land Border Encounters (last visited September 19, 2025), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (detailing southwest land border encounters between 2022 and 2025 and collecting previous year statistics showing the same for Fiscal Years 2017 to 2022).

[2] *See* U.S. Dep't of Homeland Sec., Off. of the Inspector Gen., OIG-23-45, CBP Could Do More to Plan for Facilities Along the Southwest Border at 14 (Aug. 29, 2023), https://www.oig.dhs.gov/sites/default/files/assets/2023-09/OIG-23-45-Aug23.pdf (noting that Border Patrol has, at various points, exercised prosecutorial discretion authority to "release noncitizens without placing them in removal proceedings" when doing so is necessary "to mitigate operational challenges, including risks to national security"); U.S. Dep't of Homeland Sec., Off. of the Inspector Gen., OIG-19-46, Management Alert - DHS Needs to Address

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

7

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

future immigration proceedings.[3] Between 2019 and 2024, nearly 3 million individuals were released by U.S. Border Patrol with notices to appear or report, on their own recognizance, as an exercise of prosecutorial discretion, or as part of an alternative to detention or parole with conditions programs.[4]

30.    Once released from DHS custody, "[t]he majority of migrants disperse from the border and travel by bus or plane to other areas typically away from their entry point."[5] Cumulatively, more than 45,000 settled in Washington between 2022 and 2024.

31.    Upon arrival, these newcomers faced numerous barriers to securing stable shelter. The long and expensive journey to Washington left many without much money. Some were also burdened by the trauma of the hardships that forced them to flee from their countries of birth. And, given their immigration status, most lacked access to federal support or employment authorization.

---

Dangerous Overcrowding Among Single Adults at El Paso Del Norte Processing Center (May 30, 2019), https://www.oig.dhs.gov/sites/default/files/assets/Mga/2019/oig-19-46-may19-mgmtalert.pdf (alerting DHS to "dangerous overcrowding" and reports that "detainees had been held in standing-room-only conditions for days or weeks").

[3] CBP Could Do More to Plan for Facilities Along the Southwest Border, *supra* note 2 at 1.

[4] U.S. Dep't of Homeland Sec., Off. of Homeland Sec. Statistics, Immigr. Enf't and Legal Processes Monthly Tables (Jan. 16, 2025), https://ohss.dhs.gov/topics/immigration/immigration-enforcement/monthly-tables (Yearly Southwest Border Book-outs by Calendar Year); *see also* Elizabeth M. Webster and Audrey Singer, Congressional Research Service, R47681, FEMA Assistance for Migrants Through the Emergency Food and Shelter Program-Humanitarian (EFSP-H) and Shelter and Services Program (SSP) at 4-5 (Aug. 31, 2023), https://www.congress.gov/crs-product/R47681 (describing the "[s]everal factors" that "led DHS to release more encountered migrants into the United States than had been typical" during this period, including shifts in "the demographic composition" of encountered migrants away from singe adults and toward "family units" and individuals with "health- or age-related vulnerabilities").

[5] Webster and Singer, *supra* note 4 at 4; *see also* U.S. Immigr. and Customs Enf't, Fiscal Year 2023: ICE Annual Report at 9 (Dec. 29, 2023), https://www.ice.gov/doclib/eoy/iceAnnualReportFY2023.pdf ("ICE does not transport released noncitizens to their destination in the interior of the United States and does not choose where released noncitizens ultimately settle.").

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

8

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

32.     Unfortunately, Washington's housing and homeless crisis response system was already over capacity at this time and stretched too thin to provide the kind of initial support that would not only meet the immediate needs of these newcomers but also allow them to find their bearings in their new home. Indeed, most of Washington's emergency shelters were already filled each night. Unsurprisingly, of the estimated 21,457 noncitizen migrants who arrived in Washington in 2023, approximately 3,841, or 18 percent, reported experiencing homelessness.

33.     The unsustainable strain of this additional need was abundantly clear to local shelters, like Seattle-based Mary's Place, which saw the amount of shelter space it allocated to noncitizen migrants jump from 25 percent in 2023 to 48 percent in 2024.

34.     Statewide, Washington estimates that approximately 1,200 to 1,500 noncitizen migrants were reliant on unstable housing options in 2024, including hotels, family shelters, or tent encampments, which had formed in several locations during this period, particularly in King County.[6]

35.     The largest tent encampment formed in early 2023 on the property of the Riverton Park United Methodist Church (RPUMC) in the City of Tukwila. At its peak, upwards of 300 noncitizen migrants, mainly from Venezuela, Angola, and Congo, were living in "50 to 60 tents" that had been "crammed into the church's front lawn, around side buildings and on the pavement of what used to be a parking lot."[7] The RPUMC encampment residents included families with children, as well as pregnant and post-partum people.

---

[6] *See, e.g.*, Anna Patrick, *Asylum-seekers removed from Kent encampment; many questions remain*, Seattle Times (Sept. 28, 2024), https://www.seattletimes.com/seattle-news/homeless/asylum-seekers-removed-from-kent-encampment-many-questions-remain/; Gene Johnson, *Hundreds of asylum-seekers are camped out near Seattle. There's a vacant motel next door*, Assoc. Press (June 7, 2024), https://apnews.com/article/seattle-kent-asylum-seekers-aa05d9f113f2e16d3dfa463ae4e25358; Michelle Esteban, *Hundreds of refugees set up encampment at Powell Barnett Park in Seattle*, KOMO News (April 30, 2024), https://komonews.com/news/local/seattle-refugees-encampment-powell-barnett-park-central-district-migrants-asylum-seeking-process-quality-innkent-hotel-venezuela-congo-central-africa-tukwila-church.

[7] Nura Ahmed and Guy Oron, *Nowhere to lay their head: Hundreds of migrants making camp at Tukwila church*, Real Change News (Nov. 2, 2023),

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

9

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

36.    For a group that included those who arrived in Washington after "surviving war, rape and other atrocities," encampments provided a measure of relative safety and stability.[8] But they also lacked adequate protection from the elements or appropriate sanitation infrastructure, which presented numerous public health and safety issues.[9]

37.    The City of Tukwila eventually proclaimed a state of emergency at the RPUMC encampment, finding that the site "constitutes a humanitarian crisis where the need for resources for safe sanitary shelter is acute and beyond the capabilities of Tukwila itself to manage."[10]

38.    Washington recognized that, without additional resources and better coordination among service providers, the needs of its new noncitizen migrant residents would continue to go unmet. True to its values, Washington responded, launching the Washington Migrant and Asylum-Seeker Support Project (the "WA MASS Project") in October 2024, which increased the state's capacity to help the recently arrived noncitizen migrants meet their most basic needs: suitable shelter; access to food, water, and acute medical care; and basic hygiene supplies, like clean diapers.

