The Honorable Barbara J. Rothstein

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON, | NO. 2:25-cv-01401-BJR |
| Plaintiff, | DECLARATION OF SARAH K. PETERSON |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security, | |
| FEDERAL EMERGENCY MANAGEMENT AGENCY, and | |
| DAVID RICHARDSON, in his official capacity as the Senior Official Performing the Duties of the FEMA Administrator, | |
| Defendants. | |

DECLARATION OF SARAH K. PETERSON
NO. 2:25-cv-01401-BJR

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

I, Sarah K. Peterson, declare as follows:

1.    I am over the age of 18, competent to testify as to the matters herein. I am familiar with the information in the statements set forth below through personal knowledge and from documents and information that have been provided to and reviewed by me, in my professional capacity. If called as a witness, I could and would testify competently to the matters set forth below.

### Background

2.    I serve as the Washington State Refugee Coordinator and the Director of Washington's Office of Refugee and Immigrant Assistance (ORIA) within the Economic Services Administration (ESA) at the Washington Department of Social and Health Services (DSHS). Prior to joining DSHS in 2014, I worked for approximately 14 years in nonprofit organizations that served immigrant and refugee communities in Philadelphia, Pennsylvania. In 2003, I earned my Master's Degree in Social Work from the University of Pennsylvania. I worked for HIAS Pennsylvania (Hebrew Immigrant Aid Society) for eight years helping to support their work in Philadelphia providing immigration legal services and refugee resettlement. It is at this organization that I gained direct experience helping people navigate federal immigration processes as well as access to public benefits programs.

3.    As Director of ORIA, I oversee an agency that administers more than $100 million in state and federal funds to provide comprehensive services for refugees and immigrants living in Washington State. Washington State has a long legacy of welcoming many kinds of noncitizen migrants, including refugees and asylum seekers. ORIA offers programs and services that help these newcomers reach their full potential and contribute to thriving and diverse communities in Washington State.

4.    Central to ORIA's work is its partnerships with more than 100 different community-based organizations across the state, and my team of professional staff and I engage with these community stakeholders on a monthly and quarterly basis to understand how the

DECLARATION OF SARAH K. PETERSON
NO. 2:25-cv-01401-BJR

1

programs that we oversee are impacting the lives of refugees and immigrants. This regular community engagement enables ORIA to learn and receive feedback about how state and federal policies impact people in the community.

**Noncitizen Migrants Arrive in Washington**

5.      Beginning in 2022, Washington experienced a steady increase in the number of noncitizen migrants who settled in Washington after they were released by the U.S. Department of Homeland Security (DHS) near the southwest border. According to estimates I have seen, more than 45,000 noncitizen migrants settled in Washington and applied for public assistance with DSHS between 2022 and 2024, many of whom were seeking some form of humanitarian relief, including asylum.

6.      The long and expensive journey to Washington left many without much money. Some were also burdened by the trauma of the hardships that forced them to flee from their countries of birth. And, because of their immigration status, most were ineligible for federal support and many also lacked an Employment Authorization Document, which meant that they could not legally work to support themselves. As a result, when these newcomers arrived in Washington, they needed help from state, local, and private resources to meet their basic needs, especially shelter.

7.      Unfortunately, Washington's housing and homeless crisis response system was already over capacity at this time and stretched too thin to provide the kind of initial support that would not only meet the immediate needs of these newcomers but also allow them to find their bearings in their new home. Indeed, most of Washington's emergency shelters were already filled each night. Those that had bed space were allocating an increasingly large share of it to noncitizen migrants. For instance, the Seattle-based shelter, Mary's Place, went from providing approximately 25 percent of its bed space to noncitizen migrants in 2023 to 48 percent in 2024.

8.      Given the confluence of these factors, many noncitizen migrants experienced homelessness upon their arrival. For example, of the estimated 21,457 noncitizen migrants who

DECLARATION OF SARAH K. PETERSON
NO. 2:25-cv-01401-BJR

2

arrived in Washington and received state-funded public assistance in 2023, approximately 3,841, or 18 percent, reported experiencing homelessness. And, an estimated 1,200 to 1,500 noncitizen migrants were reliant on unstable housing options in 2024, including hotels, family shelters, or tent encampments.