39.    Specifically, the WA MASS Project vested the Washington Department of Social & Health Services (DSHS) Office of Refugee and Immigrant Assistance (ORIA) with new legal authority to "administer services to immigrants who are ineligible for federal [refugee resettlement] services" and to "contract with . . . community-based organizations" for that purpose. Wash. Rev. Code § 74.74.060; Laws of 2024 ch. 153, SHB 2368. The Legislature also

---

https://www.realchangenews.org/news/2023/11/01/tukwila-church-asylum-seekers-humanitarian-crisis.

[8] *See id.*

[9] Johnson, *supra* note 6 (quoting a Congolese man living in the Kent encampment, who shared that the living conditions were "very difficult" and that he and his wife did not have enough food or any way to wash themselves); *see also* Ahmed and Oron, *supra* note 7 (describing the RPUMC encampment's overflowing dumpsters and heavily used restrooms).

[10] Allan Ekberg, Mayor of the City of Tukwila, *Proclamation* (Oct. 6, 2023), https://www.tukwilawa.gov/wp-content/uploads/Emergency-Proclamation-re-Riverton-Park-United-Methodist-Church-RPUMC.pdf.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

10

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

appropriated $25 million for the WA Mass Project, which funded a one-year pilot project designed to provide essential services for noncitizen migrants who had entered the United States in 2022 or later, did not qualify for federal refugee resettlement assistance, had not been granted a permanent immigration status, and had a household income below 200% of the federal poverty guidelines.[11]

40.    Through the WA MASS Project, Washington sought to build a statewide network of organizations that could deliver a coordinated response to meet the specific and immediate needs of the recently arrived noncitizen migrants. The funds available through the WA MASS Project were competitively awarded to organizations that could provide services in six core service areas: (1) reception and navigation services, (2) emergency shelter, (3) housing navigation and rental assistance, (4) culturally responsive case management services, (5) immigration-related legal services, and (6) education, employment, and training services.

41.    Although the support provided through the WA MASS Project was an important expression of Washington's values, as well as an important infusion of material support, Washington recognized that more was needed to ensure that the essential needs of its noncitizen migrant residents were met, particularly given the time-limited nature of the WA MASS pilot program. Accordingly, Washington looked to expand the reach of the WA MASS Project by adding federal Shelter and Services Program funds into its resource mix.

**2.    Congress created the Shelter and Services Program to ensure states, localities, and community organizations could meet the needs of noncitizen migrants, after their release from DHS custody**

42.    Recognizing the need for additional resources to help local communities meet the needs of noncitizen migrants, in 2019, Congress began appropriating funds to FEMA for disbursement "to jurisdictions or local recipient organizations serving communities that have

_____

[11] Press Release, Wash. State Dep't of Social and Health Services, *Washington state launches Migrant and Asylum-Seeker Support Project* (Nov. 6, 2024), https://www.dshs.wa.gov/os/office-communications/media-release/washington-state-launches-migrant-and-asylum-seeker-support-project.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

11

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

1    experienced a significant influx of" noncitizen migrants as reimbursement "for costs incurred in
2    providing services" to those newcomers. *See* Emergency Supplemental Appropriations for
3    Humanitarian Assistance and Security at the Southern Border Act, Pub. L. No. 116-26, Title III,
4    133 Stat. 1020, 1020-21 (July 1, 2019).

5        43.    President Trump signed the first iteration of this funding into law on July 1, 2019,
6    appropriating $30,000,000 "for the emergency food and shelter program," which "provid[ed]
7    assistance to aliens released from the custody of the Department of Homeland Security" through
8    grants administered by FEMA under the Emergency Food and Shelter Program - Humanitarian
9    (EFSP-H). *See id.* Congress continued to support the EFSP-H grant program with further
10   appropriations in 2021 and 2022. *See* American Rescue Plan Act of 2021, Pub. L. No. 117-2,
11   135 Stat. 79 (March 11, 2021) ($110,000,000); Consolidated Appropriations Act, 2022, Pub. L.
12   No. 117-103, 136 Stat. 345 (March 15, 2022) ($150,000,000).

13       44.    In 2023, Congress established the Shelter and Services Program by appropriating
14   $800,000,000 "to support sheltering and related activities provided by non-Federal entities . . . in
15   support of relieving overcrowding in short-term [CBP] holding facilities." Consolidated
16   Appropriations Act, 2023, Pub. L. No. 117-328, 136 STAT. 4730 (Dec. 29, 2022). In an
17   accompanying Joint Explanatory Statement, Congress clarified that "the $800 million [wa]s
18   appropriated for" the creation of the SSP but, "'[i]n order to avoid any interruption in support
19   for CBP short-term holding facility decompression,' up to $785 million" was available for award
20   under the existing EFSP-H grant program.[12] SSP, which awards funds directly to recipients, was
21   meant to replace the EFSP-H, which distributed funds to recipients through a national board.[13]

22       45.    Congress reauthorized the Shelter and Services Program in March 2024 and
23   directed CBP to transfer $650,000,000 to FEMA "to support sheltering and related activities

24   ─────────────────────
         [12] U.S. Dep't of Homeland Sec., Fiscal Year 2023 Report to Congress at 2 (October 18,
25   2023), https://www.dhs.gov/sites/default/files/2023-11/2023_1018_fema_shelter_and_services
     _program_fy23.pdf.
26       [13] *Id.*

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR                                    12                        ATTORNEY GENERAL OF WASHINGTON
                                                                                  Civil Rights Division
                                                                                  800 Fifth Avenue, Suite 2000
                                                                                  Seattle, WA  98104
                                                                                  206-464-7744

1    provided by non-Federal entities, in support of relieving overcrowding in [CBP's] short-term

2    holding facilities." Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138

3    STAT. 597, 598 (March 23, 2024).

4         46.    On April 12, 2024, FEMA announced that it was accepting applications for

5    $340,900,000 in competitive SSP grant funds, which it would award by September 30, 2024.