9.    Tent encampments became an increasingly common and visible form of shelter for these newcomers. Several tent encampments formed during this period, particularly in King County. The largest, and most high profile of these formed in early 2023 on the property of the Riverton Park United Methodist Church (RPUMC) in the City of Tukwila.

10.    It was clear that additional resources were needed to better address the needs of our noncitizen migrant residents and, in its 2024 session, the Washington State Legislature passed House Bill 2368, which gave DSHS new legal authority to "administer services to immigrants who are ineligible for federal [refugee resettlement] services" and to "contract with . . . community-based organizations" for that purpose. Wash. Rev. Code § 74.74.060; Laws of 2024 ch. 153, SHB 2368.

11.    The Legislature also appropriated $25 million to DSHS to provide support services for people who had recently arrived in the United States and Washington and were ineligible for federal refugee services. With that funding, DSHS established a pilot project, called the Washington Migrant and Asylum-Seekers Support (WA MASS) Project, which established a network of more than 20 organizations across Washington that would, with state funds, provide support and services to help asylum-seekers and other migrants meet their short-term, basic needs.

12.    The WA MASS Project uses a hub and spoke model. The International Rescue Committee (IRC) serves as the Newcomer Reception and Navigation Hub and, in that role, has responsibility for screening potential clients for eligibility. The services provided through the WA MASS Project are available to noncitizen migrants who entered the United States in 2022

or later and do not qualify for federal refugee resettlement assistance or have a permanent immigration status.

13.    Once eligibility is established, IRC conducts an intake and needs assessment for the WA MASS Project clients and refers the client to an appropriate "spoke" organization, which provides services to the client. The WA MASS Project's "spoke" organizations receive competitively awarded grants to provide services in five core areas: (2) emergency shelter, (3) housing navigation and rental assistance, (4) culturally responsive case management services, (5) immigration-related legal services, and (6) education, employment, and training services.

14.    The WA MASS Project opened with a "soft" launch on October 1, 2024 and offered services to noncitizen migrants in King and Pierce Counties. By November 1, 2024, it was operating statewide.

15.    Funding for the initial year of the WA MASS Project expired on June 30, 2025.

16.    In its first year of operation, the WA MASS Project conducted intakes for more than 6,600 noncitizen migrants and connected many of those people to services substantially funded through the WA MASS Project. However, the need for services has continued to outpace our ability to provide those services. Several hundred noncitizen migrants who went through the intake process are awaiting housing support, for example.

17.    It was always expected that, even with the additional state resources, demand for services would outpace supply. Accordingly, Washington jumped at the opportunity to use federal Shelter and Services Program (SSP) funding to expand the reach of the WA MASS Project.

**Washington's Shelter and Services Program Grant**

18.    On April 12, 2024, the Federal Emergency Management Agency (FEMA), which is a subagency within DHS, published a Notice of Funding Opportunity (NOFO), announcing that $340,900,000 million in grants would be awarded through a competitive application process

DECLARATION OF SARAH K. PETERSON
NO. 2:25-cv-01401-BJR

4

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

under the Shelter and Services Program (SSP-C). FY2024 funding for SSP-C grants was authorized and appropriated by the Department of Homeland Security Appropriations Act, 2024, Pub. L. No. 118-47, Title II. *See* ECF No. 18-2 (FY24 SSP-C NOFO) at FEMA_AR_000004-000006.

19.    "Eligible Applicants" for this funding opportunity, which included states, were evaluated on their ability, "either internally or through a partnership, to carry out" the "allowable activit[ies] for which they propose funding." The services provided through these "allowable activities" had to be provided free of charge. *Id.* at FEMA_AR_000008.

20.    "Allowable Activities" were divided into "Primary Services" and "Secondary Services." Primary Services included providing shelter, food, transportation, acute medical care and supplies, personal hygiene supplies. Secondary Services included renovations or modifications to facilities, clothing, outreach information, and translation services. The labor necessary to provide Primary and Secondary Services was also considered an allowable activity. *Id.* at FEMA_AR_000065-70.