6    *See* FY 2024 SSP-C Notice of Funding Opportunity (NOFO), attached as Exhibit 1. FEMA

7    expressly stated that these funds were being made available, "*[a]s directed by Congress*, . . . to

8    enable non-federal entities to off-set allowable costs incurred for services associated with

9    noncitizen migrants recently encountered and released by DHS," in order to achieve "the primary

10   purpose of SSP": "'relieving overcrowding in short-term holding facilities of [CBP].'" *Id.* at 5

11   (emphasis added) (quoting Pub. L. No. 118-47, 138 STAT. at 598).

12        47.    Although the grants were awarded on September 30, 2024, their performance

13   period was October 1, 2023 – September 30, 2026, which meant that grant recipients could seek

14   reimbursement for any allowable expenses incurred during that period. *See id* at 7.

15        48.    As specified in the NOFO, state and local governments, Native American tribes,

16   and certain non-profit organizations were eligible to apply and would be evaluated based on their

17   ability to meet "Performance Measures," such as the number of meals and nights of lodging they

18   had provided or expected to provide, and the number of "noncitizen migrants served through

19   translation services." *See id.* at 6-7.

20        49.    In keeping with the purpose of SSP, only services provided to "noncitizen

21   migrants released from a DHS facility" were reimbursable under SSP grants. *See* NOFO at 47.

22   In addition, only costs related to the "allowable activities" designated by FEMA in an appendix

23   to the NOFO were subject to reimbursement. *See id.* at 47-51.

24        50.    In order to be reimbursed for an allowable expense under an SSP award, grant

25   recipients were required to submit documentation, including the names, Alien Registration

26

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

13

1  Numbers, and evidence of DHS processing, for the individuals being served, as well as proof of

2  payment for the allowable services provided. *See id.* at 52-53.

3      **3.    FEMA awards Washington more than $4 million in SSP funds to continue**
       **providing shelter and services to noncitizen migrants in Washington**

4

5      51.    Washington submitted its application for a competitive Shelter and Services

6  Grant on June 21, 2024. *See* Washington SSP Application, attached as Exhibit 2.

7      52.    In its application, Washington proposed disbursing SSP funds to three

8  subrecipient partners, which it identified as well-suited to help advance the complementary goals

9  of the WA MASS Project and SSP: the City of Tukwila, Public Health - Seattle & King County

10  (Public Health), and the non-profit organization, Mary's Place Seattle. Washington planned to

11  identify additional subrecipient partner organizations at a later date that would also be able to

12  provide shelter and other essential services to noncitizen migrants.

13      53.    Washington's proposed subrecipients each had established track records of

14  successfully providing shelter and other services to noncitizen migrants and Washington

15  anticipated that, collectively and with support from SSP funds, they would be able to provide

16  shelter and other services to approximately 525 noncitizen migrants each day.

17      54.    In support of its application, Washington described the services its intended

18  subrecipients had already provided to noncitizen migrants, which would have been reimbursable

19  and/or extended through Washington's SSP grant.

20      55.    For instance, in October 2023, the City of Tukwila paid for the construction and

21  operation of a large, heated tent structure at the RPUMC encampment, and also hired a

22  consulting firm with experience doing outreach and providing services to unhoused populations.

23  *See id.* at 4-21. Washington estimated that the City of Tukwila's efforts at RPUMC and other

24  locations throughout the city were "support[ing] 200 to 250 people per night." *Id.* at 2.

25      56.    Washington also sought SSP funds to support Public Health's work providing

26  culturally relevant health information and acute medical care for noncitizen migrants residing in

various encampments and hotels in Seattle and King County, including at RPUMC. In particular, Public Health hired community navigators—health workers with relevant cultural and language competencies—that provided in-language guidance and support to noncitizen migrants on critical topics for those living in a congregate shelter with limited facilities. Through the community navigators, Public Health was able to provide information on best practices for hygiene and sanitation, rodent prevention, food safety, severe weather safety, vaccination, and health care system navigation, including health care enrollment and linkage to care.

57.    Beyond its work to share information with noncitizen migrants, Public Health also provided goods and services. For instance, it provided direct healthcare through its Mobile Medical van, arranged transportation for pregnant people with health emergencies, such as preeclampsia, and handed out essential items, like hygiene kits, baby formula and diapers, and baby and maternity clothing.

58.    Washington also planned to use SSP funds to support the work of Mary's Place, a Seattle-based non-profit with a long history of providing emergency shelter for unhoused families, including pregnant people, families with infants or medically fragile children, and families fleeing domestic violence. Washington estimated that Mary's Place was able to serve approximately 150 noncitizen migrants per day with a 24/7 shelter operation that included, in addition to bed space, a centralized food service, connections to housing specialists, healthcare, youth programming, legal clinics, job fairs, and resume workshops.

59.    In addition to the City of Tukwila, Public Health, and Mary's Place, Washington planned to identify through the WA MASS Project's competitive application process one or more additional partner organizations that were expected to provide shelter and services to an additional 425 noncitizen migrants each day.

60.    As part of its application, Washington certified that it and its intended subrecipients either had or would develop the "internal controls and processes" necessary "to clearly identify migrants who will be receiving services to be funded by SSP dollars and to ensure

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

15

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

said migrants were processed and released from DHS apart from other populations served."
*See* Washington SSP Application Worksheet (Tab 5), attached as Exhibit 3. Washington further
certified that, when seeking reimbursement for services rendered, it would submit "verified
status and release dates . . . by Alien Registration Number . . . or evidence of DHS
processing . . . for any A-numbers being submitted with this application." *Id.*

61.    On September 26, 2024, FEMA notified Washington that its SSP grant
application had been approved and that it had been awarded $4,039,516. *See* SSP Award Package
at 1, attached as Exhibit 4.

62.    Included with FEMA's Award Package was an Award Summary, which
described the purpose of the Shelter and Services Program:

> The Fiscal Year (FY) 2024 Shelter and Services Program (SSP) provides
> non-federal entities that *serve noncitizen migrants recently released from DHS
> custody* to temporarily provide shelter, food, transportation, acute medical care,
> personal hygiene supplies, and labor necessary to manage cases to provide these
> services, and to provide funding to non-federal entities to increase their capacity to
> *temporarily shelter noncitizen migrants recently released from DHS custody*,
> including renovations and modifications to existing facilities**.**

*Id.* at 2 (emphases added).