21.    SSP-C awards had a three-year period of performance, running from October 1, 2023 to September 30, 2026. *Id.* at FEMA_AR_000007. Applications could, accordingly, be based on goods and services that had already been provided, as well as goods and services the applicant anticipated providing. *See id.*

22.    Washington submitted its application for a FY 2024 SSP-C grant on June 13, 2024. ECF No. 18-3 at FEMA_AR_000081-82; ECF No. 18-5 at FEMA_AR_000116-117. In its application, Washington proposed disbursing SSP funds to three subrecipient partners, which it identified as well-suited to help advance the complementary goals of the WA MASS Project and SSP: the City of Tukwila, Public Health - Seattle & King County (Public Health), and the non-profit organization, Mary's Place Seattle. Washington planned to identify additional subrecipient partner organizations at a later date that would also be able to provide shelter and

DECLARATION OF SARAH K. PETERSON
NO. 2:25-cv-01401-BJR

5

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

other essential services to noncitizen migrants. ECF No. 18-4 (SSP-C Application Attachment) at FEMA_AR_000090.

23.    Washington's proposed subrecipients each had established track records of successfully providing shelter and other services to noncitizen migrants and Washington anticipated that, collectively and with support from SSP funds, they would be able to provide shelter and other services to approximately 525 noncitizen migrants each day. *See id.*

24.    In support of its application, Washington described the services its intended subrecipients had already provided to noncitizen migrants, which would have been reimbursable and/or extended through Washington's SSP grant. *Id.* at FEMA_AR_000089-90. For instance, in October 2023, the City of Tukwila paid for the construction and operation of a large, heated tent structure at the RPUMC encampment, and also hired a consulting firm with experience doing outreach and providing services to unhoused populations. Washington estimated that the City of Tukwila's efforts at RPUMC and other locations throughout the city were supporting 200 to 250 people per night.

25.    Washington also sought SSP funds to support Public Health's work providing culturally relevant health information and acute medical care for noncitizen migrants residing in various encampments and hotels in Seattle and King County, including at RPUMC. In particular, Public Health hired community navigators—health workers with relevant cultural and language competencies—that provided in-language guidance and support to noncitizen migrants on critical topics for those living in a congregate shelter with limited facilities. Through the community navigators, Public Health was able to provide information on best practices for hygiene and sanitation, rodent prevention, food safety, severe weather safety, vaccination, and health care system navigation, including health care enrollment and linkage to care.

26.    Beyond its work to share information with noncitizen migrants, Public Health also provided goods and services. For instance, it provided direct healthcare through its Mobile Medical van, arranged transportation for pregnant people with health emergencies, such as

DECLARATION OF SARAH K. PETERSON
NO. 2:25-cv-01401-BJR

6

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

preeclampsia, and handed out essential items, like hygiene kits, baby formula and diapers, and baby and maternity clothing.

27.    Washington also planned to use SSP funds to support the work of Mary's Place, a Seattle-based non-profit with a long history of providing emergency shelter for unhoused families, including pregnant people, families with infants or medically fragile children, and families fleeing domestic violence. Washington estimated that Mary's Place was able to serve approximately 150 noncitizen migrants per day with a 24/7 shelter operation that included, in addition to bed space, a centralized food service, connections to housing specialists, healthcare, youth programming, legal clinics, job fairs, and resume workshops.

28.    In addition to the City of Tukwila, Public Health, and Mary's Place, Washington planned to identify through the WA MASS Project's competitive application process one or more additional partner organizations that were expected to provide shelter and services to an additional 425 noncitizen migrants each day. ECF No. 18-4 at FEMA_AR_000089-90.

29.    As part of its application, Washington certified that it and its intended subrecipients either had or would develop the "internal controls and processes" necessary "to clearly identify migrants who will be receiving services to be funded by SSP dollars and to ensure said migrants were processed and released from DHS apart from other populations served." Washington also certified that, when seeking reimbursement for services rendered, it would submit "verified status and release dates . . . by Alien Registration Number . . . or evidence of DHS processing . . . for any A-numbers being submitted with this application." *See* ECF No. 18-16 at FEMA_AR_000209.