63.    In connection with the award, FEMA also provided an approved scope of
work for Washington's SSP grant, which included the following budgeted amounts:

   a.   $25,237.66 for DSHS, through a subrecipient partner, to rent hotel/motel
        rooms as emergency shelter for an estimated 500-600 noncitizen migrants;

   b.   $284,035.32 for the City of Tukwila's six-month rental of a large tent at
        RPUMC, which provided shelter to 75 noncitizen migrants;

   c.   $182,500 for the City of Tukwila's operation of a food pantry at the
        RPUMC;

   d.   $180,000 for the City of Tukwila serving 12,000 meals to noncitizen
        migrant residents at RPUMC and hotels in Tukwila;

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR                    16            ATTORNEY GENERAL OF WASHINGTON
                                                              Civil Rights Division
                                                           800 Fifth Avenue, Suite 2000
                                                             Seattle, WA  98104
                                                                206-464-7744

e. $688,098.92 for the City of Tukwila retaining the services of Innovative Impact Strategies, LLC (i2), which was engaged to help manage the temporary shelter and services being provided to the 250-300 noncitizen migrants residing at RPUMC;

f. $22,947.99 to the City of Tukwila for garbage and refuse collection, site cleanup and disposal of debris;

g. $10,000 to the City of Tukwila for translation and interpretation services to help with community and external communications at RPUMC;

h. $117,000 for Public Health to purchase a one-year supply of diapers for 150 infants;

i. $25,500 for Public Health to provide emergency medical transportation for pregnant people needing stabilization due to preeclampsia, for three years;

j. $11,250 for Public Health to purchase maternity clothes for 150 pregnant people;

k. $4,500 for Public Health to purchase baby clothing for 150 babies;

l. $30,000 for Public Health to purchase a one-year supply of baby formula for 20 babies;

m. $161,032.20 for Public Health mobile teams to conduct health screenings for noncitizen migrants residing in emergency shelters and hotels in King County;

n. $175,000 for Public Health to purchase 5,000 hygiene kits containing soap, shampoo, combs, brushes, deodorant, baby wipes, body wipes, and storage bags;

o. $10,000 for Public Health to purchase and distribute hygiene and sanitation outreach materials;

1      p.  $250,000 for Public Health to hire a full-time equivalent midwife for three

2          years to provide health screenings for pregnant people.

3      q.  $246,375.00 for Mary's Place to provide meals to 150 people per day for

4          one year; and

5      r.  $684,375.00 for Mary's Place to provide shelter beds to 150 noncitizen

6          migrants per day for one year.

7      64.    In total, FEMA's approved scope of work contemplated that Washington would

8   allocate its $4,039,516 award to subrecipients in the following amounts: $1,507,088.34 for the

9   City of Tukwila; $1,218,595.18 for Public Health; and $1,080,741 for Mary's Place. The

10  remaining $233,091.48 was reserved for additional lodging costs and DSHS' administrative

11  expenses.

12     65.    Although the entire award amount was obligated to Washington, FEMA placed

13  payment holds on $1,480,000, pending its review of more detailed cost breakdowns and

14  justifications. Washington anticipated being able to provide that information and, over the

15  course of the performance period, utilizing the full award amount.

16     66.    These funds would have been used to reimburse allowable expenses for services

17  that had already been provided, as well as to support the continued provision of services by

18  Washington's intended subrecipients.

19     67.    Washington entered into a client service contract with Mary's Place on

20  February 20, 2025, pursuant to which the state is obligated to reimburse Mary's Place for the

21  full amount it planned to allocate from the SSP award. Given the uncertainty created by

22  Defendants' actions, Washington decided not to move forward with similar client service

23  contracts for the City of Tukwila and Public Health.

24

25

26

**B.     The Trump Administration Illegally Cut Funding Appropriated by Congress for the Shelter and Services Program**

**1.     President Trump directed DHS to eliminate federal funding from "Sanctuary Jurisdictions"**

68.     As soon as he took office, President Trump issued an executive order entitled "Protecting the American People Against Invasion" (the "Invasion EO"). Exec. Order 14159, 90 Fed. Reg. 8443 (Jan. 29, 2025). The Invasion EO asserted that the United States had experienced an "unprecedented flood of illegal immigration" and that this influx "has cost taxpayers billions of dollars at the Federal, State, and local levels." *Id.* at 8443.

69.     The Invasion EO also called for a "Funding Review" and directed the Secretary of DHS, among other agency officials, to review "all contracts, grants or other agreements providing federal funding to non-governmental organizations" that support or provide services, "directly or indirectly," to "removable or illegal aliens" and to "[p]ause distribution of all further funds pursuant to such agreements pending the results of" this review. *Id.* at 8447.

70.     The Invasion EO further directed the DHS Secretary to ensure that "so-called 'sanctuary' jurisdictions" did not receive federal funds. *Id.* at 8446.

71.     DHS considers Washington to be a "sanctuary jurisdiction."[14]

72.     On January 28, 2025, Secretary Noem issued a memorandum directing DHS "Component and Office Heads" to place "on hold pending review" all DHS "grant disbursements and assessments of grant applications that: (a) go to non-profit organizations or for which non-profit organizations are eligible, and (b) touch in any way on immigration." Secretary Noem, Memorandum for Component and Office Heads (Jan. 28, 2025) (the "January 28 Noem Memo"), attached as Exhibit 5. Secretary Noem gave the DHS component heads one week to "provide a

---

[14] *See* U.S. Dep't of Homeland Sec., Sanctuary Jurisdictions Defying Fed. Immigr. Law, *available at* https://web.archive.org/web/20250531234232/https://www.dhs.gov/sanctuary-jurisdictions (last visited on June 20, 2025); *see also* Simone Carter, *Trump targets WA state with 'sanctuary jurisdiction' list, and wants to withhold funds*, The Olympian (June 3, 2025), https://www.theolympian.com/news/politics-government/article307552996.html.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

19

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

1    report to the Undersecretary for Management" with "a summary of every grant covered by this

2    memorandum and its status." *Id.*

3           73.    The Secretary's reason for this sweeping decision "include[d]" her unsupported

4    "concerns" that the grants: (1) "may be funding illegal activities, such as encouraging or inducing

5    illegal immigration, 8 U.S.C. § 1324(a)(1)(A)(iv), or illegal harboring of illegal aliens, 8 U.S.C.