30.    Washington selected its intended subrecipients carefully based on their track record and also on their ability and willingness to collect the information necessary to seek reimbursement for their work. For example, subrecipients had to create new processes for tracking and reporting Alien Registration Numbers and entry to the United States. Moreover, because the SSP-C grant had a performance period that predated the NOFO's publication, SSP

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

funds could be used to reimburse service providers for costs they had already incurred, but only if they could collect the requisite information from past clients with whom they might no longer be in contact. This retrospective data collection was time-intensive.

31.     Undertaking the burden and cost of adapting their services and administrative processes to meet the information collection requirements of the Shelter and Services Program was justifiable only by the prospect of unlocking access to a substantial amount of federal support. SSP funds were particularly attractive because of the three-year performance period, which provided greater flexibility predictability than other funding sources, including the WA MASS Project funds, which are appropriated one-year at a time.

32.     On September 26, 2024, FEMA notified Washington that its SSP grant application had been approved and that it had been awarded $4,039,516. With the award, FEMA included an approved scope of work, indicating which of Washington's proposed activities were allowable under the award and how much of the award FEMA thought was reasonable to allocate for that purpose. ECF No. 18-6 (SSP-C Award Letter) at FEMA_AR_000118.

33.     Although the entire award amount was obligated to Washington, FEMA placed payment holds on $1,480,000, pending its review of more detailed cost breakdowns and justifications. *Id.* at FEMA_AR_000156, 000172. Washington anticipated being able to provide that information and, over the course of the performance period, utilizing the full award amount.

34.     The approved scope of work included activities that Washington and its intended subrecipients had already performed, which would have been eligible for reimbursement. Other approved activities concerned services that would be provided in the future, including additional emergency housing options.

35.     I understand that, on February 10, 2025, FEMA deobligated the full amount of Washington's award. FEMA neither provided advance notice that it was taking that action, nor followed-up with an after-the-fact explanation.

DECLARATION OF SARAH K. PETERSON
NO. 2:25-cv-01401-BJR

8

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

36. On March 11, 2025, FEMA notified Washington that, in light of its "significant concerns that SSP funding is going to entities engaged in facilitating illegal activities," it was "temporarily withholding payments" under the SSP grant "pursuant to 2 C.F.R. § 200.339(a)" and "instituting specific conditions . . . pursuant to 2 C.F.R. § 200.208." ECF No. 18-9 (March 11 Letter).

37. The March 11 Letter notified Washington that FEMA was imposing "special conditions," which would include "additional monitoring and review of [Washington's] award(s)"; a requirement that Washington provide FEMA with documents and information regarding the individuals to whom services had been provided under the SSP award within 30 days, including "names and contact information" for those individuals; and a requirement that Washington submit affidavits "attesting" that neither Washington nor its subrecipients had any "knowledge or suspicion that" the SSP funds had been used in violation of 8 U.S.C. § 1324.

38. FEMA also instructed Washington not "to incur any additional costs under the grant," until further notice.

39. FEMA did not identify specific incidents or evidence that gave rise to the "significant concerns" that supposedly justified the imposition of these conditions.

40. FEMA promised that "[u]pon the conclusion of" its newly imposed "monitoring" period, it would notify Washington if further action would be taken. The March 11 Letter also notified Washington of its "right to appeal" the decision to withhold the funds and/or impose special conditions by writing to the FEMA Grant Programs Directorate within 60 days, which I calculated to be May 10, 2025.

41. On April 1, 2025, before Washington's deadline for responding to FEMA's information request or appealing the withholding decision had run, FEMA terminated Washington's SSP grant. *See* ECF No. 18-11 (Termination Notice).

42. The Termination Notice did not mention the "significant concerns" that had purportedly motivated FEMA to withhold Washington's SSP funds and impose monitoring

DECLARATION OF SARAH K. PETERSON
NO. 2:25-cv-01401-BJR

9

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

requirements only a few weeks earlier. Nor did the Termination Notice contend that the "special conditions" Defendants imposed would have been insufficient to correct Washington's alleged noncompliance. Indeed, the Termination Notice did not even mention that FEMA had previously accused Washington of failing to comply with the terms and conditions of its grant.