6    §§ 1324(a)(1)(A)(ii)-(iii)"; (2) may include "racially discriminatory language"; and (3) "may not

7    be an efficient use of government resources." *Id.*

8           74.    Despite having tasked DHS component and office heads with identifying covered

9    grant programs, Secretary Noem summarily asserted that the "hold . . . appl[ies] to the Shelter

10   and Services Program[.]" *Id.*; *see also* Decl. of Cameron Hamilton at ¶ 9, *City of New York v.*

11   *Trump*, 25-cv-1510 (S.D.N.Y.), ECF No. 17-1 (testifying that, based on the January 28 Noem

12   Memo, "FEMA did not have the authorization to make [a] payment" to New York City under an

13   open SSP award).

14          75.    On February 14, 2025, Mr. Hamilton, the Senior Official Performing the Duties

15   of the Administrator at FEMA, issued Grant Processing Guidance, which implemented Secretary

16   Noem's instruction by placing "[g]rants under the Shelter and Services Program . . . on hold,

17   pending a compliance review," and prohibited FEMA from making any "new obligation,

18   disbursement or payment of funds previously obligated." *See* FEMA, Grant Processing Guidance

19   (Feb. 14, 2025), attached as Exhibit 6. The FEMA Grant Processing Guidance thus put yet

20   another bureaucratic layer between the funds and SSP grant recipients, thereby ensuring they

21   remained unavailable. *Id.*

22          76.    But Defendants did more than merely place the Shelter and Service Program "on

23   hold"; they eliminated it entirely. Indeed, the transaction history for the Shelter and Services

24   Program on USASpending.gov shows that, on February 10, 2025, FEMA de-obligated more than

25

26

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

20

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

$885 million in funds previously awarded as SSP grants,[15] including Washington's full award amount of $4,039,516.[16]



| Modification Number | Assistance Listing | Action Date | Amount | Action Type | Transaction Description |
|---|---|---|---|---|---|
| -- | 97.141 | 02/10/2025 | -$4,039,516 | C: REVISION | SHELTER AND SERVICES PROGRAM |
| 0 | 97.141 | 09/27/2024 | $4,039,516 | A: NEW | SHELTER AND SERVICES PROGRAM |

| | |
|---|---|
| ● Outlayed Amount | $0.00 |
| ● Obligated Amount | $0.00 |
| ○ Non-Federal Funding | $0.00 |
| ● Total Funding | $0.00 |

77.    On information and belief, FEMA de-obligated unspent funds for the entire Shelter and Services Program.

78.    Practically, FEMA's de-obligation[17] of all Shelter and Services Program funds rendered grant recipients, like Washington, unable to seek reimbursement for allowable expenses incurred under the grant. This behind-the-scenes accounting maneuver carried legal significance, as well. As Defendants have elsewhere explained, "[t]hat SSP funds were de-obligated reflect[ed] the accounting reality that the government terminated plaintiffs' grant awards."[18]

79.    FEMA did not notify Washington of this action, either before or after it occurred.

---

[15] *See* USASpending.gov, Advanced Search (last visited September 16, 2025), https://www.usaspending.gov/search/?hash=f8657adf538ed7ee783fa1f3978e7586

[16] *See* U.S. Dep't of Homeland Sec., EMW-2024-SP-05140 (last visited on July 25, 2025), https://www.usaspending.gov/award/ASST_NON_EMW-2024-SP-05140_7022.

[17] De-obligation is "[a]n agency's cancellation or downward adjustment of previously incurred obligations." U.S. Gov't Accountability Office, A Glossary of Terms Used in the Federal Budget Process, GAO-05-734SP at 44 (Sept. 2005), https://www.gao.gov/assets/gao-05-734sp.pdf.

[18] *See* Defs.' PI Opp. Mem. at 8, *City of Chicago v. U.S. Dep't of Homeland Sec.*, 25-cv-5463 (N.D. Ill. July 30, 2025), ECF No. 37.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

21

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

80.     Next, having "paused" access to SSP funds based on their availability to non-profit organizations and connection to immigration, *see* January 28 Noem Memo, Secretary Noem directed all DHS components, including FEMA, "to review all federal financial assistance awards to determine if Department funds, directly or indirectly, are going to sanctuary jurisdictions" and to "cease providing federal funding to sanctuary jurisdictions" identified in that process." *See* Memorandum for All Agencies and Offices, Restricting Grant Funding for Sanctuary Jurisdictions (Feb. 19, 2025) (the "February 19 Noem Memo"), attached as Exhibit 7.

81.     FEMA carried out the directives imposed by the January 28 Noem Memo and the February 19 Noem Memo by: (1) identifying grant programs that, in FEMA's view, do not "align with Administration and Secretary priorities on non-governmental organizations, immigration, and sanctuary jurisdictions"; and (2) recommending that DHS place "conditions or restrictions" on all Shelter and Services Program awards, *see* Approval of FEMA-Administered Grant Disbursements at 1-2, attached as Exhibit 8, and further (3) review all SSP awards "for [t]ermination," *see id.*, Table A.

82.     Secretary Noem approved FEMA's recommendations on March 25, 2025. *See generally id.* at 3-4 (reflecting Secretary Noem's signature and approval of FEMA's recommendations).

**2.     Defendants imposed "special conditions" on grants made under the Shelter and Services Program before announcing the Program's termination**

83.     On March 11, 2025, FEMA notified Washington that, in light of its "significant concerns that SSP funding is going to entities engaged in facilitating illegal activities," it was "temporarily withholding payments" under the SSP grant "pursuant to 2 C.F.R. § 200.339(a)" and "instituting specific conditions . . . pursuant to 2 C.F.R. § 200.208." *See* Letter from Cameron Hamilton at 1 (March 11, 2025) (the "March 11 Letter"), attached as Exhibit 9.

84.     As "special conditions," FEMA announced that it would conduct "additional monitoring and review of [Washington's] award(s)"; require Washington to provide FEMA with

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

22

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

documents and information regarding the individuals to whom services had been provided under the SSP award within 30 days, including "names and contact information" for those individuals; and submit affidavits "attesting" that neither Washington nor its subrecipients have any "knowledge or suspicion that" the SSP funds had been used in violation of 8 U.S.C. § 1324. *See id.* at 1-2.

85.     FEMA further directed Washington not "to incur any additional costs under the grant," until further notice. *Id.* at 2.

86.     FEMA did not identify specific incidents or evidence that gave rise to the "significant concerns" that supposedly justified the imposition of these conditions. Nor did it acknowledge that it had already zeroed out Washington's SSP funds on February 10, 2025, or that Washington had yet to submit any reimbursement requests under the relatively new award.