43.    Rather, FEMA simply stated that it was terminating Washington's SSP award because "funding . . . non-federal entities to provide shelter, food, transportation, acute medical care, and personal hygiene supplies for individuals released from DHS short-term holding facilities"—individuals who "often have no legal status and are in the United States unlawfully"—"is not consistent with DHS's current priorities." FEMA cited 2 C.F.R. § 200.340(a)(2) (2020) as authorization for its termination decision.

44.    My understanding is that the explicit purpose of Shelter and Services Program was to provide funding to non-federal entities, like Washington, to provide noncitizen migrants with shelter, food, transportation, acute medical care, and personal hygiene supplies to help them settle into their new communities, after their release by DHS. Thus, FEMA's reason for terminating Washington's SSP grant seems to completely undermine and conflict with the purpose of the Shelter and Services Program.

45.    If the NOFO had made clear that the SSP grant could be summarily terminated, based on nothing more than a change in policy priorities by a new Administration's disagreement with the clear purpose of the Shelter and Services Program, Washington would not have undertaken the effort that went into preparing an application or asked our local partners and intended subrecipients to reorient their programs and processes to help Washington make a strong case for an SSP grant.

46.    FEMA also instructed Washington to close out the grant within 120 days, which I calculated as falling on July 30, 2025, and further advised that, if Washington "wish[ed] to object to the termination of this award, it should submit a written objection within 30 days."

DECLARATION OF SARAH K. PETERSON
NO. 2:25-cv-01401-BJR

10

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

47.    On April 23, 2025, Washington sent FEMA a written objection to its unlawful decision to withhold and then terminate the SSP grant, which disputed that Washington had breached any obligations under the SSP grant, asserted that FEMA's decisions were unlawful and were causing Washington to suffer irreparable harm, and demanded that FEMA reverse its decision and/or respond to the objection letter by May 9, 2025. ECF No. 18-14.

48.    On July 28, 2025, Washington submitted a second objection letter, which reiterated its prior objections to FEMA's decision to withhold or terminate Washington's SSP grant or to demand that Washington prematurely complete closeout procedures for its unlawfully terminated award. ECF No. 18-15.

49.    On August 20, 2025, FEMA sent a letter to provide "official notice" of its "final determination" to deny request that it reverse its decision to terminate the Shelter and Services Program. FEMA's letter stated that this decision was not appealable and it also repeated the demand for Washington to submit closeout documentation. ECF No. 18-13. Washington did not respond to this letter.

50.    On September 11, 2025, FEMA advised Washington that, if Washington did not submit "the required closeout documents by October 13, 2025," it would not only "administratively close[]" Washington's SSP grant but also deem the failure to close out the award to be a "material failure," which could "be considered in FEMA's oversight of other current and future awards." ECF No. 18-17. Defendants also threatened to "de-obligate [unspent funds] from the total grant amount," *see id.*, despite the fact that, as noted above, Defendants de-obligated Washington's entire award amount on February 10, 2025.

51.    Confronted with these threats, Washington submitted a packet of closeout materials on October 13, 2025, subject to its ongoing objection that FEMA's actions were unlawful. True and accurate copies of the materials Washington provided in response to FEMA's closeout demand are attached as Exhibits A-E.

DECLARATION OF SARAH K. PETERSON
NO. 2:25-cv-01401-BJR

11

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

52.    In a cover letter that accompanied Washington's submission, we explained that FEMA's actions not only created a great deal of uncertainty about the viability of the grant funds but also triggered a far earlier closeout deadline. *See* Exhibit B.

53.    Those impediments prevented Washington from having a full opportunity to provide necessary budget justifications to unlock the full award amount, expending that full award amount, formalizing necessary subrecipient agreements, and working with those subrecipient entities to collect the necessary information to request reimbursement under the award.

### FEMA's Grant Termination Harms Washington

54.    Prior to March 11, 2025, when FEMA instructed Washington to cease incurring expenses under its award, Washington and its intended subrecipients had already provided services that would have been reimbursable under the terms of the award.