87.     FEMA promised that "[u]pon the conclusion of" its newly imposed "monitoring" period, it would notify Washington if further action would be taken. *Id.* It also notified Washington of its "right to appeal" the decision to withhold the funds and/or impose special conditions by writing to the FEMA Grant Programs Directorate by May 10, 2025. *See id.* ("Your organization has the right to appeal this action within 60 days of the date of this letter.").

88.     FEMA sent nearly identical notices to other SSP grant recipients around this time, as well.

89.     On April 1, 2025, before the deadline for responding to FEMA's information request or appealing the withholding decision had run, FEMA announced that it had formally terminated the Shelter and Services Program. *See* Termination Notice from Cameron Hamilton, Senior Official Performing the Duties of the Administrator at 1 (April 1, 2025) (the "Termination Notice"), attached as Exhibit 10.

90.     The Termination Notice did not mention the "significant concerns" that had purportedly motivated FEMA to withhold SSP funds and impose monitoring requirements on

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

23

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

grantees only a few weeks earlier. Nor did the Termination Notice contend that the "special conditions" Defendants imposed would have been insufficient to correct any alleged noncompliance. *See id.* Indeed, the Termination Notice did not even mention that FEMA had previously accused Washington of failing to comply with the terms and conditions of its grant.

91.     Rather, FEMA simply stated that it was terminating Washington's SSP award because "funding . . . non-federal entities to provide shelter, food, transportation, acute medical care, and personal hygiene supplies for individuals released from DHS short-term holding facilities"—individuals who "often have no legal status and are in the United States unlawfully"—"is not consistent with DHS's current priorities." Termination Notice at 1. That determination, according to FEMA, justified termination under 2 C.F.R. § 200.340(a)(2), which provides that an "award may be terminated" if it "no longer effectuates the program goals or agency priorities."[19] *See* Termination Notice at 1.

92.     FEMA thus instructed Washington to begin closing out the grant and advised that, if Washington "wish[ed] to object to the termination of this award, it should submit a written objection within 30 days." *Id.* at 2.

93.     Even where notices or letters referred directly to Washington's grant, Defendants' correspondence gave no indication that their adverse actions were based on facts and circumstances specific to Washington's grant. Rather, Defendants' actions appeared to be responsive to the Administration's broader policy aims of restricting federal funding to noncitizen migrants and so-called "Sanctuary Jurisdictions."

94.     On April 23, 2025, Washington responded with its written objection to FEMA's unlawful decision to withhold and then terminate its SSP grant. *See* Letter from Cheryl Strange, Secretary of the Washington Department of Social and Health Services at 1 (April 23, 2025),

---

[19] The Office of Management and Budget revised this regulation in 2024 and the operative language is now located at 2 C.F.R. § 200.340(a)(4). *See* 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024).

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF NO. 2-25-cv-01401-BJR

24

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

attached as Exhibit 11. Washington disputed that it had breached any obligations under the SSP grant, asserted that FEMA's decisions were unlawful and were causing Washington to suffer irreparable harm, and demanded that FEMA reverse its decision and/or respond to its objection letter by May 9, 2025. *Id.* at 2.

95.      In lieu of closeout materials, Washington sent a further objection letter to FEMA on July 28, 2025, which reasserted its objections and reiterated that Washington had fully complied with all SSP grant obligations and that it intended to seek reimbursement for allowable expenses under the award in due course. *See* Letter from Cheryl Strange, Secretary of the Washington Department of Social and Health Services at 1-2 (July 28, 2025), attached as Exhibit 12.

96.      On August 20, 2025, Defendants provided "official notice" they had reached a "final determination" to deny Washington's appeal of Defendants' termination of its SSP grant. *See* FEMA Shelter and Services Program Appeal Decision at 1 (Aug. 20, 2025), attached as Exhibit 13. Defendants stated that this "official notice" was not appealable and also repeated their earlier demand for Washington to submit documentation to close out the award. *Id.* Washington did not respond to Defendants' August 20, 2025 letter.

97.      On September 11, 2025, Defendants advised Washington that, if Washington does not submit "the required closeout documents by October 13, 2025," they will not only "administratively close[]" Washington's SSP grant but will also record this as a "material failure," which "may be considered in FEMA's oversight of other current and future awards." FEMA Notification of Administrative Closeout (Sept. 11, 2025), attached as Exhibit 14.

98.      Defendants also threatened to "de-obligate [unspent funds] from the total grant amount," *see id.*, despite the fact that, as noted above, Defendants de-obligated Washington's entire award amount on February 10, 2025.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

25

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

99.    Despite Defendants' most recent threat of further adverse action, if Washington does not comply with a prematurely imposed closeout deadline, Defendants have assured Washington and the Court "that the $4,039,516 funds awarded to Washington under its SSP grant may not be re-obligated to another entity or potential grantee, and those funds will remain available through September 30, 2029 to satisfy obligations, if any, to Washington under its grant." *See* ECF No. 11 at 2; ECF No. 12 at 1.

**3.    Defendants' termination of the Shelter and Services Program irreparably harms Washington and its subrecipients**

100.    When Defendants terminated the Shelter and Services Program, Washington and its intended subrecipients had already provided services that would have been reimbursable under the terms of the award. And, although Washington had not yet requested reimbursement for any such expenses, it would have done so in due course.

101.    Washington also intended to work with its subrecipients to ensure that the needs of noncitizen migrants continued to be met, at least through the end of the SSP performance period on September 30, 2026.

102.    Without SSP funds, there is likely to be an overall drop in the level of services provided to noncitizen migrants in Washington; neither state or local governments or community organizations are likely to fill the $4,039,516 hole left by Defendants' termination of Washington's SSP grant.

## V.    CLAIMS FOR RELIEF

### COUNT I
### Violation of the Separation of Powers Doctrine

103.    Plaintiffs repeat and incorporate by reference the allegations set forth in each of the preceding paragraphs.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

26

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

104.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-327 (2015).

105.    "The Separation of Powers was an integral part of the Founders' design" of our constitutional order, *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018), and fidelity to that principle remains necessary to "preserve the liberty of all the people," *Collins v. Yellen*, 594 U.S. 220, 245 (2021).