55.    However, Washington has never requested reimbursement for any of those allowable costs from its SSP grant, including through the closeout process. As noted above, FEMA's unlawful termination cut short the time Washington should have had to perform under the grant and to prepare the materials FEMA requires to secure reimbursement for allowable expenses. If the Shelter and Services Program is restored and Washington has an opportunity to continue performing under the award and to request reimbursement for all allowable expenses, it would do so, in due course and consistent with the SSP grant's performance period.

56.    Since March 11, 2025, however, Washington and its intended subrecipients have been unable to incur any expenses under its award. This has prevented Washington and its subrecipients from providing services they intended to pay for using SSP funds, including additional emergency shelter options and critical care services. Only services that can be entirely supported through other funds can be provided.

57.    Thus, if Washington does not regain access to its SSP funds, there is likely to be an overall drop in the level of services provided to noncitizen migrants in Washington; neither

DECLARATION OF SARAH K. PETERSON          12          ATTORNEY GENERAL OF WASHINGTON
NO. 2:25-cv-01401-BJR                                         Civil Rights Division
                                                             800 Fifth Avenue, Suite 2000
                                                             Seattle, WA  98104
                                                             (206) 464-7744

state or local governments or community organizations are likely to fill the $4,039,516 hole left by the loss of Washington's SSP grant.

58.   In July 2025, the Legislature appropriated $25 million to DSHS, which will support a second year of the WA MASS Project. This funding is available only for state FY 2026 and expires on June 30, 2026. Even with this additional state funding, I expect that the needs of our new noncitizen migrant residents will continue to outpace the collective ability of Washington and its WA MASS Project partners to meet that need. I do not expect that having access to our SSP grant funds will enable us to meet everyone's needs but it will certainly make a material difference to Washington and its intended subrecipients and bring us that much closer to doing so.

59.   The drop in service levels in Washington will have downstream consequences that will affect the programs, services, and budgets of Washington and its political subdivisions.

60.   For instance, I anticipate that having fewer resources dedicated to connecting noncitizen migrants with shelter will mean that more people resort to living in tents or other informal and inadequate shelters. Although tent encampments can provide a measure of stability and security for their residents, they generally do not provide suitable shelter, particularly during hot summer months or cold, wet winter months.

61.   Tent encampments also tend to lack the infrastructure necessary for healthy living conditions, like a bathroom, clean water for washing, drinking, and cooking, trash receptacles, or refrigerated storage for perishable food items. Accordingly, those living there are at greater risk of contracting and spreading communicable diseases.

62.   Tent encampments have also typically occupied public spaces, like public parks or sidewalks, which excludes access to those spaces for other residents of the community.

63.   Washington also planned to use its SSP grant to provide personal hygiene supplies and medical care and supplies, both of which would increase the general health and well-being of noncitizen migrants. Investing in a population's general health and well-being

DECLARATION OF SARAH K. PETERSON
NO. 2:25-cv-01401-BJR

13

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

reduces the likelihood that minor ailments will become more serious and require expensive, emergency care.

64.    Investing in wellness and preventive healthcare materially benefits Washington and its political subdivisions, which substantially bear the cost of healthcare for this largely uninsured population.

65.    Even setting aside the financial costs to Washington from the loss of its SSP funds, the uncertainty about the availability of this funding has impeded DSHS's ability to budget and plan. For instance, to pass federal funds through to its intended subrecipients, DSHS needs to execute client service contracts with each entity. DSHS has entered in such an arrangement with Mary's Place but, once it became unclear whether FEMA would actually honor the SSP grant, could not move forward with agreements for the City of Tukwila or Public Health.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

DATED and SIGNED this 17th day of December 2025 at Seattle, Washington.

_____
Sarah K. Peterson

DECLARATION OF SARAH K. PETERSON    14    ATTORNEY GENERAL OF WASHINGTON
NO. 2:25-cv-01401-BJR                        Civil Rights Division
                                             800 Fifth Avenue, Suite 2000
                                             Seattle, WA  98104
                                             (206) 464-7744