106.    Pursuant to that doctrine, the Constitution "grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco*, 897 F.3d at 1231 (first citing U.S. Const. art. I, §9, cl. 7 (Appropriations Clause), and then citing U.S. Const. art. I, §8, cl. 1 (Spending Clause)). The ability to control federal spending is "[a]mong Congress's most important authorities." *Biden v. Nebraska*, 600 U.S. 477, 505 (2023). The Appropriations Clause thus operates as a "bulwark of the Constitution's separation of powers" and prevents the Executive from "possess[ing] an unbounded power over the public purse of the nation." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.) (internal citations omitted).

107.    In addition, Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution states that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and [a] House of Representatives." U.S. Const. art. I, §1; *see Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."). Accordingly, "[a]side from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress." *City & Cnty. of San Francisco*, 897 F.3d at 1232. That means that "'the President does not have unilateral authority to refuse to spend'" funds that have been lawfully appropriated by Congress

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

27

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

or to "'decline to follow a statutory mandate or prohibition simply because of policy objections.'" *Id.* (quoting *In re Aiken Cnty.*, 725 F.3d 255, 259, 261 n.1 (D.C. Cir. 2013)).

108.    The Constitution further delineates the division of responsibilities between the Legislative and Executive Branches by specifying that the Executive must "take Care that the Laws be faithfully executed." U.S. Const. Art. II, Sec. 3; *see Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes [the] laws and the President . . . faithfully executes them." (brackets and quotation marks omitted)). The Executive Branch violates the Take Care Clause where it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution"); *see also Util. Air. Reg. Grp.*, 573 U.S. at 327 (noting that the President "act[s] at time through agencies").

109.    The federal courts have "not hesitated to enforce the principle of separation of powers embodied in the Constitution when its application has proved necessary for the decisions of cases or controversies properly before it." *Buckley v. Valeo*, 424 U.S. 1, 123 (1976). Thus, "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins*, 594 U.S. at 245.

110.    Congress created the Shelter and Services Program through duly enacted authorizing legislation and appropriated funding under that program "to support sheltering and related activities provided by non-Federal entities . . . in support of relieving overcrowding in short-term [CBP] holding facilities." *See* Pub. L. No. 117-328, 136 STAT. 4730; Pub. L. No. 118-47, 138 STAT. 597, 598. Congress thus knowingly decided to spend money for the benefit

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

28

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

of a group that was certain to include some who had entered into the United States without inspection and might ultimately be ordered removed from the country. Doing so, in Congress' judgment, was desirable in order to achieve its objective of relieving overcrowding in DHS detention facilities.

111.    Defendants may disagree with Congress' policy choice but that does not entitle them to ignore Congress' clear funding command and their decision to terminate the Shelter and Services Program for that reason violates the Separation of Powers doctrine.

## COUNT II
### Violation of the Spending Clause
### U.S. Const. Art. I, Sec. 8, cl. 1

112.    Plaintiffs repeat and incorporate by reference the allegations set forth in each of the preceding paragraphs.

113.    The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ." U.S. Const. Art. I, Sec. 8, cl. 1.

114.    The Spending Clause requires any conditions on federal funds to be imposed "unambiguously," *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17 (1981), so that States deciding whether to accept such funding can "exercise their choice knowingly, cognizant of the consequences of their participation," *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). This is because "legislation enacted pursuant to the spending power is much in the nature of a contract," where Congress's authority "to legislate . . . rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst*, 451 U.S. at 17. Accordingly, Congress must provide States clear notice of the applicable funding conditions. *See, e.g.*, *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

29

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

115. Nothing in the Shelter and Services Program authorizing legislation, or anywhere else in the U.S. Code, allows Defendants to pause, withhold, or terminate grants made under that program simply because they dislike the program and find that it conflicts with their current policy preferences or priorities. *See* Termination Notice at 1 (citing 2 C.F.R. § 200.340(a)(2)). And, within the confines of the Spending Clause, no statute could empower agencies to administer grant funds in such an arbitrary fashion. Washington would not have applied for or accepted SSP funds—with all the recordkeeping and other administrative burdens acceptance entails—had it understood that Defendants might decide, midstream, to terminate the grant because providing shelter and other services to noncitizen migrants was no longer an agency priority. *See Arlington Cent. Sch. Dist. Bd. of Educ.*, 548 U.S. at 296 (analyzing Spending Clause claim "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [federal] funds and the obligations that go with those funds").

116. Defendants' actions to pause, withhold, and terminate the Shelter and Services Program based only on a change in agency priorities violates the Spending Clause.

**COUNT III**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706 (2)(A)**
**Arbitrary and Capricious**

117. Plaintiffs repeat and incorporate by reference the allegations set forth in each of the preceding paragraphs.

118. Defendants are "agencies" under the Administrative Procedure Act (APA), 5 U.S.C. § 551(1), and their decision to pause, withhold, and eventually terminate the Shelter and Services Program constitutes "[a]gency action made [judicially] reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704; *see Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

119.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

120.    An agency action is arbitrary and capricious if it is not "reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency fails to meet that standard if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins., Co.*, 463 U.S. 29, 43 (1983). Furthermore, where an agency changes its position on an issue, it must acknowledge the change, account for the "serious reliance interests" that may have attached to the prior policy, and provide a "reasoned explanation" if it is "disregarding facts and circumstances that underlay or were engendered by the prior policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009). Finally, courts must set aside agency actions as arbitrary and capricious where, "viewing the evidence as a whole," there is "a significant mismatch between the decision the [agency] made and the rationale [it] provided." *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019). "Accepting contrived reasons" of that sort "would defeat the purpose of the enterprise" and convert judicial review into "an empty ritual." *Id.* at 785.

121.    Defendants' actions pausing, withholding, and terminating the Shelter and Services Program is arbitrary and capricious for myriad reasons.

122.    To start, on January 28, Secretary Noem announced a policy that funds under the Shelter and Services Program should be withheld, even as she instructed DHS component and office heads to undertake a review of funding programs. But, instead of merely withholding SSP funds, Defendants de-obligated all (or nearly all) available SSP funds on February 10, 2025,

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

31

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

without notice or explanation and as an expression of their intention to terminate the program wholesale. Defendants then proceeded to undertake a sham process—asserting a need, based on vague reference to unspecified "concerns," to investigate whether recipients, including Washington, had used SSP funds for illegal purposes, despite knowing that Washington had not yet requested a single dollar from its SSP grant and, more importantly, that Defendants had already taken steps toward terminating the Program entirely. Less than a month later, however, Defendants formally announced that their termination of the Shelter and Services Program was complete in a notice that did not even briefly mention their "concerns" about SSP grants being used to fund illegal activities. Instead, Defendants stated simply that they were terminating the Shelter and Services Program because of their policy-based objection to "provid[ing] support for illegal aliens." Termination Notice at 1.

123.    Defendants' explanations for their actions, if an explanation was offered at all, were contrived, pretextual, and fail to consider that Congress specifically authorized and funded the Shelter and Services Program to "reliev[e] overcrowding in [CBP's] short-term holding facilities" by reimbursing "non-Federal entities" that provide "shelter and related activities" for noncitizen migrants. *See* Pub. L. No. 118-47, 138 STAT. 597, 598. Ignoring that clear statutory purpose, Defendants' actions were taken for the purpose of depriving disfavored groups of federal support, including noncitizen migrants, nonprofit organizations, and jurisdictions deemed to be so-called "sanctuary" jurisdictions. Defendants thus "relied on factors which Congress has not intended it to consider[.]" *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.

124.    Defendants have thus fallen well short of the APA's requirement that agency actions be "reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423.

125.    Defendants' actions also run afoul of the regulations governing their administration of federal awards, including because they: (1) failed to provide notice to Washington before zeroing out its funding on February 10, 2 C.F.R. § 200.342; (2) imposed

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

32

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

specific conditions on SSP awards without explaining why those conditions were being imposed, *id.* § 200.208(2); and (3) terminated the Shelter and Services Program without allowing Washington time to satisfy the specific conditions, appeal the withholding decision, or actually determine that the specific conditions were insufficient to remedy Washington's alleged noncompliance, *see id.* § 200.339.

126.    Defendants' failure to comply with binding regulations renders their conduct arbitrary and capricious. *See Erie Boulevard Hydropower, LP v. FERC*, 878 F.3d 258, 269 (D.C. Cir. 2017) ("[I]f an agency action fails to comply with its regulations, that action may be set aside as arbitrary and capricious.").

## COUNT IV
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)-(C)
### Contrary to Law

127.    Plaintiffs repeat and incorporate by reference the allegations set forth in each of the preceding paragraphs.

128.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law; . . . contrary to constitutional right, power, privilege, or immunity;" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C).

129.    The Shelter and Services Program was created by Congress in order "to support sheltering and related activities provided by non-Federal entities . . . in support of relieving overcrowding in short-term [CBP] holding facilities." *See* Pub. L. No. 118-47, 138 STAT. 597, 598. Thus, by design, the Shelter and Services Program was created to provide financial support to non-Federal entities, like Washington and its intended subrecipient partners, as reimbursement for the cost of providing emergency shelter and related services to noncitizen migrants following their release into the community by DHS. Congress thus made a conscious choice to provide funds in a manner that would benefit some individuals who may have entered into the United

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

33

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

States unlawfully because doing so was necessary to achieve its goal of "relieving overcrowding in short-term [CBP] holding facilities." *Id.*

130.    Defendants openly engaged in actions meant to contravene the clear purpose of the Shelter and Services Program and, in turn, violated the Constitution's Separation of Powers principle and usurped Congress' authority under the Spending Clause. Finally, they attempt to justify their actions by misconstruing 2 C.F.R. § 200.340(a)(2), which does not, and could not, permit their straightforward effort to undermine a duly enacted funding program they do not like.

131.    Accordingly, Defendants have acted contrary to law and in excess of their statutory authority and their actions should be set aside.

**COUNT V**
***Ultra Vires***

132.    Plaintiffs repeat and incorporate by reference the allegations set forth in each of the preceding paragraphs.

133.    An executive agency "has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see also Nat'l Fed. Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided.").

134.    Defendants may exercise only that authority which is conferred by statute. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (federal agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires").

135.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

34

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

136.    Because Defendants paused, withheld, and terminated the Shelter and Services Program for reasons that directly conflict with the very purpose for which that funding program was authorized and appropriated, they acted in excess of their statutory authorization to administer that program.

137.    Defendants' *ultra vires* actions have caused and will continue to cause ongoing, irreparable harm to Washington for which there is no adequate remedy at law.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Washington prays that this Court:

138.    Declare that Defendants' decision to pause, withhold, or terminate the Shelter and Services Program was unlawful because it: (a) arrogates Congress' power to control federal spending in violation of the Separation of Powers doctrine; (b) rests on an assertion of unfettered authority to terminate grants, in violation of the Spending Clause; (c) constitutes arbitrary and capricious agency decision-making, in violation of the APA; (d) contravenes multiple sources of binding law, in violation of the APA; and (e) is *ultra vires*.

139.    Preliminarily and permanently enjoin Defendants to rescind any and all decisions to pause, withhold, or terminate the Shelter and Services Program;

140.    Vacate and set aside Defendants' decisions to pause, withhold, or terminate the Shelter and Services Program;

141.    Retain jurisdiction to monitor Defendants' compliance with this Court's judgment;

142.    Award Washington its reasonable fees, costs, and expenses, including attorneys' fees; and

143.    Award such additional relief as the interests of justice may require.

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

35

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
206-464-7744

1      DATED this 19th day of September 2025.

2                   Respectfully submitted,

3                   NICHOLAS W. BROWN
                   Attorney General

4

5                   */s/ Benjamin Seel*
                   BENJAMIN SEEL, WSBA # 61165

6                   EMILY C. NELSON, WSBA # 48440
                   Assistant Attorneys General

7                   Wing Luke Civil Rights Division
                   Washington State Attorney General's Office

8                   800 Fifth Avenue, Suite 2000
                   Seattle, WA 98104

9                   (206) 464-7744
                   benjamin.seel@atg.wa.gov

10                  emily.nelson@atg.wa.gov

11                   *Attorneys for Plaintiff State of Washington*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

36

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on September 22, 2025, I electronically filed the foregoing

3  document with the Clerk of the United States District Court for the Western District of

4  Washington via the CM/ECF system which will send notifications of such filing to all parties

5  who are entered in this matter and registered with the CM/ECF system.

6

7  DATED this 22nd day of September, 2025.

8

9                                   *s/ Tiffany Jennings*

10                                  TIFFANY JENNINGS
                                    Paralegal

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
NO. 2-25-cv-01401-BJR

37

**ATTORNEY GENERAL OF WASHINGTON**
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
206-464-7744